Eric F. Leon (EL-5780)
Laura B. Kadetsky (LK-8039)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE CEDARBAUM

| | |
|---|---|
| APLUS HOLDINGS INC., | **COMPLAINT** |
| *Plaintiff,* | Case No. **08 CV 2760** |
| - against - | **ECF Case** |
| IVAN VACHOVSKY and LILIAN VACHOVSKY, | |
| *Defendants.* | |

Plaintiff APLUS Holdings Inc. ("APLUS") for its complaint against Ivan Vachovsky and Lilian Vachovsky (collectively, the "Sellers" or the "Shareholders") alleges on personal knowledge with respect to its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE CASE

1.     APLUS is forced to bring this action because the Sellers made misrepresentations and breached representations and warranties that were a material inducement to APLUS entering into a stock purchase and sale among the parties and related entities at the purchase price of $32,900,000 in cash (subject to certain adjustments) plus stock of APLUS equal to 10% of its capital stock outstanding at closing.

2.     Effective July 25, 2006 (the "Closing Date"), APLUS purchased from the Sellers all of the shares of authorized capital stock in Abacus America, Inc. ("Abacus America"), Aplus.Net Philippines Inc. ("Abacus Philippines"), and Abacus Trade Ltd. ("Abacus Bulgaria")

(with Abacus America and Abacus Philippines, each a "Company" or a "Group Company" and collectively, the "Companies" or the "Group Companies") pursuant to a Stock Purchase Agreement ("SPA"), other than four shares of Abacus Philippines. In the SPA, the Sellers made representations and warranties concerning the Companies that were material inducements to APLUS to purchase the Companies at a certain price based on a multiple of their earnings before interest, taxes, depreciation, and amortization ("EBITDA"). APLUS discovered after the purchase that several of those representations and warranties were false and misleading.

3.      Due to the Sellers' misrepresentations, APLUS incurred losses in excess of $5,100,000.00. The Sellers' misrepresentations may cause APLUS additional losses that are not yet calculable. Pursuant to the parties' agreement, APLUS is entitled to indemnification from the Sellers for its losses.

4.      Further, the Sellers breached representations and warranties in the SPA and have been unjustly enriched. Accordingly, APLUS is entitled to damages from the Sellers for breach of representations and warranties and unjust enrichment.

## THE PARTIES

5.      APLUS is a holding company created to own the Companies.

6.      APLUS is a Delaware corporation with a principal place of business located in New York, New York.

7.      At all times prior to the Closing Date, the Sellers personally operated the Companies and owned all or substantially all of the capital stock in the Companies. The Sellers' actual knowledge was imputed to the Companies pursuant to the SPA. The Sellers are now minority owners of APLUS.

8.      On information and belief, the Sellers are citizens of California.

## JURISDICTION AND VENUE

9.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states, and the amount in controversy is greater than $75,000.00.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and pursuant to Section 9.14 of the SPA.

## BACKGROUND

11.    Effective July 25, 2006, APLUS and the Sellers entered into the SPA, pursuant to which APLUS purchased from the Sellers all of the outstanding capital stock of the Companies (except for four shares of the one thousand shares of Abacus Philippines) for the amount of $32,900,000 in cash (subject to certain adjustments) plus stock of APLUS equal to 10% of its capital stock outstanding at closing. A copy of the SPA is attached as Exhibit A.

12.    In Articles II and III of the SPA, the Sellers made representations and warranties concerning the Companies and themselves.

13.    APLUS relied on the representations and warranties in the SPA in deciding to purchase the Companies' stock and in determining a value for that stock based on a multiple of EBITDA. Article II of the SPA specifically stated that:

> As a *material inducement* to [APLUS] to enter into this Agreement and to consummate the transactions contemplated hereby, the Companies and each Shareholder, jointly and severally, represent and warrant to [APLUS] that the statements contained in this ARTICLE II are correct and complete as of the Closing Date.

14.    APLUS discovered after the Closing Date, however, that certain of the Sellers' and the Companies' representations and warranties were not true and correct but instead were false and misleading and that the Sellers therefore breached the SPA's representations and

warranties. APLUS further discovered that the Sellers made several of those misrepresentations knowingly and intentionally.

15.    If APLUS had been aware of the Sellers' misrepresentations and breaches of representations and warranties, APLUS would not have agreed to pay such a high price for the Companies' stock.

16.    Under Section 6.2(a) of the SPA, the Sellers agreed to indemnify APLUS for any losses to APLUS caused by breaches of representations and warranties or by certain other events:

> After the Closing, the Shareholders, jointly and severally, shall indemnify [APLUS] and its Subsidiaries… for any loss, liability, action, cause of action, cost, damage, Tax or expense, whether or not arising out of Third Party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing…) which any Buyer Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:
>
> (i)    any facts or circumstances which constitute a breach of any representation or warranty of any Group Company or Seller under [the SPA], or in any of the certificates or other instruments or documents furnished by any Group Company or Seller pursuant to [the SPA];
>
> (ii)    any breach of any covenant, agreement or other provisions of [the SPA] by any Group Company (but excluding a breach by any Group Company under <u>Article VII</u> of [the SPA]) or Seller;
>
> (iii)    any Closing Indebtedness or Unpaid Seller Expenses to the extent not previously taken into account in the calculation of the Final Cash Consideration;
>
> (iv)    any Pre-Closing Taxes pursuant to <u>Section 6.7</u>; [or]
>
> (v)    any Pending Litigation….

17.    As memorialized in Section 9.3 of the SPA, APLUS determined the consideration it was willing to pay for the Companies based on a multiple of EBITDA, and APLUS is entitled to claim losses and indemnification under Article VI of the SPA based on such multiple if the applicable loss results in more than a one-time reduction to EBITDA. Any

misrepresentation that falsely increased EBITDA therefore also increased the purchase price that

the parties paid for the Companies' stock.

**Non-payment of Taxes**

   18. Under Section 2.11(b) of the SPA, the Sellers represented that, except as

otherwise disclosed:

> [E]ach Group Company has timely paid all Taxes due and owing by it
> (whether or not such Taxes are shown or required to be shown on a Tax
> Return) and has timely withheld and paid over (or made adequate reserves
> for payment) to the appropriate taxing authority all Taxes which it is
> required to withhold from amounts paid or owing to any employee,
> shareholder, creditor or other Third Party....

   19. Under Section 6.7 of the SPA, the Sellers agreed to

> [J]ointly and severally indemnify the Buyer Indemnified Persons
> [APLUS] and hold them harmless from and against, without duplication,
> any Losses attributable to (i) Taxes (or the non-payment thereof) of any
> Group Company for all taxable periods ending on or before the Closing
> Date and the portion through the end of the Closing Date for any taxable
> period that includes (but does not end on) the Closing Date....

   20. After the Closing Date, APLUS discovered that Abacus Bulgaria did not

pay any Bulgarian value added tax ("VAT") prior to closing. Under Bulgarian tax law in effect

at that time, all revenues earned by Abacus Bulgaria pre-closing (except those earned by Abacus

Bulgaria for "software development" services) were subject to VAT. The failure to pay these

taxes may cause future losses to APLUS. Pursuant to Section 6.2(a) of the SPA, the Sellers are

responsible for indemnifying APLUS for such future losses. The failure to pay these taxes also

falsely increased EBITDA and thus increased the amount that APLUS paid for the Companies.

The Company's failure to pay required VAT taxes and thus its misrepresentation were knowing

and intentional.

21.     After the Closing Date, APLUS discovered that Abacus Bulgaria did not pay income and other taxes due on the payment of bonuses and commissions made to Bulgarian employees between January 2006 and May 2006. Under Bulgarian tax law in effect at that time, those bonuses and commissions were subject to income and other taxes. The failure to pay these taxes may cause future losses to APLUS. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for such future losses. The failure to pay these taxes also falsely increased EBITDA and thus increased the amount that APLUS paid for the Companies.

**Misrepresentations in Financial Statements**

22.     Under Section 2.5 of the SPA, the Sellers represented that the financial statements attached to the SPA for 2003, 2004, 2005, and partial year 2006

> [F]airly present[] the financial condition as of the dates thereof, operating results and cash flows for the periods of Abacus America then ended…Each Group Company maintains and, for all periods covered by the Financial Statements (or if shorter, such period as such Group Company has been in existence), has maintained books, records and accounts which, in reasonable detail, fairly reflect the transactions and dispositions of the assets of such Group Company.

23.     Further, under Section 2.6 of the SPA the Sellers represented that

> Except as set forth on Schedule 2.6, no Group Company has any liability or obligation, other than (i) Liabilities set forth on the liabilities side of the Most Recent Balance Sheet, or (ii) Liabilities and obligations which have arisen after the Most Recent Balance Sheet Date in the ordinary course of business (none of which is a Liability resulting from any breach of contract, tort, infringement, misappropriation, claim, lawsuit, violation of Law or environmental Liability or clean-up obligation and none of which is material either individually or in the aggregate).

24.     After the Closing Date, APLUS discovered that the Sellers failed to report the deduction of the portion of its credit card revenues that had been automatically deducted from credit card payments made to the Companies by customers paying with either American

Express or the Discover Card between January 2006 and June 2006. No accounting for this deduction was included in the Companies' financial statements. The failure to report these deductions falsely increased EBITDA and thus increased the amount that APLUS paid for the Companies.

### Failure to Pay Licensing Fees and Wrongful Use of Intellectual Property

25.    Under Section 2.13(c)(ii) of the SPA, the Sellers represented that:

> [N]o Group Company has infringed, misappropriated or otherwise conflicted with, and the operation of the business of any Group Company as currently conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property Rights of any other Persons and no Group Company has any Knowledge of any facts or circumstances that indicate a likelihood of the foregoing.

26.    After the Closing Date, APLUS discovered that, prior to the closing, Abacus Bulgaria used illicit copies of web design software products, including Dreamweaver, Flash, and FTP, as well as unlicensed versions of Microsoft Office. In order to replace the illicit and unlicensed software with legal copies, APLUS incurred losses, and it may incur future losses relating to the prior illicit use. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses. The Company's use of such illicit and unlicensed software and thus its misrepresentation were knowing and intentional.

27,    After the Closing Date, APLUS discovered that, prior to the closing and during the months in which the Companies' financial statements were calculated, Abacus America underreported to Microsoft its use of Microsoft server and other licenses in the U.S. and thus underpaid Microsoft license fees. If Microsoft makes any claims for these underpaid license fees, APLUS may incur losses. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for any such future losses. The failure to pay these fees also falsely increased EBITDA and thus increased the amount that APLUS paid for the Companies. The

Company's use of such illicit and unlicensed software and thus its misrepresentation were knowing and intentional.

28.    After the Closing Date, APLUS discovered that, prior to the closing, Abacus America used an unlicensed Avaya phone system in its San Diego office. In order to replace the unlicensed phone system with a licensed phone system, APLUS incurred losses and may incur future losses relating to this prior unlicensed use. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses.

29.    After the Closing Date, APLUS discovered that the Companies had used unlicensed copies of images owned by Getty Images on their customers' web sites and on their own web sites. APLUS has incurred losses and may incur future losses to compensate Getty Images for such unlicensed use of its intellectual property. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses.

**Litigation-related Expenses and Failure to Disclose Pending Litigation**

30.    As stated above, under Section 6.2(a) of the SPA, the Sellers agreed to indemnify APLUS for

> any loss, liability, action, cause of action, cost, damage, Tax or expense, whether or not arising out of Third Party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing[)]...which any Buyer Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of...(v) any Pending Litigation....

31.    Further, under Section 2.14 of the SPA, the Sellers represented that, except as otherwise disclosed, "there are no actions, suits, hearings, proceedings (including any arbitration proceedings), orders, investigations, grievances, indictments, [or] claims...(a)

pending or, to the Knowledge of any Group Company, threatened against or affecting any Group Company or its assets...."

32.    After the Closing Date, Abacus America incurred legal fees and settlement costs and will incur future costs in relation to up to two disclosed lawsuits already pending when the SPA went into effect. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses.

33.    After the Closing Date, APLUS discovered that a number of cases filed against Abacus America in small claims courts in various jurisdictions and in the Better Business Bureau relating to pre-closing events were not disclosed in the SPA. The Sellers did not disclose these cases prior to closing and therefore breached the representations in Section 2.14. APLUS incurred losses in making settlement payments in relation to these cases and may incur future related losses. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses.

**Non-disclosure of Newly Hired Personnel**

34.    Pursuant to Section 2.9 of the SPA, the Sellers represented that, between June 30, 2005, and the Closing Date, "no Group Company has...(h) entered into any employment...agreement, written or oral...[or] (i) made any material change in employment terms (including base compensation) for any of its directors, officers or employees...." Further, pursuant to Section 2.17(a) of the SPA, the Sellers represented that they provided "a true, complete and correct list of (i) all employees of each Group Company...."

35.    After the Closing Date, APLUS discovered that within days prior to closing, and significantly after June 30, 2005, one or more of the Companies hired twenty-four sales people in Phoenix, Arizona. None of these employees were disclosed to APLUS before the closing. Nearly all of these employees were terminated within approximately two months after

the closing date because they were unproductive, inexperienced, and/or not reasonably necessary for the Companies' operations. APLUS incurred losses in compensation expenses for these unproductive, inexperienced, and/or unnecessary personnel. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these losses.

**Misrepresentations Relating to Leased Property**

36.     Pursuant to Section 2.23(c) of the SPA, the Sellers represented that the property leased by the Companies

> is in good condition and repair (normal wear and tear excepted) and is sufficient for the conduct of the business of the Group Companies...To the knowledge of the Group Companies, (i) there are no structural deficiencies or latent defects affecting any of the Improvements and (ii) there are no facts or conditions affecting any of the Improvements which could, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the business of the Group Companies.

The SPA defined "Improvements" as "[a]ll buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property."

37.     Referenced in the SPA was an AT&T contract for the Companies' Phoenix data center that stated that that facility had a capacity of 1Gig of bandwidth. After the Closing Date, however, APLUS discovered that Lilian Vachovsky had instructed AT&T to configure the bandwidth at the Phoenix data center to have only 100Mps, thus decreasing the contracted capacity of the facility by 90%. The reconfiguration was not disclosed to APLUS, either in the SPA or elsewhere.

38.     The reconfiguration had a materially negative impact on the use or occupancy of the Phoenix data center and thus caused APLUS to incur losses in order to (1) contract with another service provider to obtain suitable bandwidth for operation of the Phoenix

data center, (2) pay Service Level Agreement credits to dedicated server customers as a result of downtime experienced by those customers because of the insufficient bandwidth, and (3) compensate customers for complete loss of capacity at the Phoenix data center between November 29, 2007, and December 5, 2007, as a result of signal degradation. APLUS has incurred current losses relating to these events and also expects to incur future losses relating to these events. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these current and future losses.

39.    Lilian Vachovsky's misrepresentation of the bandwidth of the Phoenix data center was knowing and intentional, as she personally instructed AT&T to decrease the bandwidth to 90% of what was represented in the AT&T contract and thus in the SPA. APLUS relied on the representations in determining whether the Phoenix data center was suitable for the purposes for which it was then being used and in determining the value of the Companies' stock based on a multiple of EBITDA.

40.    Further, pursuant to Section 2.10 of the SPA, the Sellers represented that each tangible asset of the Companies was "suitable for the purposes for which it is presently used."

41.    After the Closing Date, APLUS incurred losses to upgrade the electrical systems at its Phoenix facility to make the facility suitable for the operation of the Companies' business. Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for these losses.

**Failure to Disclose Contracts**

42.    Pursuant to Section 2.12 of the SPA, the Sellers represented that they and the Companies provided a complete list of all contracts involving the Companies to APLUS.

43.    After the Closing Date, APLUS discovered that Abacus America was a party to a contract with Qwest and that neither the existence of nor a copy of that contract were disclosed to APLUS.  APLUS may incur future losses relating to this contract.  Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for any such future losses.

## Overpayment of Working Capital Adjustment

44.    Pursuant to Section 1.3 of the SPA, on July 31, 2006, the Sellers provided a Working Capital Statement that was to set forth "(i) the Net Working Capital (ii) the Closing Indebtedness (other than Closing Indebtedness included in the calculation of Net Working Capital and (iii) the Unpaid Seller Expenses (other than Unpaid Seller Expenses included in the calculation of Net Working Capital)." The Sellers should have done so truthfully and correctly.

45.    APLUS later discovered that the Sellers misrepresented expenses relating to domain name registrations by improperly including them in the Working Capital Statement. These inaccurate inclusions will cause losses to APLUS.  Pursuant to Section 6.2(a) of the SPA, the Sellers are responsible for indemnifying APLUS for any such future losses.

## Summary of Claims

46.    The Sellers thus made misrepresentations and breached the representations and warranties in the SPA as described above.  In addition, the Sellers' breaches of several of the representations and warranties in the SPA were knowing and intentional.

47.    On December 17, 2007, and January 24, 2008, APLUS informed the Sellers in writing that their misrepresentations breached the SPA and the representations and warranties therein and requested indemnification for its losses.  The Sellers have failed and refused to indemnify APLUS for its losses.

48.    The Sellers' breaches of representations and warranties have already caused losses to APLUS in the amount of $5,131,451.00, may cause future losses to APLUS that are not yet calculable, and increased the amount that APLUS paid for the Companies based on EBITDA. The Sellers' misrepresentations and breaches of representations and warranties also falsely increased EBITDA and thus increased the amount that APLUS paid for the Companies. In addition, the increase in EBITDA caused by the Sellers' misrepresentations may have increased the Companies' effective interest rate under certain loans and thus increased its interest expenses, causing additional losses to APLUS.

49.    Under Section 9.12 of the SPA, the parties expressly agreed that all issues and questions concerning the construction, validity, enforcement, and interpretation of the SPA and the schedules and exhibits attached to the SPA would be governed by and construed in accordance with New York law without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of New York.

50.    Under Section 6.2(a) of the SPA, the Sellers agreed to pay APLUS's attorneys' fees and expenses arising out of any indemnifiable losses under the SPA.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
(Breach of Representations and Warranties)

51.    APLUS incorporates the above paragraphs as if fully set forth herein.

52.    APLUS and the Sellers are parties to a valid and binding contract — the SPA.

53.    In the SPA, the Sellers made representations and warranties that were a material inducement to APLUS entering into the SPA at the agreed upon purchase price. APLUS reasonably relied on the Sellers' representations and warranties in the SPA.

54.     The Sellers representations and warranties were false and misleading in material respects as described above.   The Sellers made several of those misrepresentations knowingly and intentionally.

55.     Because of the Sellers' misrepresentations and breaches of representations and warranties, APLUS has incurred losses and expects to incur future losses to repair, replace, otherwise ameliorate, or pay for the subjects of the Sellers' misrepresentations and breaches of representations and warranties.

56.     The Sellers' misrepresentations and breaches of representations and warranties falsely increased the EBITDA of the Companies on or around the Closing Date and thus increased the purchase price of the Companies' stock.

57.     As a result of the Sellers' misrepresentations, APLUS has been damaged in the amount of $5,131,451.00 and future amounts not yet calculable.

### SECOND CLAIM FOR RELIEF
### (Indemnification)

58.     APLUS incorporates the above paragraphs as if fully set forth herein.

59.     In the SPA, the Sellers agreed to indemnify APLUS for losses that APLUS might incur after the Closing Date due to any breaches of representations or warranties of any Company or the Sellers in the SPA or relating to taxes for taxable periods before and through the Closing Date or to litigation pending as of the Closing Date.

60.     APLUS did incur losses after the Closing Date due to the Sellers' breaches of representations and warranties, non-payment of pre-closing taxes, and litigation pending as of the Closing Date.  APLUS has requested indemnification from the Sellers for those losses.

61.     The Sellers, however, have failed and refused to indemnify APLUS for its losses, in violation of Section 6.2(a) of the SPA.

62.    Accordingly, APLUS is entitled to specific performance of the SPA and/or damages of not less than $5,131,451.00 and future amounts not yet calculable.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment)

63.    APLUS incorporates the above paragraphs as if fully set forth herein.

64.    Because of the Sellers' misrepresentations and breaches of representations and warranties as described above, APLUS has incurred losses and expects to incur future losses to repair, replace, otherwise ameliorate, or pay for the subjects of the Sellers' misrepresentations and breaches of representations and warranties. The amount of those losses is properly due and owing to APLUS.

65.    The Sellers' misrepresentations and breaches of representations and warranties falsely increased the EBITDA of the Companies on or around the Closing Date and thus increased the purchase price of the Companies' stock. APLUS thus overpaid for the stock of the Companies on the Closing Date. The amount of that overpayment is properly due and owing to APLUS.

66.    The Sellers have been unjustly enriched by their retention of funds that were not due or owing to them. The Sellers have refused to transfer those funds to APLUS, thereby enriching themselves at APLUS's expense.

67.    It would be inequitable and unjust to allow the Sellers to retain the benefits obtained at the expense of APLUS as a result of the Sellers' improper conduct. APLUS is entitled, therefore, to recover any benefits that the Sellers realized as a result of their improper conduct.

68.    In order to avoid the unjust enrichment of the Defendants, damages should be awarded to APLUS in an amount not less than $5,131,451.00.

## PRAYER FOR RELIEF

WHEREFORE, APLUS prays for judgment as follows:

1. On Count One, damages against the Sellers for breach of representations and warranties in an amount to be determined at trial.

2. On Count Two, indemnification by the Sellers in an amount to be determined at trial.

3. On Count Three, damages against the Sellers for unjust enrichment in an amount to be determined at trial.

4. Costs and reasonable attorneys' fees as provided by contract.

5. Such other and further relief as this Court may deem just and proper.

Dated: March 14, 2008
New York, New York

By: _____
Eric F. Leon (EL-5780)
Laura B. Kadetsky (LK-8039)
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel for Plaintiff APLUS Holdings Inc.*

# EXHIBIT A

EXECUTION COPY

STOCK PURCHASE AGREEMENT

by and among

APLUS HOLDINGS INC.,

IVAN VACHOVSKY,

LILIAN VACHOVSKY,

ABACUS AMERICA, INC.,

APLUS.NET PHILIPPINES INC.

and

ABACUS TRADE LTD.

Dated as of

July 25, 2006

TABLE OF CONTENTS

**ARTICLE I Stock Purchase; Closing** ...........................................................................1
    1.1.    Stock Purchase ...........................................................................1
    1.2.    The Closing. ...........................................................................1
    1.3.    Post-Closing Adjustments to the Cash Consideration. ....................2

**ARTICLE II Representations and Warranties of the Companies and the Shareholders Regarding the Group Companies** ..........................4
    2.1.    Organization; Power; Good Standing ...........................................4
    2.2.    Capitalization ...........................................................................4
    2.3.    Investments; Indebtedness; Accounts; Subsidiaries ......................5
    2.4.    Authorization; Execution & Enforceability; No Breach. .................5
    2.5.    Financial Statements ...........................................................6
    2.6.    Absence of Undisclosed Liabilities ...........................................7
    2.7.    Accounts Receivable ...........................................................7
    2.8.    Products and Services Warranty ...........................................7
    2.9.    Absence of Certain Developments ...........................................7
    2.10.   Assets ...........................................................................9
    2.11.   Tax Matters ...........................................................................9
    2.12.   Contracts and Commitments. ...........................................11
    2.13.   Intellectual Property Rights. ...........................................13
    2.14.   Litigation ...........................................................................16
    2.15.   Brokerage ...........................................................................16
    2.16.   Insurance ...........................................................................16
    2.17.   Labor Matters. ...........................................................16
    2.18.   Employee Benefits. ...........................................................17
    2.19.   Compliance with Laws; Permits. ...........................................19
    2.20.   Environmental and Safety Matters. ...........................................19
    2.21.   Affiliate Transactions. ...........................................................20
    2.22.   Suppliers and Customers. ...........................................21
    2.23.   Real Property. ...........................................................21
    2.24.   Certain International Business Practices. ...............................23

**ARTICLE III Representations and Warranties of the Sellers** .........................23
    3.1.    Capacity; Execution and Enforceability; No Breach. .....................24
    3.2.    Title to Shares ...........................................................................24
    3.3.    Brokerage ...........................................................................24
    3.4.    Litigation, etc ...........................................................................24
    3.5.    Investment Intent ...........................................................25
    3.6.    Restricted Securities. ...........................................................25

**ARTICLE IV Representations and Warranties of the Buyer** ..........................26
    4.1.    Organization ...........................................................................26
    4.2.    Authorization; Execution and Enforceability; No Breach. ..............26
    4.3.    Brokerage ...........................................................................27

i

4.4. Investment Intent ...........................................................................27
4.5. Capitalization .................................................................................27
4.6. Purpose..........................................................................................27

**ARTICLE V Closing Conditions**...............................................................**28**
5.1. Conditions Precedent to Obligations of the Buyer .........................28
5.2. Conditions Precedent to Obligations of the Sellers ........................30

**ARTICLE VI Indemnification**....................................................................**30**
6.1. Survival of Representations and Warranties...................................30
6.2. General Indemnification.................................................................31
6.3. Limitations on Indemnification; Determination of Loss and Amount.........32
6.4. Tax Benefit.....................................................................................33
6.5. Manner of Payment........................................................................33
6.6. Third Party Claims.........................................................................34
6.7. Indemnification of Pre-Closing Taxes ...........................................35
6.8. Waiver............................................................................................35
6.9. Final Cash Consideration Adjustment ...........................................36

**ARTICLE VII Post-Closing Covenants and Agreements**.........................**36**
7.1. Tax Matters....................................................................................36
7.2. Continued Employment; Consulting Services ................................38
7.3. Restrictive Covenants.....................................................................38
7.4. Further Assurances.........................................................................40
7.5. Confidentiality................................................................................41
7.6. Release............................................................................................41
7.7. Mercedes Automobile.....................................................................41
7.8. Certain Computers ........................................................................42
7.9. Email Transition.............................................................................42
7.10. Transition of Accounts...................................................................42
7.11. Certain Transition Services............................................................42

**ARTICLE VIII Definitions**........................................................................**43**

**ARTICLE IX Miscellaneous**.....................................................................**52**
9.1. Fees and Expenses..........................................................................52
9.2. Press Release and Announcements ................................................52
9.3. Remedies........................................................................................53
9.4. Consent to Amendments; Waivers..................................................53
9.5. Successors and Assigns...................................................................53
9.6. Severability.....................................................................................53
9.7. Counterparts...................................................................................54
9.8. Descriptive Headings; Interpretation.............................................54
9.9. Entire Agreement............................................................................54
9.10. No Third-Party Beneficiaries.........................................................54
9.11. Schedules and Exhibits...................................................................54
9.12. Governing Law ...............................................................................54

ii

| 9.13. | Waiver of Jury Trial | 55 |
| 9.14. | Consent to Jurisdiction | 55 |
| 9.15. | Notices | 55 |
| 9.16. | No Strict Construction | 56 |

**EXHIBITS**

| Exhibit A | — | Closing Adjustment Certificate |
| Exhibit B | — | Net Working Capital |
| Exhibit C | — | Form SLA |

**SCHEDULES**

| Schedule 2.1 | — | Organization; Power; Good Standing |
| Schedule 2.2 | — | Capitalization |
| Schedule 2.3(a) | — | Indebtedness |
| Schedule 2.3(b) | — | Accounts |
| Schedule 2.3(c) | — | Subsidiaries |
| Schedule 2.4(c) | — | No Breach |
| Schedule 2.5 | — | Financial Statements |
| Schedule 2.6 | — | Absence of Undisclosed Liabilities |
| Schedule 2.9 | — | Absence of Certain Developments |
| Schedule 2.11 | — | Tax Matters |
| Schedule 2.12(a) | — | Contracts and Commitments |
| Schedule 2.13(a) | — | Intellectual Property Rights |
| Schedule 2.13(b) | — | Intellectual Property Rights |
| Schedule 2.13(c) | — | Intellectual Property Rights |
| Schedule 2.14 | — | Litigation |
| Schedule 2.15 | — | Brokerage |
| Schedule 2.16 | — | Insurance |
| Schedule 2.17(a) | — | Labor Matters |
| Schedule 2.17(b) | — | Labor Matters |
| Schedule 2.18(a) | — | Employee Benefits |
| Schedule 2.18(g) | — | Employee Benefits |
| Schedule 2.19(a) | — | Compliance with Laws |
| Schedule 2.19(b) | — | Permits |
| Schedule 2.20(a) | — | Environmental and Safety Matters |
| Schedule 2.21(a) | — | Affiliate Transactions |
| Schedule 2.21(b) | — | Affiliate Transactions |
| Schedule 2.22 | — | Suppliers and Customers |
| Schedule 2.23(b) | — | Real Property |
| Schedule 3.3 | — | Brokerage |
| Schedule 4.2(c) | — | No Breach |
| Schedule 7.10 | — | Certain Accounts |

iii

## STOCK PURCHASE AGREEMENT

   This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of July 25, 2006, is entered into by and among APLUS Holdings Inc., a Delaware corporation (the "Buyer"), Ivan Vachovsky and Lilian Vachovsky (each, a "Shareholder" and, collectively, the "Shareholders" or a "Seller" and, collectively, the "Sellers"), Abacus America, Inc., a California corporation ("Abacus America"), Aplus.Net Philippines Inc., a corporation formed under the laws of the Philippines ("Abacus Philippines"), and Abacus Trade Ltd., a Bulgarian limited liability company ("Abacus Bulgaria", and together with Abacus America and Abacus Philippines, each, a "Company" and, collectively, the "Companies"). Capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in ARTICLE VIII.

   WHEREAS, the Sellers collectively own all of the Shares (as defined below); and

   WHEREAS, subject to the terms and conditions set forth herein, the Buyer desires to purchase all of the Shares from the Sellers, and each Seller desires to sell all of the Shares held by such Seller to the Buyer in consideration for the Cash Consideration and Equity Consideration (in each case as defined below).

   NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
### Stock Purchase; Closing

   1.1. Stock Purchase. Subject to the terms and conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase and acquire from each Seller, the Shares owned by such Seller and, in exchange, the Buyer shall pay to the Sellers, in the aggregate, the Cash Consideration and Equity Consideration.

   1.2. The Closing.

     (a) Time and Place of Closing. The consummation of the transactions contemplated by this Agreement (collectively, the "Closing") will take place at the offices of Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022 commencing at 10:00 a.m. local time on the date of this Agreement. The date and time of the Closing are referred to as the "Closing Date".

     (b) Closing Adjustments to Cash Consideration. The Shareholders have previously prepared and delivered to the Buyer a certificate (which is attached hereto as Exhibit A), executed by each Shareholder, certifying their good faith estimate of the following amounts: (i) the Net Working Capital; (ii) the Closing Indebtedness; and (iii) the Unpaid Seller Expenses (the "Closing Adjustment Certificate").

     (c) Deliveries at the Closing. At the Closing:

(i)     <u>Deliveries by the Sellers to the Buyer</u>.  The Sellers shall deliver to the Buyer all certificates representing the Shares.

(ii)     <u>Deliveries by the Buyer to the Sellers</u>.  The Buyer shall (A) pay (or cause to be paid) to the Sellers the Cash Consideration by wire transfer of immediately available funds to one account as designated by the Sellers by written notice to the Buyer not less than two (2) Business Days prior to the Closing Date and (B) deliver to the Sellers a photocopy of the certificates representing the Equity Consideration.

(iii)     <u>Other Deliveries</u>.  The opinion of counsel and other documents and agreements required to be delivered pursuant to ARTICLE V shall be delivered.

1.3.     <u>Post-Closing Adjustments to the Cash Consideration</u>.

(a)     Within seventy-five (75) days after the Closing Date, the Buyer shall deliver to the Sellers a closing statement (the "Closing Statement") setting forth (i) the Net Working Capital (ii) the Closing Indebtedness (other than Closing Indebtedness included in the calculation of Net Working Capital) and (iii) the Unpaid Seller Expenses (other than Unpaid Seller Expenses included in the calculation of Net Working Capital).  During the thirty (30) days immediately following the Sellers' receipt of the Closing Statement, the Shareholders and their designated representatives shall be permitted to review the working papers and underlying documentation (excluding documentation to which a legal privilege may attach) relating to the Closing Statement.  The Closing Statement shall become final and binding (in its final and binding form, the "Final Closing Statement") upon all parties on the thirtieth (30th) day following receipt thereof by the Shareholders unless the Shareholders give written notice of their disagreement (a "Notice of Disagreement") to the Buyer prior to such date.  Any Notice of Disagreement shall (1) specify in reasonable detail the nature and amount of any disagreement so asserted (the "Disputed Items") and (2) as to Net Working Capital, only include disagreements based on mathematical errors or based on the Net Working Capital as of immediately prior to the Closing not being calculated in accordance with the definition of Net Working Capital in ARTICLE VIII.  If a timely Notice of Disagreement is received by the Buyer, then the Closing Statement (as revised as contemplated in clause (x) or (y) below) shall become final and binding upon all parties on the earlier of (x) the date the Buyer and the Shareholders resolve in writing any differences they have with respect to any matter specified in the Notice of Disagreement or (y) the date any matters properly in dispute are finally resolved in writing by the Independent Auditor; *provided*, that any items that are not so disputed shall become final and binding upon the parties on the thirtieth (30th) day following the Sellers' receipt of the Closing Statement.  During the thirty (30) days immediately following the delivery of a Notice of Disagreement, the Buyer and the Shareholders shall seek in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement.  During such period, the Buyer and its representatives shall have full access to the working papers of the Shareholders and underlying documentation (excluding documentation to which a legal privilege may attach) used in connection with the Shareholders' preparation of the Notice of Disagreement.  If, at the end of such thirty (30) day period, any Disputed Item specified in the Notice of Disagreement has not been resolved by the Shareholders and the Buyer, the Shareholders and the Buyer shall submit to an independent auditing firm of national recognition mutually selected by the Buyer and the Shareholders (the "Independent Auditor") for review and resolution any such

2

Disputed Items which remain in dispute (including such party's proposed resolution thereof) and which were properly included in the Notice of Disagreement, and the Independent Auditor shall make a final determination of each Disputed Item as of immediately prior to the Closing based solely on presentations by the Buyer and the Shareholders (and not by independent review), which determination shall be binding on the parties. The Independent Auditor (i) shall be bound by the principles set forth in this Section 1.3, (ii) shall limit its review to matters specifically set forth in the Notice of Disagreement and (iii) shall not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.

(b)     The Independent Auditor shall be retained to resolve such dispute promptly and, in any event, within thirty (30) days from the date the dispute is submitted to the Independent Auditor. The fees and expenses of the Independent Auditor acting under this Section 1.3 shall be borne proportionately by the Buyer and the Shareholders on the basis of the discrepancy (in dollars) between such party's determination of the Disputed Items (in the aggregate) as presented to the Independent Auditor and the final and binding determination of the Disputed Items (in the aggregate) by the Independent Auditor. The determination as to each Disputed Item as determined by agreement of the Buyer and the Shareholders or by the Independent Auditor shall be final and binding on all parties. The Cash Consideration as further adjusted pursuant to this Section 1.3 shall be referred to herein as the "Final Cash Consideration".

(c)     The Cash Consideration shall be adjusted as follows:

(i)     increased by the amount, if any, by which the Final Net Working Capital is greater than the Estimated Net Working Capital, or decreased by the amount, if any, by which the Final Net Working Capital is less than the Estimated Net Working Capital;

(ii)     increased by the amount, if any, by which the Final Closing Indebtedness is less than the Estimated Closing Indebtedness, or decreased by the amount, if any, by which the Final Closing Indebtedness is greater than the Estimated Net Closing Indebtedness;

(iii)     increased by the amount, if any, by which the Final Unpaid Seller Expenses are less than the Estimated Unpaid Seller Expenses, or decreased by the amount, if any, by which the Final Unpaid Seller Expenses are greater than the Estimated Unpaid Seller Expenses.

(d)     To the extent that the Cash Consideration is adjusted as contemplated by Section 1.3(c), the Buyer or the Sellers (jointly and severally), as applicable, shall pay such amount to the Sellers or the Buyer, as applicable, within five (5) Business Days of the final determination of such amount pursuant to Section 1.3(a), together with interest thereon at a rate equal to the prime rate as published in the Wall Street Journal on the Closing Date (the "Applicable Rate") calculated on the basis of the number of days elapsed from the Closing Date to the date of the payment, by wire transfer of immediately available funds to one or more accounts designated by the Sellers or the Buyer, as applicable.

## ARTICLE II
### Representations and Warranties of the Companies and the Shareholders Regarding the Group Companies

As a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Companies and each Shareholder, jointly and severally, represent and warrant to the Buyer that the statements contained in this ARTICLE II are correct and complete as of the Closing Date.

2.1.    <u>Organization; Power; Good Standing</u>.    Each Group Company is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is licensed or qualified to conduct its business and is in good standing in every jurisdiction where it is required to be so licensed or qualified (which such jurisdictions are set forth on Schedule 2.1), except where the failure to be so licensed or qualified could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Group Company possesses full corporate power and authority necessary to own and operate its properties and to carry on its businesses as presently conducted. The copies of the certificate of incorporation and bylaws (or other comparable organizational documents) of each Group Company which have been furnished to the Buyer reflect the same as amended through the date of this Agreement and are true, complete and correct copies of the originals. The minute books of each Group Company (containing the records of meetings of the stockholders, the board of directors and any committees of the board of directors, and the management and controlling bodies and the general managers or executive directors, as the case may be) which have been furnished to the Buyer are true, complete and correct copies of the originals. The stock certificate books and the stock record books of each Group Company which have been furnished to the Buyer are true, complete and correct copies of the originals and accurately reflect transactions in its stock at any time prior to the date of this Agreement.

2.2.    <u>Capitalization</u>.    The authorized capital stock of (a) Abacus America consists of (i) Fifty million (50,000,000) shares of no par common stock, Five Million (5,000,000) shares of which are issued and outstanding (the "America Common Shares"), and (ii) 50,000,000 shares of no par preferred stock, no shares of which are issued and outstanding (together with the America Common Shares, collectively, the "America Shares"), (b) Abacus Philippines consists of Four Hundred Thousand Pesos (P400,000), divided into Four Thousand (4,000) shares with par value of One Hundred Pesos (P100) per share, of which One Thousand (1,000) shares are issued and outstanding (the "Philippines Shares") and (c) Abacus Bulgaria consists of one hundred and ninety six (196) equal shares with a par value of one hundred (100) Bulgarian Leva per share (the "Bulgaria Shares" and together with the America Shares and the Philippines Shares, collectively the "Shares"). The Shares are held beneficially and of record by the Sellers as set forth on Schedule 2.2 (other than as set forth thereon), free and clear of any Liens. Upon delivery to the Buyer at the Closing of certificates representing the America Shares and certificates representing 996 of the Philippines Shares, duly endorsed by the applicable Seller for transfer to the Buyer, and upon such Seller's receipt of payment therefor, valid title to such Seller's America Shares and Philippines Shares will pass to the Buyer, free and clear of any Liens. Upon execution of this Agreement and the consummation of the Closing, the transfer of the Bulgaria Shares to the Buyer will be effective as between the Sellers and the Buyer, free and clear of any Liens. As of the Closing and immediately thereafter, the Shares will constitute all of

4

the issued and outstanding shares of each Company's capital stock, will be duly authorized, validly issued, fully-paid and non-assessable and will have been issued free and clear of any preemptive or similar rights.  Except as set forth on Schedule 2.2, no Company has any outstanding (1) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for, or to purchase, its capital stock or (2) any stock appreciation rights or phantom stock or similar plans or rights.  Upon the payment to each holder of stock options in the amount set forth next to such holder's name on Schedule 2.2 (less all applicable tax and other withholdings), all stock options issued to or held by such holder will be relinquished, terminated and surrendered. There are no (x) outstanding obligations of any Company (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among any Company's stockholders with respect to the voting or transfer of such Company's capital stock.

2.3.    Investments; Indebtedness; Accounts; Subsidiaries.

(a)    Except as set forth on Schedule 2.3(a), no Group Company has any Indebtedness.

(b)    Except as set forth on Schedule 2.3(b), no Group Company has any bank or other deposit accounts.

(c)    Except as set forth on Schedule 2.3(c), no Group Company has any Subsidiary or has or holds the right to make an Investment in any other Person.  The authorized, issued and outstanding capital stock of each Subsidiary of any Company is set forth on Schedule 2.3(c), all of which is duly authorized, validly issued, fully-paid and non-assessable and is held beneficially and of record as set forth on Schedule 2.3(c), free and clear of any Liens. No Subsidiary of any Company has any outstanding (i) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for or to purchase its capital stock or (ii) any stock appreciation rights or phantom stock or similar plans or rights.  There are no (x) outstanding obligations of any Subsidiary of any Company (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among the stockholders of any Subsidiary of any Company with respect to the voting or transfer of such Subsidiary's capital stock.

2.4.    Authorization; Execution & Enforceability; No Breach.

(a)    Each Group Company possesses full corporate power and authority to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)    Each Group Company's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all

necessary action on the part of such Group Company and such Group Company's stockholders. Each Transaction Document to which a Group Company is a party has been duly and validly executed and delivered by such Group Company and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of such Group Company, enforceable against such Group Company in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)    Except as set forth on Schedule 2.4(c), the execution and delivery by each Group Company of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by such Group Company does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon such Group Company's capital stock or assets, including the Shares, pursuant to, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) the certificate of incorporation or bylaws (or other comparable organizational documents) of such Group Company, (B) any Law, order, judgment or decree to which such Group Company is subject, or (C) any of the Material Contracts to which such Group Company is subject. Each notice and consent set forth on Schedule 2.4(c) has been delivered or obtained, as applicable, by the applicable Group Company at or prior to the Closing.

2.5.    Financial Statements. Attached hereto as Schedule 2.5 are true, complete and correct copies of the (a) balance sheet and statements of income and cash flow for Abacus America as of and for the fiscal years ended June 30, 2003, June 30, 2004, and June 30, 2005, and (b) unaudited balance sheet (the "Most Recent Balance Sheet") and statements of income and cash flows for Abacus America as of and for the nine (9) month period ended as of March 31, 2006 (the "Most Recent Balance Sheet Date") (collectively, the "Financial Statements"). Each of the Financial Statements (including the notes thereto, if any) has been prepared from, and is consistent with, the books and records of each Group Company, and fairly presents the financial condition as of the dates thereof, operating results and cash flows for the periods of Abacus America then ended and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby in accordance with past custom and practice of Abacus America (subject, in the case of unaudited financial statements, to the absence of footnotes and normal year-end adjustments (which are not material individually or in the aggregate)). Each Group Company maintains and, for all periods covered by the Financial Statements (or, if shorter, such period as such Group Company has been in existence), has maintained books, records and accounts which, in reasonable detail, fairly reflect the transactions and dispositions of the assets of such Group Company. The Group Companies' accountants have not notified any Group Company of any deficiencies in the design or operation of any of the Group Companies' internal controls in connection with its audits of the Financial Statements. Also included on Schedule 2.5 is a true, complete and correct list of all items and amounts (in U.S. Dollars) Abacus Bulgaria invoiced to Abacus America for the period from January 1, 2004 through June 30, 2006 (reported on a monthly basis), and the aggregate expenses and Liabilities of Abacus Bulgaria for such period did not exceed such amounts.

6

2.6.   Absence of Undisclosed Liabilities.  Except as set forth on Schedule 2.6, no Group Company has any Liability or obligation, other than (i) Liabilities set forth on the liabilities side of the Most Recent Balance Sheet, or (ii) Liabilities and obligations which have arisen after the Most Recent Balance Sheet Date in the ordinary course of business (none of which is a Liability resulting from any breach of contract, tort, infringement, misappropriation, claim, lawsuit, violation of Law or environmental Liability or clean-up obligation and none of which is material either individually or in the aggregate).  Except as set forth on Schedule 2.6, no Group Company is a guarantor or is otherwise liable for any Liability (including Indebtedness) of any other Person.

2.7.   Accounts Receivable.  All notes and accounts receivable reflected on the Most Recent Balance Sheet are valid notes and accounts receivable, are not subject to set-offs or counterclaims, have been prepared from, and are in accordance with, the books and records of the Group Companies, arose solely out of bona fide sales and delivery of goods or performance of services, are current and collectible in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the Most Recent Balance Sheet, as adjusted for the passage of time through the Closing Date consistent with past custom and practice

2.8.   Products and Services Warranty.  All products and services licensed, sold or delivered by the Group Companies (excluding deliveries between Group Companies) have been in conformity in all material respects with all applicable contractual commitments and all express and implied warranties, and no Group Company has any Liability (or has received written notice of any action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against it giving rise to any such Liability) for replacement thereof or other damages in connection therewith, other than replacements or damages in the ordinary course of business consistent with past custom and practice.  Attached hereto as Exhibit C is a true and correct copy of the Service Level Agreement form used by the Group Companies (the "Form SLA").  Other than as set forth in the Form SLA, no products licensed, sold or delivered and no services rendered by any Group Company are subject to any guarantee, warranty or other indemnity beyond the applicable industry standard terms and conditions of such sale or service.  No Group Company is a party to any Service Level Agreement that contains terms or conditions that are materially less favorable to such Group Company than those set forth in the Form SLA.

2.9.   Absence of Certain Developments.  Since June 30, 2005, there has occurred no fact, event or circumstance which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as expressly contemplated by this Agreement or as set forth on Schedule 2.9, since June 30, 2005, the Group Companies have conducted their business only in the ordinary course consistent with past custom and practice, and no Group Company has:

(a)   authorized for issuance, issued, sold, delivered, or granted any notes, bonds or other debt securities or any capital stock or other equity interests or any securities or rights convertible, exchangeable or exercisable into any capital stock or other equity interests;

(b)   discharged or satisfied any Lien or paid any material obligation or Liability, other than current Liabilities paid in the ordinary course of business consistent with past custom and practice;

7

(c)     declared, set aside or made any payment or distribution of cash with respect to its capital stock or other equity interests or declared, set aside or made any payment or distribution of other property with respect to its capital stock or other equity interests or purchased, redeemed or otherwise acquired any shares of its capital stock or other equity interests (including any warrants, options or other rights to acquire its capital stock or other equity interests);

(d)     accelerated any billing of customers or collection of receivables;

(e)     delayed, postponed or canceled (i) the payment of accounts payable or any other Liability, (ii) the purchase of inventory, or (iii) the replacement of inoperable, worn out or obsolete assets with assets of comparable quality, in each case other than in the ordinary course of business consistent with past custom and practice;

(f)     sold, assigned, transferred, leased, licensed, failed to maintain or abandoned any of its assets, tangible or intangible, or taken any action that could reasonably be expected to cause the loss, lapse or abandonment of any Intellectual Property Rights, except sales of inventory in the ordinary course of business consistent with past custom and practice;

(g)     made any loan to, or entered into any other transaction with, any of its directors, officers or employees;

(h)     entered into any employment or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(i)     made any material change in employment terms (including base compensation) for any of its directors, officers or employees;

(j)     adopted, amended, modified or terminated any bonus, profit-sharing, incentive, severance or other plan, contract or commitment for the benefit of any of its directors, officers or employees (or taken any such action with respect to any other Employee Benefit Plan);

(k)     made any loans or advances to, guarantees for the benefit of, or any Investments in, any Person or formed any Subsidiary;

(l)     made capital expenditures or commitments therefor in excess of $25,000 individually or in the aggregate;

(m)     suffered any damage, destruction or casualty loss exceeding $10,000 in the aggregate, not covered by insurance, or experienced any material changes in the amount and scope of insurance coverage;

(n)     made any Tax election or changed an annual accounting period, made any change in its cash management practices or in any method of accounting or accounting policies, or made any write-down in the value of its inventory that is material or outside of the ordinary course of business consistent with past custom and practice;

8

(o)    other than compensation paid in the ordinary course of business, consistent with past custom and practice, directly or indirectly engaged in any transaction or entered into, amended or terminated, any arrangement with any of its officers, directors, shareholders or other Affiliates;

(p)    amended its certificate of incorporation, bylaws or other organizational documents;

(q)    taken any action or omitted to take any action which act or omission could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(r)    entered into any new line of business, or incurred or committed to incur any capital expenditures, obligations or Liabilities in connection therewith;

(s)    entered into any acquisition agreement or agreement to acquire by merger, consolidation or otherwise, or agreement to acquire a substantial portion of the assets of, or in any other manner, any business of any other Person;

(t)    cancelled or waived (i) any right or claim (or series of related rights and claims) either involving more than $25,000 or outside the ordinary course of business, or (ii) any debts or claims against any of its Affiliates;

(u)    entered into, accelerated, terminated, modified or cancelled any agreement, contract, lease, License or other arrangement involving more than $25,000; or

(v)    agreed, whether orally or in writing, to do any of the foregoing.

2.10.   Assets.   The Group Companies have good and valid title to, a valid leasehold interest in, or a valid license to use the properties and assets, tangible or intangible, shown on the Most Recent Balance Sheet or acquired thereafter, free and clear of all Liens, except for (a) properties and assets disposed of in the ordinary course of business since the Most Recent Balance Sheet Date and (b) Permitted Liens. The Group Companies own, have a valid leasehold interest in, or have a valid license to use, all of the properties, assets and rights, whether tangible or intangible, that are currently used in or are necessary for the conduct of their business as presently conducted. Each tangible asset is free from material defects, has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to reasonable wear and tear) and is suitable for the purposes for which it is presently used. Aviji, Inc. owns no assets and has no liabilities, and at no point in time has owned any asset used or usable in the business of the Group Companies as presently conducted. Abacus Philippines owns no assets other than deposit accounts reflected in the Financial Statements and has no liabilities, and at no point in time has owned any asset used or usable in the business of the Group Companies as presently conducted.

2.11.   Tax Matters.   Except as set forth on Schedule 2.11:

(a)    each Group Company has filed all Tax Returns which it is required to file under applicable laws and regulations, and all such Tax Returns are true, complete and

9

correct in all respects and have been prepared in compliance with all applicable laws and regulations;

(b)    each Group Company has timely paid all Taxes due and owing by it (whether or not such Taxes are shown or required to be shown on a Tax Return) and has timely withheld and paid over (or made adequate reserves for payment) to the appropriate taxing authority all Taxes which it is required to withhold from amounts paid or owing to any employee, shareholder, creditor or other Third Party;

(c)    the Sellers have delivered to the Buyer true, complete and correct copies of all federal income tax returns, examination reports, and statement of deficiencies assessed against, or agreed to by each Group Company for all taxable periods ended on or after June 30, 2001;

(d)    no Group Company (i) has waived any statute of limitations with respect to any Taxes of any Group Company or agreed to any extension of time for filing any Tax Return which has not been filed or (ii) has consented to any extension of time with respect to any Tax assessment or deficiency;

(e)    no foreign, federal, state or local Tax audits or assessments or administrative or judicial proceedings are threatened or pending with respect to any Group Company;

(f)    there are no Liens on any of the assets of any Group Company that arose in connection with any failure (or alleged failure) to pay any Tax;

(g)    there is no dispute with or claim by any taxing authority concerning any Tax liability of any Group Company;

(h)    no Group Company (i) has been a member of an Affiliated Group or filed or been included in a combined, consolidated or unitary income Tax Return or (ii) is a party to or bound by any Tax allocation or Tax sharing agreement;

(i)    no Group Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code;

(j)    no Group Company has engaged in any reportable transaction within the meaning of Section 6111 and 6112 of the Code;

(k)    no Group Company or Seller has requested or received a ruling from any taxing authority or signed any binding agreement with any taxing authority that might impact any tax attribute or the amount of Tax due from any Group Company after the Closing Date;

(l)    all nonqualified deferred compensation plans (within the meaning of Section 409A of the Code) of each Group Company are in compliance with Section 409A of the Code;

(m)    the unpaid Taxes of the Group Companies (i) did not, as of the Most Recent Balance Sheet Date, exceed the reserve for Tax liability (as opposed to a reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet (as opposed to the notes thereto) and (ii) will not exceed that reserve as adjusted for operations and transactions through the Closing Date in accordance with the past custom and practice of the Group Companies in filing their Tax Returns;

(n)    no Group Company is liable for the Taxes of another Person (i) under Treasury Regulation § 1.1502-6 (or comparable provisions of state, local or foreign law), (ii) as a transferee or successor, (iii) by contract or indemnity or (iv) otherwise;

(o)    no Group Company is a party to any agreement, contract, arrangement, or plan that has resulted or would result, separately or in the aggregate, in the payment of an "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local, or foreign Tax law);

(p)    no Group Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date, (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law), (iv) installment sale or open transaction disposition made on or prior to the Closing Date, or (v) prepaid amount received on or prior to the Closing Date;

(q)    no Group Company has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii);

(r)    no Group Company is, or at any time has been, subject to (i) the dual consolidated loss provisions of Section 1503(d) of the Code, (ii) the overall foreign loss provisions of Section 904(f) of the Code or (iii) the recharacterization provisions of Section 952(c)(2) of the Code; and

(s)    no Group Company has deferred revenue on which Taxes will be owed in tax years subsequent to June 30, 2006.

2.12.   <u>Contracts and Commitments</u>.

(a)    Except as set forth on <u>Schedule 2.12(a)</u>, no Group Company is a party to, or bound by, any written or oral:

(i)    pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees;

11

(ii)     collective bargaining agreement or any other contract with any labor union, or severance agreements, programs, policies or arrangements;

(iii)    written personnel policies, rules or procedures applicable to employees of any Group Company;

(iv)    management agreement or contract for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis (A) providing annual cash or other compensation in excess of $50,000, (B) providing for the payment of any cash or other compensation or benefits upon the consummation of the transactions contemplated hereby or (C) otherwise restricting its ability to terminate the employment of any employee at any time for any lawful reason or for no reason without penalty or Liability;

(v)     contract or agreement involving any Government Entity;

(vi)    agreement or indenture relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset (tangible or intangible) or material group of assets (tangible or intangible) or any letter of credit arrangements, or any guarantee therefor;

(vii)   lease or agreement under which it is (A) lessee of or holds or operates any personal property, owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed $10,000 or (B) lessor of or permits any Third Party to hold or operate any personal property owned or controlled by it;

(viii)  agreements relating to the ownership of, Investments in or loans and advances to any Person, including Investments in joint ventures, partnerships and minority equity investments;

(ix)    license, royalty, indemnification or other agreement with respect to any Intellectual Property Rights (other than licenses for commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000);

(x)     agent, sales representative, sales or distribution agreement;

(xi)    power of attorney or other similar agreement or grant of agency;

(xii)   contract or agreement prohibiting it from freely engaging in any business or competing anywhere in the world or restricting the use of any Intellectual Property Rights, including any co-existence, settlement, nondisclosure or confidentiality agreements;

(xiii)  settlement or similar agreement;

(xiv)   agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or

12

for the furnishing or receipt of services, the performance of which will extend over a period of more than one year, result in a material loss to the Group Companies, or involve consideration in excess of $25,000;

(xv)    agreement involving any Company Affiliate;

(xvi)    agreement under which it has granted any Person any registration rights (including demand and piggyback registration rights);

(xvii)    agreement under which the consequences of a default or termination could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; or

(xviii)    agreement (or group of related agreements) which is material to its operations and business or involves consideration in excess of $25,000 annually and is not otherwise required to be disclosed pursuant to any of the foregoing.

(b)    Each of the contracts, agreements and instruments set forth or required to be set forth on Schedule 2.12(a) (together with the Real Property Leases and Insurance Policies, collectively the "Material Contracts") are legal, valid, binding and enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and in full force and effect. No party to any Material Contract has repudiated any material provision of such Material Contract. No Group Company is in default under, in breach of, or in receipt of any claim of default or breach under, any Material Contract. To the Knowledge of each Group Company, no event has occurred which, with the passage of time or the giving of notice or both, would result in a default or breach by any Group Company under any Material Contract, and no Group Company or Seller has any Knowledge of any existing or threatened breach or cancellation by any other party to any Material Contract.

(c)    The Buyer has been supplied with (i) a true, complete and correct copy of each written Material Contract, together with all amendments, waivers or other changes thereto, and (ii) a true, complete and correct description of the terms and conditions of each oral Material Contract.

2.13.    Intellectual Property Rights.

(a)    Schedule 2.13(a) contains a true, complete and correct list of all of the following that are owned or used by any Group Company: (i) patented or registered Intellectual Property Rights, (ii) pending patent applications and applications for registration of other Intellectual Property Rights, (iii) computer software material to the conduct of the business of any Group Company (other than licenses for commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000), (iv) trade or corporate names and Internet domain names, and (v) material unregistered trademarks and service marks.

(b)    Except as set forth on Schedule 2.13(b), the Group Companies own all right, title and interest in and to, or have the right to use pursuant to a valid and enforceable license set forth on Schedule 2.12(a), free and clear of all Liens, all Intellectual Property Rights

13

set forth on Schedule 2.13(a) and commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000 used in or necessary to operate the business of any Group Company as currently conducted and as currently proposed to be conducted. The Company Intellectual Property Rights are valid, enforceable and subsisting, and no loss, other than by expiration of patents at the end of their respective statutory terms and the expiration of licenses at the end of their respective terms, of any of the Company Intellectual Property Rights is threatened or pending. The Group Companies have taken all commercially reasonable, customary and necessary action, including the payment of all fees and taxes (to the extent applicable), to maintain and protect the Company Intellectual Property Rights. The Group Companies first used the name "APlus.net" in commerce in connection with web hosting and related services by at least as early as May 1996.

(c)     Except as set forth on Schedule 2.13(c), (i) there are no claims against a Group Company that were either made within the past six (6) years or are presently pending contesting the validity, use, enforceability, ownership or registrability of any of the Company Intellectual Property Rights, and to the Knowledge of the Group Companies, there is no reasonable basis for any such claim, (ii) no Group Company has infringed, misappropriated or otherwise conflicted with, and the operation of the business of any Group Company as currently conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property Rights of any other Persons and no Group Company has any Knowledge of any facts or circumstances that indicate a likelihood of the foregoing, (iii) no Group Company or Seller has received any notices (including cease-and-desist letters or offers to license) alleging infringement or misappropriation of, or other conflict with, any Intellectual Property Rights of any other Person, and (iv) to the Knowledge of the Group Companies, no other Person is infringing, misappropriating or otherwise conflicting with any of the Company Intellectual Property Rights. The transactions contemplated by this Agreement will not impair the right, title or interest of any Group Company in and to the Company Intellectual Property Rights and Company Systems, and all of the Company Intellectual Property Rights and Company Systems will be owned or available for use by the Group Companies immediately after the Closing on terms and conditions identical to those under which the Group Companies owned or used the Company Intellectual Property Rights and Company Systems immediately prior to the Closing. To the Knowledge of the Group Companies, no current or former employee, consultant, director or officer of any Group Company has disclosed to any Third Party or otherwise used any confidential information of such Group Company except in the course of their employment or engagement with such Group Company and at the direction of such Group Company.

(d)     The Group Companies own all right, title and interest in and to all Intellectual Property Rights authored, developed or otherwise created by each current and former employee, consultant, director and officer of the Group Companies, without any restrictions or obligations owed to such employee, consultant, director or officer with respect to such Group Company's use or ownership of such Intellectual Property Rights.

(e)     The software, firmware, hardware (whether general or special purpose), networks and interfaces that are used or relied on by the Group Companies in the conduct of their respective businesses (collectively, the "Company Systems") are sufficient for the immediate needs of the Group Companies, including as to capacity and ability to process current peak volumes in a timely manner. In the twelve (12) month period prior to the date of

14

this Agreement, there have been no bugs in, failures, breakdowns, or continued substandard performance of any Company Systems which have caused the substantial disruption or interruption in or to the use of the Company Systems or the operation of the business of any Group Company.

(f)     The software included in the Company Intellectual Property (the "Company Software") is not subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license) that could (i) require, or condition the use or distribution of such software, on the disclosure, licensing, or distribution of any source code for any portion of such Software or (ii) otherwise impose any limitation, restriction, or condition on the right or ability of any Group Company to use, license or distribute any software.

(g)     In each agreement in which any Group Company has licensed software, firmware, hardware, networks or interfaces to Third Parties, such Group Company has (i) limited its liability to no more than the amount of the fees paid pursuant to such agreement and (ii) not warranted as to the performance or functionality of such software, firmware, hardware, networks or interfaces other than stating that such software, firmware, hardware, networks or interfaces will perform in accordance with their respective documentation and/or specifications.

(h)     (i) No source code for any Company Software has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of a Group Company, (ii) no Group Company has a duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any Company Software to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of a Group Company, and (iii) no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) could, individually or in the aggregate, reasonably be expected to result in the delivery, license, or disclosure of the source code for any Company Software to any Person who is not, as of the date of this Agreement, an employee of a Group Company.

(i)     The Group Companies are in compliance with (i) all applicable data protection or privacy laws governing the collection or use of personal information and (ii) any privacy policies or related policies, programs or other notices that concern any Group Company's collection or use of personal information.

15

2.14. <u>Litigation</u>. Except as set forth on <u>Schedule 2.14</u>, there are no actions, suits, hearings, proceedings (including any arbitration proceedings), orders, investigations, grievances, indictments, claims, condemnations, assessments, expropriations or other proceedings in eminent domain (a) pending or, to the Knowledge of any Group Company, threatened against or affecting any Group Company or its assets, or (b) pending or threatened by any Group Company against any Third Party, in each case, at law or in equity, or before or by any Government Entity (including any actions, suits, proceedings or investigations with respect to the transactions contemplated by this Agreement). No Group Company is subject to any judgment, order or decree of any Government Entity. The actions, suits and proceedings required to be listed on <u>Schedule 2.14</u> could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.15. <u>Brokerage</u>. Except as set forth on <u>Schedule 2.15</u>, there are and will be no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which any Group Company is a party or to which any Group Company is subject for which any Group Company or the Buyer could become obligated.

2.16. <u>Insurance</u>. <u>Schedule 2.16</u> set forth a description of each insurance policy maintained by any Group Company with respect to its properties, assets and business (including the name of the insurer, the policy number, and the period, amount and scope of coverage) (collectively, the "<u>Insurance Policies</u>"). No Group Company (a) is in default with respect to its obligations under any insurance policy maintained by it, or (b) has ever been denied insurance coverage. Each such Insurance Policy is legal, valid, binding and enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally) and in full force and effect. <u>Schedule 2.16</u> sets forth a list of all claims, if any, made by any Group Company since July 1, 2002 against an insurer in respect of coverage under an insurance policy and there have been no denials of claims nor reservation of rights letters with regard to such claims. The insurance coverage of the Group Companies is placed with insurers rated "Excellent" or better by AM Best. No Group Company has any self-insurance or co-insurance programs.

2.17. <u>Labor Matters</u>.

(a)    <u>Schedule 2.17(a)</u> sets forth a true, complete and correct list of (i) all employees of each Group Company, (ii) the position, date of hire, current annual rate of compensation (or with respect to employees compensated on an hourly or per diem basis, the hourly or per diem rate of compensation), including any bonus, contingent or deferred compensation, (iii) the total compensation for each executive and key employee during the period beginning on July 1, 2005 and ending on June 30, 2006, including any bonus, contingent or deferred compensation, (iv) a list of each of the directors of each Group Company, and (v) the current annual rate of compensation of each such director. No executive or key employee of any Group Company and no group of employees or contractors of any Group Company (including salespersons) has informed any Group Company (whether orally or in writing) of any plan to terminate employment with or services for any Group Company, and, to the Knowledge of each

16

Group Company, no such person or persons has any plans to terminate employment with or services for any Group Company.

(b)    Except as set forth on Schedule 2.17(b), no Group Company: (i) has experienced any strikes, grievances, claims of unfair labor practices, or other material labor disputes; (ii) has committed any material unfair labor practice; (iii) has Knowledge of any union organizational or decertification activities underway or threatened by, on behalf of or against any labor union with respect to employees of any Group Company; (iv) has any material workman's compensation liability, experience or pending matter; (v) has, within the past three (3) years, implemented any plant closing or layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, provincial or local plant closing or mass layoff Law (collectively, the "WARN Act"), and no such action will be implemented without advance notification to the Buyer; or (vi) is subject to any pending or, to the Knowledge of the Group Companies, threatened, employment-related charge, complaint, grievance, investigation, or inquiry of any kind in any forum, relating to an alleged violation or breach by any Group Company (or its officers or directors) of any employment or labor related Law, regulation or contract, and, to the Knowledge of each Group Company, no employee or agent of any Group Company has committed any act or omission giving rise to Liability for any violation or breach identified in this Section 2.17(b).

(c)    Abacus Bulgaria has fulfilled all statutory requirements so that foreigners may legally work at its enterprise in Bulgaria, either as its own employees or as employees commissioned by a foreign employer.

2.18.   Employee Benefits.

(a)    Schedule 2.18(a) sets forth a true, complete and correct list of each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and each other benefit plan, program or arrangement maintained, sponsored, contributed to or required to be contributed to by any Group Company, or with respect to which any Group Company has any current or potential Liability (each, an "Employee Benefit Plan" and collectively, the "Employee Benefit Plans").

(b)    With respect to each Employee Benefit Plan, the Sellers have delivered to the Buyer true, complete and correct copies of, as applicable: (i) plan and trust documents, with all amendments thereto; (ii) summary plan descriptions; (iii) the most recent determination or opinion letter received from the IRS; (iv) the three (3) most recent annual reports (Form 5500-series, with all applicable attachments); (v) all related insurance contracts, other funding arrangements and administrative services agreements; and (vi) all other documents pursuant to which such Employee Benefit Plan is maintained, funded and administered.

(c)    Each Employee Benefit Plan (and each related trust, insurance contract or fund) has been maintained, funded and administered in accordance with its terms and the terms of any applicable collective bargaining agreement and complies in all material respects in form and in operation with all applicable requirements of ERISA, the Code and other applicable Laws. Each Group Company (except as set forth on Schedule 2.18(a)) and each Person that at any relevant time is or has been treated as a single employer with any Group

17

Company for purposes of Section 414 of the Code (each, an "ERISA Affiliate") have complied and are in compliance with the requirements of Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state Laws ("COBRA").

(d)    Each Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has received a determination from the IRS that such Employee Benefit Plan is so qualified, and, to the Knowledge of the Group Companies, nothing has occurred since the date of such determination that could adversely affect the qualification of such Employee Benefit Plan; and each such Employee Benefit Plan has been timely amended to comply with the provisions of the legislation commonly referred to as "GUST" and "EGTRRA" and has been submitted to the IRS for a determination or opinion letter that takes the GUST amendments into account within the GUST remedial amendment period.

(e)    With respect to each Employee Benefit Plan, all contributions or payments (including all employer contributions, employee salary reduction contributions, and premium payments) that are due have been made within the time periods prescribed by the terms of each Employee Benefit Plan, ERISA, the Code and other applicable Laws, and all contributions or payments for any period ending on or before the Closing Date that are not yet due have been made or properly accrued.

(f)    No Group Company or any ERISA Affiliate maintains, sponsors, contributes to, has any obligation to contribute to, or has any current or potential Liability under or with respect to (i) any "defined benefit plan" as defined in Section 3(35) of ERISA or any other plan subject to the funding requirements of Section 412 of the Code or Section 302 or Title IV of ERISA, (ii) any "multiemployer plan" as defined in Section 3(37) of ERISA , or (iii) any benefit plan, program or arrangement that provides for post-retirement medical, life insurance or other similar benefits (other than health continuation coverage required by COBRA). No Group Company or any ERISA Affiliate has any current or potential Liability under Title IV of ERISA.

(g)    Except as set forth on Schedule 2.18(g), no Group Company or any ERISA Affiliate maintains, contributes to, or has an obligation to contribute to, or has any Liability with respect to, the provision of any health or life insurance or other welfare-type benefits for current or future retired or terminated directors, officers, employees or contractors (or any spouse or other dependent thereof) other than in accordance with COBRA.

(h)    With respect to each Employee Benefit Plan, (i) there have been no non-exempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code), (ii) no "fiduciary" (as defined in Section 3(21) of ERISA) has any Liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of such Employee Benefit Plan, and (iii) no action, investigation, suit, proceeding, hearing, audit or claim (other than routine claims for benefits) is pending or threatened, and there are no facts that would give rise to or could reasonably be expected to give rise to any such action, investigation, suit , proceeding, hearing, audit or claim.

(i)    Each Group Company has, for purposes of each Employee Benefit Plan, correctly classified those individuals performing services for such Group Company as

18

common law employees, leased employees, independent contractors or agents of such Group Company. The transactions contemplated by this Agreement will not cause the acceleration of vesting in, or payment of, any benefits under any Employee Benefit Plan and will not otherwise accelerate or increase any liability or obligation under any Employee Benefit Plan.

(j)    Abacus Bulgaria does not have any outstanding social security or health security contributions.

2.19.    Compliance with Laws; Permits.

(a)    Each Group Company has complied, and is in compliance in all material respects, with all applicable Laws. Except as set forth on Schedule 2.19(a), no notices have been received by and no claims have been filed against any Group Company alleging a violation of any Laws.

(b)    The Group Companies hold all Licenses from any Government Entity or Standards Organization required for the conduct of their business and the ownership of their properties, and Schedule 2.19(b) sets forth a true, complete and correct list of all of such Licenses held by the Group Companies. No notices have been received by the any Group Company alleging the failure to hold any License of any Government Entity or Standards Organization. Each Group Company is in compliance with all material terms and conditions of all Licenses which it holds. All of such Licenses are in full force and effect and, immediately after the Closing, will be in full force and effect and available for use by the Group Companies. No loss or expiration of any License is pending or, to the Knowledge of the Group Companies, threatened or reasonably foreseeable (including as a result of the transactions contemplated hereby) other than expiration in accordance with the terms thereof, which terms do not expire as a result of the consummation of the transactions contemplated hereby.

2.20.    Environmental and Safety Matters.

(a)    Each Group Company has complied with and is currently in compliance in all material respects with all Environmental Laws. Without limiting the foregoing, each Group Company has obtained and complied with, and is currently in compliance with, all Licenses required pursuant to any Environmental Laws for the occupancy of its properties or facilities or the operation of its business, a true, complete and correct list of all such Licenses being set forth on Schedule 2.20(a).

(b)    No Group Company has received any notice, report or other information regarding any violation of any Environmental Laws or any Liability, including any investigatory, remedial or corrective obligations, relating to the Group Companies or any of their current or former properties or operations arising under Environmental Laws.

(c)    None of the following exists at the Phoenix Property or, to the Knowledge of the Group Companies, at any other property or facility currently owned, occupied or operated by any Group Company:

(i)    underground storage tanks;

19

(ii)    asbestos-containing materials in any form or condition;

(iii)    materials or equipment containing polychlorinated biphenyls; or

(iv)    groundwater wells, landfills, surface impoundments or other disposal areas.

(d)    No Group Company nor any of its predecessors or Affiliates has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed Persons to or released any Hazardous Substance, or owned or operated any facility or property (and no such property or facility is contaminated by any Hazardous Substance) so as to give rise to any Liabilities, including any Liability for response costs, corrective action costs, personal injury, natural resource damages, property damage or attorneys fees or any investigative, corrective or remedial obligations, pursuant to CERCLA, the Solid Waste Disposal Act, as amended, or any other Environmental Laws.

(e)    No Group Company has (either expressly or by operation of law) assumed, undertaken or otherwise become subject to any Liability or corrective or remedial obligation of any other Person relating to any Environmental Laws.

(f)    No Group Company nor any of its predecessors or Affiliates have manufactured, sold, marketed, installed, removed or distributed asbestos or products or items containing asbestos, and none of such Persons has any Liabilities with respect to the presence or alleged presence of asbestos-containing material in any product or item on, at or upon any property or facility.

(g)    The Sellers have furnished to the Buyer all environmental audits, reports and other material environmental documents relating to the former or current properties, facilities or operations of the Group Companies and their predecessors or Affiliates, to the extent such documents are in the possession, custody or control of the Group Companies or the Sellers.

(h)    Neither the performance by any Group Company pursuant to any Transaction Document nor the consummation of the transactions contemplated hereby and thereby will result in any obligations for site investigation or cleanup, or notification to or consent of Government Entities or Third Parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental Laws.

2.21.    Affiliate Transactions.

(a)    Except as set forth on Schedule 2.21(a), no employee, officer, director, shareholder or Affiliate of the Group Companies (including each Seller), or any Person in the Family Group of any of the foregoing (each, a "Company Affiliate") (i) is a party to any agreement, contract, commitment, arrangement, or transaction with any Group Company or that pertains to the business of the Group Companies other than any employment, non-competition, confidentiality or other similar agreements between any Group Company and any Person who is an officer, director or employee of the Group Companies (each, an "Affiliate Agreement"); or (ii) owns, leases, or has any economic or other interest in any asset, tangible or intangible, that is

20

used by any Group Company in carrying out its business (together with the Affiliate Agreements, collectively the "Affiliate Transactions").

(b)     As of the Closing, there will be no outstanding or unsatisfied obligations of any kind (including inter-company accounts, notes, guarantees, loans, or advances) between any Group Company, on the one hand, and a Company Affiliate on the other hand, except to the extent arising out of the post-Closing performance of an Affiliate Agreement that is in writing and is set forth on Schedule 2.21(b) (and a true, complete and correct copy of which has been provided to the Buyer).    The satisfaction, release, termination, or other disposition of an Affiliate Transaction will not cause, and could not, individually or in the aggregate, reasonably be expected to cause, any Group Company to suffer a material Adverse Consequence, except to the extent that such Adverse Consequence is reflected on the Most Recent Balance Sheet and does not and will not impose any obligation or other Liability on any Group Company from and after the Closing.

2.22.   Suppliers and Customers.    Schedule 2.22 sets forth a complete and accurate list of: (a) all customers of Abacus America and its Subsidiaries during the fiscal year ended June 30, 2006, that generated at least $25,000 of revenue to the Group Companies in such fiscal year, showing the approximate total sales to each such customer during such fiscal year and the percentage of the total sales of the Group Companies represented by such sales; and (b) all suppliers to the Group Companies from whom the Group Companies made aggregate purchases in excess of $25,000 during the fiscal year ended June 30, 2006, showing the approximate total purchases by the Group Companies from each such supplier during such fiscal year.    Except as set forth on Schedule 2.22, (A) the relationship of the Group Companies with each such customer and supplier is, to the Knowledge of each Group Company, a good commercial working relationship and (B) (i) no such customer or supplier within the last twelve (12) months has canceled or otherwise terminated, or threatened to cancel, or to the Knowledge of the Group Companies, intends to cancel or terminate, its relationship with any Group Company, (ii) no such customer or supplier during the last twelve (12) months has decreased materially or threatened to decrease or limit materially its business with any Group Company, or to the Knowledge of the Group Companies, intends to modify materially its relationship with any Group Company (including changing the terms, whether related to payment, price or otherwise), (iii) no such supplier during the last twelve (12) months has materially increased or threatened to materially increase the prices charged by such supplier to any Group Company for the goods or services provided by such supplier to any Group Company, and (iv) to the Knowledge of the Group Companies, the consummation by each Group Company of the transactions contemplated by this Agreement will not adversely affect the relationship of the Group Companies with any of such customers and suppliers.    Abacus Bulgaria's only customer is Abacus America.

2.23.   Real Property.

(a)     No Group Company has any Owned Real Property.    Abacus Bulgaria previously owned residential real property and land located at 22 Veliko Tarnovo Str., Sofia, Bulgaria, and vacant land located at complex Mladost 2, Sofia, Bolgaria (collectively, the "Bulgarian Real Property"), title to which was transferred to the Shareholders prior to the Closing.

21

(b)    Schedule 2.23(b) sets forth the address of each Leased Real Property and a true, complete and correct list of all leases, subleases and other occupancy agreements (written and oral), including all amendments, extensions and other modifications pursuant to which any Group Company holds any Leased Real Property (the "Real Property Leases"), including the date and the names of the parties to such Real Property Leases. The Sellers have previously delivered to the Buyer true, complete and correct copies of all the Real Property Leases and, in the case of an oral Real Property Lease, a written summary of the material terms thereof. The Group Companies have a good and valid leasehold interest in and to all of the Leased Real Property, subject to no Liens except for Permitted Liens. Except as set forth on Schedule 2.23(b), with respect to each Real Property Lease: (i) such Real Property Lease is legal, valid, binding and in full force and effect and is enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally; (ii) there exists no breach or default or condition which, with the giving of notice, the passage of time or both, could become a breach or default under such Real Property Lease, or permit the termination, modification or acceleration of rent under such Real Property Lease; (iii) the Group Companies' possession and quiet enjoyment of the Leased Real Property under such Real Property Lease has not been disturbed, and to the Knowledge of the Group Companies, there are no disputes with respect to such Real Property Lease; (iv) no security deposit or portion thereof deposited with respect to such Real Property Lease has been applied in respect of a breach or default under such Real Property Lease which has not been redeposited in full; (v) no Group Company owes or will owe in the future, any brokerage commissions or finder's fees with respect to such Real Property Lease; (vi) the other party to such Real Property Lease is not a Company Affiliate; (vii) no Group Company has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (viii) there are no Liens on the estate or interest created by such Real Property Lease and no Group Company has collaterally assigned or granted any other security interest in such Real Property Lease.

(c)    The Leased Real Property constitutes all of the real property owned, leased, occupied or otherwise utilized in connection with the business of the Group Companies. The Leased Real Property is in good condition and repair (normal wear and tear excepted) and is sufficient for the conduct of the business of the Group Companies. The Phoenix Property and, to the Knowledge of the Group Companies, the other Leased Real Property conforms in all material respects to all applicable building, zoning and other laws, ordinances, rules and regulations. There is no pending or, to the Knowledge of the Group Companies, any threatened condemnation proceeding, lawsuit or administrative action affecting any portion of the Leased Real Property. None of the Leased Real Property or any portion thereof is located in a flood hazard area (as defined by the Federal Emergency Management Agency). All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (the "Improvements") are in good condition and repair (normal wear and tear excepted). To the Knowledge of the Group Companies, (i) there are no structural deficiencies or latent defects affecting any of the Improvements and (ii) there are no facts or conditions affecting any of the Improvements which could, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the business of the Group Companies. Each parcel of Leased Real Property has direct access to a public street adjoining the Leased Real Property, and

22

such access is not dependent on any land or other real property interest which is not included in the Phoenix Property or, to the Knowledge of the Group Companies, the other Leased Real Property. None of the Improvements or any portion thereof at the Phoenix Property or, to the Knowledge of the Group Companies, at any other Leased Real Property is dependent for its access, use or operation on any land, building, improvement or other real property interest which is not included in the Leased Real Property.

2.24.  Certain International Business Practices.  No Group Company nor any director, officer, agent or employee of any Group Company has directly or indirectly:

(a)  made or agreed to make any contribution, payment or gift to any government official, employee or agent where either the contribution, payment or gift or the purpose thereof was illegal under the laws of any federal, state, local or foreign jurisdiction;

(b)  made or agreed to make any illegal contribution, or illegally reimbursed any political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office;

(c)  paid or delivered any fee, commission or any other sum of money or item of property, however characterized, to any finder, agent, government official or other party, in the United States or any other country, which (i) in any manner relates to the assets, business or operations of the respective Group Company and (ii) the Group Companies, or any officer or director of the Group Companies, knew or had reason to believe to have been illegal under any federal, state or local laws (or any rules or regulations thereunder) of the United States or any other country having jurisdiction;

(d)  made or provided any material false statement or material omission to any agency of any federal, state or local government, purchaser of products or services, or foreign government or foreign agency, in connection with the importation of merchandise (including the valuation or classification of imported merchandise, the duty treatment of imported merchandise, the eligibility of imported merchandise for favorable duty rates or other special treatment, country-of-origin marking, North American Free Trade Agreement certificates, or other statements or certificates concerning origin, quota or visa rights) or other approvals required by a foreign government or agency; or

(e)  engaged in or otherwise participated in, assisted or facilitated any transaction that is prohibited by any applicable embargo or related trade restriction imposed by the United States Office of Foreign Assets Control or any other agency of the United States Government.

**ARTICLE III**
**Representations and Warranties of the Sellers**

As a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Sellers jointly and severally represent and warrant to the Buyer that the statements contained in this ARTICLE III with respect to each Seller are correct and complete as of the Closing Date.

23

3.1.   Capacity; Execution and Enforceability; No Breach.

(a)   Each Seller has full capacity to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)   Each Seller's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all necessary action on the part of such Seller. Each Transaction Document to which a Seller is a party has been duly and validly executed and delivered by such Seller and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)   Except as set forth on Schedule 2.4(c), the execution and delivery by each Seller of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by such Seller does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon the Shares pursuant to, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) any Law, order, judgment or decree to which such Seller is subject, or (B) any material agreement or instrument to which such Seller is subject.

3.2.   Title to Shares. Each Seller owns of record and beneficially the Shares as set forth opposite such Seller's name on Schedule 2.2, and such Seller has good and valid title to such Shares, free and clear of all Liens and, at the Closing, such Seller will deliver to the Buyer good and valid title to such Shares, free and clear of all Liens and Taxes. No Seller owns or has the right to acquire, directly or indirectly, any other shares of capital stock of any Group Company. No Seller is a party to any option, warrant, purchase right, or other contract or commitment that could require a Seller to sell, transfer, or otherwise dispose of any capital stock of any Group Company (other than this Agreement). No Seller is a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of any Group Company.

3.3.   Brokerage. Except as set forth on Schedule 3.3, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which any Seller is a party or to which any Seller is subject for which any Group Company or the Buyer could become obligated.

3.4.   Litigation, etc. There are no actions, suits, proceedings (including any arbitration proceedings), orders, investigations or claims pending or, to the Knowledge of the

24

Sellers, threatened against or affecting the Sellers in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby.

3.5.  Investment Intent.  In connection with the acquisition of the Equity Consideration hereunder, each Seller represents and warrants to the Buyer that:

(a)  The Equity Consideration to be acquired by the Sellers pursuant to this Agreement will be acquired for their own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act of 1933 (the "1933 Act"), or any applicable state securities laws, and such Equity Consideration will not be disposed of in contravention of the 1933 Act or any applicable state securities laws.

(b)  Such Seller is able to bear the economic risk of the investment in the Equity Consideration for an indefinite period of time because the Equity Consideration will, when acquired, be subject to the transfer restrictions contained in the Stockholders Agreement and has not been registered under the 1933 Act.

(c)  Such Seller has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Equity Consideration and has had full access to such other information concerning the Buyer as such Seller has requested. Such Seller has reviewed, or has had an opportunity to review copies of the following documents; (i) Buyer's certificate of incorporation and bylaws, (ii) the Stockholders Agreement, and (iii) the Registration Rights Agreement.

(d)  Such Seller acknowledges and agrees that, except as set forth in the Stockholders Agreement, none of the Buyer or any Group Company will have any duty or obligation to disclose to such Seller, and such Seller will have no right to be advised of, any material information regarding the Buyer or any Group Company at any time after the date of this Agreement including prior to, upon, or in connection with the sale of the Equity Consideration by such Seller.

3.6.  Restricted Securities.  Each Seller understands and agrees that, until registered under the 1933 Act or transferred pursuant to the provisions of Rule 144 as promulgated by the Securities and Exchange Commission, all certificates evidencing any of the Equity Consideration will bear a legend, prominently stamped or printed thereon, reading substantially as follows:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT ANY EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS, OR THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS. THE TRANSFER OF THE SECURITIES REPRESENTED BY THIS

CERTIFICATE IS SUBJECT TO A STOCKHOLDERS AGREEMENT DATED AS OF JULY 25, 2006, BY AND AMONG THE ISSUER OF SUCH SECURITIES (THE "COMPANY") AND CERTAIN OF THE COMPANY'S STOCKHOLDERS. A COPY OF SUCH STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

## ARTICLE IV
### Representations and Warranties of the Buyer

As a material inducement to the Companies and the Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Companies and the Sellers that the statements contained in this <u>ARTICLE IV</u> with respect to the Buyer are correct and complete as of the Closing Date.

4.1.    <u>Organization</u>.  The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and is licensed or qualified to conduct its business and is in good standing in every jurisdiction where it is required to be so licensed or qualified except where the failure to be so licensed or qualified could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. The copies of the certificate of incorporation and bylaws (or other comparable organizational documents) of Buyer which have been furnished to the Shareholders reflect all amendments made thereto at any time prior to the date of this Agreement and are true, complete and correct copies of the originals.

4.2.    <u>Authorization; Execution and Enforceability; No Breach</u>.

(a)    The Buyer possesses full corporate power and authority to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)    The Buyer's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all necessary action on the part of the Buyer and the Buyer's stockholders. Each Transaction Document to which the Buyer is a party has been duly and validly executed and delivered by the Buyer and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)    Except as set forth on <u>Schedule 4.2(c)</u>, the execution and delivery by the Buyer of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by the Buyer does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon the Buyer's capital stock or assets, (iv) give any Third

26

Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) the certificate of incorporation or bylaws of the Buyer, (B) any Law, order, judgment or decree to which the Buyer is subject, or (C) any agreement or instrument to which the Buyer is subject.

4.3.    Brokerage.    There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which the Buyer is a party or to which the Buyer is subject for which any Seller could become liable or obligated.

4.4.    Investment Intent.    The Buyer is acquiring the Shares for investment purposes only and not with a view to distribution or resale.    The Buyer understands and agrees that all certificates evidencing any of the Shares will initially bear a legend, prominently stamped or printed thereon, reading substantially as follows:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS.    THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT ANY EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS, OR THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS."

4.5.    Capitalization.    As of the date of this Agreement, the authorized capital stock of the Buyer consists of 2,900,000 shares of common stock, par value $0.001 per share, and 100,000 shares of preferred stock, par value $0.001 per share.    Immediately after the Closing, the Equity Consideration will be duly authorized, validly issued, fully-paid and non-assessable and free and clear of any Liens (other than those incurred by the Shareholders, as set forth in the Stockholders Agreement or as otherwise set forth herein) and will have been issued and transferred free and clear of any preemptive or similar rights.    As of the date of this Agreement, the Buyer does not have any outstanding (i) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for, or to purchase, its capital stock or (ii) any stock appreciation rights or phantom stock or similar plans or rights. As of the date of this Agreement, there are no (x) outstanding obligations of the Buyer (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among the Buyer's stockholders with respect to the voting or transfer of the Buyer's capital stock (other than the Stockholders Agreement).

4.6.    Purpose.    The Buyer was formed solely for the purpose of acquiring, directly or indirectly, the Shares as set forth in this Agreement and consummating the other transactions contemplated by the Transaction Documents.    Since the date of its inception, the

Buyer has not engaged in any activity other than such actions in connection with (a) its organization and (b) the preparation, negotiation and execution of the Transaction Documents and the transactions (including financing transactions) contemplated hereby and thereby.

## ARTICLE V
## Closing Conditions

5.1.    Conditions Precedent to Obligations of the Buyer.  The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing by the Buyer:

(a)    Accuracy of Representations and Warranties; Performance of Covenants.  The representations and warranties of the Group Companies and the Sellers contained in this Agreement (i) that are qualified as to materiality (including Material Adverse Effect) must be true and correct in all respects, and (ii) that are not so qualified must be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period).  Each Group Company and Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing.

(b)    No Material Adverse Effect.  No fact, event or circumstance shall have occurred which has had or could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    No Legal Prohibition.  No Law, judgment, injunction or order shall have been enacted, promulgated, entered or enforced by any court or Government Entity which would prohibit the consummation of the transactions contemplated by this Agreement.

(d)    Consents and Approvals.  Each Group Company and Seller shall have made all filings and shall have obtained all permits, authorizations, consents and approvals required to be obtained by the Group Companies and/or Sellers to consummate the transactions contemplated by this Agreement as set forth on Schedule 2.4(c) and shall have delivered true, complete and correct copies of such to the Buyer.

(e)    UCC-3's; Payoff Letters.  The Buyer shall have received duly executed payoff letters or UCC-3 termination statements and other terminations, pay-offs and/or releases (in each case, in a form reasonably satisfactory to the Buyer) or, at the Buyer's option, assignments, necessary to terminate, release or assign, as the case may be, all Liens on the properties and assets of the Group Companies and evidence of the complete satisfaction in full of all outstanding Indebtedness of the Group Companies.

(f)    Resignations.  Each Group Company shall have received duly executed resignations of its directors and officers (in each case, in a form reasonably satisfactory to the Buyer) and delivered true, complete and correct copies thereof to the Buyer.

(g)    Termination of Affiliate Transactions.    The Buyer shall have received evidence satisfactory to the Buyer of the termination of all Affiliate Transactions other than those set forth on Schedule 2.21(b).

(h)    Non-foreign Affidavit.    Each Seller shall have delivered to the Buyer a non-foreign affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code Section 1445 stating that such Seller is not a "Foreign Person" as defined in Section 1445 of the Code.

(i)    Legal Opinion.    The Buyer shall have received an opinion addressed to the Buyer from Musick Peeler & Garrett LLP, counsel to the Group Companies and the Sellers, dated the Closing Date and in form and substance reasonably satisfactory to the Buyer, which also permits the administrative agent and lenders under the Buyer's (or its Subsidiary's) credit facility to rely on such opinion.

(j)    Stock Pledge Agreements.    Each Shareholder shall have delivered to the Buyer a Stock Pledge Agreement, duly executed by such Shareholder.

(k)    Professional Services Agreement.    Abacus America shall have delivered to Catalyst Investors, L.L.C. the Professional Services Agreement, duly executed by Abacus America.

(l)    Software License Agreement.    Rodopi Software, Inc. and Abacus America shall have duly executed the Software License Agreement.

(m)    Registration Rights Agreement.    The Shareholders shall have duly executed the Registration Rights Agreement.

(n)    Stockholders Agreement.    The Shareholders shall have duly executed the Stockholders Agreement.

(o)    Phoenix Datacenter Lease.    Abacus Phoenix, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Abacus America, and Litmath, LLC shall have duly executed the Phoenix Datacenter Lease.

(p)    Alabanza Litigation.    Abacus America, Cedant, Inc., and the Shareholders shall have duly executed the Alabanza Litigation Assignment Agreement.

(q)    Group Company Deliveries.    The Group Companies shall have delivered to the Buyer at or prior to the Closing:

(i)    good standing certificates with respect to each Group Company from the state of its incorporation (or formation) and each state where it is qualified to conduct business, dated within ten (10) days prior to the Closing Date;

(ii)    certified copies of the resolutions of the shareholders and/or directors of each Company approving the transactions contemplated by this Agreement;

29

(iii)    a certified copy of the certificate of incorporation of each Group Company; and

(iv)    such other documents relating to the transactions contemplated by this Agreement as the Buyer may reasonably request.

5.2.    <u>Conditions Precedent to Obligations of the Sellers</u>.  The obligations of the Sellers under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all the following conditions, any one or more of which may be waived in writing by the Shareholders:

(a)    <u>Accuracy of Representations and Warranties; Performance of Covenants</u>.  Except as expressly contemplated by this Agreement, the representations and warranties of the Buyer contained in this Agreement (i) that are qualified as to materiality must be true and correct in all respects, and (ii) that are not so qualified must be true and correct in all material respects, as of the Closing with the same force and effect as though made on and as of the Closing.  The Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

(b)    <u>No Legal Prohibition</u>.  No Law, judgment, injunction or order shall have been enacted, promulgated, entered or enforced by any court or Government Entity which would prohibit consummation by such party of the transactions contemplated hereby.

(c)    <u>Registration Rights Agreement</u>.  The Buyer and the other parties thereto (other than the Shareholders) shall have duly executed the Registration Rights Agreement.

(d)    <u>Stockholders Agreement</u>.  The Buyer and the other parties thereto (other than the Shareholders) shall have duly executed the Stockholders Agreement.

(e)    <u>Alabanza Litigation</u>.  Abacus America and Cedant, Inc. shall have duly executed the Alabanza Litigation Assignment Agreement.

## ARTICLE VI
## Indemnification

6.1.    <u>Survival of Representations and Warranties</u>.  The representations and warranties in this Agreement shall survive the Closing and until the eighteen (18)-month anniversary of the Closing Date, except that the representations and warranties set forth in Section 2.1 (Organization; Power, Good Standing), Section 2.2 (Capitalization); Section 2.3(c) (Subsidiaries); Section 2.4(a) and (b) (Authorization; Execution & Enforceability); Section 2.11 (Tax Matters); Section 2.15 (Brokerage); Section 2.18 (Employee Benefits); Section 2.21 (Affiliate Transactions); Section 3.1(a) and (b) (Capacity; Execution & Enforceability); Section 3.2 (Title to Shares); Section 3.3 (Brokerage); Section 4.1 (Organization); and Section 4.2(a) and (b) (Authorization; Execution & Enforceability) and Section 4.3 (Brokerage) (collectively, the "Fundamental Representations") shall survive indefinitely; provided, that any representation or warranty in respect of which indemnity may be sought under this ARTICLE

30

VI, and the indemnity with respect thereto, shall, with respect to any claimed inaccuracy or breach, survive the time at which it would otherwise terminate pursuant to this Section 6.1 and until such time it is finally resolved if notice of such inaccuracy or breach thereof giving rise to such right or potential right of indemnity shall have been given to the party against whom such indemnity may be sought prior to such time. The representations and warranties in this Agreement shall survive for the periods set forth in this Section 6.1 and shall in no event be affected by any investigation, inquiry or examination made for or on behalf of any party, or the Knowledge of any party's officers, directors, shareholders, employees or agents, or the acceptance by any party of any certificate or opinion hereunder. The agreements and covenants set forth in this Agreement shall survive indefinitely, unless specifically stated otherwise.

    6.2.   General Indemnification.

    (a)   Indemnification Obligations of the Shareholders. After the Closing, the Shareholders, jointly and severally, shall indemnify the Buyer and its Subsidiaries, and their respective officers, directors, employees, agents, representatives, successors and permitted assigns (other than the Sellers) (collectively, the "Buyer Indemnified Persons") and save and hold each of them harmless against and pay on behalf of or reimburse the Buyer Indemnified Persons as and when incurred for any loss, liability, action, cause of action, cost, damage, Tax or expense, whether or not arising out of Third Party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing and after deducting (1) all insurance proceeds actually received in connection with any of the foregoing, (2) all payments actually received from responsible parties other than the Shareholders, and (3) the adjustments in Buyer's favor pursuant to Section 1.3(c), but only to the extent that the matter to be indemnified was included in such an adjustment) (collectively, "Losses", and each a "Loss"), which any Buyer Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

    (i)   any facts or circumstances which constitute a breach of any representation or warranty of any Group Company or Seller under this Agreement, or in any of the certificates or other instruments or documents furnished by any Group Company or Seller pursuant to this Agreement;

    (ii)   any breach of any covenant, agreement or other provision of this Agreement by any Group Company (but excluding a breach by any Group Company under ARTICLE VII of this Agreement) or Seller;

    (iii)   any Closing Indebtedness or Unpaid Seller Expenses to the extent not previously taken into account in the calculation of the Final Cash Consideration;

    (iv)   any Pre-Closing Taxes pursuant to Section 6.7;

    (v)   any Pending Litigation; or

    (vi)   the Bulgarian Real Property.

31

If and to the extent any provision of this Section 6.2(a) is unenforceable for any reason, each Shareholder hereby agrees to make the maximum contribution to the payment and satisfaction of the Loss for which indemnification is provided for in this Section 6.2(a) which is permissible under applicable Laws. Notwithstanding anything contained herein, in no event shall any Group Company be required to provide indemnification or contribution for any obligation of any Shareholder under this Section 6.2(a).

(b)    Indemnification Obligations of the Buyer. After the Closing, the Buyer shall indemnify each Seller and its Affiliates (other than the Group Companies) (collectively, the "Seller Indemnified Persons") and hold them harmless against and pay on behalf of or reimburse the Seller Indemnified Persons as and when incurred for any Losses which any Seller Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

(i)    any facts or circumstances which constitute a breach of any representation or warranty of the Buyer under this Agreement or in any of the certificates or other instruments or documents furnished by the Buyer pursuant to this Agreement; or

(ii)    any breach of any covenant, agreement or other provision by the Buyer under this Agreement or by any Group Company under ARTICLE VII of this Agreement.

If and to the extent any provision of this Section 6.2(b) is unenforceable for any reason, the Buyer hereby agrees to make the maximum contribution to the payment and satisfaction of the Loss for which indemnification is provided for in this Section 6.2(b) which is permissible under applicable Laws.

6.3.    Limitations on Indemnification; Determination of Loss and Amount. Notwithstanding anything contained in Section 6.2:

(a)    the Shareholders shall not be required to indemnify any Buyer Indemnified Person in respect of any Losses for which indemnity is claimed under Section 6.2(a)(i), and the Buyer shall not be required to indemnify any Seller Indemnified Person in respect of any Losses for which indemnity is claimed under Section 6.2(b)(i), unless and until the aggregate of all such Losses for which indemnification is being sought under Section 6.2(a)(i) or Section 6.2(b)(i), as the case may be, exceeds $300,000 (the "Basket") (and then only for the amount by which such Losses exceed the Basket); provided, that the Basket shall not limit indemnification with respect to Losses relating to breaches of any Fundamental Representation or any facts or circumstances which constitute fraud;

(b)    in no event shall the Shareholders be required to indemnify the Buyer Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(a)(i), and in no event shall the Buyer be required to indemnify the Seller Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(b)(i), in each case for such aggregate Losses in excess of $18,000,000 (the "Cap"); provided, that Losses relating to breaches of any Fundamental Representation or any facts or circumstances which constitute fraud shall neither be applied toward, nor limited by, the Cap;

(c)     in no event shall the Shareholders be required to indemnify the Buyer Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(a)(i) for breaches of Fundamental Representations and under Sections 6.2(a)(iv) and 6.2(a)(v), and in no event shall the Buyer be required to indemnify the Seller Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(b)(i), in each case for such aggregate Losses in excess of the aggregate of the Final Cash Consideration plus the Non-Compete Amount (and also including, with respect to the Shareholders only, the shares of capital stock representing the Equity Consideration as provided in the Stock Pledge Agreement) (the "Maximum Cap"); *provided*, that Losses relating to any facts or circumstances which constitute fraud shall neither be applied toward, nor limited by, the Maximum Cap;

(d)     in the event that policies of insurance maintained by the Buyer or the Group Companies may cover any of the Losses to be indemnified hereunder, the Buyer and/or such Group Company shall use good faith and commercially reasonable efforts to make all proofs of loss and take all other commercially reasonable steps necessary to collect from the applicable insurers for any of the Losses covered by any such insurance; *provided*, that the costs of such collection shall be included in the calculation of Losses hereunder; and

(e)     in view of the limitations on indemnification set forth in this ARTICLE VI, for purposes of determining whether any Loss has occurred, or the amount of such Loss (but not for purposes of determining whether a breach of any representation, warranty or covenant has occurred), the representations, warranties and covenants of the parties set forth in this Agreement (or in any of the certificates or other instruments or documents furnished by any party pursuant to this Agreement) shall be considered without regard to any qualification based on "materiality" or "Material Adverse Effect".

6.4.     Tax Benefit.   If the amount with respect to which any claim is made under this ARTICLE VI (an "Indemnity Claim") gives rise to a Tax Benefit to the party that made the claim, such party shall refund to the Responsible Party the amount of such Tax Benefit when, as and if actually realized; *provided, however*, that such obligation of the Indemnified Party to refund to the Responsible Party the amount of any Tax Benefit shall only apply to the extent that such Tax Benefit is actually realized within two (2) years following the date on which such Indemnity Claim is made.

6.5.     Manner of Payment.   At the sole option of the Buyer, any indemnification of the Buyer Indemnified Persons pursuant to Section 6.2 may be effected by (a) direct recourse against the Shareholders, or (b) offsetting such amount against (i) any unpaid portion of the Non-compete Amount (provided, however, that if it is determined by a court of competent jurisdiction that indemnity was not owed to the applicable Buyer Indemnified Persons by the Shareholders, then the Shareholders shall be entitled to all remedies (including interest at the Applicable Rate) for Buyer's failure to pay any portion of the Non-compete Amount so off-set) or (ii) any indemnification obligation owing to Seller Indemnified Persons pursuant to Section 6.2, or (c) any combination of the foregoing. Other than as set forth in (a) through (c) above, any indemnification owing pursuant to this Section 6.2 shall be effected by wire transfer of immediately available funds to an account designated in writing by the applicable Indemnified Party within fifteen (15) days after the determination thereof (either by agreement of the parties or judgment of a court of competent jurisdiction); *provided*, that if the Shareholders fail to make

33

such payment within such 15-day period, then the Buyer may offset such amount against any Equity Consideration paid to any Shareholder pursuant to this Agreement, which shall be valued at the lesser of (A) the fair market value of such Equity Consideration as of the Closing Date (which shall be the price per share paid at the Closing by the other stockholders of the Buyer) or (B) the fair market value of such Equity Consideration on the date of such offset (as reasonably determined in good faith by the board of directors of the Buyer). Any indemnification payments shall be made together with interest accruing thereon from the date the amount is due and payable by the applicable party, but no earlier than fifteen (15) days after written notice of the indemnification claim is made, to the date of payment at the Applicable Rate. Any party required by this ARTICLE VI to provide indemnification shall be subrogated to each and every claim of the Buyer Indemnified Persons or the Seller Indemnified Persons, as applicable, against Third Parties (i) responsible in whole or in part, directly or indirectly, for the Losses giving rise to the rights to indemnity hereunder, (ii) that owe to the Buyer Indemnified Persons or the Seller Indemnified Persons, as applicable, any obligation of indemnity or reimbursement for such Losses, whether by contract or otherwise, or (iii) that provide insurance which covers such Losses as to which indemnity is owed hereunder.

   6.6.   Third Party Claims.   If any action, lawsuit, proceeding, investigation or other claim (each a "Proceeding") is initiated by any Third Party against any Person entitled to seek indemnification under this ARTICLE VI (an "Indemnified Party"), and if such Indemnified Party intends to seek indemnification with respect thereto under this ARTICLE VI, such Indemnified Party shall promptly, after receipt of written notice of such Proceeding, provide written notice of such Proceeding to the party or parties from whom the Indemnified Party intends to seek indemnification (the "Responsible Party"), which notice shall describe such Proceeding in reasonable detail and the amount thereof (if known and quantifiable); provided, that the failure to so notify a Responsible Party shall not relieve such Responsible Party of its obligations hereunder unless and to the extent the Responsible Party shall be actually and materially prejudiced by such failure to so notify. A Responsible Party shall be entitled to participate in the defense of such Proceeding giving rise to an Indemnified Party's claim for indemnification at such Responsible Party's expense, and at its option (subject to the limitations set forth below) shall be entitled to assume the defense thereof by appointing a reputable counsel reasonably acceptable to the Indemnified Party to be the lead counsel in connection with such defense within thirty (30) days of its receipt of notice of the Proceeding; provided, that prior to the Responsible Party assuming control of such defense, it shall (x) demonstrate to the Indemnified Party in writing such Responsible Party's financial ability to provide full indemnification to the Indemnified Party with respect to such Proceeding (including the ability to post any bond required by the court or adjudicative body before which such Proceeding is taking place), and (y) agree in writing to be fully responsible for all Losses relating to such Proceeding; provided, further, that:

          (a)     the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose;

          (b)     the Responsible Party shall not be entitled to assume control of such defense if (A) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, criminal allegation or investigation, (B) the Indemnified Party reasonably believes an adverse determination with respect to the Proceeding giving rise to

34

such claim for indemnification would be materially detrimental to or materially injure the Indemnified Party's reputation or future business prospects, (C) the Indemnified Party is advised by counsel chosen by it that there are one or more defenses available to the Indemnified Party which the Responsible Party has not or cannot assert on behalf of the Indemnified Party or (D) the Responsible Party failed or is failing to vigorously prosecute or defend such claim;

(c)     if the Responsible Party shall control the defense of any such claim, the Responsible Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of a Proceeding or ceasing to defend such Proceeding if, pursuant to or as a result of such settlement or cessation, injunctive or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly and unconditionally release the Indemnified Party from all Liabilities and obligations with respect to such claim; and

(d)     the Responsible Party may compromise or settle any such claim without the consent of the Indemnified Party if the sole consideration for such compromise or settlement shall be a cash payment or the mutual dismissal of claims, such compromise or settlement effects a full release the Indemnified Party from all Liabilities and obligations with respect to such claim, and the Responsible Party actually makes such cash payment and acknowledges in writing it has no recourse for the same against the Indemnified Party.

6.7.     Indemnification of Pre-Closing Taxes.  Notwithstanding anything to the contrary in this Agreement and without limiting the indemnification obligations of the Shareholders in respect of Taxes in this ARTICLE VI, each Shareholder shall jointly and severally indemnify the Buyer Indemnified Persons and hold them harmless from and against, without duplication, any Losses attributable to (i) Taxes (or the non-payment thereof) of any Group Company for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date, (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Group Company (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation § 1.1502-6 or any analogous or similar state, local, or foreign law or regulation, (iii) Taxes of a Seller arising from the transactions contemplated by this Agreement, and (iv) any and all Taxes of any Person (other than the Group Companies) imposed on any Group Company as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing (all such Taxes in clauses (i), (ii), (iii) and (iv), collectively, "Pre-Closing Taxes").  For the avoidance of doubt, any such Losses attributable to Pre-Closing Taxes shall be reduced by the accrued Taxes attributable to such Losses to the extent such accrued Taxes have been included as a deduction to the Cash Consideration (including as a deduction to Net Working Capital).

6.8.     Waiver.  Each Seller hereby acknowledges and agrees that such Seller (a) shall not make any claim for indemnification hereunder against the Buyer or any Group Company by reason of the fact that such Seller was a shareholder, director, officer, employee or agent of any Group Company or was serving at the request of any Group Company as a partner, trustee, director, officer, employee or agent of another entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses or

35

otherwise) solely with respect to any Proceeding brought by any of the Buyer Indemnified Persons against such Seller or any claim against such Seller in connection with this Agreement and (b) shall have no claims or right to contribution or indemnity from the Buyer or any Group Company with respect to any amounts paid by such Seller pursuant to this ARTICLE VI.

6.9.    Final Cash Consideration Adjustment.  All indemnification payments made under this ARTICLE VI shall be deemed to be an adjustment to the Final Cash Consideration.

## ARTICLE VII
### Post-Closing Covenants and Agreements

Each of the parties hereto agrees as follows with respect to the period after the Closing Date:

7.1.    Tax Matters.

(a)    Tax Periods Ending on or Before the Closing Date.  The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for any Group Company for all periods ending on or prior to the Closing Date which are filed after the Closing Date.  The Buyer shall permit the Shareholders to review and comment on each such Tax Return described in the preceding sentence prior to filing.  The Shareholders shall pay the amount of all Taxes with respect to such periods to the Buyer no later than five (5) days before the date on which Taxes are paid with respect to such periods.  For all income Tax Returns for any Group Company for all periods ending on or prior to the Closing Date which are filed after the date of this Agreement but before the Closing Date, the Sellers and the Companies shall permit the Buyer to review and comment on each such Tax Return before filing and shall pay all Taxes due thereon.

(b)    Tax Periods Beginning Before and Ending After the Closing Date.  The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of any Group Company for taxable periods which begin before the Closing Date and end after the Closing Date.  The Buyer shall permit the Shareholders a period of not less than thirty (30) days to review and comment on each such Tax Return described in the preceding sentence (solely with respect to the portion of such Tax Return relating to the period prior to the Closing Date) prior to filing.  If the Shareholders disagree in any material respect with any such Tax Return (solely with respect to the portion of such Tax Return relating to the period prior to the Closing Date), the Shareholders and the Buyer shall promptly meet (in person or by telephone) and attempt in good faith to resolve their differences, and, if unable to do so, shall refer the dispute to a mutually acceptable independent tax accountant for a binding resolution.  The Shareholders shall pay to the Buyer an amount equal to the portion of such Taxes which relates to the portion of such taxable period ending on the Closing Date no later than five (5) days before the date on which Taxes are paid with respect to such periods.  For purposes of this Section 7.1(b), in the case of any Taxes that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax

36

for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date. Any credits relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the Closing Date. All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Companies.

        (c)    <u>Tax Sharing Agreements</u>. Any tax sharing agreement between the Sellers and any Group Company shall be terminated as of the Closing Date and shall have no further effect for any taxable year (whether the current year, a future year or a past year).

        (d)    <u>Cooperation on Tax Matters</u>.

        (i)    The Buyer and each Group Company, on the one hand, and each Seller on the other, shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this <u>Section 7.1</u> and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention and, upon the other party's request, the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Buyer and each Group Company, on the one hand, and each Seller on the other, agree to retain all books and records with respect to Tax matters pertinent to any Group Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the other party, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

        (ii)    The Buyer and each Seller further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

        (iii)    The Buyer, on the one hand, and each Seller on the other, further agree, upon request, to provide each other party all information that either party may be required to report pursuant to Sections 6043 and 6043A of the Code and all Treasury Regulations promulgated thereunder.

        (iv)    Notwithstanding <u>Section 6.6</u> (relating to Third Party claims), all Tax claims shall be governed by the provisions of this <u>Section 7.1(d)</u> and not by <u>Section 6.6</u>.

        (e)    <u>Certain Taxes</u>. All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by the Shareholders when due, and each Shareholder shall, at its own expense, file all necessary Tax Returns and other documentation

with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, the Group Companies shall, and shall cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

7.2. <u>Continued Employment; Consulting Services</u>. Lilian Vachovsky shall continue to be employed by the Group Companies and, unless and until otherwise requested by the Buyer, shall (i) work exclusively for the Group Companies, (ii) devote her full business time (unless Buyer elects, in its sole discretion, that she shall serve in a part-time capacity) and best efforts to the performance of her duties for the Group Companies, and (iii) generally use her best efforts to promote the success of the business of the Group Companies, for the period beginning on the Closing Date and ending on the 180th day following the Closing or such earlier date as determined by the Buyer in its sole discretion (it being understood that her employment shall terminate upon receipt of written notice from the Buyer of such termination, or upon such later date as is specified in such notice, but not later than the 180th day following the Closing). For up to the first 90 days of such post-Closing employment, Abacus America shall pay to Lilian Vachovsky a monthly salary equal to $10,000 (pro rated for any partial month), and for up to the next 90 days of such post-Closing employment, Abacus America shall pay to Lilian Vachovsky a monthly salary equal to $16,667 (pro rated for any partial month), in all cases, payable in accordance with the relevant Abacus America policies in effect from time to time, including normal payroll practices, and subject to all applicable employment and withholding taxes. Ivan Vachovsky shall provide consulting services to the Group Companies, as requested by the Buyer, for up to 150 hours (which need not be on consecutive business days) without additional compensation, and thereafter up to 100 hours at the discounted rate of $200 per hour, payable by Abacus America. At and after the Closing, Ivan Vachovsky's status shall be that of an independent contractor, and not that of an agent or employee, of the Group Companies. As an independent contractor, he will not be eligible for, nor entitled to, and shall not participate in, any of the health, disability, life insurance or other employee benefit programs of the Group Companies or the Buyer, and no Group Company will obtain workers' compensation insurance for him. The Group Companies and Ivan Vachovsky agree to treat the post-Closing consulting relationship as one of service recipient and independent contractor for all federal, state and local income and wage tax purposes. The Group Companies will not deduct or withhold from any amounts owing from Abacus America to him any federal, state, local or foreign withholding taxes, excise tax, or employment taxes. Ivan Vachovsky shall indemnify the Group Companies and the Buyer for any amounts they are required to pay as a result of the failure to pay any such taxes, together with any interest, penalties and related expenses thereto. Each Seller hereby covenants and agrees that, without the advance consent of the Buyer's board of directors or the Buyer's chief executive officer, such Seller shall not cause any Group Company to incur any expense or to make any payment (other than ordinary course payroll payments to employees).

7.3. <u>Restrictive Covenants</u>.

(a) <u>Non-Solicit</u>. Each Shareholder hereby covenants and agrees that during the period beginning on the date of this Agreement and ending on the later to occur of (x) the second (2nd) anniversary of the Closing Date, and (y) the first (1st) anniversary of the termination of the date on which Ivan Vachovsky ceases to be a director of the Buyer (*provided*, that such date shall not be later than the fifth (5th) anniversary of the Closing Date) (in either case, such period herein referred to as the "Restrictive Period"), such Shareholder shall not,

38

directly or indirectly (other than as specifically agreed to in Section 7.11(a)), (i) induce or attempt to induce any officer, employee, representative or agent of any Group Company or the Buyer or any of their respective Subsidiaries (collectively, the "Restricted Entities") to leave the employ of such Restricted Entity, (ii) hire any person who was an employee of, or a salesperson for, any Restricted Entity at any time during the year prior to the date of this Agreement or, during the Restrictive Period, within the twelve (12) months following the date of termination of such person's employment with such Restricted Entity, (iii) in any other way interfere with the relationship between any Restricted Entity and any employee thereof, or (iv) induce or attempt to induce any customer, supplier, licensee or other business relation of any Restricted Entity to cease doing business with such Restricted Entity, or in any way interfere with the relationship between any Restricted Entity and any customer, supplier, licensee or other business relation thereof (including by inducing or attempting to induce any such person or entity to reduce the amount of business it does with any Restricted Entity).

(b)    Non-Disparagement.  Each Shareholder hereby covenants and agrees that such Shareholder shall not, directly or indirectly, make any public statement or other public communication (whether written or oral) that impugns or attacks the reputation or character of any Restricted Entity, or damages the goodwill of any Restricted Entity.  The Buyer hereby covenants and agrees that it shall not, and shall cause its officers and directors not to, directly or indirectly, make any public statement or other public communication (whether written or oral) that impugns or attacks the reputation or character of any Shareholder.  This Section 7.3(b) shall not prohibit or restrict any Shareholder or Restricted Entity (or its respective attorneys) from responding to any inquiry about this Agreement or its underlying facts and circumstances by the Securities and Exchange Commission, the National Association of Securities Dealers, Inc., any other self-regulatory organization or any Government Entity or through judicial process.

(c)    Non-Compete.  Each Shareholder hereby covenants and agrees that during the Restrictive Period, such Shareholder shall not, directly or indirectly, (i) acquire, finance, own any interest in, manage, control, participate in, consult with, render services for, operate or in any manner engage in a business which is substantially the same as or competitive with any business engaged in by any Group Company as of the date of this Agreement or as of the Closing Date, including web hosting, website design, domain registration and Internet access (collectively, a "Competing Business") or (ii) for the purpose of conducting or engaging in a Competing Business, call upon, solicit, advise or otherwise do, or attempt to do, business with any clients, suppliers, customers or accounts of any Group Company, in each case, anywhere in the world.  Notwithstanding the foregoing, a Shareholder may be a passive owner (which shall not prohibit the exercise of any rights as a shareholder) of not more than 5% of the outstanding stock of any class of any public corporation that engages in a Competing Business.

(d)    Consideration.  In consideration of the covenants and agreements set forth in Section 7.3(a), 7.3(b) and 7.3(c) (collectively, the "Restrictive Covenants"), the Buyer shall pay, or shall cause to be paid, the Non-Compete Amount to the Shareholders (to be allocated fifty percent (50%) to each Shareholder).  The payment to each Shareholder of such Shareholder's portion of the Non-Compete Amount shall be made in two equal installments occurring on December 31, 2007 and December 31, 2008, such payments to be made by wire transfer of immediately available funds to an account designated by such Shareholder by written

39

notice to the Buyer not less than two (2) Business Days prior to such payment; *provided,* that such payments shall be deemed to have been made to the extent that the Buyer exercises its rights under Section 6.5(b)(i); and *provided, further,* that if either Shareholder breaches any of the Restrictive Covenants, then both Shareholders shall be deemed to have forfeited all right, title and interest in and to any such payment and neither the Buyer nor any Group Company shall have any obligation to make any further payments to the Shareholders pursuant to this Section 7.3(d), and shall return to the Buyer any portion of the Non-Compete Amount that the Shareholders have already received pursuant to this Section 7.3(d).

(e)    Acknowledgement.    Each Shareholder acknowledges and agrees that the Restrictive Covenants are reasonable in temporal and geographical scope and in all other respects, and that such covenants have been a material inducement to the Buyer to (i) enter into this Agreement and (ii) to pay such Shareholder the Non-compete Amount pursuant to the terms and conditions of Section 7.3(d).

(f)    Enforcement.    Each of the Buyer and the Shareholders acknowledges and agrees that: (i) if, at the time of enforcement of any Restrictive Covenant a court shall hold that the duration or scope stated herein are unreasonable under circumstances then existing, the Buyer and the Shareholders agree that the maximum duration or scope under such circumstances shall be substituted for the stated duration or scope and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope permitted by law; (ii) in addition to Section 9.14 and not in limitation thereof, if the courts of any one or more of such jurisdictions hold any Restrictive Covenant unenforceable in whole or in part, it is the intention of the Buyer and the Shareholders that such determination shall not bar or in any way adversely affect the rights of any party hereto to equitable relief and remedies hereunder in courts of any other jurisdiction as to breaches or violations of any Restrictive Covenant, such covenants being, for this purpose, severable into diverse and independent covenants; and (iii) in the event of any Shareholder's breach of any Restrictive Covenant, money damages would be inadequate and neither the Group Companies nor the Buyer would have adequate remedy at law and that the Group Companies and the Buyer, in addition and supplementary to other rights and remedies existing in their favor, may apply to any court of law or equity of competent jurisdiction for specific performance, injunctive relief and/or other relief in order to enforce or prevent any violations of such covenants (without posting a bond or other security).  In addition, in the event of a breach or violation of any Restrictive Covenant, the Restrictive Period shall be tolled until such breach or violation has been duly cured.

7.4.    Further Assurances.

(a)    Following the Closing, the Sellers shall execute and deliver such further instruments of conveyance and transfer and take such additional action as the Buyer may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement, including the transfer to the Buyer of the Shares and the conduct by the Group Companies of its business (including with respect to obtaining and maintaining all Licenses and consents necessary or desirable in connection therewith), and the Sellers shall execute such documents as may be necessary to assist the Buyer in preserving or perfecting its rights in the Shares and its ability to conduct the business of the Group Companies.

40

(b)      Following the Closing, the Sellers shall not in any manner take, or cause to be taken any action which is designed or intended to discourage, or could, individually or in the aggregate, reasonably be anticipated to have the effect of discouraging brokers, distributors, customers, suppliers, referral sources, Government Entities, insurance companies, lessors, consultants, salespersons, advisors and other business associates from maintaining the same business relationships with the Group Companies after the date of this Agreement as were maintained with the Group Companies prior to the date of this Agreement.   Following the Closing, each Seller shall refer all customer inquiries with respect to the business of the Group Companies to the Buyer or the Group Companies.

7.5.   Confidentiality.   Following the Closing, the Sellers shall maintain as confidential and shall not use or disclose (except as required by law or as authorized in writing by the Buyer) any information or materials relating to the businesses, operations and affairs of any of the Restricted Entities (including any business plans, practices and procedures, pricing information, sales figures, profit or loss figures, information relating to customers, clients, suppliers, sources of supply and customer lists) that are not already generally available to the public.  In the event any Seller is required by law to disclose any such confidential information, such Seller shall promptly notify the Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyer to obtain a protection order or other confidentiality treatment and disclose only that portion, if any, of the confidential information as is required by law.

7.6.   Release.   As a material inducement to the Buyer to enter into this Agreement, effective as of the Closing, each Seller, solely in such Seller's capacity as a shareholder of the Companies, agrees not to sue and fully releases and discharges each Group Company and each of its respective directors, officers, assigns and successors, past and present (collectively, the "Released Persons"), with respect to and from any and all claims, demands, rights, liens, contracts, covenants, proceedings, causes of action, obligations, debts, and losses of whatever kind or nature in law, equity or otherwise, whether now known or unknown, and whether or not concealed or hidden, all of which such Seller now owns or holds or has at any time owned or held against the Released Persons; *provided, however,* that nothing in this Section 7.6 shall prohibit any Seller from enforcing such Seller's rights under the Transaction Documents.  It is the intention of each Seller that such release be effective as a bar to each and every claim, demand and cause of action hereinabove specified and in furtherance of such intention, each Seller hereby expressly waives, effective as of the Closing, any and all rights and benefits conferred upon him by the provisions of applicable law or regulation and expressly consents that this release will be given full force and effect according to each and all of its express terms and provisions, including those related to unknown and unsuspected claims, demands and causes of action, if any, as those relating to any other claims, demands and causes of action hereinabove specified, but only to the extent such section is applicable to releases such as this.

7.7.   Mercedes Automobile.  The Shareholders shall timely make all monthly payments in accordance with the terms and conditions of the Retail Installment Sale Contract by and between Abacus America, Ivan Vachovsky and W.I. Simonson, dated as of February 15, 2006 for the purchase of that certain 2007 Mercedes S550, VIN WDDNG71X67A022455, and shall pay in full such loan no later than the date that is 60 days following the Closing.  The Buyer

shall make no claim to possession of the Mercedes at any time, unless the Shareholders fail to make any such payments. The Shareholders and the Buyer shall cooperate to transfer title to the Mercedes to the Shareholders as soon as practicable, but in any event no later than upon the payment of all amounts due under the Mercedes Loan Agreement.

7.8.    Certain Computers. · The Shareholders and the Buyer agree to negotiate in good faith for the sale to the Shareholders of the personal computer and the laptop computer currently used by Ivan Vachovsky in the conduct of the business of the Group Companies promptly following the Closing at the residual value of such items; *provided*, that the Shareholders shall, at or prior to the closing of such sale, transfer any files, software or data in any form or medium contained on such computers that are related to any Group Company (and, following such transfer, delete or destroy such files, software or data).

7.9.    Email Transition.  For a period of six (6) months following the Closing Date, the Buyer shall cause Abacus America to set an auto-responder to notify senders of messages to the email accounts identified below of the contact information for the new Chief Executive Officer of Abacus America and the email address of Ivan Vachovsky (which is ivan@ivanv.com).    The email accounts subject to this section are ivan@aplus.net, ivachovsky@aplus.net and ivanv@aplus.net.

7.10.    Transition of Accounts.   Within sixty (60) days following the Closing Date, the Buyer shall cause the Group Companies to either close the accounts listed on Schedule 7.10 or take such actions necessary to cause the termination, without liability to the Shareholders (without in any way limiting the Shareholders' liability under this Agreement), of those certain personal guarantees provided by the Shareholders to secure a Company's performance of such accounts.

7.11.    Certain Transition Services.

(a)    Devstart.  For a period of ninety (90) days following the Closing Date ("Transition Period"), the Buyer shall cause Abacus America, and the Shareholders shall cause DevStart, Inc. ("Devstart") to each negotiate in good faith to reach an agreement, on commercially reasonable terms, with respect to the following matters: (i) the rental by DevStart of 40 dedicated servers which are currently used by DevStart, (ii) the license by DevStart of access to root zones of Abacus America for *domaininformer.com* tools, (iii) the license by Abacus America of Devstart's search engine related tools at *promotionworld.com* and (iv) the license by Abacus America of Devstart's domain tools at *domaininformer.com*.  During the Transition Period, Abacus America shall continue to (1) provide DevStart with the 40 dedicated servers that are currently used by DevStart, (2) sublease the office space currently used by Devstart in Abacus Bulgaria's Sofia, Bulgaria facility (approximately 700 square feet) (the "Bulgaria Facility") at a rate of $1,200 per month, payable monthly in advance and (3) shall continue to grant Devstart access to root zones of Abacus America for *domaininformer.com* tools. During the Transition Period, Devstart shall continue to license to Abacus America, free of charge, (A) Devstart's search engine related tools at *promotionworld.com* and (B) Devstart's domain tools at *domaininformer.com*. At the end of the Transition Period, the Shareholders shall cause Devstart to immediately vacate the Bulgaria Facility.  The parties agree that Devstart may make an offer of employment, and hire, Vladislav Borisov to work at Devstart.

      (b)    <u>Rodopi</u>.   During the Transition Period, Abacus Bulgaria shall continue to sublease the office space currently used by Rodopi Software, Inc. in Abacus Bulgaria's Sofia, Bulgaria facility (approximately 700 square feet) at a rate of $1,200 per month, payable monthly in advance. Until March 31, 2007, Abacus America shall continue to sublease the office space currently used by Rodopi Software, Inc. in Abacus America's Barnes Canyon facility (approximately 3,900 square feet) at a rate of $6,300 per month, payable monthly in advance. At the end of the Transition Period or at March 31, 2007, as applicable, the Shareholders shall cause Rodopi Software, Inc. to immediately vacate such premises.

## ARTICLE VIII
### Definitions

For the purposes hereof, the following terms have the meanings set forth below:

"<u>1933 Act</u>" has the meaning set forth in <u>Section 3.5</u>.

"<u>Abacus America</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Abacus Bulgaria</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Abacus Philippines</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Adverse Consequences</u>" means all Proceedings, hearings, charges, complaints, demands, injunctions, orders, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, Taxes, Liens, lost profits, diminution in value, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise. With respect to an individual, "Affiliate" shall also include any member of such individual's, Family Group. With respect to a trust or similar entity, "Affiliate" shall also include any beneficiary or trustee of such trust or entity.

"<u>Affiliated Group</u>" means any affiliated group as defined in Code §1504 that has filed a consolidated return for U.S. federal income tax purposes (or any consolidated, combined or unitary group under state, local or foreign law) for a period during which any Group Company was a member.

"<u>Affiliate Agreements</u>" has the meaning set forth in <u>Section 2.21(a)</u>.

"<u>Affiliate Transactions</u>" has the meaning set forth in <u>Section 2.21(a)</u>.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement.

"Alabanza Litigation Assignment Agreement" means that certain Assignment of Existing Litigation and Indemnity Agreement, dated as of the Closing Date, by and among Abacus America, Cedant, Inc. and the Shareholders.

"America Common Shares" has the meaning set forth in Section 2.2.

"America Shares" has the meaning set forth in Section 2.2.

"Applicable Rate" has the meaning set forth in Section 1.3(d).

"Basket" has the meaning set forth in Section 6.3(a).

"Bulgaria Facility" has the meaning set forth in Section 7.11(a).

"Bulgarian Lev" means the lawful currency of the Republic of Bulgaria.

"Bulgarian Real Property" has the meaning set forth in Section 2.23(a).

"Business Day" means each day which is not a day on which banking institutions in the city of New York, New York are authorized or obligated by law or executive order to close.

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Buyer Indemnified Persons" has the meaning set forth in Section 6.2(a).

"Cap" has the meaning set forth in Section 6.3(b).

"Cash Consideration" means that amount of cash equal to the sum of (a) $32,900,000 plus (b) the Estimated Net Working Capital Adjustment (which amount may be a negative number), minus (c) the Estimated Closing Indebtedness, minus (d) the Estimated Unpaid Seller Expenses.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

"Closing" has the meaning set forth in Section 1.2(a).

"Closing Adjustment Certificate" has the meaning set forth in Section 1.2(b).

"Closing Date" has the meaning set forth in Section 1.2(a).

"Closing Indebtedness" means, in the aggregate, the Indebtedness of the Group Companies as of immediately prior to the Closing plus the aggregate amount of all payments made or to be made to the holders of options to acquire shares of stock of any Group Company which were outstanding at or prior to the Closing (as set forth on Schedule 2.2).

"Closing Statement" has the meaning set forth in Section 1.3(a).

"COBRA" has the meaning set forth in Section 2.18(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" has the meaning set forth in the preamble to this Agreement.

"Company Affiliate" has the meaning set forth in Section 2.21.

"Company Intellectual Property Rights" means all of the Intellectual Property Rights owned, used or held for use by any Group Company, including all of the Intellectual Property Rights set forth on Schedule 2.13(a).

"Company Software" has the meaning set forth in Section 2.13(f).

"Company Systems" has the meaning set forth in Section 2.13(e).

"Competing Business" has the meaning set forth in Section 7.3(c).

"Devstart" has the meaning set forth in Section 7.11(a).

"Disputed Item" has the meaning set forth in Section 1.3(a).

"Employee Benefit Plans" has the meaning set forth in Section 2.18(a).

"Environmental Laws" means whenever enacted or in effect all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health, safety and pollution or protection of the environment.

"Equity Consideration" means that number of shares of each class of the capital stock of the Buyer equal to ten percent (10%) of the issued and outstanding shares of such class as of immediately after the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 2.18(c).

"Estimated Closing Indebtedness" means the Closing Indebtedness as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Estimated Net Working Capital" means the Net Working Capital as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Estimated Net Working Capital Adjustment" means, to the extent that the Estimated Net Working Capital (a) is greater than zero, then such positive amount, or (ii) is less than zero, then such negative amount.

45

"Estimated Unpaid Seller Expenses" means the Unpaid Seller Expenses as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Family Group" means, with respect to any natural person, such person's spouse, parents and siblings, and each of their respective descendants (whether natural or adopted) and any trust or other entity (including a corporation, partnership or limited liability Companies) formed solely for the benefit of such person and/or such person's spouse, parents, siblings and/or their respective descendants (whether natural or adopted).

"Final Cash Consideration" has the meaning set forth in Section 1.3(b).

"Final Closing Indebtedness" means the Closing Indebtedness as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Final Closing Statement" has the meaning set forth in Section 1.3(a).

"Final Net Working Capital" means the Net Working Capital as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Final Unpaid Seller Expenses" means the Unpaid Seller Expenses as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Financial Statements" has the meaning set forth in Section 2.5.

"Form SLA" has the meaning set forth in Section 2.8.

"Fund II" means Catalyst Investors II, L.P., a Delaware limited partnership and Catalyst Investors QP II, L.P., a Delaware limited partnership.

"Fundamental Representations" has the meaning set forth in Section 6.1.

"GAAP" means United States generally accepted accounting principles consistently applied, as in effect from time to time.

"Group Company" and "Group Companies" means a Company or the Companies, respectively, and their respective Subsidiaries (direct or indirect).

"Government Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over any Group Company.

"Hazardous Substance" means any pollutant, contaminant or other substance for which standards of conduct or Liability may be imposed pursuant to Environmental Laws, and shall include odors, noise, mold, radioactive materials, petroleum, and asbestos.

"Improvements" has the meaning set forth in Section 2.23(c).

"Indebtedness" means at a particular time, without duplication, (i) any obligations under any indebtedness for borrowed money (including all obligations for principal, interest premiums, penalties, fees, expenses, breakage costs and bank overdrafts thereunder), (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any commitment by which a Person assures a financial institution against loss (including contingent reimbursement obligations with respect to letters of credit), (iv) any off-balance sheet financing, including synthetic leases and project financing, (v) all obligations under lease arrangements that are or should be recorded as capital leases of such Person under GAAP, (vi) any payment obligations in respect of banker's acceptances or letters of credit, (vii) any Liability with respect to interest rate swaps, collars, caps and similar hedging obligations, (viii) the present value of post-retirement health care benefit Liabilities, (ix) all obligations for the deferred and unpaid purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice that are not more than ninety (90) days past due), (x) any Outstanding Checks, (xi) any indebtedness referred to in clauses (i) through (x) above of any Person which is either guaranteed by, or secured by a Lien upon any Group Company or any of its assets and (xii) accrued and unpaid interest of any such foregoing obligation.

"Indemnified Party" has the meaning set forth in Section 6.6.

"Indemnity Claim" has the meaning set forth in Section 6.4.

"Independent Auditor" has the meaning set forth in Section 1.3(a).

"Insurance Policies" has the meaning set forth in Section 2.16.

"Intellectual Property Rights" means any and all of the following in any jurisdiction throughout the world: (i) inventions (whether or not patentable or reduced to practice), patents, patent applications and patent disclosures and improvements thereto together with all reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof, (ii) trademarks, service marks, trade dress, trade names, slogans, logos, designs, Internet domain names, corporate names and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof, all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing, (iii) copyrights and works of authorship (including "look and feel"), moral rights and all applications, registrations and renewals in connection therewith, (iv) computer software (including source code, executable code, data, databases and related documentation), (v) all rights of privacy and publicity, including rights to use of the names, likenesses, voices, signatures and biographical information of real persons, (vi) trade secrets and other confidential information (including ideas, know-how, processes, methods, techniques, research and development, drawings, specifications, layouts, designs, formulae, algorithms, compositions, industrial models, architectures, plans, proposals, technical data, financial, business and marketing plans and proposals, customer and supplier lists and price and cost information), (vii) all other intellectual property and proprietary rights, and (viii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

47

"Investment" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interest (including partnership interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" means, with respect to any Person, the actual knowledge of such Person (and if such Person is not an individual, such Person's officers, directors (or other comparable individuals) and senior employees) or the knowledge that such Person would have had after reasonable inquiry and investigation (and if such Person is not an individual, such Person's officers, directors (or other comparable individuals) and senior employees).

"Laws" means all statutes, laws, codes, ordinances, regulations, rules, orders, judgments, writs, injunctions, assessments, awards, acts or decrees of any Government Entity.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by any Group Company including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Group Company.

"Liability" means any liability (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including any liability for Taxes.

"License" means any security clearance, permit, license, variance, franchise, order, approval, consent, certificate, registration, accreditation or other authorization of any Government Entity or Standards Organization, and other similar rights.

"Lien" means any mortgage, pledge, security interest, encumbrance, deed of trust, right-of-way, right of setoff, claim, lien, charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), easement, option, proxy, power-of-attorney, voting agreement, or any restriction on transfer.

"Loss" has the meaning set forth in Section 6.2(a).

"Material Adverse Effect" means a material adverse effect upon (i) the business, operations, prospects, assets, liabilities, condition (financial or otherwise) or operating results of the Group Companies, taken as a whole or (ii) the ability of the Group Companies or the Sellers to consummate the transactions contemplated hereby or perform their respective obligations under the Transaction Documents.

"Material Contracts" has the meaning set forth in Section 2.12(b).

"Maximum Cap" has the meaning set forth in Section 6.3(c).

"Most Recent Balance Sheet" has the meaning set forth in Section 2.5.

48

"Most Recent Balance Sheet Date" has the meaning set forth in Section 2.5.

"Net Working Capital" means, as of immediately prior to the Closing, the (i) current assets of the Group Companies, minus (ii) current liabilities of the Group Companies (including twenty-five percent (25%) of any deferred revenue plus any Taxes that will become due and owing in respect of such deferred revenue), in each case, as determined in accordance with GAAP; provided, that any calculation of Net Working Capital shall be made in accordance with the schedule of line items as set forth on Exhibit B attached hereto.

"Non-Compete Amount" means an amount equal to $2,000,000.

"Notice of Disagreement" has the meaning set forth in Section 1.3(a).

"Owned Real Property" means all land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, owned by any Group Company.

"Outstanding Checks" means the value of all checks issued by the Group Companies and still outstanding as of the Closing Date.

"Pending Litigation" means all of the matters that are required to be listed on Schedule 2.14 (whether or not actually listed).

"Permitted Liens" means (a) Liens for Taxes or assessments and similar charges, which either are (i) not delinquent or (ii) being contested in good faith and by appropriate proceedings, and for which adequate reserves (as determined in accordance with GAAP) have been established on the Group Companies' books with respect thereto, (b) Taxes which are a lien and not yet due and payable, (c) zoning, building and other land use regulations imposed by Government Entities having jurisdiction over the Leased Real Property which are not violated by the current use and operation of the Lease Real Property, (d) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Leased Real Property which do not materially impair the occupancy or use of the Leased Real Property by the Group Companies for the purposes for which it is currently used in connection with the Group Companies' business, (e) as of the date of this Agreement, Liens securing financing of the Companies; provided, that such Liens will not constitute Permitted Liens as of the Closing, (f) carrier's, warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations for work for which payment is not yet due or, if due, that are not overdue by more than thirty (30) days and which in the aggregate could not reasonably be expected to have a Material Adverse Effect or are being contested in good faith, (g) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, (h) Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which adequate reserves in accordance with GAAP, bonds or other security have been provided or are fully covered by insurance without a reservation of rights, and (i) Liens of trade vendors created in connection with Indebtedness that will remain outstanding after the Closing.

49

"Person" means an individual, partnership, corporation, limited liability company, association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Government Entity or any department, agency or political subdivision thereof.

"Phoenix Datacenter Lease" means that certain Lease Agreement, dated as of the Closing Date, by and between Abacus Phoenix, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Abacus America, and Litmath, LLC, an Arizona LLC.

"Phoenix Property" means that land and facility located at 3265 North 27th Street, Phoenix, Arizona.

"Pre-Closing Taxes" has the meaning set forth in Section 6.7.

"Proceeding" has the meaning set forth in Section 6.6.

"Professional Services Agreement" means that certain Professional Services Agreement, dated as of the Closing Date, by and among Abacus America, the Buyer and Catalyst Investors, L.L.C.

"Real Property Leases" has the meaning set forth in Section 2.23(b).

"Released Persons" has the meaning set forth in Section 7.6.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the Closing Date, by and among the Buyer, Fund II and the Shareholders.

"Responsible Party" has the meaning set forth in Section 6.6.

"Restricted Entities" has the meaning set forth in Section 7.3(a).

"Restrictive Covenants" has the meaning set forth in Section 7.3(d).

"Restrictive Period" has the meaning set forth in Section 7.3(a).

"Seller Expenses" has the meaning set forth in Section 9.1.

"Seller Indemnified Persons" has the meaning set forth in Section 6.2(b).

"Sellers" has the meaning set forth in the preamble to this Agreement.

"Shareholders" has the meaning set forth in the preamble to this Agreement.

"Shares" has the meaning set forth in Section 2.2.

"Software License Agreement" means that certain Software License and Support Agreement, dated as of the Closing Date, by and between Abacus America and Rodopi Software, Inc., a California corporation.

"Standards Organization" means any Person responsible for allocation or management of Internet domain names, Internet protocol addresses or similar identifiers on the World Wide Web, including the International Corporation for Assigned Names and Numbers ("ICANN").

"Stock Pledge Agreement" means that certain Stock Pledge Agreement, dated as of the Closing Date, by and among the Buyer and the Shareholders.

"Stockholders Agreement" means that certain Stockholders Agreement, dated as of the Closing Date, by and among the Buyer, Fund II, the Shareholders and certain other stockholders of the Buyer from time to time party to such agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" means (a) federal, state, province, county, local, foreign or other income, gross receipts, ad valorem, franchise, profits, windfall profits, value-added, goods and services, sales or use, transfer, registration, excise, utility, environmental (including taxes under Code Section 59A) communications, real or personal property, capital stock, license, payroll, wage or other withholding, employment, unemployment, disability, social security (or similar), severance, stamp, occupation, alternative or add-on minimum, estimated, customs duties, fees, assessments charges and other taxes of any kind whatsoever, whether disputed or not, (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (a) above, and (c) all amounts described in clauses (a) and (b) above payable as a result of having been a member of a consolidated, combined, affiliated or unitary group.

"Tax Benefit" means, with respect to any party, an amount by which the Tax Liability of such party (or group of Affiliates including such party) is actually reduced (including by deduction, reduction of income by virtue of increased tax basis or otherwise, entitlement to refund, credit or otherwise), net of any increase in such party's Tax Liability, as a result of its receipt of payment for the applicable Indemnity Claim (but in any case, not below zero).

51

"Tax Return" means any return, declaration, report, claim for refund, estimate, information report, return statement or filing relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"Third Party" means any Person other than a party to this Agreement (or an Affiliate thereof).

"Transaction Documents" means, collectively, this Agreement and all other agreements and instruments contemplated by this Agreement (including the Professional Services Agreement, the Stockholders Agreement, the Registration Rights Agreement, the Phoenix Datacenter Lease, and the Alabanza Litigation Assignment Agreement).

"Transition Period" has the meaning set forth in Section 7.11(a).

"Treasury Regulation" means the United States Treasury Regulations promulgated under the Code, and any reference to any particular Treasury Regulation section shall be interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

"Unpaid Seller Expenses" means those Seller Expenses which have not been paid as of immediately prior to the Closing and which are not included in the calculation of Net Working Capital.

"WARN Act" has the meaning set forth in Section 2.17(b).

## ARTICLE IX
### Miscellaneous

9.1.    Fees and Expenses.  The Buyer shall pay all costs and expenses incurred by the Buyer in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby; *provided*, that immediately after the Closing, the Group Companies shall pay (or reimburse the Buyer for) all such costs and expenses incurred by the Buyer.  The Sellers shall pay at or prior to the Closing all costs and expenses incurred by the Sellers or the Group Companies in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby, including any brokerage fees incurred by the Sellers or the Companies (collectively, the "Seller Expenses").

9.2.    Press Release and Announcements.  None of the parties hereto nor any of their respective representatives shall issue any press releases or make any public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the Buyer or the Shareholders, as the case may be.  Notwithstanding the foregoing, any such press release or public announcement may be made if required by applicable Law or a securities exchange rule; *provided*, that the party required to make such press release or public announcement shall, to the extent possible, confer with the other parties concerning the timing and content of such press release or public announcement before the same is made.

9.3.  Remedies.  The indemnity obligations under ARTICLE VI shall be the sole and exclusive remedy for any breach of any representation, warranty or covenant contained in this Agreement, other than for a claim of fraud or willful misconduct and except that nothing in this sentence or in any other provision of this Agreement shall operate to interfere with or impede the operation of the provisions of Section 1.3 with respect to disputes regarding the Cash Consideration or to limit the rights of the parties to seek equitable remedies (including specific performance or injunctive relief, without posting a bond or other security).  Except as otherwise expressly provided above in this Section 9.3, all such rights and remedies shall be cumulative and non-exclusive, and may be exercised singularly or concurrently.  Notwithstanding anything in this Agreement to the contrary, no party shall be liable to any other party to this Agreement for any indirect, special, incidental or consequential damages, including loss of future profit or revenue, loss of use, or cost of capital, or for punitive damages, arising out of or in relation to the performance of this Agreement, whether or not such liability is claimed in contract, tort (including negligence and strict liability), warranty, or any other legal or equitable theory; *provided, however,* that the foregoing exclusion shall not apply to preclude recovery under any indemnity for Third Party claims pursuant to Section 6.2(a) or 6.2(b).  Notwithstanding the foregoing or any other provision of this Agreement, the parties acknowledge that the Buyer determined the consideration it was willing to pay for the Group Companies based on a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) and the Buyer Indemnified Persons shall be entitled to claim Losses under ARTICLE VI based on such multiple if the applicable Loss results in more than a one-time reduction to EBITDA.

9.4.  Consent to Amendments; Waivers.  This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by the Buyer and the Shareholders.  No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

9.5.  Successors and Assigns.  This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except that neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by any Seller without the prior written consent of the Buyer, and neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by the Buyer without the prior written consent of the Shareholders; *provided*, that the Buyer and the Group Companies may assign this Agreement and their rights and obligations hereunder without such prior written consent to any of its Affiliates, any Person which provides financing to the Group Companies, the Buyer or any of their respective Affiliates, and any subsequent purchaser of the Buyer, the Group Companies or any of their respective Affiliates (whether by merger, consolidation, sale of stock, sale of assets or otherwise).

9.6.  Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable law or

.53

rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

9.7.    Counterparts.  This Agreement may be executed in counterparts (including by means of facsimile signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.

9.8.    Descriptive Headings; Interpretation.  The headings and captions used in this Agreement and the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules and Exhibits hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.  The words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation."  The word "if" means "if and only if."  The meanings given to terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.   All references to "dollars" or "$" will be deemed references to the lawful money of the United States of America.

9.9.    Entire Agreement.  This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way, including the Letter of Intent, dated May 12, 2006, by and among Catalyst Investors II, L.P., Ivan Vachovsky, Lilian Vachovsky, APlus.net, Inc., Aviji, Inc., and Abacus Bulgaria.

9.10.    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

9.11.    Schedules and Exhibits.  All Schedules and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

9.12.    Governing Law.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  In furtherance of the foregoing, the internal law of the State of New York shall control the interpretation and construction of this Agreement (and all

54

Schedules and Exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

9.13.  Waiver of Jury Trial.   TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.   EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS SECTION 9.13 CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT.   ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 9.13 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

9.14.  Consent to Jurisdiction.  . Each of the parties hereto submits to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, New York, New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum.  Each of the parties hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in Section 9.15.

9.15.  Notices.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile (if received prior to 5:00 pm (local time of the recipient) on a Business Day (or otherwise on the next Business Day)), three (3) Business Days after being sent to recipient by U.S. First Class mail (postage prepaid), or one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).  Such notices, demands and other communications shall be sent to the Buyer, the Sellers and the Group Companies at the addresses indicated below, or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.  All notices, demands and other communications hereunder may be given by any other means (including electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.

If to the Group Companies (after the Closing) or to the Buyer:

    c/o Catalyst Investors II, L.P.
    711 Fifth Avenue, Suite 402
    New York, NY 10022
    Attn: Ryan McNally
    Facsimile: (212) 319-5771

with a copy (which shall not constitute notice to the Group Companies) to:

    Kirkland & Ellis LLP
    153 East 53rd Street
    New York, NY 10022
    Attn: Michael Brosse, Esq.
    Facsimile: (212) 446-6460

If to the Sellers:

    For U.S. Mail:

    Ivan Vachovsky
    P.O. Box 8274
    San Diego, CA 92067-8274

    For FedEx, UPS and other deliveries (other than U.S. Mail):

    Ivan Vachovsky
    17181 Camino Acampo
    San Diego, CA, 92067

    Facsimile: (707) 922-7201

with a copy (which shall not constitute notice to the Sellers) to:

    Musick, Peeler & Garrett LLP
    225 Broadway, Suite 1900
    San Diego, California 92101
    Attn: Gary L. Wollberg, Esq.
    Facsimile: (619) 231-1234

    9.16.  <u>No Strict Construction</u>.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

*   *   *   *   *

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement on the date first written above.

APLUS HOLDINGS INC.

By: _____
    Name: Tyler Newton
    Title: President and Chief Financial Officer


_____
Ivan Vachovsky


_____
Lilian Vachovsky


ABACUS AMERICA, INC.


By: _____
    Name:
    Title:


ABACUS TRADE LTD.


By: _____
    Name:
    Title:


APLUS.NET PHILIPPINES INC.


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement on the date first written above.

APLUS HOLDINGS INC.

By: _____
Name:
Title:

_____
Ivan Vachovsky

_____
Lilian Vachovsky

ABACUS AMERICA, INC.

By: _____
Name:
Title:

ABACUS TRADE LTD.

By: _____
Name: Lilian Vachovsky
Title: General Manager

APLUSNET PHILIPPINES INC.

By: _____
Name: ERLINDA C. BELTRAN
Title: CHIEF ACCOUNTANT

**EXHIBIT A**

See attached.

## CLOSING ADJUSTMENT CERTIFICATE

Reference is hereby made to that certain Stock Purchase Agreement (the "Agreement"), to be entered into among APLUS Holdings Inc. (the "Buyer"), Ivan Vachovsky, Lilian Vachovsky (collectively, "Sellers"), Abacus America, Inc., a California corporation, Abacus Trade Ltd., and Aplus.net Philippines Inc. Capitalized terms used herein and not defined herein shall have the meanings given to them in the Agreement.

The Sellers hereby certify to the Buyer that the following are our good faith estimates of the following amounts:

(i) Net Working Capital = $6,078,423

(ii) Closing Indebtedness = $3,156,227

(iii) Unpaid Seller Expenses = $1,000,000


_____
Ivan Vachovsky


_____
Lilian Vachovsky

**EXHIBIT B**

See attached.

# *Exhibit B*

Working Capital Adjustment

**Current Assets**
Cash (Unrestricted and Restricted)
Marketable Securities
Shareholder Loan Receivable
Accounts Receivable
Accounts Receivable - Rodopi (fixed)                    $    100,000.00
Inventory
Prepaid Expenses
Other Current Assets
    Total Current Assets

**Current Liabilities**
Accounts Payable / Payroll Liabilities
Accrued Expenses
Deferred Revenue (25% of GAAP balance)
Short Term Notes Payable
Other Current Liabilities
    Total Current Liabilities

    Total Working Capital

**EXHIBIT C**

See attached.

 SERVICE LEVEL AGREEMENT

# Service Level Agreement

**Abacus America, Inc. ("Aplus.Net") is committed to providing reliable, high quality services to its customers. We currently host over 4,000 servers, and hence, network uptime and server availability are of the highest importance to us. The following service levels are designed to assure Aplus.Net customers of ultimate server performance and the maximal uptime of servers hosted.**

**1. Server Hardware Replacement.** Aplus.Net guarantees that all Server Hardware will function properly for the lifetime of the server. We will replace any failed component at zero cost to the Customer within one (1) hour of receipt of the Customer's service ticket and identification of the problem. The following computer hardware is considered "Server Hardware": Processor(s), RAM, hard disk(s), motherboard, NIC card, Power Supply. The Customer will receive 5% off his/her monthly bill for every hour following the first hour that the server is not functioning due to hardware failure. See Remedies section below.

**2. Power and HVAC Availability.** We guarantee that our power and HVAC systems will be available 100% of the time in a given month, excluding Maintenance, as defined below. If these systems do not function properly the Customer is entitled to a Facilities Failure refund. "Facilities Failure" is defined as: (a) the Aplus.Net power or HVAC systems were not available (b) the Customer submits an Aplus.Net trouble ticket detailing the unavailability of the Aplus.Net power or HVAC systems resulting in Customer downtime.

**3. 100% Network Uptime.** Aplus.Net guarantees that the Aplus.Net network will be functioning and available 100% of the time, excluding Maintenance (defined below). If that is not the case, the Customer is entitled to a Network Downtime refund. "Network Downtime" is defined as the inability to send and/or receive data due to a failure of network equipment managed and owned by Aplus.Net.

**4. Server Delivery.** We guarantee your server will be up within 24 hours of receipt of signed paperwork. For every hour we are late we will refund 5% of the monthly fee - up to 100% off. The guarantee is valid only for our Standard, Premium, and Standard AMD server plans. Guarantee is not valid for any custom server configurations. By 'server up' we mean the server will be setup in our data center, connected to the Internet, and have an Operating System and Control Panel of your choice. The guarantee does not include installation of any custom software applications.

**5. Remedies.** In the event that the Customer experiences downtime due to failure of Server Hardware or Facilities Failure or Network Downtime as described herein, provided the Customer follows the procedures described in this document, Aplus.Net will apply a Credit to that Customer's account. For each hour (or portion thereof) of downtime, the Customer will receive 5% off the server monthly fee (SMF) he/she is paying for the affected server. SMF is the standard monthly fee for the hosting of a given server. It does not include the amount paid for add-on services/hardware such as additional RAM, HDD etc.

**6. Procedures to claim credit.** In order to claim Credits, the Customer must open an Aplus.Net trouble ticket. All downtimes will be measured from the time the ticket is received and validated by Aplus.Net technicians to the time Aplus.Net, in its sole discretion, is able to resolve the issue. A Customer may not receive more than one (1) Credit per incident and in no event will a Customer receive greater than 100% discount off the monthly fee.

Credit will be issued only to accounts that are in good standing. No Credit will be applied to accounts that are past-due or for accounts that are cancelled before the conditions for payment of the Credit are met. Upon cancellation of the Customer's account, any outstanding or previously accrued Credits will be forfeited. Credits will be applied against purchases or renewals for which payment is due after the date the credit is applied. Credits will not be applied against past due balances.

# -aplus.net          SERVICE LEVEL AGREEMENT

**7. Exceptions.** Customer shall not be entitled to any Credit if downtime is caused by:

    i.   The actions of the Customer or other persons authorized by the Customer to use the Service;

    ii.   Failure of systems, network equipment, power, facilities, or connections not provided and/or owned by Aplus.Net;

    iii.   The failure of Third Party Service to the Aplus.Net's network;

    iv.   Application, software, or operating system failure;

    v.   The result of network maintenance activity (see Maintenance section below);

    vi.   Denial of Service attack, hacker activity, or other malicious event targeting Aplus.Net or an Aplus.Net Customer;

    vii.   Failure of any Network or Internet Infrastructure not owned or managed by Aplus.Net. Server Hardware Replacement guarantee does not include the time required to perform data restores and backups, if applicable.

**8. Maintenance.** "Maintenance" is defined as Scheduled Maintenance or Emergency Maintenance.

"Scheduled Maintenance" is defined as any maintenance in the Apus.Net data center (a) of which the customer is notified at least 24 hours beforehand, or (b) that is performed during Aplus.Net's standard maintenance hours.

"Emergency Maintenance" is defined as any maintenance in the Aplus.Net data center that: (a) in Aplus.Net sole discretion, is necessary to avoid an immediate threat to the Aplus.Net's data center or the Customer's server and (b) of which the Customer is notified. Any Emergency Maintenance in excess of 2 hours per event will count as Network Downtime.

This Service Level Agreement and all Aplus.Net Services are subject to the Aplus.Net Terms of Service.