UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

APLUS HOLDINGS INC.,

                  Plaintiff-
                  Counterclaim Defendant,

          - against -

IVAN VACHOVSKY and
LILIAN VACHOVSKY,

                  Defendants-
                  Counterclaim Plaintiffs.

08cv2760(MGC)(DFE)

**AMENDED ANSWER
AND COUNTERCLAIM**

      Defendants Ivan Vachovsky and Lilian Vachovsky ("Defendants"), by and

through their undersigned counsel, Markowitz & Chattoraj LLP, submit the following

Amended Answer and Counterclaim to the March 14, 2008 Complaint of Plaintiff Aplus

Holdings Inc. ("APLUS" or "Plaintiff").

## <u>NATURE OF THE CASE</u>

      1.     In response to the allegations contained in Paragraph 1 of the Complaint,

Defendants admit that Plaintiff purports to bring this action on the basis of Defendants'

alleged breach of certain warranties and representations in their agreement with Plaintiff,

the Stock Purchase Agreement ("SPA"), for the stock purchase and sale of their company

to Plaintiff for cash consideration plus APLUS stock. Defendants deny the remainder of

the allegations in Paragraph 1 of the Complaint, and aver that Plaintiff, an entity whose

majority owner is Catalyst Investors, a New York equity fund, brings this meritless action

not as a result of any breach by Defendants, but rather as a means to try to delay or avoid

payment to Defendants of $2 million that Plaintiff owes to Defendants under the SPA.

      2.     Defendants deny the allegations contained in Paragraph 2 of the

Complaint except, with respect to those allegations contained in Paragraph 2 of the

Complaint that concern the contents, meaning and/or implications of the SPA, state that these constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

3.     Defendants deny the allegations contained in Paragraph 3 of the Complaint and aver that, even if the factual allegations in the Complaint are taken as true and at face value, Plaintiff has not even remotely come close to incurring losses in excess of $5,100,000.00.

4.     Defendants deny the allegations contained in Paragraph 4 of the Complaint.

**THE PARTIES**

5.     Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.     Defendants deny upon information and belief the allegations contained in Paragraph 6 of the Complaint except admit that APLUS is a Delaware corporation.

7.     Defendants admit the allegations contained in Paragraph 7 of the Complaint except, with respect to those allegations contained in Paragraph 7 of the Complaint that concern the contents, meaning and/or implications of the SPA, state that these constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

8.     Defendants admit the allegations contained in Paragraph 8 of the Complaint.

**JURISDICTION AND VENUE**

9.      The allegations contained in Paragraph 9 of the Complaint constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants admit the allegations contained in Paragraph 9 of the Complaint, and aver that regardless of the amount in controversy, Plaintiff is not entitled to relief of any kind.

10.      The allegations contained in Paragraph 10 of the Complaint constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants admit the allegations contained in Paragraph 10 of the Complaint, and respectfully refer the Court to Section 9.14 of the SPA for the contents thereof.

**BACKGROUND**

11.      In response to the allegations contained in Paragraph 11 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof and further state that, while Plaintiff purports to attach a copy of the SPA as Exhibit A to the Complaint, the attached copy of the SPA does not contain any of the SPA's various schedules, attachments and statements.

12.      In response to the allegations contained in Paragraph 12 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

13.    Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of the Complaint except, with respect to those allegations contained in Paragraph 13 of the Complaint that concern the contents, meaning and/or implications of the SPA, state that these constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

14.    Defendants deny the allegations contained in Paragraph 14 of the Complaint.

15.    Defendants deny the allegations contained in Paragraph 15 of the Complaint.

16.    In response to the allegations contained in Paragraph 16 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

17.    Defendants deny the allegations contained in Paragraph 17 of the Complaint and further state that the last sentence of Section 9.3 of the SPA reads in part that "the Buyer determined the consideration it was willing to pay for the Group Companies based on a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) and the Buyer Indemnified Persons shall be entitled to claim Losses under ARTICLE VI based on such multiple if the Applicable Loss results in more than a one-time reduction to EBITDA," which Defendants expressly deny occurred here.

18.    In response to the allegations contained in Paragraph 18 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

19.    In response to the allegations contained in Paragraph 19 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

20.    Defendants deny the allegations contained in Paragraph 20 of the Complaint.

21.    Defendants deny the allegations contained in Paragraph 21 of the Complaint.

22.    In response to the allegations contained in Paragraph 22 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.  Defendants further state that, in light of the quotation in Paragraph 22 of the Complaint of a section of the SPA referencing "Financial Statements," it is notable that Plaintiff attaches a copy of the SPA as Exhibit A to the Complaint that does not contain any of the SPA's various schedules, attachments and statements.

23.    In response to the allegations contained in Paragraph 23 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.  Defendants further state that, in light of the quotation in Paragraph 23 of the Complaint of a section of the SPA referencing "the Most Recent Balance Sheet," it is notable that Plaintiff attaches a copy of the SPA as Exhibit A to the Complaint that does not contain any of the SPA's various schedules, attachments and statements.

24.    Defendants deny the allegations contained in Paragraph 24 of the Complaint.

25.    In response to the allegations contained in Paragraph 25 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

26.    Defendants deny the allegations contained in Paragraph 26 of the Complaint.

27.    Defendants deny the allegations contained in Paragraph 27 of the Complaint.

28.    Defendants deny knowledge of the allegations contained in Paragraph 28 of the Complaint.

29.    Defendants deny the allegations contained in Paragraph 29 of the Complaint except deny knowledge or information sufficient to form a belief as to the

truth or falsity of when Plaintiff "discovered" the alleged use of "unlicensed copies of images owned by Getty Images."

30.     In response to the allegations contained in Paragraph 30 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

31.     In response to the allegations contained in Paragraph 31 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

32.     In response to the allegations of Paragraph 32 of the Complaint, Defendants state that, to the extent these allegations concern the contents, meaning, and/or implications of the SPA, they constitute a legal conclusion to which no response is required and Defendants respectfully refer the Court to the SPA for the contents thereof but state that, to the extent these allegations concerns the incurrence of "legal fees and settlement costs" as well as "future costs" in relation to two unspecified lawsuits, Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the contents of those allegations.

33.     Defendants deny the allegations contained in Paragraph 33 of the Complaint except deny knowledge or information sufficient to form a belief as to whether there have been "a number of cases filed against Abacus America in small

claims courts in various jurisdictions and in the Better Business Bureau relating to pre-closing events [that] were not disclosed in the SPA" and when Plaintiff may have "discovered" the existence of such cases.

34.     In response to the allegations contained in Paragraph 34 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

35.     Defendants deny the allegations contained in Paragraph 35 of the Complaint.

36.     In response to the allegations contained in Paragraph 36 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

37.     Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38.     Defendants deny the allegations contained in Paragraph 38 of the Complaint.

39.     Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40.     In response to the allegations contained in Paragraph 40 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications

of the SPA and constitute a legal conclusion to which no response is required, but to the

extent a response is required, Defendants respectfully refer the Court to the SPA for the

contents thereof.

    41.    Defendants deny the allegations contained in Paragraph 41 of the

Complaint.

    42.    In response to the allegations contained in the first sentence of Paragraph

42 of the Complaint, Defendants state that these allegations concern the contents,

meaning, and/or implications of the SPA and constitute a legal conclusion to which no

response is required, but to the extent a response is required, Defendants respectfully

refer the Court to the SPA for the contents thereof.

    43.    Defendants deny the allegations contained in Paragraph 43 of the

Complaint.

    44.    In response to the allegations contained in Paragraph 44 of the Complaint,

Defendants state that these allegations concern the contents, meaning, and/or implications

of the SPA and constitute a legal conclusion to which no response is required, but to the

extent a response is required, Defendants respectfully refer the Court to the SPA for the

contents thereof, further state that Defendants provided a Working Capital Statement

pursuant to the SPA that was truthful and correct, and note that Plaintiff attaches a copy

of the SPA as Exhibit A to the Complaint that does not contain any of the SPA's various

schedules, attachments and statements.

    45.    Defendants deny the allegations contained in Paragraph 45 of the

Complaint.

46.     Defendants deny the allegations contained in Paragraph 46 of the Complaint.

47.     Defendants deny the allegations contained in Paragraph 47 of the Complaint, except Defendants admit that APLUS sent letters to Defendants on or about the referenced dates purporting to demand monies from Defendants in alleged reliance on certain provisions of the SPA and Defendants have not acceded to Plaintiff's demands because, among other things, Defendants have not breached the SPA, Plaintiff has not suffered losses due to any purported breach of the SPA by Defendants, and Plaintiff is not entitled or due under any law or contract to indemnification from Defendants.

48.     Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49.     In response to the allegations contained in Paragraph 49 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

50.     In response to the allegations contained in Paragraph 50 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

## CAUSES OF ACTION

51.    In response to Paragraph 51 of the Complaint, Defendants incorporate by reference their responses to the allegations contained in the above paragraphs.

52.    Defendants admit the allegations contained in Paragraph 52 of the Complaint.

53.    In response to the allegations contained in Paragraph 53 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

54.    Defendants deny the allegations contained in Paragraph 54 of the Complaint.

55.    Defendants deny the allegations contained in Paragraph 55 of the Complaint.

56.    Defendants deny the allegations contained in Paragraph 56 of the Complaint.

57.    Defendants deny the allegations contained in Paragraph 57 of the Complaint.

58.    In response to Paragraph 58 of the Complaint, Defendants incorporate by reference their responses to the allegations contained in the above paragraphs.

59.    In response to the allegations contained in Paragraph 59 of the Complaint, Defendants state that these allegations concern the contents, meaning, and/or implications of the SPA and constitute a legal conclusion to which no response is required, but to the

extent a response is required, Defendants respectfully refer the Court to the SPA for the contents thereof.

60.     Defendants deny the allegations contained in Paragraph 60 of the Complaint, except Defendants admit that APLUS sent letters to Defendants purporting to demand monies from Defendants in alleged reliance on certain provisions of the SPA.

61.     Defendants deny the allegations contained in Paragraph 61 of the Complaint, except Defendants admit that APLUS sent letters to Defendants purporting to demand monies from Defendants in alleged reliance on certain provisions of the SPA, and Defendants have not acceded to Plaintiff's demands.

62.     Defendants deny the allegations contained in Paragraph 62 of the Complaint.

63.     In response to Paragraph 63 of the Complaint, Defendants incorporate by reference their responses to the allegations contained in the above paragraphs.

64.     Defendants deny the allegations contained in Paragraph 64 of the Complaint.

65.     Defendants deny the allegations contained in Paragraph 65 of the Complaint.

66.     Defendants deny the allegations contained in Paragraph 66 of the Complaint.

67.     Defendants deny the allegations contained in Paragraph 67 of the Complaint.

68.     Defendants deny the allegations contained in Paragraph 68 of the Complaint.

## AFFIRMATIVE DEFENSES

Without admitting any of the allegations of Plaintiff's Complaint, Defendants hereby assert the following defenses.

### FIRST AFFIRMATIVE DEFENSE

69.    Plaintiff's Complaint fails to state a claim against Defendants upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

70.    Plaintiff's claims are off-set, in whole or in part, by Defendants' claims against Plaintiff, as set forth below.

### THIRD AFFIRMATIVE DEFENSE

71.    Some or all of Plaintiff's claims are barred by the "Basket" amount set forth in Section 6.3(a) of the SPA.

### FOURTH AFFIRMATIVE DEFENSE

72.    Plaintiff's claims are barred, in whole or in part, by Plaintiff's own failure to exercise due diligence prior to entering into the SPA.

### FIFTH AFFIRMATIVE DEFENSE

73.    Some or all of Plaintiff's claims are barred because such claims are *de minimis* and/or are not material.

74.    In the alternative, some or all of Plaintiff's claims are barred because the alleged misrepresentations by Defendants in connection with the SPA were *de minimis* and/or were not material.

### SIXTH AFFIRMATIVE DEFENSE

75.    Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel, waiver, acquiescence, or ratification.

## SEVENTH AFFIRMATIVE DEFENSE

76.     Plaintiff's alleged losses, in whole or in part, were proximately caused by Plaintiff's own acts and omissions.

## EIGHTH AFFIRMATIVE DEFENSE

77.     Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate its alleged losses.

## NINTH AFFIRMATIVE DEFENSE

78.     Some or all of Plaintiff's alleged claims are barred by the definition of "Loss" in the SPA, which bars recovery for alleged future lost profits and for injuries not actually incurred.

## TENTH AFFIRMATIVE DEFENSE

79.     Some or all of Plaintiff's alleged claims are unripe, and Plaintiff has not suffered an injury in fact.

## ELEVENTH AFFIRMATIVE DEFENSE

80.     Plaintiff's First and Third Claims for Relief are barred by Section 9.3 of the SPA, which provides that indemnification is the sole and exclusive means by which Plaintiff can seek to recover for the alleged losses.

## TWELFTH AFFIRMATIVE DEFENSE

81.     Plaintiff's Third Claim for Relief is barred because an express contract governs the relations between the parties.

## THIRTEENTH AFFIRMATIVE DEFENSE

82.     Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## FOURTEENTH AFFIRMATIVE DEFENSE

83.    Plaintiff's claims are barred, in whole or in part, because, to the extent any information was not disclosed in the Schedules to the SPA, Plaintiff was actually or constructively on notice of such information pursuant to the "bespeaks caution" doctrine or other similar doctrines of constructive notice.

## FIFTEENTH AFFIRMATIVE DEFENSE

84.    Plaintiff's claims are barred, in whole or in part, because the tax treatment, license fees, and other information known to Defendants and provided to Plaintiff in connection with the SPA was formulated, approved and/or provided to Defendants by professional auditors and accountants upon whom Defendants were entitled to rely.

## SIXTEENTH AFFIRMATIVE DEFENSE

85.    Plaintiff's claims are barred, in whole or in part, because Plaintiff itself acted to frustrate the purpose of the underlying agreement, preventing Defendants from effectuating the agreement and reaping the benefit of their bargain.

## SEVENTEENTH AFFIRMATIVE DEFENSE

86.    Plaintiff's claims are barred, in whole or in part, by relevant contractual limitations periods.

## EIGHTEENTH AFFIRMATIVE DEFENSE

87.    Plaintiff's claims are barred, in whole or in part, by Plaintiff's own failure to perform under the relevant agreements.

## NINETEENTH AFFIRMATIVE DEFENSE

88.    Final audited financial statements demonstrate that the company's earnings were higher than reflected in the financial statements incorporated into the SPA.

89.    As a result, Plaintiffs were able to purchase the company at a substantially lower price, and Defendants received reduced proceeds from the sale.

90.    Plaintiff's claims are barred, in whole or in part, or set off, in the amount of Plaintiff's underpayment for the company under the SPA.

### TWENTIETH AFFIRMATIVE DEFENSE

91.    To the extent Plaintiff's claims rely on allegations of oral representations or misrepresentations, such claims are barred, in whole or in part, by the applicable statute of frauds.

### COUNTERCLAIM

Defendants-Counterclaim Plaintiffs Ivan Vachovsky ("Ivan") and Lilian Vachovsky ("Lilian") (collectively with Ivan, the "Vachovskys"), by and through their undersigned counsel, Markowitz & Chattoraj LLP, as and for their Counterclaim against Plaintiff-Counterclaim Defendant APLUS Holdings Inc. ("APLUS"), allege as follows:

1.    On or about July 25, 2006, the Vachovskys sold their Internet web hosting and management company, Abacus America, Inc., d/b/a Aplus.Net ("Abacus America"), along with two other companies they owned, to a holding entity, APLUS, whose parent corporations are Catalyst Investors QP II, L.P. and Catalyst Investors II, L.P. (collectively "Catalyst").  Catalyst is a New York equity fund, and APLUS is the holding company created by Catalyst for the purchase and operations of these companies.  Since the sale by the Vachovskys, APLUS has been run by Catalyst and its handpicked Chief Executive Officer ("CEO"), Gabriel Murphy.

2.    The new management and ownership at APLUS files this lawsuit against the Vachovskys demanding more than five million dollars from the Vachovskys on the purported basis that the Vachovskys somehow breached warranties and representations in

the sale agreement.  This lawsuit enables APLUS to claim that the non-compete amounts it owes the Vachovskys under the purchase agreement are more than offset by "losses" purportedly caused by the Vachovskys' so-called "breaches" of their warranties and representations under the agreement.

3.     As the Vachovskys set forth above in their Amended Answer to the Complaint and now explain further below, however, APLUS's contentions suffer from a fatal flaw:  they are baseless and without merit because, among other things, APLUS suffered no losses as a result of any of the Vachovskys purported breaches of warranties and representations.

4.     Accordingly, the Vachovskys file this counterclaim to recover the monies they are properly owed under the Stock Purchase Agreement (the "SPA""), a true and correct copy of which (including its schedules and exhibits) is annexed hereto as Exhibit A.

## JURISDICTION

5.     This Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367(a), because the claims set forth herein are so related to the claims set forth in the Complaint that they form part of the same case or controversy.

## RELEVANT FACTS

### Background

6.     Ivan and Lilian Vachovsky founded their first company in Bulgaria in 1990.  Recognizing the entrepreneurial opportunities created by the fall of Communism and needing to feed their family at a time when jobs were hard to find in Bulgaria, the Vachovskys founded a company specializing in the repair, resale and assembly of

17

electronic goods and eventually computers.  This company ultimately became Abacus

Trade Ltd. ("Abacus Bulgaria").  Like many entrepreneurs before them, the Vachovskys

chose to start this business based on what they already knew; Ivan Vachovsky has a

master's degree in electronics and a Ph.D in applied mathematics, and Lilian Vachovsky,

Ivan's wife, has a master's degree in computer science.

      7.     After investing several years of effort in their new company, the

Vachovskys realized the Bulgarian market presented limited opportunities because, if

nothing else, Bulgaria's total population numbered only approximately seven million.

The Vachovskys decided to move to the United States in order to pursue the American

dream.  Thus, in 1992, Ivan Vachovsky came to the United States and founded Abacus

America, a California corporation.  Lilian Vachovsky followed in 1993.

      8.     In 1996, several years after their move to the United States, the

Vachovskys decided to have their company move into the fledgling Internet services and

website hosting market.  It was at this time that Abacus America began operating under

the d/b/a of "Aplus.Net."

      9.     Over the following 10 years, by working twelve-hour days, seven days a

week, and by devoting their energy and attention to every last detail of the company's

operations, the Vachovskys were able to build their business into a company grossing

over $24 million in annual gross revenues.  During that time, the Vachovskys took few if

any vacations, and worked around the clock.  In addition to working, the Vachovskys

raised their two teenage sons and, in 1995, added twin baby daughters to their family.

Notably, thirty days after delivering her twin girls, Lilian Vachovsky was back at work

running the operations of the company full-time.

10.    In early 2006, a private equity firm called Catalyst Investors approached the Vachovskys about purchasing Abacus America, Abacus Bulgaria and the Vachovskys' Philippines operations known as Aplus.Net Philippines Inc. ("Abacus Philippines").  After extensive negotiations, and the examination by Catalyst and its investor bankers, accountants, and attorneys of Abacus's books and records as well as visits by Catalyst and its advisors to Abacus Bulgaria and Abacus America's San Diego facilities (but not to Abacus America's brand new Phoenix data center), Catalyst agreed to buy the Abacus entities from the Vachovskys in a transaction that valued the company at approximately $36,000,000.

**The Non-Compete Payment**

11.    The Stock Purchase Agreement ("SPA") governs the obligations of the parties to each other with respect to the sale of Vachovskys' businesses to APLUS.  As a result, the SPA is critical to this action; likewise, the extensive disclosures contained in the Schedules attached to the SPA, which APLUS chose not to include with the Complaint, are directly relevant to the claims in this case.  As mentioned above, a true and correct copy of the July 25, 2006 SPA, this time with schedules attached, is attached hereto as Exhibit A.

12.    Under Section 7.3 of the SPA, Ivan and Lilian Vachovsky agreed not to disparage, compete with, or solicit the clients or employees of, APLUS for a period of years after their sale of the company.  The Vachovskys have complied and are continuing to comply with the terms of these negative covenants; in so doing, the Vachovskys have rendered and are continuing to render performance for this provision of their bargain and

agreement.  Notably, nowhere, not in the Complaint nor in any communication with the Vachovskys, does APLUS contend otherwise.

13.    In express consideration for these negative covenants, the SPA provided as follows:

> In consideration of the covenants and agreements set forth in Section 7.3(a), 7.3(b) and 7.3(c) (collectively, the "Restrictive Covenants"), the Buyer shall pay, or shall cause to be paid, the Non-Compete Amount to the Shareholders (to be allocated fifty percent (50%) to each Shareholder). The payment to each Shareholder of such Shareholder's portion of the Non-Compete Amount shall be made in two equal installments occurring on December 31, 2007 and December 31, 2008, such payments to be made by wire transfer of immediately available funds to an account designated by such Shareholder by written 39 notice to the Buyer not less than two (2) Business Days prior to such payment; *provided,* that such payments shall be deemed to have been made to the extent that the Buyer exercises its rights under Section 6.5(b)(i); and *provided, further,* that if either Shareholder breaches any of the Restrictive Covenants, then both Shareholders shall be deemed to have forfeited all right, title and interest in and to any such payment.  (SPA § 7.3(d).)

14.    The SPA defines the "Non-Compete Amount" to mean "an amount equal to $2,000,000." SPA Art. VIII, at 49.  This provision, which enables APLUS to offset its obligation to pay the Vachovsky's the Non-Compete Amount with its rights to invoke indemnification, provides APLUS with the loophole it needs and forms the true basis of this lawsuit.

**Plaintiff's Pretextual Claims**

15.    The Vachovskys have performed and are continuing to perform all their duties under the SPA.

16.    Based on its absurd claims for "indemnification," APLUS purports to offset its long standing obligation to pay the Vachovskys the two installments of the Non-

Compete Amount, based on a series of patently absurd claims.

17.    Although the Complaint is tellingly devoid of detail, APLUS sent two letters to the Vachovskys, the first on December 17, 2007 and the second on January 24, 2008, which purported to notify the Vachovskys of APLUS "indemnification" claims. A true and correct copy of APLUS's letter to Ivan Vachovsky, dated December 17, 2007, is attached hereto as Exhibit B.  A true and correct copy of APLUS's second letter to Ivan Vachovsky, dated January 24, 2008, is attached hereto as Exhibit C.

18.    Even cursory review of the Complaint and the two letters demonstrate that the supposed losses purportedly caused by the misrepresentations alleged in the Complaint either admittedly have not occurred or resulted from a cause other than any alleged misrepresentation by the Vachovskys.  For example, the Complaint alleges (¶¶ 18-21) that the company failed to pay certain Bulgarian taxes before the closing of the transaction and "may incur future losses" from such alleged nonpayment.  But as the Complaint suggests by its allegation that APLUS "*may* incur future losses" and as the December 17, 2007 letter make clear, APLUS has suffered no losses whatsoever from such allegedly unpaid taxes.  No Bulgarian authority has imposed any additional tax liability on the company.

**Plaintiff's Anticipatory Breach and Repudiation of the SPA**

19.    In the letters attached hereto as Exhibits B and C, APLUS informed the Vachovskys that it did not intend to pay them the first installment of the Non-Compete Amount, which was due to be paid on December 31, 2007.  APLUS claimed that the Non-Compete Amount was offset by the alleged "losses" set forth in the letters (and now, in the Complaint).  Indeed, APLUS claimed, and continues to allege in the Complaint,

that the Vachovskys owe Plaintiff over $5 million as "indemnification" for APLUS's

bogus "losses."

20.     By notifying the Vachovskys that it did not intend to pay the first half of

the Non-Compete Amount, due on December 31, 2007, and by claiming that, instead, the

Vachovskys owed APLUS over $5 million in "indemnification," APLUS anticipatorily

breached and repudiated its agreement with the Vachovskys.

## CAUSE OF ACTION
(Breach of Contract)

21.     Defendant-Counterclaim Plaintiffs repeat and reallege the allegations set

forth above and incorporate them as if fully set forth herein.

22.     APLUS and the Vachovskys are parties to a valid and binding agreement

and contract, the SPA.

23.     As set forth above, the Vachovskys have fully performed and are

continuing to perform all of their obligations under the SPA.

24.     By repudiating its obligation to pay the Vachovskys the Non-Compete

Amount when due, based on spurious indemnification claims, APLUS failed to perform

its obligations under the SPA.

25.     As a result of APLUS's breach of the contract, the Vachovskys have been

damaged in an amount to be determined at trial, but in no event less than $2 million, plus

applicable interest, attorneys' fees, and costs.

WHEREFORE, Defendant-Counterclaim Plaintiffs Ivan Vachovsky and Lilian

Vachovsky respectfully request that this Court enter judgment against Plaintiff-

Counterclaim Defendant APLUS Holdings, Inc.:

(1)     dismissing the Complaint in its entirety and with prejudice;

(2)     awarding money damages to Defendant-Counterclaim Plaintiffs in the amount of their damages, interest, costs, and expenses, including attorney fees, incurred in defending against the claims asserted by Plaintiff-Counterclaim Defendant;

(3)     awarding money damages to Defendant-Counterclaim Plaintiffs on their Counterclaim, in the amount of their damages, including interest, costs, and expenses, resulting from APLUS's breach of the agreement between the parties, in an amount to be determined at trial but in no event less than $2 million;

(4)     awarding money damages to Defendant-Counterclaim Plaintiffs in the amount of their damages, interest, costs, and expenses, including attorney fees, incurred in prosecuting their claims against Plaintiff-Counterclaim Defendant; and

(5)     granting such other and further relief as the Court deems just and proper.


Dated: New York, New York          s/ Alon Markowitz_____
       August 8, 2008              Alon Markowitz (AM 0111)
                                   MARKOWITZ & CHATTORAJ LLP
                                   271 Madison Avenue, 20th Floor
                                   New York, New York 10016
                                   (212) 481-1220

                                   Attorneys for Defendants-Counterclaim
                                   Plaintiffs Ivan Vachovsky and Lilian
                                   Vachovsky

# EXHIBIT A

**EXECUTION COPY**

STOCK PURCHASE AGREEMENT

by and among

APLUS HOLDINGS INC.,

IVAN VACHOVSKY,

LILIAN VACHOVSKY,

ABACUS AMERICA, INC.,

APLUS.NET PHILIPPINES INC.

and

ABACUS TRADE LTD.

Dated as of

July 25, 2006

TABLE OF CONTENTS

**ARTICLE I Stock Purchase; Closing** ........................................................................1
    1.1.    Stock Purchase ........................................................................................1
    1.2.    The Closing. ..............................................................................................1
    1.3.    Post-Closing Adjustments to the Cash Consideration. ...........................2

**ARTICLE II Representations and Warranties of the Companies and the**
**Shareholders Regarding the Group Companies** ......................................................4
    2.1.    Organization; Power; Good Standing ......................................................4
    2.2.    Capitalization ..........................................................................................4
    2.3.    Investments; Indebtedness; Accounts; Subsidiaries ...............................5
    2.4.    Authorization; Execution & Enforceability; No Breach. .........................5
    2.5.    Financial Statements ...............................................................................6
    2.6.    Absence of Undisclosed Liabilities .........................................................7
    2.7.    Accounts Receivable ...............................................................................7
    2.8.    Products and Services Warranty .............................................................7
    2.9.    Absence of Certain Developments...........................................................7
    2.10.   Assets ......................................................................................................9
    2.11.   Tax Matters .............................................................................................9
    2.12.   Contracts and Commitments....................................................................11
    2.13.   Intellectual Property Rights. ...................................................................13
    2.14.   Litigation.................................................................................................16
    2.15.   Brokerage ................................................................................................16
    2.16.   Insurance .................................................................................................16
    2.17.   Labor Matters..........................................................................................16
    2.18.   Employee Benefits. .................................................................................17
    2.19.   Compliance with Laws; Permits. ............................................................19
    2.20.   Environmental and Safety Matters..........................................................19
    2.21.   Affiliate Transactions.............................................................................20
    2.22.   Suppliers and Customers.........................................................................21
    2.23.   Real Property. ..........................................................................................21
    2.24.   Certain International Business Practices..................................................23

**ARTICLE III Representations and Warranties of the Sellers** ................................23
    3.1.    Capacity; Execution and Enforceability; No Breach. .............................24
    3.2.    Title to Shares .........................................................................................24
    3.3.    Brokerage ................................................................................................24
    3.4.    Litigation, etc ..........................................................................................24
    3.5.    Investment Intent ....................................................................................25
    3.6.    Restricted Securities................................................................................25

**ARTICLE IV Representations and Warranties of the Buyer** .................................26
    4.1.    Organization............................................................................................26
    4.2.    Authorization; Execution and Enforceability; No Breach. .....................26
    4.3.    Brokerage................................................................................................27

| | | |
|---|---|---|
| 4.4. | Investment Intent | 27 |
| 4.5. | Capitalization | 27 |
| 4.6. | Purpose | 27 |

**ARTICLE V Closing Conditions** .......................................................................**28**
| | | |
|---|---|---|
| 5.1. | Conditions Precedent to Obligations of the Buyer | 28 |
| 5.2. | Conditions Precedent to Obligations of the Sellers | 30 |

**ARTICLE VI Indemnification** ...........................................................................**30**
| | | |
|---|---|---|
| 6.1. | Survival of Representations and Warranties | 30 |
| 6.2. | General Indemnification. | 31 |
| 6.3. | Limitations on Indemnification; Determination of Loss and Amount | 32 |
| 6.4. | Tax Benefit | 33 |
| 6.5. | Manner of Payment | 33 |
| 6.6. | Third Party Claims | 34 |
| 6.7. | Indemnification of Pre-Closing Taxes | 35 |
| 6.8. | Waiver | 35 |
| 6.9. | Final Cash Consideration Adjustment | 36 |

**ARTICLE VII Post-Closing Covenants and Agreements** ...........................**36**
| | | |
|---|---|---|
| 7.1. | Tax Matters. | 36 |
| 7.2. | Continued Employment; Consulting Services | 38 |
| 7.3. | Restrictive Covenants. | 38 |
| 7.4. | Further Assurances | 40 |
| 7.5. | Confidentiality | 41 |
| 7.6. | Release | 41 |
| 7.7. | Mercedes Automobile | 41 |
| 7.8. | Certain Computers | 42 |
| 7.9. | Email Transition | 42 |
| 7.10. | Transition of Accounts | 42 |
| 7.11. | Certain Transition Services | 42 |

**ARTICLE VIII Definitions** ................................................................................**43**

**ARTICLE IX Miscellaneous** .............................................................................**52**
| | | |
|---|---|---|
| 9.1. | Fees and Expenses | 52 |
| 9.2. | Press Release and Announcements | 52 |
| 9.3. | Remedies | 53 |
| 9.4. | Consent to Amendments; Waivers | 53 |
| 9.5. | Successors and Assigns | 53 |
| 9.6. | Severability | 53 |
| 9.7. | Counterparts | 54 |
| 9.8. | Descriptive Headings; Interpretation | 54 |
| 9.9. | Entire Agreement | 54 |
| 9.10. | No Third-Party Beneficiaries | 54 |
| 9.11. | Schedules and Exhibits | 54 |
| 9.12. | Governing Law | 54 |

9.13.   Waiver of Jury Trial ..................................................................................55
9.14.   Consent to Jurisdiction.............................................................................55
9.15.   Notices ....................................................................................................55
9.16.   No Strict Construction .............................................................................56

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | – | Closing Adjustment Certificate |
| Exhibit B | – | Net Working Capital |
| Exhibit C | – | Form SLA |

**SCHEDULES**

| | | |
|---|---|---|
| Schedule 2.1 | – | Organization; Power; Good Standing |
| Schedule 2.2 | – | Capitalization |
| Schedule 2.3(a) | – | Indebtedness |
| Schedule 2.3(b) | – | Accounts |
| Schedule 2.3(c) | – | Subsidiaries |
| Schedule 2.4(c) | – | No Breach |
| Schedule 2.5 | – | Financial Statements |
| Schedule 2.6 | – | Absence of Undisclosed Liabilities |
| Schedule 2.9 | – | Absence of Certain Developments |
| Schedule 2.11 | – | Tax Matters |
| Schedule 2.12(a) | – | Contracts and Commitments |
| Schedule 2.13(a) | – | Intellectual Property Rights |
| Schedule 2.13(b) | – | Intellectual Property Rights |
| Schedule 2.13(c) | – | Intellectual Property Rights |
| Schedule 2.14 | – | Litigation |
| Schedule 2.15 | – | Brokerage |
| Schedule 2.16 | – | Insurance |
| Schedule 2.17(a) | – | Labor Matters |
| Schedule 2.17(b) | – | Labor Matters |
| Schedule 2.18(a) | – | Employee Benefits |
| Schedule 2.18(g) | – | Employee Benefits |
| Schedule 2.19(a) | – | Compliance with Laws |
| Schedule 2.19(b) | – | Permits |
| Schedule 2.20(a) | – | Environmental and Safety Matters |
| Schedule 2.21(a) | – | Affiliate Transactions |
| Schedule 2.21(b) | – | Affiliate Transactions |
| Schedule 2.22 | – | Suppliers and Customers |
| Schedule 2.23(b) | – | Real Property |
| Schedule 3.3 | – | Brokerage |
| Schedule 4.2(c) | – | No Breach |
| Schedule 7.10 | – | Certain Accounts |

## STOCK PURCHASE AGREEMENT

This STOCK PURCHASE AGREEMENT (this "Agreement"), dated as of July 25, 2006, is entered into by and among APLUS Holdings Inc., a Delaware corporation (the "Buyer"), Ivan Vachovsky and Lilian Vachovsky (each, a "Shareholder" and, collectively, the "Shareholders" or a "Seller" and, collectively, the "Sellers"), Abacus America, Inc., a California corporation ("Abacus America"), Aplus.Net Philippines Inc., a corporation formed under the laws of the Philippines ("Abacus Philippines"), and Abacus Trade Ltd., a Bulgarian limited liability company ("Abacus Bulgaria", and together with Abacus America and Abacus Philippines, each, a "Company" and, collectively, the "Companies"). Capitalized terms used herein and not otherwise defined herein have the meanings given to such terms in ARTICLE VIII.

WHEREAS, the Sellers collectively own all of the Shares (as defined below); and

WHEREAS, subject to the terms and conditions set forth herein, the Buyer desires to purchase all of the Shares from the Sellers, and each Seller desires to sell all of the Shares held by such Seller to the Buyer in consideration for the Cash Consideration and Equity Consideration (in each case as defined below).

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
### Stock Purchase; Closing

1.1.    Stock Purchase. Subject to the terms and conditions of this Agreement, at the Closing, each Seller shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase and acquire from each Seller, the Shares owned by such Seller and, in exchange, the Buyer shall pay to the Sellers, in the aggregate, the Cash Consideration and Equity Consideration.

1.2.    The Closing.

(a)    Time and Place of Closing. The consummation of the transactions contemplated by this Agreement (collectively, the "Closing") will take place at the offices of Kirkland & Ellis LLP, Citigroup Center, 153 East 53rd Street, New York, New York 10022 commencing at 10:00 a.m. local time on the date of this Agreement. The date and time of the Closing are referred to as the "Closing Date".

(b)    Closing Adjustments to Cash Consideration. The Shareholders have previously prepared and delivered to the Buyer a certificate (which is attached hereto as Exhibit A), executed by each Shareholder, certifying their good faith estimate of the following amounts: (i) the Net Working Capital; (ii) the Closing Indebtedness; and (iii) the Unpaid Seller Expenses (the "Closing Adjustment Certificate").

(c)    Deliveries at the Closing. At the Closing:

(i)     <u>Deliveries by the Sellers to the Buyer</u>.  The Sellers shall deliver to the Buyer all certificates representing the Shares.

(ii)     <u>Deliveries by the Buyer to the Sellers</u>.  The Buyer shall (A) pay (or cause to be paid) to the Sellers the Cash Consideration by wire transfer of immediately available funds to one account as designated by the Sellers by written notice to the Buyer not less than two (2) Business Days prior to the Closing Date and (B) deliver to the Sellers a photocopy of the certificates representing the Equity Consideration.

(iii)     <u>Other Deliveries</u>.  The opinion of counsel and other documents and agreements required to be delivered pursuant to <u>ARTICLE V</u> shall be delivered.

1.3.     <u>Post-Closing Adjustments to the Cash Consideration</u>.

(a)     Within seventy-five (75) days after the Closing Date, the Buyer shall deliver to the Sellers a closing statement (the "<u>Closing Statement</u>") setting forth (i) the Net Working Capital (ii) the Closing Indebtedness (other than Closing Indebtedness included in the calculation of Net Working Capital) and (iii) the Unpaid Seller Expenses (other than Unpaid Seller Expenses included in the calculation of Net Working Capital).  During the thirty (30) days immediately following the Sellers' receipt of the Closing Statement, the Shareholders and their designated representatives shall be permitted to review the working papers and underlying documentation (excluding documentation to which a legal privilege may attach) relating to the Closing Statement.  The Closing Statement shall become final and binding (in its final and binding form, the "<u>Final Closing Statement</u>") upon all parties on the thirtieth (30th) day following receipt thereof by the Shareholders unless the Shareholders give written notice of their disagreement (a "<u>Notice of Disagreement</u>") to the Buyer prior to such date.  Any Notice of Disagreement shall (1) specify in reasonable detail the nature and amount of any disagreement so asserted (the "<u>Disputed Items</u>") and (2) as to Net Working Capital, only include disagreements based on mathematical errors or based on the Net Working Capital as of immediately prior to the Closing not being calculated in accordance with the definition of Net Working Capital in <u>ARTICLE VIII</u>.  If a timely Notice of Disagreement is received by the Buyer, then the Closing Statement (as revised as contemplated in clause (x) or (y) below) shall become final and binding upon all parties on the earlier of (x) the date the Buyer and the Shareholders resolve in writing any differences they have with respect to any matter specified in the Notice of Disagreement or (y) the date any matters properly in dispute are finally resolved in writing by the Independent Auditor; *provided*, that any items that are not so disputed shall become final and binding upon the parties on the thirtieth (30th) day following the Sellers' receipt of the Closing Statement.  During the thirty (30) days immediately following the delivery of a Notice of Disagreement, the Buyer and the Shareholders shall seek in good faith to resolve in writing any differences which they may have with respect to any matter specified in the Notice of Disagreement.  During such period, the Buyer and its representatives shall have full access to the working papers of the Shareholders and underlying documentation (excluding documentation to which a legal privilege may attach) used in connection with the Shareholders' preparation of the Notice of Disagreement.  If, at the end of such thirty (30) day period, any Disputed Item specified in the Notice of Disagreement has not been resolved by the Shareholders and the Buyer, the Shareholders and the Buyer shall submit to an independent auditing firm of national recognition mutually selected by the Buyer and the Shareholders (the "<u>Independent Auditor</u>") for review and resolution any such

2

Disputed Items which remain in dispute (including such party's proposed resolution thereof) and which were properly included in the Notice of Disagreement, and the Independent Auditor shall make a final determination of each Disputed Item as of immediately prior to the Closing based solely on presentations by the Buyer and the Shareholders (and not by independent review), which determination shall be binding on the parties. The Independent Auditor (i) shall be bound by the principles set forth in this Section 1.3, (ii) shall limit its review to matters specifically set forth in the Notice of Disagreement and (iii) shall not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party.

(b)    The Independent Auditor shall be retained to resolve such dispute promptly and, in any event, within thirty (30) days from the date the dispute is submitted to the Independent Auditor. The fees and expenses of the Independent Auditor acting under this Section 1.3 shall be borne proportionately by the Buyer and the Shareholders on the basis of the discrepancy (in dollars) between such party's determination of the Disputed Items (in the aggregate) as presented to the Independent Auditor and the final and binding determination of the Disputed Items (in the aggregate) by the Independent Auditor. The determination as to each Disputed Item as determined by agreement of the Buyer and the Shareholders or by the Independent Auditor shall be final and binding on all parties. The Cash Consideration as further adjusted pursuant to this Section 1.3 shall be referred to herein as the "Final Cash Consideration".

(c)    The Cash Consideration shall be adjusted as follows:

(i)    increased by the amount, if any, by which the Final Net Working Capital is greater than the Estimated Net Working Capital, or decreased by the amount, if any, by which the Final Net Working Capital is less than the Estimated Net Working Capital;

(ii)    increased by the amount, if any, by which the Final Closing Indebtedness is less than the Estimated Closing Indebtedness, or decreased by the amount, if any, by which the Final Closing Indebtedness is greater than the Estimated Net Closing Indebtedness;

(iii)    increased by the amount, if any, by which the Final Unpaid Seller Expenses are less than the Estimated Unpaid Seller Expenses, or decreased by the amount, if any, by which the Final Unpaid Seller Expenses are greater than the Estimated Unpaid Seller Expenses.

(d)    To the extent that the Cash Consideration is adjusted as contemplated by Section 1.3(c), the Buyer or the Sellers (jointly and severally), as applicable, shall pay such amount to the Sellers or the Buyer, as applicable, within five (5) Business Days of the final determination of such amount pursuant to Section 1.3(a), together with interest thereon at a rate equal to the prime rate as published in the Wall Street Journal on the Closing Date (the "Applicable Rate") calculated on the basis of the number of days elapsed from the Closing Date to the date of the payment, by wire transfer of immediately available funds to one or more accounts designated by the Sellers or the Buyer, as applicable.

## ARTICLE II
### Representations and Warranties of the Companies and the Shareholders Regarding the Group Companies

As a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Companies and each Shareholder, jointly and severally, represent and warrant to the Buyer that the statements contained in this ARTICLE II are correct and complete as of the Closing Date.

2.1. <u>Organization; Power; Good Standing</u>. Each Group Company is a corporation duly organized, validly existing and in good standing under the Laws of the jurisdiction of its incorporation and is licensed or qualified to conduct its business and is in good standing in every jurisdiction where it is required to be so licensed or qualified (which such jurisdictions are set forth on Schedule 2.1), except where the failure to be so licensed or qualified could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Group Company possesses full corporate power and authority necessary to own and operate its properties and to carry on its businesses as presently conducted. The copies of the certificate of incorporation and bylaws (or other comparable organizational documents) of each Group Company which have been furnished to the Buyer reflect the same as amended through the date of this Agreement and are true, complete and correct copies of the originals. The minute books of each Group Company (containing the records of meetings of the stockholders, the board of directors and any committees of the board of directors, and the management and controlling bodies and the general managers or executive directors, as the case may be) which have been furnished to the Buyer are true, complete and correct copies of the originals. The stock certificate books and the stock record books of each Group Company which have been furnished to the Buyer are true, complete and correct copies of the originals and accurately reflect transactions in its stock at any time prior to the date of this Agreement.

2.2. <u>Capitalization</u>. The authorized capital stock of (a) Abacus America consists of (i) Fifty million (50,000,000) shares of no par common stock, Five Million (5,000,000) shares of which are issued and outstanding (the "America Common Shares"), and (ii) 50,000,000 shares of no par preferred stock, no shares of which are issued and outstanding (together with the America Common Shares, collectively, the "America Shares"), (b) Abacus Philippines consists of Four Hundred Thousand Pesos (P400,000), divided into Four Thousand (4,000) shares with par value of One Hundred Pesos (P100) per share, of which One Thousand (1,000) shares are issued and outstanding (the "Philippines Shares") and (c) Abacus Bulgaria consists of one hundred and ninety six (196) equal shares with a par value of one hundred (100) Bulgarian Leva per share (the "Bulgaria Shares" and together with the America Shares and the Philippines Shares, collectively the "Shares"). The Shares are held beneficially and of record by the Sellers as set forth on Schedule 2.2 (other than as set forth thereon), free and clear of any Liens. Upon delivery to the Buyer at the Closing of certificates representing the America Shares and certificates representing 996 of the Philippines Shares, duly endorsed by the applicable Seller for transfer to the Buyer, and upon such Seller's receipt of payment therefor, valid title to such Seller's America Shares and Philippines Shares will pass to the Buyer, free and clear of any Liens. Upon execution of this Agreement and the consummation of the Closing, the transfer of the Bulgaria Shares to the Buyer will be effective as between the Sellers and the Buyer, free and clear of any Liens. As of the Closing and immediately thereafter, the Shares will constitute all of

the issued and outstanding shares of each Company's capital stock, will be duly authorized, validly issued, fully-paid and non-assessable and will have been issued free and clear of any preemptive or similar rights. Except as set forth on Schedule 2.2, no Company has any outstanding (1) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for, or to purchase, its capital stock or (2) any stock appreciation rights or phantom stock or similar plans or rights. Upon the payment to each holder of stock options in the amount set forth next to such holder's name on Schedule 2.2 (less all applicable tax and other withholdings), all stock options issued to or held by such holder will be relinquished, terminated and surrendered. There are no (x) outstanding obligations of any Company (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among any Company's stockholders with respect to the voting or transfer of such Company's capital stock.

2.3.    Investments; Indebtedness; Accounts; Subsidiaries.

(a)    Except as set forth on Schedule 2.3(a), no Group Company has any Indebtedness.

(b)    Except as set forth on Schedule 2.3(b), no Group Company has any bank or other deposit accounts.

(c)    Except as set forth on Schedule 2.3(c), no Group Company has any Subsidiary or has or holds the right to make an Investment in any other Person. The authorized, issued and outstanding capital stock of each Subsidiary of any Company is set forth on Schedule 2.3(c), all of which is duly authorized, validly issued, fully-paid and non-assessable and is held beneficially and of record as set forth on Schedule 2.3(c), free and clear of any Liens. No Subsidiary of any Company has any outstanding (i) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for or to purchase its capital stock or (ii) any stock appreciation rights or phantom stock or similar plans or rights. There are no (x) outstanding obligations of any Subsidiary of any Company (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among the stockholders of any Subsidiary of any Company with respect to the voting or transfer of such Subsidiary's capital stock.

2.4.    Authorization; Execution & Enforceability; No Breach.

(a)    Each Group Company possesses full corporate power and authority to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)    Each Group Company's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all

necessary action on the part of such Group Company and such Group Company's stockholders. Each Transaction Document to which a Group Company is a party has been duly and validly executed and delivered by such Group Company and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of such Group Company, enforceable against such Group Company in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)     Except as set forth on Schedule 2.4(c), the execution and delivery by each Group Company of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by such Group Company does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon such Group Company's capital stock or assets, including the Shares, pursuant to, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) the certificate of incorporation or bylaws (or other comparable organizational documents) of such Group Company, (B) any Law, order, judgment or decree to which such Group Company is subject, or (C) any of the Material Contracts to which such Group Company is subject.  Each notice and consent set forth on Schedule 2.4(c) has been delivered or obtained, as applicable, by the applicable Group Company at or prior to the Closing.

2.5.     Financial Statements.  Attached hereto as Schedule 2.5 are true, complete and correct copies of the (a) balance sheet and statements of income and cash flow for Abacus America as of and for the fiscal years ended June 30, 2003, June 30, 2004, and June 30, 2005, and (b) unaudited balance sheet (the "Most Recent Balance Sheet") and statements of income and cash flows for Abacus America as of and for the nine (9) month period ended as of March 31, 2006 (the "Most Recent Balance Sheet Date") (collectively, the "Financial Statements").  Each of the Financial Statements (including the notes thereto, if any) has been prepared from, and is consistent with, the books and records of each Group Company, and fairly presents the financial condition as of the dates thereof, operating results and cash flows for the periods of Abacus America then ended and has been prepared in accordance with GAAP consistently applied throughout the periods covered thereby in accordance with past custom and practice of Abacus America (subject, in the case of unaudited financial statements, to the absence of footnotes and normal year-end adjustments (which are not material individually or in the aggregate)).  Each Group Company maintains and, for all periods covered by the Financial Statements (or, if shorter, such period as such Group Company has been in existence), has maintained books, records and accounts which, in reasonable detail, fairly reflect the transactions and dispositions of the assets of such Group Company. The Group Companies' accountants have not notified any Group Company of any deficiencies in the design or operation of any of the Group Companies' internal controls in connection with its audits of the Financial Statements. Also included on Schedule 2.5 is a true, complete and correct list of all items and amounts (in U.S. Dollars) Abacus Bulgaria invoiced to Abacus America for the period from January 1, 2004 through June 30, 2006 (reported on a monthly basis), and the aggregate expenses and Liabilities of Abacus Bulgaria for such period did not exceed such amounts.

6

2.6.    <u>Absence of Undisclosed Liabilities</u>.  Except as set forth on <u>Schedule 2.6</u>, no Group Company has any Liability or obligation, other than (i) Liabilities set forth on the liabilities side of the Most Recent Balance Sheet, or (ii) Liabilities and obligations which have arisen after the Most Recent Balance Sheet Date in the ordinary course of business (none of which is a Liability resulting from any breach of contract, tort, infringement, misappropriation, claim, lawsuit, violation of Law or environmental Liability or clean-up obligation and none of which is material either individually or in the aggregate).  Except as set forth on <u>Schedule 2.6</u>, no Group Company is a guarantor or is otherwise liable for any Liability (including Indebtedness) of any other Person.

2.7.    <u>Accounts Receivable</u>.  All notes and accounts receivable reflected on the Most Recent Balance Sheet are valid notes and accounts receivable, are not subject to set-offs or counterclaims, have been prepared from, and are in accordance with, the books and records of the Group Companies, arose solely out of bona fide sales and delivery of goods or performance of services, are current and collectible in accordance with their terms at their recorded amounts, subject only to the reserve for bad debts set forth on the Most Recent Balance Sheet, as adjusted for the passage of time through the Closing Date consistent with past custom and practice

2.8.    <u>Products and Services Warranty</u>.  All products and services licensed, sold or delivered by the Group Companies (excluding deliveries between Group Companies) have been in conformity in all material respects with all applicable contractual commitments and all express and implied warranties, and no Group Company has any Liability (or has received written notice of any action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against it giving rise to any such Liability) for replacement thereof or other damages in connection therewith, other than replacements or damages in the ordinary course of business consistent with past custom and practice.  Attached hereto as <u>Exhibit C</u> is a true and correct copy of the Service Level Agreement form used by the Group Companies (the "<u>Form SLA</u>").  Other than as set forth in the Form SLA, no products licensed, sold or delivered and no services rendered by any Group Company are subject to any guarantee, warranty or other indemnity beyond the applicable industry standard terms and conditions of such sale or service.  No Group Company is a party to any Service Level Agreement that contains terms or conditions that are materially less favorable to such Group Company than those set forth in the Form SLA.

2.9.    <u>Absence of Certain Developments</u>.  Since June 30, 2005, there has occurred no fact, event or circumstance which, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.  Except as expressly contemplated by this Agreement or as set forth on <u>Schedule 2.9</u>, since June 30, 2005, the Group Companies have conducted their business only in the ordinary course consistent with past custom and practice, and no Group Company has:

(a)    authorized for issuance, issued, sold, delivered, or granted any notes, bonds or other debt securities or any capital stock or other equity interests or any securities or rights convertible, exchangeable or exercisable into any capital stock or other equity interests;

(b)    discharged or satisfied any Lien or paid any material obligation or Liability, other than current Liabilities paid in the ordinary course of business consistent with past custom and practice;

7

(c)     declared, set aside or made any payment or distribution of cash with respect to its capital stock or other equity interests or declared, set aside or made any payment or distribution of other property with respect to its capital stock or other equity interests or purchased, redeemed or otherwise acquired any shares of its capital stock or other equity interests (including any warrants, options or other rights to acquire its capital stock or other equity interests);

(d)     accelerated any billing of customers or collection of receivables;

(e)     delayed, postponed or canceled (i) the payment of accounts payable or any other Liability, (ii) the purchase of inventory, or (iii) the replacement of inoperable, worn out or obsolete assets with assets of comparable quality, in each case other than in the ordinary course of business consistent with past custom and practice;

(f)     sold, assigned, transferred, leased, licensed, failed to maintain or abandoned any of its assets, tangible or intangible, or taken any action that could reasonably be expected to cause the loss, lapse or abandonment of any Intellectual Property Rights, except sales of inventory in the ordinary course of business consistent with past custom and practice;

(g)     made any loan to, or entered into any other transaction with, any of its directors, officers or employees;

(h)     entered into any employment or collective bargaining agreement, written or oral, or modified the terms of any existing such contract or agreement;

(i)     made any material change in employment terms (including base compensation) for any of its directors, officers or employees;

(j)     adopted, amended, modified or terminated any bonus, profit-sharing, incentive, severance or other plan, contract or commitment for the benefit of any of its directors, officers or employees (or taken any such action with respect to any other Employee Benefit Plan);

(k)     made any loans or advances to, guarantees for the benefit of, or any Investments in, any Person or formed any Subsidiary;

(l)     made capital expenditures or commitments therefor in excess of $25,000 individually or in the aggregate;

(m)     suffered any damage, destruction or casualty loss exceeding $10,000 in the aggregate, not covered by insurance, or experienced any material changes in the amount and scope of insurance coverage;

(n)     made any Tax election or changed an annual accounting period, made any change in its cash management practices or in any method of accounting or accounting policies, or made any write-down in the value of its inventory that is material or outside of the ordinary course of business consistent with past custom and practice;

(o)    other than compensation paid in the ordinary course of business, consistent with past custom and practice, directly or indirectly engaged in any transaction or entered into, amended or terminated, any arrangement with any of its officers, directors, shareholders or other Affiliates;

(p)    amended its certificate of incorporation, bylaws or other organizational documents;

(q)    taken any action or omitted to take any action which act or omission could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect;

(r)    entered into any new line of business, or incurred or committed to incur any capital expenditures, obligations or Liabilities in connection therewith;

(s)    entered into any acquisition agreement or agreement to acquire by merger, consolidation or otherwise, or agreement to acquire a substantial portion of the assets of, or in any other manner, any business of any other Person;

(t)    cancelled or waived (i) any right or claim (or series of related rights and claims) either involving more than $25,000 or outside the ordinary course of business, or (ii) any debts or claims against any of its Affiliates;

(u)    entered into, accelerated, terminated, modified or cancelled any agreement, contract, lease, License or other arrangement involving more than $25,000; or

(v)    agreed, whether orally or in writing, to do any of the foregoing.

2.10.    <u>Assets</u>.  The Group Companies have good and valid title to, a valid leasehold interest in, or a valid license to use the properties and assets, tangible or intangible, shown on the Most Recent Balance Sheet or acquired thereafter, free and clear of all Liens, except for (a) properties and assets disposed of in the ordinary course of business since the Most Recent Balance Sheet Date and (b) Permitted Liens.  The Group Companies own, have a valid leasehold interest in, or have a valid license to use, all of the properties, assets and rights, whether tangible or intangible, that are currently used in or are necessary for the conduct of their business as presently conducted.  Each tangible asset is free from material defects, has been maintained in accordance with normal industry practice, is in good operating condition and repair (subject to reasonable wear and tear) and is suitable for the purposes for which it is presently used.  Aviji, Inc. owns no assets and has no liabilities, and at no point in time has owned any asset used or usable in the business of the Group Companies as presently conducted. Abacus Philippines owns no assets other than deposit accounts reflected in the Financial Statements and has no liabilities, and at no point in time has owned any asset used or usable in the business of the Group Companies as presently conducted.

2.11.    <u>Tax Matters</u>.  Except as set forth on <u>Schedule 2.11</u>:

(a)    each Group Company has filed all Tax Returns which it is required to file under applicable laws and regulations, and all such Tax Returns are true, complete and

correct in all respects and have been prepared in compliance with all applicable laws and regulations;

(b)     each Group Company has timely paid all Taxes due and owing by it (whether or not such Taxes are shown or required to be shown on a Tax Return) and has timely withheld and paid over (or made adequate reserves for payment) to the appropriate taxing authority all Taxes which it is required to withhold from amounts paid or owing to any employee, shareholder, creditor or other Third Party;

(c)     the Sellers have delivered to the Buyer true, complete and correct copies of all federal income tax returns, examination reports, and statement of deficiencies assessed against, or agreed to by each Group Company for all taxable periods ended on or after June 30, 2001;

(d)     no Group Company (i) has waived any statute of limitations with respect to any Taxes of any Group Company or agreed to any extension of time for filing any Tax Return which has not been filed or (ii) has consented to any extension of time with respect to any Tax assessment or deficiency;

(e)     no foreign, federal, state or local Tax audits or assessments or administrative or judicial proceedings are threatened or pending with respect to any Group Company;

(f)     there are no Liens on any of the assets of any Group Company that arose in connection with any failure (or alleged failure) to pay any Tax;

(g)     there is no dispute with or claim by any taxing authority concerning any Tax liability of any Group Company;

(h)     no Group Company (i) has been a member of an Affiliated Group or filed or been included in a combined, consolidated or unitary income Tax Return or (ii) is a party to or bound by any Tax allocation or Tax sharing agreement;

(i)     no Group Company has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Sections 355 or 361 of the Code;

(j)     no Group Company has engaged in any reportable transaction within the meaning of Section 6111 and 6112 of the Code;

(k)     no Group Company or Seller has requested or received a ruling from any taxing authority or signed any binding agreement with any taxing authority that might impact any tax attribute or the amount of Tax due from any Group Company after the Closing Date;

(l)     all nonqualified deferred compensation plans (within the meaning of Section 409A of the Code) of each Group Company are in compliance with Section 409A of the Code;

10

(m)    the unpaid Taxes of the Group Companies (i) did not, as of the Most Recent Balance Sheet Date, exceed the reserve for Tax liability (as opposed to a reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the face of the Balance Sheet (as opposed to the notes thereto) and (ii) will not exceed that reserve as adjusted for operations and transactions through the Closing Date in accordance with the past custom and practice of the Group Companies in filing their Tax Returns;

(n)    no Group Company is liable for the Taxes of another Person (i) under Treasury Regulation § 1.1502-6 (or comparable provisions of state, local or foreign law), (ii) as a transferee or successor, (iii) by contract or indemnity or (iv) otherwise;

(o)    no Group Company is a party to any agreement, contract, arrangement, or plan that has resulted or would result, separately or in the aggregate, in the payment of an "excess parachute payment" within the meaning of Section 280G of the Code (or any corresponding provision of state, local, or foreign Tax law);

(p)    no Group Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or prior to the Closing Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law) executed on or prior to the Closing Date, (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Section 1502 of the Code (or any corresponding or similar provision of state, local or foreign income Tax law), (iv) installment sale or open transaction disposition made on or prior to the Closing Date, or (v) prepaid amount received on or prior to the Closing Date;

(q)    no Group Company has been a United States real property holding corporation within the meaning of Code §897(c)(2) during the applicable period specified in Code §897(c)(1)(A)(ii);

(r)    no Group Company is, or at any time has been, subject to (i) the dual consolidated loss provisions of Section 1503(d) of the Code, (ii) the overall foreign loss provisions of Section 904(f) of the Code or (iii) the recharacterization provisions of Section 952(c)(2) of the Code; and

(s)    no Group Company has deferred revenue on which Taxes will be owed in tax years subsequent to June 30, 2006.

2.12.    <u>Contracts and Commitments</u>.

(a)    Except as set forth on <u>Schedule 2.12(a)</u>, no Group Company is a party to, or bound by, any written or oral:

(i)    pension, profit sharing, stock option, employee stock purchase or other plan or arrangement providing for deferred or other compensation to employees;

(ii)    collective bargaining agreement or any other contract with any labor union, or severance agreements, programs, policies or arrangements;

(iii)    written personnel policies, rules or procedures applicable to employees of any Group Company;

(iv)    management agreement or contract for the employment of any officer, individual employee or other Person on a full-time, part-time, consulting or other basis (A) providing annual cash or other compensation in excess of $50,000, (B) providing for the payment of any cash or other compensation or benefits upon the consummation of the transactions contemplated hereby or (C) otherwise restricting its ability to terminate the employment of any employee at any time for any lawful reason or for no reason without penalty or Liability;

(v)    contract or agreement involving any Government Entity;

(vi)    agreement or indenture relating to borrowed money or other Indebtedness or the mortgaging, pledging or otherwise placing a Lien on any material asset (tangible or intangible) or material group of assets (tangible or intangible) or any letter of credit arrangements, or any guarantee therefor;

(vii)    lease or agreement under which it is (A) lessee of or holds or operates any personal property, owned by any other party, except for any lease of personal property under which the aggregate annual rental payments do not exceed $10,000 or (B) lessor of or permits any Third Party to hold or operate any personal property owned or controlled by it;

(viii)    agreements relating to the ownership of, Investments in or loans and advances to any Person, including Investments in joint ventures, partnerships and minority equity investments;

(ix)    license, royalty, indemnification or other agreement with respect to any Intellectual Property Rights (other than licenses for commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000);

(x)    agent, sales representative, sales or distribution agreement;

(xi)    power of attorney or other similar agreement or grant of agency;

(xii)    contract or agreement prohibiting it from freely engaging in any business or competing anywhere in the world or restricting the use of any Intellectual Property Rights, including any co-existence, settlement, nondisclosure or confidentiality agreements;

(xiii)    settlement or similar agreement;

(xiv)    agreement (or group of related agreements) for the purchase or sale of raw materials, commodities, supplies, products, or other personal property, or

12

for the furnishing or receipt of services, the performance of which will extend over a period of more than one year, result in a material loss to the Group Companies, or involve consideration in excess of $25,000;

(xv)    agreement involving any Company Affiliate;

(xvi)    agreement under which it has granted any Person any registration rights (including demand and piggyback registration rights);

(xvii)    agreement under which the consequences of a default or termination could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; or

(xviii) agreement (or group of related agreements) which is material to its operations and business or involves consideration in excess of $25,000 annually and is not otherwise required to be disclosed pursuant to any of the foregoing.

(b)    Each of the contracts, agreements and instruments set forth or required to be set forth on <u>Schedule 2.12(a)</u> (together with the Real Property Leases and Insurance Policies, collectively the "<u>Material Contracts</u>") are legal, valid, binding and enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, and in full force and effect.  No party to any Material Contract has repudiated any material provision of such Material Contract.  No Group Company is in default under, in breach of, or in receipt of any claim of default or breach under, any Material Contract. To the Knowledge of each Group Company, no event has occurred which, with the passage of time or the giving of notice or both, would result in a default or breach by any Group Company under any Material Contract, and no Group Company or Seller has any Knowledge of any existing or threatened breach or cancellation by any other party to any Material Contract.

(c)    The Buyer has been supplied with (i) a true, complete and correct copy of each written Material Contract, together with all amendments, waivers or other changes thereto, and (ii) a true, complete and correct description of the terms and conditions of each oral Material Contract.

2.13.    <u>Intellectual Property Rights</u>.

(a)    <u>Schedule 2.13(a)</u> contains a true, complete and correct list of all of the following that are owned or used by any Group Company: (i) patented or registered Intellectual Property Rights, (ii) pending patent applications and applications for registration of other Intellectual Property Rights, (iii) computer software material to the conduct of the business of any Group Company (other than licenses for commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000), (iv) trade or corporate names and Internet domain names, and (v) material unregistered trademarks and service marks.

(b)    Except as set forth on <u>Schedule 2.13(b)</u>, the Group Companies own all right, title and interest in and to, or have the right to use pursuant to a valid and enforceable license set forth on <u>Schedule 2.12(a)</u>, free and clear of all Liens, all Intellectual Property Rights

13

set forth on <u>Schedule 2.13(a)</u> and commercially available, off-the-shelf software with a replacement cost and/or annual license fee of less than $10,000 used in or necessary to operate the business of any Group Company as currently conducted and as currently proposed to be conducted. The Company Intellectual Property Rights are valid, enforceable and subsisting, and no loss, other than by expiration of patents at the end of their respective statutory terms and the expiration of licenses at the end of their respective terms, of any of the Company Intellectual Property Rights is threatened or pending. The Group Companies have taken all commercially reasonable, customary and necessary action, including the payment of all fees and taxes (to the extent applicable), to maintain and protect the Company Intellectual Property Rights. The Group Companies first used the name "APlus.net" in commerce in connection with web hosting and related services by at least as early as May 1996.

(c)    Except as set forth on <u>Schedule 2.13(c)</u>, (i) there are no claims against a Group Company that were either made within the past six (6) years or are presently pending contesting the validity, use, enforceability, ownership or registrability of any of the Company Intellectual Property Rights, and to the Knowledge of the Group Companies, there is no reasonable basis for any such claim, (ii) no Group Company has infringed, misappropriated or otherwise conflicted with, and the operation of the business of any Group Company as currently conducted does not infringe, misappropriate or otherwise conflict with, any Intellectual Property Rights of any other Persons and no Group Company has any Knowledge of any facts or circumstances that indicate a likelihood of the foregoing, (iii) no Group Company or Seller has received any notices (including cease-and-desist letters or offers to license) alleging infringement or misappropriation of, or other conflict with, any Intellectual Property Rights of any other Person, and (iv) to the Knowledge of the Group Companies, no other Person is infringing, misappropriating or otherwise conflicting with any of the Company Intellectual Property Rights. The transactions contemplated by this Agreement will not impair the right, title or interest of any Group Company in and to the Company Intellectual Property Rights and Company Systems, and all of the Company Intellectual Property Rights and Company Systems will be owned or available for use by the Group Companies immediately after the Closing on terms and conditions identical to those under which the Group Companies owned or used the Company Intellectual Property Rights and Company Systems immediately prior to the Closing. To the Knowledge of the Group Companies, no current or former employee, consultant, director or officer of any Group Company has disclosed to any Third Party or otherwise used any confidential information of such Group Company except in the course of their employment or engagement with such Group Company and at the direction of such Group Company.

(d)    The Group Companies own all right, title and interest in and to all Intellectual Property Rights authored, developed or otherwise created by each current and former employee, consultant, director and officer of the Group Companies, without any restrictions or obligations owed to such employee, consultant or officer with respect to such Group Company's use or ownership of such Intellectual Property Rights.

(e)    The software, firmware, hardware (whether general or special purpose), networks and interfaces that are used or relied on by the Group Companies in the conduct of their respective businesses (collectively, the "Company Systems") are sufficient for the immediate needs of the Group Companies, including as to capacity and ability to process current peak volumes in a timely manner. In the twelve (12) month period prior to the date of

14

this Agreement, there have been no bugs in, failures, breakdowns, or continued substandard performance of any Company Systems which have caused the substantial disruption or interruption in or to the use of the Company Systems or the operation of the business of any Group Company.

(f)    The software included in the Company Intellectual Property (the "Company Software") is not subject to any "copyleft" or other obligation or condition (including any obligation or condition under any "open source" license) that could (i) require, or condition the use or distribution of such software, on the disclosure, licensing, or distribution of any source code for any portion of such Software or (ii) otherwise impose any limitation, restriction, or condition on the right or ability of any Group Company to use, license or distribute any software.

(g)    In each agreement in which any Group Company has licensed software, firmware, hardware, networks or interfaces to Third Parties, such Group Company has (i) limited its liability to no more than the amount of the fees paid pursuant to such agreement and (ii) not warranted as to the performance or functionality of such software, firmware, hardware, networks or interfaces other than stating that such software, firmware, hardware, networks or interfaces will perform in accordance with their respective documentation and/or specifications.

(h)    (i) No source code for any Company Software has been delivered, licensed, or made available to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of a Group Company, (ii) no Group Company has a duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any Company Software to any escrow agent or other Person who is not, as of the date of this Agreement, an employee of a Group Company, and (iii) no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) could, individually or in the aggregate, reasonably be expected to result in the delivery, license, or disclosure of the source code for any Company Software to any Person who is not, as of the date of this Agreement, an employee of a Group Company.

(i)    The Group Companies are in compliance with (i) all applicable data protection or privacy laws governing the collection or use of personal information and (ii) any privacy policies or related policies, programs or other notices that concern any Group Company's collection or use of personal information.

2.14.  <u>Litigation</u>.  Except as set forth on <u>Schedule 2.14</u>, there are no actions, suits, hearings, proceedings (including any arbitration proceedings), orders, investigations, grievances, indictments, claims, condemnations, assessments, expropriations or other proceedings in eminent domain (a) pending or, to the Knowledge of any Group Company, threatened against or affecting any Group Company or its assets, or (b) pending or threatened by any Group Company against any Third Party, in each case, at law or in equity, or before or by any Government Entity (including any actions, suits, proceedings or investigations with respect to the transactions contemplated by this Agreement).  No Group Company is subject to any judgment, order or decree of any Government Entity.  The actions, suits and proceedings required to be listed on <u>Schedule 2.14</u> could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.15.  <u>Brokerage</u>.  Except as set forth on <u>Schedule 2.15</u>, there are and will be no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which any Group Company is a party or to which any Group Company is subject for which any Group Company or the Buyer could become obligated.

2.16.  <u>Insurance</u>.  <u>Schedule 2.16</u> set forth a description of each insurance policy maintained by any Group Company with respect to its properties, assets and business (including the name of the insurer, the policy number, and the period, amount and scope of coverage) (collectively, the "<u>Insurance Policies</u>").  No Group Company (a) is in default with respect to its obligations under any insurance policy maintained by it, or (b) has ever been denied insurance coverage.  Each such Insurance Policy is legal, valid, binding and enforceable in accordance with its terms (except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally) and in full force and effect.  <u>Schedule 2.16</u> sets forth a list of all claims, if any, made by any Group Company since July 1, 2002 against an insurer in respect of coverage under an insurance policy and there have been no denials of claims nor reservation of rights letters with regard to such claims.  The insurance coverage of the Group Companies is placed with insurers rated "Excellent" or better by AM Best.  No Group Company has any self-insurance or co-insurance programs.

2.17.  <u>Labor Matters</u>.

(a)  <u>Schedule 2.17(a)</u> sets forth a true, complete and correct list of (i) all employees of each Group Company, (ii) the position, date of hire, current annual rate of compensation (or with respect to employees compensated on an hourly or per diem basis, the hourly or per diem rate of compensation), including any bonus, contingent or deferred compensation, (iii) the total compensation for each executive and key employee during the period beginning on July 1, 2005 and ending on June 30, 2006, including any bonus, contingent or deferred compensation, (iv) a list of each of the directors of each Group Company, and (v) the current annual rate of compensation of each such director.  No executive or key employee of any Group Company and no group of employees or contractors of any Group Company (including salespersons) has informed any Group Company (whether orally or in writing) of any plan to terminate employment with or services for any Group Company, and, to the Knowledge of each

Group Company, no such person or persons has any plans to terminate employment with or services for any Group Company.

(b)    Except as set forth on <u>Schedule 2.17(b)</u>, no Group Company: (i) has experienced any strikes, grievances, claims of unfair labor practices, or other material labor disputes; (ii) has committed any material unfair labor practice; (iii) has Knowledge of any union organizational or decertification activities underway or threatened by, on behalf of or against any labor union with respect to employees of any Group Company; (iv) has any material workman's compensation liability, experience or pending matter; (v) has, within the past three (3) years, implemented any plant closing or layoff of employees that could implicate the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state, provincial or local plant closing or mass layoff Law (collectively, the "<u>WARN Act</u>"), and no such action will be implemented without advance notification to the Buyer; or (vi) is subject to any pending or, to the Knowledge of the Group Companies, threatened, employment-related charge, complaint, grievance, investigation, or inquiry of any kind in any forum, relating to an alleged violation or breach by any Group Company (or its officers or directors) of any employment or labor related Law, regulation or contract, and, to the Knowledge of each Group Company, no employee or agent of any Group Company has committed any act or omission giving rise to Liability for any violation or breach identified in this Section <u>2.17(b)</u>.

(c)    Abacus Bulgaria has fulfilled all statutory requirements so that foreigners may legally work at its enterprise in Bulgaria, either as its own employees or as employees commissioned by a foreign employer.

2.18.    <u>Employee Benefits</u>.

(a)    <u>Schedule 2.18(a)</u> sets forth a true, complete and correct list of each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) and each other benefit plan, program or arrangement maintained, sponsored, contributed to or required to be contributed to by any Group Company, or with respect to which any Group Company has any current or potential Liability (each, an "<u>Employee Benefit Plan</u>" and collectively, the "<u>Employee Benefit Plans</u>").

(b)    With respect to each Employee Benefit Plan, the Sellers have delivered to the Buyer true, complete and correct copies of, as applicable: (i) plan and trust documents, with all amendments thereto; (ii) summary plan descriptions; (iii) the most recent determination or opinion letter received from the IRS; (iv) the three (3) most recent annual reports (Form 5500-series, with all applicable attachments); (v) all related insurance contracts, other funding arrangements and administrative services agreements; and (vi) all other documents pursuant to which such Employee Benefit Plan is maintained, funded and administered.

(c)    Each Employee Benefit Plan (and each related trust, insurance contract or fund) has been maintained, funded and administered in accordance with its terms and the terms of any applicable collective bargaining agreement and complies in all material respects in form and in operation with all applicable requirements of ERISA, the Code and other applicable Laws. Each Group Company (except as set forth on <u>Schedule 2.18(a)</u>) and each Person that at any relevant time is or has been treated as a single employer with any Group

Company for purposes of Section 414 of the Code (each, an "ERISA Affiliate") have complied and are in compliance with the requirements of Part 6 of Subtitle B of Title I of ERISA, Section 4980B of the Code, and any similar state Laws ("COBRA").

(d)    Each Employee Benefit Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Code has received a determination from the IRS that such Employee Benefit Plan is so qualified, and, to the Knowledge of the Group Companies, nothing has occurred since the date of such determination that could adversely affect the qualification of such Employee Benefit Plan; and each such Employee Benefit Plan has been timely amended to comply with the provisions of the legislation commonly referred to as "GUST" and "EGTRRA" and has been submitted to the IRS for a determination or opinion letter that takes the GUST amendments into account within the GUST remedial amendment period.

(e)    With respect to each Employee Benefit Plan, all contributions or payments (including all employer contributions, employee salary reduction contributions, and premium payments) that are due have been made within the time periods prescribed by the terms of each Employee Benefit Plan, ERISA, the Code and other applicable Laws, and all contributions or payments for any period ending on or before the Closing Date that are not yet due have been made or properly accrued.

(f)    No Group Company or any ERISA Affiliate maintains, sponsors, contributes to, has any obligation to contribute to, or has any current or potential Liability under or with respect to (i) any "defined benefit plan" as defined in Section 3(35) of ERISA or any other plan subject to the funding requirements of Section 412 of the Code or Section 302 or Title IV of ERISA, (ii) any "multiemployer plan" as defined in Section 3(37) of ERISA , or (iii) any benefit plan, program or arrangement that provides for post-retirement medical, life insurance or other similar benefits (other than health continuation coverage required by COBRA). No Group Company or any ERISA Affiliate has any current or potential Liability under Title IV of ERISA.

(g)    Except as set forth on Schedule 2.18(g), no Group Company or any ERISA Affiliate maintains, contributes to or has an obligation to contribute to, or has any Liability with respect to, the provision of any health or life insurance or other welfare-type benefits for current or future retired or terminated directors, officers, employees or contractors (or any spouse or other dependent thereof) other than in accordance with COBRA.

(h)    With respect to each Employee Benefit Plan, (i) there have been no non-exempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code), (ii) no "fiduciary" (as defined in Section 3(21) of ERISA) has any Liability for breach of fiduciary duty or any other failure to act or comply in connection with the administration or investment of the assets of such Employee Benefit Plan, and (iii) no action, investigation, suit, proceeding, hearing, audit or claim (other than routine claims for benefits) is pending or threatened, and there are no facts that would give rise to or could reasonably be expected to give rise to any such action, investigation, suit , proceeding, hearing, audit or claim.

(i)    Each Group Company has, for purposes of each Employee Benefit Plan, correctly classified those individuals performing services for such Group Company as

common law employees, leased employees, independent contractors or agents of such Group Company. The transactions contemplated by this Agreement will not cause the acceleration of vesting in, or payment of, any benefits under any Employee Benefit Plan and will not otherwise accelerate or increase any liability or obligation under any Employee Benefit Plan.

(j)    Abacus Bulgaria does not have any outstanding social security or health security contributions.

2.19.    <u>Compliance with Laws; Permits</u>.

(a)    Each Group Company has complied, and is in compliance in all material respects, with all applicable Laws. Except as set forth on <u>Schedule 2.19(a)</u>, no notices have been received by and no claims have been filed against any Group Company alleging a violation of any Laws.

(b)    The Group Companies hold all Licenses from any Government Entity or Standards Organization required for the conduct of their business and the ownership of their properties, and <u>Schedule 2.19(b)</u> sets forth a true, complete and correct list of all of such Licenses held by the Group Companies. No notices have been received by the any Group Company alleging the failure to hold any License of any Government Entity or Standards Organization. Each Group Company is in compliance with all material terms and conditions of all Licenses which it holds. All of such Licenses are in full force and effect and, immediately after the Closing, will be in full force and effect and available for use by the Group Companies. No loss or expiration of any License is pending or, to the Knowledge of the Group Companies, threatened or reasonably foreseeable (including as a result of the transactions contemplated hereby) other than expiration in accordance with the terms thereof, which terms do not expire as a result of the consummation of the transactions contemplated hereby.

2.20.    <u>Environmental and Safety Matters</u>.

(a)    Each Group Company has complied with and is currently in compliance in all material respects with all Environmental Laws. Without limiting the foregoing, each Group Company has obtained and complied with, and is currently in compliance with, all Licenses required pursuant to any Environmental Laws for the occupancy of its properties or facilities or the operation of its business, a true, complete and correct list of all such Licenses being set forth on <u>Schedule 2.20(a)</u>.

(b)    No Group Company has received any notice, report or other information regarding any violation of any Environmental Laws or any Liability, including any investigatory, remedial or corrective obligations, relating to the Group Companies or any of their current or former properties or operations arising under Environmental Laws.

(c)    None of the following exists at the Phoenix Property or, to the Knowledge of the Group Companies, at any other property or facility currently owned, occupied or operated by any Group Company:

(i)    underground storage tanks;

19

(ii)    asbestos-containing materials in any form or condition;

(iii)    materials or equipment containing polychlorinated biphenyls; or

(iv)    groundwater wells, landfills, surface impoundments or other disposal areas.

(d)    No Group Company nor any of its predecessors or Affiliates has treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled, exposed Persons to or released any Hazardous Substance, or owned or operated any facility or property (and no such property or facility is contaminated by any Hazardous Substance) so as to give rise to any Liabilities, including any Liability for response costs, corrective action costs, personal injury, natural resource damages, property damage or attorneys fees or any investigative, corrective or remedial obligations, pursuant to CERCLA, the Solid Waste Disposal Act, as amended, or any other Environmental Laws.

(e)    No Group Company has (either expressly or by operation of law) assumed, undertaken or otherwise become subject to any Liability or corrective or remedial obligation of any other Person relating to any Environmental Laws.

(f)    No Group Company nor any of its predecessors or Affiliates have manufactured, sold, marketed, installed, removed or distributed asbestos or products or items containing asbestos, and none of such Persons has any Liabilities with respect to the presence or alleged presence of asbestos-containing material in any product or item on, at or upon any property or facility.

(g)    The Sellers have furnished to the Buyer all environmental audits, reports and other material environmental documents relating to the former or current properties, facilities or operations of the Group Companies and their predecessors or Affiliates, to the extent such documents are in the possession, custody or control of the Group Companies or the Sellers.

(h)    Neither the performance by any Group Company pursuant to any Transaction Document nor the consummation of the transactions contemplated hereby and thereby will result in any obligations for site investigation or cleanup, or notification to or consent of Government Entities or Third Parties, pursuant to any of the so-called "transaction-triggered" or "responsible property transfer" Environmental Laws.

2.21.    <u>Affiliate Transactions</u>.

(a)    Except as set forth on <u>Schedule 2.21(a)</u>, no employee, officer, director, shareholder or Affiliate of the Group Companies (including each Seller), or any Person in the Family Group of any of the foregoing (each, a "<u>Company Affiliate</u>") (i) is a party to any agreement, contract, commitment, arrangement, or transaction with any Group Company or that pertains to the business of the Group Companies other than any employment, non-competition, confidentiality or other similar agreements between any Group Company and any Person who is an officer, director or employee of the Group Companies (each, an "<u>Affiliate Agreement</u>"); or (ii) owns, leases, or has any economic or other interest in any asset, tangible or intangible, that is

used by any Group Company in carrying out its business (together with the Affiliate Agreements, collectively the "Affiliate Transactions").

(b)     As of the Closing, there will be no outstanding or unsatisfied obligations of any kind (including inter-company accounts, notes, guarantees, loans, or advances) between any Group Company, on the one hand, and a Company Affiliate on the other hand, except to the extent arising out of the post-Closing performance of an Affiliate Agreement that is in writing and is set forth on Schedule 2.21(b) (and a true, complete and correct copy of which has been provided to the Buyer).   The satisfaction, release, termination, or other disposition of an Affiliate Transaction will not cause, and could not, individually or in the aggregate, reasonably be expected to cause, any Group Company to suffer a material Adverse Consequence, except to the extent that such Adverse Consequence is reflected on the Most Recent Balance Sheet and does not and will not impose any obligation or other Liability on any Group Company from and after the Closing.

2.22.   Suppliers and Customers.   Schedule 2.22 sets forth a complete and accurate list of: (a) all customers of Abacus America and its Subsidiaries during the fiscal year ended June 30, 2006, that generated at least $25,000 of revenue to the Group Companies in such fiscal year, showing the approximate total sales to each such customer during such fiscal year and the percentage of the total sales of the Group Companies represented by such sales; and (b) all suppliers to the Group Companies from whom the Group Companies made aggregate purchases in excess of $25,000 during the fiscal year ended June 30, 2006, showing the approximate total purchases by the Group Companies from each such supplier during such fiscal year.   Except as set forth on Schedule 2.22, (A) the relationship of the Group Companies with each such customer and supplier is, to the Knowledge of each Group Company, a good commercial working relationship and (B) (i) no such customer or supplier within the last twelve (12) months has canceled or otherwise terminated, or threatened to cancel, or to the Knowledge of the Group Companies, intends to cancel or terminate, its relationship with any Group Company, (ii) no such customer or supplier during the last twelve (12) months has decreased materially or threatened to decrease or limit materially its business with any Group Company, or to the Knowledge of the Group Companies, intends to modify materially its relationship with any Group Company (including changing the terms, whether related to payment, price or otherwise), (iii) no such supplier during the last twelve (12) months has materially increased or threatened to materially increase the prices charged by such supplier to any Group Company for the goods or services provided by such supplier to any Group Company, and (iv) to the Knowledge of the Group Companies, the consummation by each Group Company of the transactions contemplated by this Agreement will not adversely affect the relationship of the Group Companies with any of such customers and suppliers.   Abacus Bulgaria's only customer is Abacus America.

2.23.   Real Property.

(a)     No Group Company has any Owned Real Property.   Abacus Bulgaria previously owned residential real property and land located at 22 Veliko Tarnovo Str., Sofia, Bulgaria, and vacant land located at complex Mladost 2, Sofia, Bolgaria (collectively, the "Bulgarian Real Property"), title to which was transferred to the Shareholders prior to the Closing.

21

(b)    Schedule 2.23(b) sets forth the address of each Leased Real Property and a true, complete and correct list of all leases, subleases and other occupancy agreements (written and oral), including all amendments, extensions and other modifications pursuant to which any Group Company holds any Leased Real Property (the "Real Property Leases"), including the date and the names of the parties to such Real Property Leases.  The Sellers have previously delivered to the Buyer true, complete and correct copies of all the Real Property Leases and, in the case of an oral Real Property Lease, a written summary of the material terms thereof.  The Group Companies have a good and valid leasehold interest in and to all of the Leased Real Property, subject to no Liens except for Permitted Liens.  Except as set forth on Schedule 2.23(b), with respect to each Real Property Lease: (i) such Real Property Lease is legal, valid, binding and in full force and effect and is enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally; (ii) there exists no breach or default or condition which, with the giving of notice, the passage of time or both, could become a breach or default under such Real Property Lease, or permit the termination, modification or acceleration of rent under such Real Property Lease; (iii) the Group Companies' possession and quiet enjoyment of the Leased Real Property under such Real Property Lease has not been disturbed, and to the Knowledge of the Group Companies, there are no disputes with respect to such Real Property Lease; (iv) no security deposit or portion thereof deposited with respect to such Real Property Lease has been applied in respect of a breach or default under such Real Property Lease which has not been redeposited in full; (v) no Group Company owes or will owe in the future, any brokerage commissions or finder's fees with respect to such Real Property Lease; (vi) the other party to such Real Property Lease is not a Company Affiliate; (vii) no Group Company has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (viii) there are no Liens on the estate or interest created by such Real Property Lease and no Group Company has collaterally assigned or granted any other security interest in such Real Property Lease.

(c)    The Leased Real Property constitutes all of the real property owned, leased, occupied or otherwise utilized in connection with the business of the Group Companies.  The Leased Real Property is in good condition and repair (normal wear and tear excepted) and is sufficient for the conduct of the business of the Group Companies.  The Phoenix Property and, to the Knowledge of the Group Companies, the other Leased Real Property conforms in all material respects to all applicable building, zoning and other laws, ordinances, rules and regulations.  There is no pending or, to the Knowledge of the Group Companies, any threatened condemnation proceeding, lawsuit or administrative action affecting any portion of the Leased Real Property.  None of the Leased Real Property or any portion thereof is located in a flood hazard area (as defined by the Federal Emergency Management Agency).  All buildings, structures, improvements, fixtures, building systems and equipment, and all components thereof, included in the Leased Real Property (the "Improvements") are in good condition and repair (normal wear and tear excepted).  To the Knowledge of the Group Companies, (i) there are no structural deficiencies or latent defects affecting any of the Improvements and (ii) there are no facts or conditions affecting any of the Improvements which could, individually or in the aggregate, interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the business of the Group Companies.  Each parcel of Leased Real Property has direct access to a public street adjoining the Leased Real Property, and

such access is not dependent on any land or other real property interest which is not included in the Phoenix Property or, to the Knowledge of the Group Companies, the other Leased Real Property. None of the Improvements or any portion thereof at the Phoenix Property or, to the Knowledge of the Group Companies, at any other Leased Real Property is dependent for its access, use or operation on any land, building, improvement or other real property interest which is not included in the Leased Real Property.

2.24.  <u>Certain International Business Practices</u>.  No Group Company nor any director, officer, agent or employee of any Group Company has directly or indirectly:

(a)  made or agreed to make any contribution, payment or gift to any government official, employee or agent where either the contribution, payment or gift or the purpose thereof was illegal under the laws of any federal, state, local or foreign jurisdiction;

(b)  made or agreed to make any illegal contribution, or illegally reimbursed any political gift or contribution made by any other Person, to any candidate for federal, state, local or foreign public office;

(c)  paid or delivered any fee, commission or any other sum of money or item of property, however characterized, to any finder, agent, government official or other party, in the United States or any other country, which (i) in any manner relates to the assets, business or operations of the respective Group Company and (ii) the Group Companies, or any officer or director of the Group Companies, knew or had reason to believe to have been illegal under any federal, state or local laws (or any rules or regulations thereunder) of the United States or any other country having jurisdiction;

(d)  made or provided any material false statement or material omission to any agency of any federal, state or local government, purchaser of products or services, or foreign government or foreign agency, in connection with the importation of merchandise (including the valuation or classification of imported merchandise, the duty treatment of imported merchandise, the eligibility of imported merchandise for favorable duty rates or other special treatment, country-of-origin marking, North American Free Trade Agreement certificates, or other statements or certificates concerning origin, quota or visa rights) or other approvals required by a foreign government or agency; or

(e)  engaged in or otherwise participated in, assisted or facilitated any transaction that is prohibited by any applicable embargo or related trade restriction imposed by the United States Office of Foreign Assets Control or any other agency of the United States Government.

## ARTICLE III
## Representations and Warranties of the Sellers

As a material inducement to the Buyer to enter into this Agreement and to consummate the transactions contemplated hereby, the Sellers jointly and severally represent and warrant to the Buyer that the statements contained in this <u>ARTICLE III</u> with respect to each Seller are correct and complete as of the Closing Date.

3.1.    Capacity; Execution and Enforceability; No Breach.

(a)    Each Seller has full capacity to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)    Each Seller's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all necessary action on the part of such Seller. Each Transaction Document to which a Seller is a party has been duly and validly executed and delivered by such Seller and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of such Seller, enforceable against such Seller in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)    Except as set forth on Schedule 2.4(c), the execution and delivery by each Seller of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by such Seller does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon the Shares pursuant to, (iv) give any Third Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) any Law, order, judgment or decree to which such Seller is subject, or (B) any material agreement or instrument to which such Seller is subject.

3.2.    Title to Shares.  Each Seller owns of record and beneficially the Shares as set forth opposite such Seller's name on Schedule 2.2, and such Seller has good and valid title to such Shares, free and clear of all Liens and, at the Closing, such Seller will deliver to the Buyer good and valid title to such Shares, free and clear of all Liens and Taxes.  No Seller owns or has the right to acquire, directly or indirectly, any other shares of capital stock of any Group Company.  No Seller is a party to any option, warrant, purchase right, or other contract or commitment that could require a Seller to sell, transfer, or otherwise dispose of any capital stock of any Group Company (other than this Agreement).  No Seller is a party to any voting trust, proxy, or other agreement or understanding with respect to the voting of any capital stock of any Group Company.

3.3.    Brokerage.  Except as set forth on Schedule 3.3, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which any Seller is a party or to which any Seller is subject for which any Group Company or the Buyer could become obligated.

3.4.    Litigation, etc.  There are no actions, suits, proceedings (including any arbitration proceedings), orders, investigations or claims pending or, to the Knowledge of the

Sellers, threatened against or affecting the Sellers in which it is sought to restrain or prohibit or to obtain damages or other relief in connection with the transactions contemplated hereby.

3.5.    Investment Intent.    In connection with the acquisition of the Equity Consideration hereunder, each Seller represents and warrants to the Buyer that:

(a)    The Equity Consideration to be acquired by the Sellers pursuant to this Agreement will be acquired for their own account and not with a view to, or intention of, distribution thereof in violation of the Securities Act of 1933 (the "1933 Act"), or any applicable state securities laws, and such Equity Consideration will not be disposed of in contravention of the 1933 Act or any applicable state securities laws.

(b)    Such Seller is able to bear the economic risk of the investment in the Equity Consideration for an indefinite period of time because the Equity Consideration will, when acquired, be subject to the transfer restrictions contained in the Stockholders Agreement and has not been registered under the 1933 Act.

(c)    Such Seller has had an opportunity to ask questions and receive answers concerning the terms and conditions of the offering of the Equity Consideration and has had full access to such other information concerning the Buyer as such Seller has requested. Such Seller has reviewed, or has had an opportunity to review copies of the following documents, (i) Buyer's certificate of incorporation and bylaws, (ii) the Stockholders Agreement, and (iii) the Registration Rights Agreement.

(d)    Such Seller acknowledges and agrees that, except as set forth in the Stockholders Agreement, none of the Buyer or any Group Company will have any duty or obligation to disclose to such Seller, and such Seller will have no right to be advised of, any material information regarding the Buyer or any Group Company at any time after the date of this Agreement including prior to, upon, or in connection with the sale of the Equity Consideration by such Seller.

3.6.    Restricted Securities.    Each Seller understands and agrees that, until registered under the 1933 Act or transferred pursuant to the provisions of Rule 144 as promulgated by the Securities and Exchange Commission, all certificates evidencing any of the Equity Consideration will bear a legend, prominently stamped or printed thereon, reading substantially as follows:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT ANY EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS, OR THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS. THE TRANSFER OF THE SECURITIES REPRESENTED BY THIS

CERTIFICATE IS SUBJECT TO A STOCKHOLDERS AGREEMENT DATED AS OF JULY 25, 2006, BY AND AMONG THE ISSUER OF SUCH SECURITIES (THE "COMPANY") AND CERTAIN OF THE COMPANY'S STOCKHOLDERS.  A COPY OF SUCH STOCKHOLDERS AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST."

## ARTICLE IV
### Representations and Warranties of the Buyer

As a material inducement to the Companies and the Sellers to enter into this Agreement and to consummate the transactions contemplated hereby, the Buyer represents and warrants to the Companies and the Sellers that the statements contained in this <u>ARTICLE IV</u> with respect to the Buyer are correct and complete as of the Closing Date.

4.1.  <u>Organization</u>.  The Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, and is licensed or qualified to conduct its business and is in good standing in every jurisdiction where it is required to be so licensed or qualified except where the failure to be so licensed or qualified could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  The copies of the certificate of incorporation and bylaws (or other comparable organizational documents) of Buyer which have been furnished to the Shareholders reflect all amendments made thereto at any time prior to the date of this Agreement and are true, complete and correct copies of the originals.

4.2.  <u>Authorization; Execution and Enforceability; No Breach</u>.

(a)  The Buyer possesses full corporate power and authority to execute and deliver each Transaction Document to which it is a party and any and all instruments necessary or appropriate in order to fully effectuate the terms and conditions of each such Transaction Document and to perform and consummate the transactions contemplated hereby and thereby.

(b)  The Buyer's execution, delivery and performance of each Transaction Document to which it is a party has been duly and validly authorized by all necessary action on the part of the Buyer and the Buyer's stockholders.  Each Transaction Document to which the Buyer is a party has been duly and validly executed and delivered by the Buyer and constitutes, or upon its execution and delivery will constitute, a valid and legally binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms and conditions, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally.

(c)  Except as set forth on <u>Schedule 4.2(c)</u>, the execution and delivery by the Buyer of each Transaction Document to which it is a party, and the fulfillment of and compliance with the respective terms hereof and thereof by the Buyer does not and will not (i) conflict with or result in a breach of the terms, conditions or provisions of, (ii) constitute a default under (whether with or without the passage of time, the giving of notice or both), (iii) result in the creation of any Lien upon the Buyer's capital stock or assets, (iv) give any Third

Party the right to modify, terminate or accelerate any obligation under, (v) result in a violation of, or (vi) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Third Party or any Government Entity pursuant to (A) the certificate of incorporation or bylaws of the Buyer, (B) any Law, order, judgment or decree to which the Buyer is subject, or (C) any agreement or instrument to which the Buyer is subject.

      4.3.   <u>Brokerage</u>. There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement to which the Buyer is a party or to which the Buyer is subject for which any Seller could become liable or obligated.

      4.4.   <u>Investment Intent</u>. The Buyer is acquiring the Shares for investment purposes only and not with a view to distribution or resale. The Buyer understands and agrees that all certificates evidencing any of the Shares will initially bear a legend, prominently stamped or printed thereon, reading substantially as follows:

      "THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR APPLICABLE STATE SECURITIES LAWS. THESE SECURITIES HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO DISTRIBUTION OR RESALE, AND MAY NOT BE SOLD, MORTGAGED, PLEDGED, HYPOTHECATED OR OTHERWISE TRANSFERRED WITHOUT ANY EFFECTIVE REGISTRATION STATEMENT FOR SUCH SECURITIES UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS, OR THE AVAILABILITY OF AN EXEMPTION FROM THE REGISTRATION PROVISIONS OF THE SECURITIES ACT OF 1933 AND APPLICABLE STATE SECURITIES LAWS."

      4.5.   <u>Capitalization</u>. As of the date of this Agreement, the authorized capital stock of the Buyer consists of 2,900,000 shares of common stock, par value $0.001 per share, and 100,000 shares of preferred stock, par value $0.001 per share. Immediately after the Closing, the Equity Consideration will be duly authorized, validly issued, fully-paid and non-assessable and free and clear of any Liens (other than those incurred by the Shareholders, as set forth in the Stockholders Agreement or as otherwise set forth herein) and will have been issued and transferred free and clear of any preemptive or similar rights. As of the date of this Agreement, the Buyer does not have any outstanding (i) stock or securities convertible, exercisable or exchangeable for any shares of its capital stock or containing any profit participation features, nor any rights or options to subscribe for, or to purchase, its capital stock or (ii) any stock appreciation rights or phantom stock or similar plans or rights. As of the date of this Agreement, there are no (x) outstanding obligations of the Buyer (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of its capital stock or any warrants, options or other rights to acquire its capital stock or (y) voting trusts, proxies or other agreements among the Buyer's stockholders with respect to the voting or transfer of the Buyer's capital stock (other than the Stockholders Agreement).

      4.6.   <u>Purpose</u>. The Buyer was formed solely for the purpose of acquiring, directly or indirectly, the Shares as set forth in this Agreement and consummating the other transactions contemplated by the Transaction Documents. Since the date of its inception, the

Buyer has not engaged in any activity other than such actions in connection with (a) its organization and (b) the preparation, negotiation and execution of the Transaction Documents and the transactions (including financing transactions) contemplated hereby and thereby.

## ARTICLE V
## Closing Conditions

5.1.    <u>Conditions Precedent to Obligations of the Buyer</u>.  The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing by the Buyer:

(a)    <u>Accuracy of Representations and Warranties; Performance of Covenants</u>.  The representations and warranties of the Group Companies and the Sellers contained in this Agreement (i) that are qualified as to materiality (including Material Adverse Effect) must be true and correct in all respects, and (ii) that are not so qualified must be true and correct in all material respects as of the Closing with the same force and effect as though made on and as of the Closing (other than those representations and warranties that address matters only as of a particular date or only with respect to a specific period of time, which need only be accurate as of such date or with respect to such period).  Each Group Company and Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing.

(b)    <u>No Material Adverse Effect</u>.  No fact, event or circumstance shall have occurred which has had or could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(c)    <u>No Legal Prohibition</u>.  No Law, judgment, injunction or order shall have been enacted, promulgated, entered or enforced by any court or Government Entity which would prohibit the consummation of the transactions contemplated by this Agreement.

(d)    <u>Consents and Approvals</u>.  Each Group Company and Seller shall have made all filings and shall have obtained all permits, authorizations, consents and approvals required to be obtained by the Group Companies and/or Sellers to consummate the transactions contemplated by this Agreement as set forth on <u>Schedule 2.4(c)</u> and shall have delivered true, complete and correct copies of such to the Buyer.

(e)    <u>UCC-3's; Payoff Letters</u>.  The Buyer shall have received duly executed payoff letters or UCC-3 termination statements and other terminations, pay-offs and/or releases (in each case, in a form reasonably satisfactory to the Buyer) or, at the Buyer's option, assignments, necessary to terminate, release or assign, as the case may be, all Liens on the properties and assets  of the Group Companies and evidence of the complete satisfaction in full of all outstanding Indebtedness of the Group Companies.

(f)    <u>Resignations</u>.  Each Group Company shall have received duly executed resignations of its directors and officers (in each case, in a form reasonably satisfactory to the Buyer) and delivered true, complete and correct copies thereof to the Buyer.

(g)    <u>Termination of Affiliate Transactions</u>.    The Buyer shall have received evidence satisfactory to the Buyer of the termination of all Affiliate Transactions other than those set forth on <u>Schedule 2.21(b)</u>.

(h)    <u>Non-foreign Affidavit</u>.    Each Seller shall have delivered to the Buyer a non-foreign affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Code Section 1445 stating that such Seller is not a "Foreign Person" as defined in Section 1445 of the Code.

(i)    <u>Legal Opinion</u>.    The Buyer shall have received an opinion addressed to the Buyer from Musick Peeler & Garrett LLP, counsel to the Group Companies and the Sellers, dated the Closing Date and in form and substance reasonably satisfactory to the Buyer, which also permits the administrative agent and lenders under the Buyer's (or its Subsidiary's) credit facility to rely on such opinion.

(j)    <u>Stock Pledge Agreements</u>.    Each Shareholder shall have delivered to the Buyer a Stock Pledge Agreement, duly executed by such Shareholder.

(k)    <u>Professional Services Agreement</u>.    Abacus America shall have delivered to Catalyst Investors, L.L.C. the Professional Services Agreement, duly executed by Abacus America.

(l)    <u>Software License Agreement</u>.    Rodopi Software, Inc. and Abacus America shall have duly executed the Software License Agreement.

(m)    <u>Registration Rights Agreement</u>.    The Shareholders shall have duly executed the Registration Rights Agreement.

(n)    <u>Stockholders Agreement</u>.    The Shareholders shall have duly executed the Stockholders Agreement.

(o)    <u>Phoenix Datacenter Lease</u>.    Abacus Phoenix, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Abacus America, and Litmath, LLC shall have duly executed the Phoenix Datacenter Lease.

(p)    <u>Alabanza Litigation</u>.    Abacus America, Cedant, Inc., and the Shareholders shall have duly executed the Alabanza Litigation Assignment Agreement.

(q)    <u>Group Company Deliveries</u>.    The Group Companies shall have delivered to the Buyer at or prior to the Closing:

(i)    good standing certificates with respect to each Group Company from the state of its incorporation (or formation) and each state where it is qualified to conduct business, dated within ten (10) days prior to the Closing Date;

(ii)    certified copies of the resolutions of the shareholders and/or directors of each Company approving the transactions contemplated by this Agreement;

(iii)    a certified copy of the certificate of incorporation of each Group Company; and

(iv)    such other documents relating to the transactions contemplated by this Agreement as the Buyer may reasonably request.

5.2.    <u>Conditions Precedent to Obligations of the Sellers</u>.  The obligations of the Sellers under this Agreement to consummate the transactions contemplated hereby will be subject to the satisfaction, at or prior to the Closing, of all the following conditions, any one or more of which may be waived in writing by the Shareholders:

(a)    <u>Accuracy of Representations and Warranties; Performance of Covenants</u>.  Except as expressly contemplated by this Agreement, the representations and warranties of the Buyer contained in this Agreement (i) that are qualified as to materiality must be true and correct in all respects, and (ii) that are not so qualified must be true and correct in all material respects, as of the Closing with the same force and effect as though made on and as of the Closing.  The Buyer shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed or complied with by the Buyer on or prior to the Closing.

(b)    <u>No Legal Prohibition</u>.  No Law, judgment, injunction or order shall have been enacted, promulgated, entered or enforced by any court or Government Entity which would prohibit consummation by such party of the transactions contemplated hereby.

(c)    <u>Registration Rights Agreement</u>.  The Buyer and the other parties thereto (other than the Shareholders) shall have duly executed the Registration Rights Agreement.

(d)    <u>Stockholders Agreement</u>.  The Buyer and the other parties thereto (other than the Shareholders) shall have duly executed the Stockholders Agreement.

(e)    <u>Alabanza Litigation</u>.  Abacus America and Cedant, Inc. shall have duly executed the Alabanza Litigation Assignment Agreement.

## ARTICLE VI
## Indemnification

6.1.    <u>Survival of Representations and Warranties</u>.  The representations and warranties in this Agreement shall survive the Closing and until the eighteen (18) month anniversary of the Closing Date, except that the representations and warranties set forth in <u>Section 2.1</u> (Organization; Power, Good Standing), <u>Section 2.2</u> (Capitalization); <u>Section 2.3(c)</u> (Subsidiaries); <u>Section 2.4(a)</u> and <u>(b)</u> (Authorization; Execution & Enforceability); <u>Section 2.11</u> (Tax Matters); <u>Section 2.15</u> (Brokerage); <u>Section 2.18</u> (Employee Benefits); <u>Section 2.21</u> (Affiliate Transactions); <u>Section 3.1(a)</u> and <u>(b)</u> (Capacity; Execution & Enforceability); <u>Section 3.2</u> (Title to Shares); <u>Section 3.3</u> (Brokerage); <u>Section 4.1</u> (Organization); and <u>Section 4.2(a)</u> and <u>(b)</u> (Authorization; Execution & Enforceability) and <u>Section 4.3</u> (Brokerage) (collectively, the "<u>Fundamental Representations</u>") shall survive indefinitely; *provided*, that any representation or warranty in respect of which indemnity may be sought under this <u>ARTICLE</u>

VI, and the indemnity with respect thereto, shall, with respect to any claimed inaccuracy or breach, survive the time at which it would otherwise terminate pursuant to this Section 6.1 and until such time it is finally resolved if notice of such inaccuracy or breach thereof giving rise to such right or potential right of indemnity shall have been given to the party against whom such indemnity may be sought prior to such time. The representations and warranties in this Agreement shall survive for the periods set forth in this Section 6.1 and shall in no event be affected by any investigation, inquiry or examination made for or on behalf of any party, or the Knowledge of any party's officers, directors, shareholders, employees or agents, or the acceptance by any party of any certificate or opinion hereunder. The agreements and covenants set forth in this Agreement shall survive indefinitely, unless specifically stated otherwise.

　　6.2.　General Indemnification.

　　　　(a)　Indemnification Obligations of the Shareholders. After the Closing, the Shareholders, jointly and severally, shall indemnify the Buyer and its Subsidiaries, and their respective officers, directors, employees, agents, representatives, successors and permitted assigns (other than the Sellers) (collectively, the "Buyer Indemnified Persons") and save and hold each of them harmless against and pay on behalf of or reimburse the Buyer Indemnified Persons as and when incurred for any loss, liability, action, cause of action, cost, damage, Tax or expense, whether or not arising out of Third Party claims (including interest, penalties, reasonable attorneys', consultants' and experts' fees and expenses and all amounts paid in investigation, defense or settlement of any of the foregoing and after deducting (1) all insurance proceeds actually received in connection with any of the foregoing, (2) all payments actually received from responsible parties other than the Shareholders, and (3) the adjustments in Buyer's favor pursuant to Section 1.3(c), but only to the extent that the matter to be indemnified was included in such an adjustment) (collectively, "Losses", and each a "Loss"), which any Buyer Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

　　　　　　(i)　any facts or circumstances which constitute a breach of any representation or warranty of any Group Company or Seller under this Agreement, or in any of the certificates or other instruments or documents furnished by any Group Company or Seller pursuant to this Agreement;

　　　　　　(ii)　any breach of any covenant, agreement or other provision of this Agreement by any Group Company (but excluding a breach by any Group Company under ARTICLE VII of this Agreement) or Seller;

　　　　　　(iii)　any Closing Indebtedness or Unpaid Seller Expenses to the extent not previously taken into account in the calculation of the Final Cash Consideration;

　　　　　　(iv)　any Pre-Closing Taxes pursuant to Section 6.7;

　　　　　　(v)　any Pending Litigation; or

　　　　　　(vi)　the Bulgarian Real Property.

31

If and to the extent any provision of this <u>Section 6.2(a)</u> is unenforceable for any reason, each Shareholder hereby agrees to make the maximum contribution to the payment and satisfaction of the Loss for which indemnification is provided for in this <u>Section 6.2(a)</u> which is permissible under applicable Laws. Notwithstanding anything contained herein, in no event shall any Group Company be required to provide indemnification or contribution for any obligation of any Shareholder under this <u>Section 6.2(a)</u>.

   (b) <u>Indemnification Obligations of the Buyer</u>. After the Closing, the Buyer shall indemnify each Seller and its Affiliates (other than the Group Companies) (collectively, the "<u>Seller Indemnified Persons</u>") and hold them harmless against and pay on behalf of or reimburse the Seller Indemnified Persons as and when incurred for any Losses which any Seller Indemnified Person may suffer, sustain or become subject to, as a result of, in connection with, relating or incidental to or by virtue of:

    (i) any facts or circumstances which constitute a breach of any representation or warranty of the Buyer under this Agreement or in any of the certificates or other instruments or documents furnished by the Buyer pursuant to this Agreement; or

    (ii) any breach of any covenant, agreement or other provision by the Buyer under this Agreement or by any Group Company under <u>ARTICLE VII</u> of this Agreement.

If and to the extent any provision of this <u>Section 6.2(b)</u> is unenforceable for any reason, the Buyer hereby agrees to make the maximum contribution to the payment and satisfaction of the Loss for which indemnification is provided for in this <u>Section 6.2(b)</u> which is permissible under applicable Laws.

   6.3. <u>Limitations on Indemnification; Determination of Loss and Amount</u>. Notwithstanding anything contained in <u>Section 6.2</u>:

   (a) the Shareholders shall not be required to indemnify any Buyer Indemnified Person in respect of any Losses for which indemnity is claimed under <u>Section 6.2(a)(i)</u>, and the Buyer shall not be required to indemnify any Seller Indemnified Person in respect of any Losses for which indemnity is claimed under <u>Section 6.2(b)(i)</u>, unless and until the aggregate of all such Losses for which indemnification is being sought under <u>Section 6.2(a)(i)</u> or <u>Section 6.2(b)(i)</u>, as the case may be, exceeds $300,000 (the "<u>Basket</u>") (and then only for the amount by which such Losses exceed the Basket); *provided*, that the Basket shall not limit indemnification with respect to Losses relating to breaches of any Fundamental Representation or any facts or circumstances which constitute fraud;

   (b) in no event shall the Shareholders be required to indemnify the Buyer Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under <u>Section 6.2(a)(i)</u>, and in no event shall the Buyer be required to indemnify the Seller Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under <u>Section 6.2(b)(i)</u>, in each case for such aggregate Losses in excess of $18,000,000 (the "<u>Cap</u>"); *provided*, that Losses relating to breaches of any Fundamental Representation or any facts or circumstances which constitute fraud shall neither be applied toward, nor limited by, the Cap;

(c)    in no event shall the Shareholders be required to indemnify the Buyer Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(a)(i) for breaches of Fundamental Representations and under Sections 6.2(a)(iv) and 6.2(a)(v), and in no event shall the Buyer be required to indemnify the Seller Indemnified Persons in respect of aggregate Losses for which indemnity is claimed under Section 6.2(b)(i), in each case for such aggregate Losses in excess of the aggregate of the Final Cash Consideration plus the Non-Compete Amount (and also including, with respect to the Shareholders only, the shares of capital stock representing the Equity Consideration as provided in the Stock Pledge Agreement) (the "Maximum Cap"); *provided*, that Losses relating to any facts or circumstances which constitute fraud shall neither be applied toward, nor limited by, the Maximum Cap;

(d)    in the event that policies of insurance maintained by the Buyer or the Group Companies may cover any of the Losses to be indemnified hereunder, the Buyer and/or such Group Company shall use good faith and commercially reasonable efforts to make all proofs of loss and take all other commercially reasonable steps necessary to collect from the applicable insurers for any of the Losses covered by any such insurance; *provided*, that the costs of such collection shall be included in the calculation of Losses hereunder; and

(e)    in view of the limitations on indemnification set forth in this ARTICLE VI, for purposes of determining whether any Loss has occurred, or the amount of such Loss (but not for purposes of determining whether a breach of any representation, warranty or covenant has occurred), the representations, warranties and covenants of the parties set forth in this Agreement (or in any of the certificates or other instruments or documents furnished by any party pursuant to this Agreement) shall be considered without regard to any qualification based on "materiality" or "Material Adverse Effect".

6.4.    Tax Benefit.    If the amount with respect to which any claim is made under this ARTICLE VI (an "Indemnity Claim") gives rise to a Tax Benefit to the party that made the claim, such party shall refund to the Responsible Party the amount of such Tax Benefit when, as and if actually realized; *provided, however,* that such obligation of the Indemnified Party to refund to the Responsible Party the amount of any Tax Benefit shall only apply to the extent that such Tax Benefit is actually realized within two (2) years following the date on which such Indemnity Claim is made.

6.5.    Manner of Payment.    At the sole option of the Buyer, any indemnification of the Buyer Indemnified Persons pursuant to Section 6.2 may be effected by (a) direct recourse against the Shareholders, or (b) offsetting such amount against (i) any unpaid portion of the Non-compete Amount (provided, however, that if it is determined by a court of competent jurisdiction that indemnity was not owed to the applicable Buyer Indemnified Persons by the Shareholders, then the Shareholders shall be entitled to all remedies (including interest at the Applicable Rate) for Buyer's failure to pay any portion of the Non-compete Amount so off-set) or (ii) any indemnification obligation owing to Seller Indemnified Persons pursuant to Section 6.2, or (c) any combination of the foregoing.    Other than as set forth in (a) through (c) above, any indemnification owing pursuant to this Section 6.2 shall be effected by wire transfer of immediately available funds to an account designated in writing by the applicable Indemnified Party within fifteen (15) days after the determination thereof (either by agreement of the parties or judgment of a court of competent jurisdiction); *provided*, that if the Shareholders fail to make

such payment within such 15-day period, then the Buyer may offset such amount against any Equity Consideration paid to any Shareholder pursuant to this Agreement, which shall be valued at the lesser of (A) the fair market value of such Equity Consideration as of the Closing Date (which shall be the price per share paid at the Closing by the other stockholders of the Buyer) or (B) the fair market value of such Equity Consideration on the date of such offset (as reasonably determined in good faith by the board of directors of the Buyer). Any indemnification payments shall be made together with interest accruing thereon from the date the amount is due and payable by the applicable party, but no earlier than fifteen (15) days after written notice of the indemnification claim is made, to the date of payment at the Applicable Rate. Any party required by this ARTICLE VI to provide indemnification shall be subrogated to each and every claim of the Buyer Indemnified Persons or the Seller Indemnified Persons, as applicable, against Third Parties (i) responsible in whole or in part, directly or indirectly, for the Losses giving rise to the rights to indemnity hereunder, (ii) that owe to the Buyer Indemnified Persons or the Seller Indemnified Persons, as applicable, any obligation of indemnity or reimbursement for such Losses, whether by contract or otherwise, or (iii) that provide insurance which covers such Losses as to which indemnity is owed hereunder.

      6.6.    Third Party Claims. If any action, lawsuit, proceeding, investigation or other claim (each a "Proceeding") is initiated by any Third Party against any Person entitled to seek indemnification under this ARTICLE VI (an "Indemnified Party"), and if such Indemnified Party intends to seek indemnification with respect thereto under this ARTICLE VI, such Indemnified Party shall promptly, after receipt of written notice of such Proceeding, provide written notice of such Proceeding to the party or parties from whom the Indemnified Party intends to seek indemnification (the "Responsible Party"), which notice shall describe such Proceeding in reasonable detail and the amount thereof (if known and quantifiable); provided, that the failure to so notify a Responsible Party shall not relieve such Responsible Party of its obligations hereunder unless and to the extent the Responsible Party shall be actually and materially prejudiced by such failure to so notify. A Responsible Party shall be entitled to participate in the defense of such Proceeding giving rise to an Indemnified Party's claim for indemnification at such Responsible Party's expense, and at its option (subject to the limitations set forth below) shall be entitled to assume the defense thereof by appointing a reputable counsel reasonably acceptable to the Indemnified Party to be the lead counsel in connection with such defense within thirty (30) days of its receipt of notice of the Proceeding; provided, that prior to the Responsible Party assuming control of such defense, it shall (x) demonstrate to the Indemnified Party in writing such Responsible Party's financial ability to provide full indemnification to the Indemnified Party with respect to such Proceeding (including the ability to post any bond required by the court or adjudicative body before which such Proceeding is taking place), and (y) agree in writing to be fully responsible for all Losses relating to such Proceeding; provided, further, that:

      (a)    the Indemnified Party shall be entitled to participate in the defense of such claim and to employ counsel of its choice for such purpose;

      (b)    the Responsible Party shall not be entitled to assume control of such defense if (A) the claim for indemnification relates to or arises in connection with any criminal proceeding, action, indictment, criminal allegation or investigation, (B) the Indemnified Party reasonably believes an adverse determination with respect to the Proceeding giving rise to

such claim for indemnification would be materially detrimental to or materially injure the Indemnified Party's reputation or future business prospects, (C) the Indemnified Party is advised by counsel chosen by it that there are one or more defenses available to the Indemnified Party which the Responsible Party has not or cannot assert on behalf of the Indemnified Party or (D) the Responsible Party failed or is failing to vigorously prosecute or defend such claim;

(c)      if the Responsible Party shall control the defense of any such claim, the Responsible Party shall obtain the prior written consent of the Indemnified Party before entering into any settlement of a Proceeding or ceasing to defend such Proceeding if, pursuant to or as a result of such settlement or cessation, injunctive or other equitable relief will be imposed against the Indemnified Party or if such settlement does not expressly and unconditionally release the Indemnified Party from all Liabilities and obligations with respect to such claim; and

(d)      the Responsible Party may compromise or settle any such claim without the consent of the Indemnified Party if the sole consideration for such compromise or settlement shall be a cash payment or the mutual dismissal of claims, such compromise or settlement effects a full release the Indemnified Party from all Liabilities and obligations with respect to such claim, and the Responsible Party actually makes such cash payment and acknowledges in writing it has no recourse for the same against the Indemnified Party.

6.7.    Indemnification of Pre-Closing Taxes.  Notwithstanding anything to the contrary in this Agreement and without limiting the indemnification obligations of the Shareholders in respect of Taxes in this ARTICLE VI, each Shareholder shall jointly and severally indemnify the Buyer Indemnified Persons and hold them harmless from and against, without duplication, any Losses attributable to (i) Taxes (or the non-payment thereof) of any Group Company for all taxable periods ending on or before the Closing Date and the portion through the end of the Closing Date for any taxable period that includes (but does not end on) the Closing Date, (ii) all Taxes of any member of an affiliated, consolidated, combined or unitary group of which any Group Company (or any predecessor of any of the foregoing) is or was a member on or prior to the Closing Date, including pursuant to Treasury Regulation § 1.1502-6 or any analogous or similar state, local, or foreign law or regulation, (iii) Taxes of a Seller arising from the transactions contemplated by this Agreement, and (iv) any and all Taxes of any Person (other than the Group Companies) imposed on any Group Company as a transferee or successor, by contract or pursuant to any law, rule, or regulation, which Taxes relate to an event or transaction occurring before the Closing (all such Taxes in clauses (i), (ii), (iii) and (iv), collectively, "Pre-Closing Taxes").  For the avoidance of doubt, any such Losses attributable to Pre-Closing Taxes shall be reduced by the accrued Taxes attributable to such Losses to the extent such accrued Taxes have been included as a deduction to the Cash Consideration (including as a deduction to Net Working Capital).

6.8.    Waiver.  Each Seller hereby acknowledges and agrees that such Seller (a) shall not make any claim for indemnification hereunder against the Buyer or any Group Company by reason of the fact that such Seller was a shareholder, director, officer, employee or agent of any Group Company or was serving at the request of any Group Company as a partner, trustee, director, officer, employee or agent of another entity (whether such claim is for judgments, damages, penalties, fines, costs, amounts paid in settlement, losses, expenses or

35

otherwise) solely with respect to any Proceeding brought by any of the Buyer Indemnified Persons against such Seller or any claim against such Seller in connection with this Agreement and (b) shall have no claims or right to contribution or indemnity from the Buyer or any Group Company with respect to any amounts paid by such Seller pursuant to this <u>ARTICLE VI</u>.

        6.9.   <u>Final Cash Consideration Adjustment</u>.  All indemnification payments made under this <u>ARTICLE VI</u> shall be deemed to be an adjustment to the Final Cash Consideration.

**ARTICLE VII**
**Post-Closing Covenants and Agreements**

        Each of the parties hereto agrees as follows with respect to the period after the Closing Date:

        7.1.   <u>Tax Matters</u>.

        (a)   <u>Tax Periods Ending on or Before the Closing Date</u>.  The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns for any Group Company for all periods ending on or prior to the Closing Date which are filed after the Closing Date. The Buyer shall permit the Shareholders to review and comment on each such Tax Return described in the preceding sentence prior to filing. The Shareholders shall pay the amount of all Taxes with respect to such periods to the Buyer no later than five (5) days before the date on which Taxes are paid with respect to such periods. For all income Tax Returns for any Group Company for all periods ending on or prior to the Closing Date which are filed after the date of this Agreement but before the Closing Date, the Sellers and the Companies shall permit the Buyer to review and comment on each such Tax Return before filing and shall pay all Taxes due thereon.

        (b)   <u>Tax Periods Beginning Before and Ending After the Closing Date</u>. The Buyer shall prepare or cause to be prepared and file or cause to be filed all Tax Returns of any Group Company for taxable periods which begin before the Closing Date and end after the Closing Date. The Buyer shall permit the Shareholders a period of not less than thirty (30) days to review and comment on each such Tax Return described in the preceding sentence (solely with respect to the portion of such Tax Return relating to the period prior to the Closing Date) prior to filing. If the Shareholders disagree in any material respect with any such Tax Return (solely with respect to the portion of such Tax Return relating to the period prior to the Closing Date), the Shareholders and the Buyer shall promptly meet (in person or by telephone) and attempt in good faith to resolve their differences, and, if unable to do so, shall refer the dispute to a mutually acceptable independent tax accountant for a binding resolution. The Shareholders shall pay to the Buyer an amount equal to the portion of such Taxes which relates to the portion of such taxable period ending on the Closing Date no later than five (5) days before the date on which Taxes are paid with respect to such periods. For purposes of this <u>Section 7.1(b)</u>, in the case of any Taxes that are imposed on a periodic basis and are payable for a taxable period that includes (but does not end on) the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall (i) in the case of any Taxes other than Taxes based upon or related to income or receipts, be deemed to be the amount of such Tax

for the entire taxable period multiplied by a fraction the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income or receipts, be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date.  Any credits relating to a taxable period that begins before and ends after the Closing Date shall be taken into account as though the relevant taxable period ended on the Closing Date.  All determinations necessary to give effect to the foregoing allocations shall be made in a manner consistent with prior practice of the Companies.

(c)    Tax Sharing Agreements.  Any tax sharing agreement between the Sellers and any Group Company shall be terminated as of the Closing Date and shall have no further effect for any taxable year (whether the current year, a future year or a past year).

(d)    Cooperation on Tax Matters.

(i)    The Buyer and each Group Company, on the one hand, and each Seller on the other, shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this Section 7.1 and any audit, litigation or other proceeding with respect to Taxes.  Such cooperation shall include the retention and, upon the other party's request, the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Buyer and each Group Company, on the one hand, and each Seller on the other, agree to retain all books and records with respect to Tax matters pertinent to any Group Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by the other party, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority.

(ii)    The Buyer and each Seller further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed (including with respect to the transactions contemplated hereby).

(iii)    The Buyer, on the one hand, and each Seller on the other, further agree, upon request, to provide each other party all information that either party may be required to report pursuant to Sections 6043 and 6043A of the Code and all Treasury Regulations promulgated thereunder.

(iv)    Notwithstanding Section 6.6 (relating to Third Party claims), all Tax claims shall be governed by the provisions of this Section 7.1(d) and not by Section 6.6.

(e)    Certain Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be paid by the Shareholders when due, and each Shareholder shall, at its own expense, file all necessary Tax Returns and other documentation

with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable law, the Group Companies shall, and shall cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

7.2.    <u>Continued Employment; Consulting Services</u>.    Lilian Vachovsky shall continue to be employed by the Group Companies and, unless and until otherwise requested by the Buyer, shall (i) work exclusively for the Group Companies, (ii) devote her full business time (unless Buyer elects, in its sole discretion, that she shall serve in a part-time capacity) and best efforts to the performance of her duties for the Group Companies, and (iii) generally use her best efforts to promote the success of the business of the Group Companies, for the period beginning on the Closing Date and ending on the 180th day following the Closing or such earlier date as determined by the Buyer in its sole discretion (it being understood that her employment shall terminate upon receipt of written notice from the Buyer of such termination, or upon such later date as is specified in such notice, but not later than the 180th day following the Closing).  For up to the first 90 days of such post-Closing employment, Abacus America shall pay to Lilian Vachovsky a monthly salary equal to $10,000 (pro rated for any partial month), and for up to the next 90 days of such post-Closing employment, Abacus America shall pay to Lilian Vachovsky a monthly salary equal to $16,667 (pro rated for any partial month), in all cases, payable in accordance with the relevant Abacus America policies in effect from time to time, including normal payroll practices, and subject to all applicable employment and withholding taxes.  Ivan Vachovsky shall provide consulting services to the Group Companies, as requested by the Buyer, for up to 150 hours (which need not be on consecutive business days) without additional compensation, and thereafter up to 100 hours at the discounted rate of $200 per hour, payable by Abacus America.  At and after the Closing, Ivan Vachovsky's status shall be that of an independent contractor, and not that of an agent or employee, of the Group Companies.  As an independent contractor, he will not be eligible for, nor entitled to, and shall not participate in, any of the health, disability, life insurance or other employee benefit programs of the Group Companies or the Buyer, and no Group Company will obtain workers' compensation insurance for him.  The Group Companies and Ivan Vachovsky agree to treat the post-Closing consulting relationship as one of service recipient and independent contractor for all federal, state and local income and wage tax purposes.  The Group Companies will not deduct or withhold from any amounts owing from Abacus America to him any federal, state, local or foreign withholding taxes, excise tax, or employment taxes.  Ivan Vachovsky shall indemnify the Group Companies and the Buyer for any amounts they are required to pay as a result of the failure to pay any such taxes, together with any interest, penalties and related expenses thereto.  Each Seller hereby covenants and agrees that, without the advance consent of the Buyer's board of directors or the Buyer's chief executive officer, such Seller shall not cause any Group Company to incur any expense or to make any payment (other than ordinary course payroll payments to employees).

7.3.    <u>Restrictive Covenants</u>.

(a)    <u>Non-Solicit</u>.  Each Shareholder hereby covenants and agrees that during the period beginning on the date of this Agreement and ending on the later to occur of (x) the second (2nd) anniversary of the Closing Date, and (y) the first (1st) anniversary of the termination of the date on which Ivan Vachovsky ceases to be a director of the Buyer (*provided*, that such date shall not be later than the fifth (5th) anniversary of the Closing Date) (in either case, such period herein referred to as the "<u>Restrictive Period</u>"), such Shareholder shall not,

directly or indirectly (other than as specifically agreed to in Section 7.11(a)), (i) induce or attempt to induce any officer, employee, representative or agent of any Group Company or the Buyer or any of their respective Subsidiaries (collectively, the "Restricted Entities") to leave the employ of such Restricted Entity, (ii) hire any person who was an employee of, or a salesperson for, any Restricted Entity at any time during the year prior to the date of this Agreement or, during the Restrictive Period, within the twelve (12) months following the date of termination of such person's employment with such Restricted Entity, (iii) in any other way interfere with the relationship between any Restricted Entity and any employee thereof, or (iv) induce or attempt to induce any customer, supplier, licensee or other business relation of any Restricted Entity to cease doing business with such Restricted Entity, or in any way interfere with the relationship between any Restricted Entity and any customer, supplier, licensee or other business relation thereof (including by inducing or attempting to induce any such person or entity to reduce the amount of business it does with any Restricted Entity).

(b)    Non-Disparagement.    Each Shareholder hereby covenants and agrees that such Shareholder shall not, directly or indirectly, make any public statement or other public communication (whether written or oral) that impugns or attacks the reputation or character of any Restricted Entity, or damages the goodwill of any Restricted Entity.  The Buyer hereby covenants and agrees that it shall not, and shall cause its officers and directors not to, directly or indirectly, make any public statement or other public communication (whether written or oral) that impugns or attacks the reputation or character of any Shareholder.  This Section 7.3(b) shall not prohibit or restrict any Shareholder or Restricted Entity (or its respective attorneys) from responding to any inquiry about this Agreement or its underlying facts and circumstances by the Securities and Exchange Commission, the National Association of Securities Dealers, Inc., any other self-regulatory organization or any Government Entity or through judicial process.

(c)    Non-Compete.    Each Shareholder hereby covenants and agrees that during the Restrictive Period, such Shareholder shall not, directly or indirectly, (i) acquire, finance, own any interest in, manage, control, participate in, consult with, render services for, operate or in any manner engage in a business which is substantially the same as or competitive with any business engaged in by any Group Company as of the date of this Agreement or as of the Closing Date, including web hosting, website design, domain registration and Internet access (collectively, a "Competing Business") or (ii) for the purpose of conducting or engaging in a Competing Business, call upon, solicit, advise or otherwise do, or attempt to do, business with any clients, suppliers, customers or accounts of any Group Company, in each case, anywhere in the world.  Notwithstanding the foregoing, a Shareholder may be a passive owner (which shall not prohibit the exercise of any rights as a shareholder) of not more than 5% of the outstanding stock of any class of any public corporation that engages in a Competing Business.

(d)    Consideration.    In consideration of the covenants and agreements set forth in Section 7.3(a), 7.3(b) and 7.3(c) (collectively, the "Restrictive Covenants"), the Buyer shall pay, or shall cause to be paid, the Non-Compete Amount to the Shareholders (to be allocated fifty percent (50%) to each Shareholder).  The payment to each Shareholder of such Shareholder's portion of the Non-Compete Amount shall be made in two equal installments occurring on December 31, 2007 and December 31, 2008, such payments to be made by wire transfer of immediately available funds to an account designated by such Shareholder by written

notice to the Buyer not less than two (2) Business Days prior to such payment; *provided*, that such payments shall be deemed to have been made to the extent that the Buyer exercises its rights under Section 6.5(b)(i); and *provided, further,* that if either Shareholder breaches any of the Restrictive Covenants, then both Shareholders shall be deemed to have forfeited all right, title and interest in and to any such payment and neither the Buyer nor any Group Company shall have any obligation to make any further payments to the Shareholders pursuant to this Section 7.3(d), and shall return to the Buyer any portion of the Non-Compete Amount that the Shareholders have already received pursuant to this Section 7.3(d).

(e)    Acknowledgement.    Each Shareholder acknowledges and agrees that the Restrictive Covenants are reasonable in temporal and geographical scope and in all other respects, and that such covenants have been a material inducement to the Buyer to (i) enter into this Agreement and (ii) to pay such Shareholder the Non-compete Amount pursuant to the terms and conditions of Section 7.3(d).

(f)    Enforcement.    Each of the Buyer and the Shareholders acknowledges and agrees that: (i) if, at the time of enforcement of any Restrictive Covenant a court shall hold that the duration or scope stated herein are unreasonable under circumstances then existing, the Buyer and the Shareholders agree that the maximum duration or scope under such circumstances shall be substituted for the stated duration or scope and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period and scope permitted by law; (ii) in addition to Section 9.14 and not in limitation thereof, if the courts of any one or more of such jurisdictions hold any Restrictive Covenant unenforceable in whole or in part, it is the intention of the Buyer and the Shareholders that such determination shall not bar or in any way adversely affect the rights of any party hereto to equitable relief and remedies hereunder in courts of any other jurisdiction as to breaches or violations of any Restrictive Covenant, such covenants being, for this purpose, severable into diverse and independent covenants; and (iii) in the event of any Shareholder's breach of any Restrictive Covenant, money damages would be inadequate and neither the Group Companies nor the Buyer would have adequate remedy at law and that the Group Companies and the Buyer, in addition and supplementary to other rights and remedies existing in their favor, may apply to any court of law or equity of competent jurisdiction for specific performance, injunctive relief and/or other relief in order to enforce or prevent any violations of such covenants (without posting a bond or other security).    In addition, in the event of a breach or violation of any Restrictive Covenant, the Restrictive Period shall be tolled until such breach or violation has been duly cured.

7.4.    Further Assurances.

(a)    Following the Closing, the Sellers shall execute and deliver such further instruments of conveyance and transfer and take such additional action as the Buyer may reasonably request to effect, consummate, confirm or evidence the transactions contemplated by this Agreement, including the transfer to the Buyer of the Shares and the conduct by the Group Companies of its business (including with respect to obtaining and maintaining all Licenses and consents necessary or desirable in connection therewith), and the Sellers shall execute such documents as may be necessary to assist the Buyer in preserving or perfecting its rights in the Shares and its ability to conduct the business of the Group Companies.

(b)    Following the Closing, the Sellers shall not in any manner take or cause to be taken any action which is designed or intended to discourage, or could, individually or in the aggregate, reasonably be anticipated to have the effect of discouraging brokers, distributors, customers, suppliers, referral sources, Government Entities, insurance companies, lessors, consultants, salespersons, advisors and other business associates from maintaining the same business relationships with the Group Companies after the date of this Agreement as were maintained with the Group Companies prior to the date of this Agreement.    Following the Closing, each Seller shall refer all customer inquiries with respect to the business of the Group Companies to the Buyer or the Group Companies.

7.5.    Confidentiality.    Following the Closing, the Sellers shall maintain as confidential and shall not use or disclose (except as required by law or as authorized in writing by the Buyer) any information or materials relating to the businesses, operations and affairs of any of the Restricted Entities (including any business plans, practices and procedures, pricing information, sales figures, profit or loss figures, information relating to customers, clients, suppliers, sources of supply and customer lists) that are not already generally available to the public.    In the event any Seller is required by law to disclose any such confidential information, such Seller shall promptly notify the Buyer in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with the Buyer to obtain a protection order or other confidentiality treatment and disclose only that portion, if any, of the confidential information as is required by law.

7.6.    Release.    As a material inducement to the Buyer to enter into this Agreement, effective as of the Closing, each Seller, solely in such Seller's capacity as a shareholder of the Companies, agrees not to sue and fully releases and discharges each Group Company and each of its respective directors, officers, assigns and successors, past and present (collectively, the "Released Persons"), with respect to and from any and all claims, demands, rights, liens, contracts, covenants, proceedings, causes of action, obligations, debts, and losses of whatever kind or nature in law, equity or otherwise, whether now known or unknown, and whether or not concealed or hidden, all of which such Seller now owns or holds or has at any time owned or held against the Released Persons; provided, however, that nothing in this Section 7.6 shall prohibit any Seller from enforcing such Seller's rights under the Transaction Documents.    It is the intention of each Seller that such release be effective as a bar to each and every claim, demand and cause of action hereinabove specified and in furtherance of such intention, each Seller hereby expressly waives, effective as of the Closing, any and all rights and benefits conferred upon him by the provisions of applicable law or regulation and expressly consents that this release will be given full force and effect according to each and all of its express terms and provisions, including those related to unknown and unsuspected claims, demands and causes of action, if any, as those relating to any other claims, demands and causes of action hereinabove specified, but only to the extent such section is applicable to releases such as this.

7.7.    Mercedes Automobile.    The Shareholders shall timely make all monthly payments in accordance with the terms and conditions of the Retail Installment Sale Contract by and between Abacus America, Ivan Vachovsky and W.I. Simonson, dated as of February 15, 2006 for the purchase of that certain 2007 Mercedes S550, VIN WDDNG71X67AO22455, and shall pay in full such loan no later than the date that is 60 days following the Closing.    The Buyer

shall make no claim to possession of the Mercedes at any time, unless the Shareholders fail to make any such payments. The Shareholders and the Buyer shall cooperate to transfer title to the Mercedes to the Shareholders as soon as practicable, but in any event no later than upon the payment of all amounts due under the Mercedes Loan Agreement.

7.8.    Certain Computers.  The Shareholders and the Buyer agree to negotiate in good faith for the sale to the Shareholders of the personal computer and the laptop computer currently used by Ivan Vachovsky in the conduct of the business of the Group Companies promptly following the Closing at the residual value of such items; *provided*, that the Shareholders shall, at or prior to the closing of such sale, transfer any files, software or data in any form or medium contained on such computers that are related to any Group Company (and, following such transfer, delete or destroy such files, software or data).

7.9.    Email Transition.  For a period of six (6) months following the Closing Date, the Buyer shall cause Abacus America to set an auto-responder to notify senders of messages to the email accounts identified below of the contact information for the new Chief Executive Officer of Abacus America and the email address of Ivan Vachovsky (which is ivan@ivanv.com).    The email accounts subject to this section are ivan@aplus.net, ivachovsky@aplus.net and ivanv@aplus.net.

7.10.    Transition of Accounts.    Within sixty (60) days following the Closing Date, the Buyer shall cause the Group Companies to either close the accounts listed on Schedule 7.10 or take such actions necessary to cause the termination, without liability to the Shareholders (without in any way limiting the Shareholders' liability under this Agreement), of those certain personal guarantees provided by the Shareholders to secure a Company's performance of such accounts.

7.11.    Certain Transition Services.

(a)    Devstart.  For a period of ninety (90) days following the Closing Date ("Transition Period"), the Buyer shall cause Abacus America, and the Shareholders shall cause DevStart, Inc. ("Devstart") to each negotiate in good faith to reach an agreement, on commercially reasonable terms, with respect to the following matters: (i) the rental by DevStart of 40 dedicated servers which are currently used by DevStart, (ii) the license by DevStart of access to root zones of Abacus America for *domaininformer.com* tools, (iii) the license by Abacus America of Devstart's search engine related tools at *promotionworld.com* and (iv) the license by Abacus America of Devstart's domain tools at *domaininformer.com*.    During the Transition Period, Abacus America shall continue to (1) provide DevStart with the 40 dedicated servers that are currently used by DevStart, (2) sublease the office space currently used by Devstart in Abacus Bulgaria's Sofia, Bulgaria facility (approximately 700 square feet) (the "Bulgaria Facility") at a rate of $1,200 per month, payable monthly in advance and (3) shall continue to grant Devstart access to root zones of Abacus America for *domaininformer.com* tools.  During the Transition Period, Devstart shall continue to license to Abacus America, free of charge, (A) Devstart's search engine related tools at *promotionworld.com* and (B) Devstart's domain tools at *domaininformer.com*.  At the end of the Transition Period, the Shareholders shall cause Devstart to immediately vacate the Bulgaria Facility.  The parties agree that Devstart may make an offer of employment, and hire, Vladislav Borisov to work at Devstart.

42

(b) <u>Rodopi</u>. During the Transition Period, Abacus Bulgaria shall continue to sublease the office space currently used by Rodopi Software, Inc. in Abacus Bulgaria's Sofia, Bulgaria facility (approximately 700 square feet) at a rate of $1,200 per month, payable monthly in advance. Until March 31, 2007, Abacus America shall continue to sublease the office space currently used by Rodopi Software, Inc.in Abacus America's Barnes Canyon facility (approximately 3,900 square feet) at a rate of $6,300 per month, payable monthly in advance. At the end of the Transition Period or at March 31, 2007, as applicable, the Shareholders shall cause Rodopi Software, Inc. to immediately vacate such premises.

## ARTICLE VIII
### Definitions

For the purposes hereof, the following terms have the meanings set forth below:

"<u>1933 Act</u>" has the meaning set forth in <u>Section 3.5</u>.

"<u>Abacus America</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Abacus Bulgaria</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Abacus Philippines</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Adverse Consequences</u>" means all Proceedings, hearings, charges, complaints, demands, injunctions, orders, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, Liabilities, Taxes, Liens, lost profits, diminution in value, losses, expenses, and fees, including court costs and reasonable attorneys' fees and expenses.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, contract or otherwise. With respect to an individual, "Affiliate" shall also include any member of such individual's, Family Group. With respect to a trust or similar entity, "Affiliate" shall also include any beneficiary or trustee of such trust or entity.

"<u>Affiliated Group</u>" means any affiliated group as defined in Code §1504 that has filed a consolidated return for U.S. federal income tax purposes (or any consolidated, combined or unitary group under state, local or foreign law) for a period during which any Group Company was a member.

"<u>Affiliate Agreements</u>" has the meaning set forth in <u>Section 2.21(a)</u>.

"<u>Affiliate Transactions</u>" has the meaning set forth in <u>Section 2.21(a)</u>.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement.

"Alabanza Litigation Assignment Agreement" means that certain Assignment of Existing Litigation and Indemnity Agreement, dated as of the Closing Date, by and among Abacus America, Cedant, Inc. and the Shareholders.

"America Common Shares" has the meaning set forth in Section 2.2.

"America Shares" has the meaning set forth in Section 2.2.

"Applicable Rate" has the meaning set forth in Section 1.3(d).

"Basket" has the meaning set forth in Section 6.3(a).

"Bulgaria Facility" has the meaning set forth in Section 7.11(a).

"Bulgarian Lev" means the lawful currency of the Republic of Bulgaria.

"Bulgarian Real Property" has the meaning set forth in Section 2.23(a).

"Business Day" means each day which is not a day on which banking institutions in the city of New York, New York are authorized or obligated by law or executive order to close.

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Buyer Indemnified Persons" has the meaning set forth in Section 6.2(a).

"Cap" has the meaning set forth in Section 6.3(b).

"Cash Consideration" means that amount of cash equal to the sum of (a) $32,900,000 plus (b) the Estimated Net Working Capital Adjustment (which amount may be a negative number), minus (c) the Estimated Closing Indebtedness, minus (d) the Estimated Unpaid Seller Expenses.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

"Closing" has the meaning set forth in Section 1.2(a).

"Closing Adjustment Certificate" has the meaning set forth in Section 1.2(b).

"Closing Date" has the meaning set forth in Section 1.2(a).

"Closing Indebtedness" means, in the aggregate, the Indebtedness of the Group Companies as of immediately prior to the Closing plus the aggregate amount of all payments made or to be made to the holders of options to acquire shares of stock of any Group Company which were outstanding at or prior to the Closing (as set forth on Schedule 2.2).

"Closing Statement" has the meaning set forth in Section 1.3(a).

44

"COBRA" has the meaning set forth in Section 2.18(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Companies" has the meaning set forth in the preamble to this Agreement.

"Company Affiliate" has the meaning set forth in Section 2.21.

"Company Intellectual Property Rights" means all of the Intellectual Property Rights owned, used or held for use by any Group Company, including all of the Intellectual Property Rights set forth on Schedule 2.13(a).

"Company Software" has the meaning set forth in Section 2.13(f).

"Company Systems" has the meaning set forth in Section 2.13(e).

"Competing Business" has the meaning set forth in Section 7.3(c).

"Devstart" has the meaning set forth in Section 7.11(a).

"Disputed Item" has the meaning set forth in Section 1.3(a).

"Employee Benefit Plans" has the meaning set forth in Section 2.18(a).

"Environmental Laws" means whenever enacted or in effect all federal, state, local and foreign statutes, regulations, ordinances and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health, safety and pollution or protection of the environment.

"Equity Consideration" means that number of shares of each class of the capital stock of the Buyer equal to ten percent (10%) of the issued and outstanding shares of such class as of immediately after the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 2.18(c).

"Estimated Closing Indebtedness" means the Closing Indebtedness as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Estimated Net Working Capital" means the Net Working Capital as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Estimated Net Working Capital Adjustment" means, to the extent that the Estimated Net Working Capital (a) is greater than zero, then such positive amount, or (ii) is less than zero, then such negative amount.

45

"Estimated Unpaid Seller Expenses" means the Unpaid Seller Expenses as set forth on the Closing Adjustment Certificate in accordance with Section 1.2(b).

"Family Group" means, with respect to any natural person, such person's spouse, parents and siblings, and each of their respective descendants (whether natural or adopted) and any trust or other entity (including a corporation, partnership or limited liability Companies) formed solely for the benefit of such person and/or such person's spouse, parents, siblings and/or their respective descendants (whether natural or adopted).

"Final Cash Consideration" has the meaning set forth in Section 1.3(b).

"Final Closing Indebtedness" means the Closing Indebtedness as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Final Closing Statement" has the meaning set forth in Section 1.3(a).

"Final Net Working Capital" means the Net Working Capital as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Final Unpaid Seller Expenses" means the Unpaid Seller Expenses as set forth on the Final Closing Statement in accordance with Section 1.3(a).

"Financial Statements" has the meaning set forth in Section 2.5.

"Form SLA" has the meaning set forth in Section 2.8.

"Fund II" means Catalyst Investors II, L.P., a Delaware limited partnership and Catalyst Investors QP II, L.P., a Delaware limited partnership.

"Fundamental Representations" has the meaning set forth in Section 6.1.

"GAAP" means United States generally accepted accounting principles consistently applied, as in effect from time to time.

"Group Company" and "Group Companies" means a Company or the Companies, respectively, and their respective Subsidiaries (direct or indirect).

"Government Entity" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government, including any court, in each case having jurisdiction over any Group Company.

"Hazardous Substance" means any pollutant, contaminant or other substance for which standards of conduct or Liability may be imposed pursuant to Environmental Laws, and shall include odors, noise, mold, radioactive materials, petroleum, and asbestos.

"Improvements" has the meaning set forth in Section 2.23(c).

"Indebtedness" means at a particular time, without duplication, (i) any obligations under any indebtedness for borrowed money (including all obligations for principal, interest premiums, penalties, fees, expenses, breakage costs and bank overdrafts thereunder), (ii) any indebtedness evidenced by any note, bond, debenture or other debt security, (iii) any commitment by which a Person assures a financial institution against loss (including contingent reimbursement obligations with respect to letters of credit), (iv) any off-balance sheet financing, including synthetic leases and project financing, (v) all obligations under lease arrangements that are or should be recorded as capital leases of such Person under GAAP, (vi) any payment obligations in respect of banker's acceptances or letters of credit, (vii) any Liability with respect to interest rate swaps, collars, caps and similar hedging obligations, (viii) the present value of post-retirement health care benefit Liabilities, (ix) all obligations for the deferred and unpaid purchase price of property or services (other than trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice that are not more than ninety (90) days past due), (x) any Outstanding Checks, (xi) any indebtedness referred to in clauses (i) through (x) above of any Person which is either guaranteed by, or secured by a Lien upon any Group Company or any of its assets and (xii) accrued and unpaid interest of any such foregoing obligation.

"Indemnified Party" has the meaning set forth in Section 6.6.

"Indemnity Claim" has the meaning set forth in Section 6.4.

"Independent Auditor" has the meaning set forth in Section 1.3(a).

"Insurance Policies" has the meaning set forth in Section 2.16.

"Intellectual Property Rights" means any and all of the following in any jurisdiction throughout the world: (i) inventions (whether or not patentable or reduced to practice), patents, patent applications and patent disclosures and improvements thereto together with all reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof, (ii) trademarks, service marks, trade dress, trade names, slogans, logos, designs, Internet domain names, corporate names and rights in telephone numbers, together with all translations, adaptations, derivations, and combinations thereof, all applications, registrations and renewals in connection therewith, and all goodwill associated with any of the foregoing, (iii) copyrights and works of authorship (including "look and feel"), moral rights and all applications, registrations and renewals in connection therewith, (iv) computer software (including source code, executable code, data, databases and related documentation), (v) all rights of privacy and publicity, including rights to use of the names, likenesses, voices, signatures and biographical information of real persons, (vi) trade secrets and other confidential information (including ideas, know-how, processes, methods, techniques, research and development, drawings, specifications, layouts, designs, formulae, algorithms, compositions, industrial models, architectures, plans, proposals, technical data, financial, business and marketing plans and proposals, customer and supplier lists and price and cost information), (vii) all other intellectual property and proprietary rights, and (viii) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

"Investment" as applied to any Person means (i) any direct or indirect purchase or other acquisition by such Person of any notes, obligations, instruments, stock, securities or ownership interest (including partnership interests and joint venture interests) of any other Person and (ii) any capital contribution by such Person to any other Person.

"IRS" means the Internal Revenue Service of the United States.

"Knowledge" means, with respect to any Person, the actual knowledge of such Person (and if such Person is not an individual, such Person's officers, directors (or other comparable individuals) and senior employees) or the knowledge that such Person would have had after reasonable inquiry and investigation (and if such Person is not an individual, such Person's officers, directors (or other comparable individuals) and senior employees).

"Laws" means all statutes, laws, codes, ordinances, regulations, rules, orders, judgments, writs, injunctions, assessments, awards, acts or decrees of any Government Entity.

"Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property held by any Group Company including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Group Company.

"Liability" means any liability (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), including any liability for Taxes.

"License" means any security clearance, permit, license, variance, franchise, order, approval, consent, certificate, registration, accreditation or other authorization of any Government Entity or Standards Organization, and other similar rights.

"Lien" means any mortgage, pledge, security interest, encumbrance, deed of trust, right-of-way, right of setoff, claim, lien, charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), easement, option, proxy, power-of-attorney, voting agreement, or any restriction on transfer.

"Loss" has the meaning set forth in Section 6.2(a).

"Material Adverse Effect" means a material adverse effect upon (i) the business, operations, prospects, assets, liabilities, condition (financial or otherwise) or operating results of the Group Companies, taken as a whole or (ii) the ability of the Group Companies or the Sellers to consummate the transactions contemplated hereby or perform their respective obligations under the Transaction Documents.

"Material Contracts" has the meaning set forth in Section 2.12(b).

"Maximum Cap" has the meaning set forth in Section 6.3(c).

"Most Recent Balance Sheet" has the meaning set forth in Section 2.5.

48

"Most Recent Balance Sheet Date" has the meaning set forth in Section 2.5.

"Net Working Capital" means, as of immediately prior to the Closing, the (i) current assets of the Group Companies, minus (ii) current liabilities of the Group Companies (including twenty-five percent (25%) of any deferred revenue plus any Taxes that will become due and owing in respect of such deferred revenue), in each case, as determined in accordance with GAAP; provided, that any calculation of Net Working Capital shall be made in accordance with the schedule of line items as set forth on Exhibit B attached hereto.

"Non-Compete Amount" means an amount equal to $2,000,000.

"Notice of Disagreement" has the meaning set forth in Section 1.3(a).

"Owned Real Property" means all land, together with all buildings, structures, improvements and fixtures located thereon, and all easements and other rights and interests appurtenant thereto, owned by any Group Company.

"Outstanding Checks" means the value of all checks issued by the Group Companies and still outstanding as of the Closing Date.

"Pending Litigation" means all of the matters that are required to be listed on Schedule 2.14 (whether or not actually listed).

"Permitted Liens" means (a) Liens for Taxes or assessments and similar charges, which either are (i) not delinquent or (ii) being contested in good faith and by appropriate proceedings, and for which adequate reserves (as determined in accordance with GAAP) have been established on the Group Companies' books with respect thereto, (b) Taxes which are a lien and not yet due and payable, (c) zoning, building and other land use regulations imposed by Government Entities having jurisdiction over the Leased Real Property which are not violated by the current use and operation of the Lease Real Property, (d) covenants, conditions, restrictions, easements and other similar matters of record affecting title to the Leased Real Property which do not materially impair the occupancy or use of the Leased Real Property by the Group Companies for the purposes for which it is currently used in connection with the Group Companies' business, (e) as of the date of this Agreement, Liens securing financing of the Companies; provided, that such Liens will not constitute Permitted Liens as of the Closing, (f) carrier's, warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations for work for which payment is not yet due or, if due, that are not overdue by more than thirty (30) days and which in the aggregate could not reasonably be expected to have a Material Adverse Effect or are being contested in good faith, (g) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, (h) Liens arising out of judgments or awards so long as an appeal or proceeding for review is being prosecuted in good faith and for the payment of which adequate reserves in accordance with GAAP, bonds or other security have been provided or are fully covered by insurance without a reservation of rights, and (i) Liens of trade vendors created in connection with Indebtedness that will remain outstanding after the Closing.

49

"Person" means an individual, partnership, corporation, limited liability company, association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Government Entity or any department, agency or political subdivision thereof.

"Phoenix Datacenter Lease" means that certain Lease Agreement, dated as of the Closing Date, by and between Abacus Phoenix, LLC, a Delaware limited liability company and a wholly-owned Subsidiary of Abacus America, and Litmath, LLC, an Arizona LLC.

"Phoenix Property" means that land and facility located at 3265 North 27th Street, Phoenix, Arizona.

"Pre-Closing Taxes" has the meaning set forth in Section 6.7.

"Proceeding" has the meaning set forth in Section 6.6.

"Professional Services Agreement" means that certain Professional Services Agreement, dated as of the Closing Date, by and among Abacus America, the Buyer and Catalyst Investors, L.L.C.

"Real Property Leases" has the meaning set forth in Section 2.23(b).

"Released Persons" has the meaning set forth in Section 7.6.

"Registration Rights Agreement" means that certain Registration Rights Agreement, dated as of the Closing Date, by and among the Buyer, Fund II and the Shareholders.

"Responsible Party" has the meaning set forth in Section 6.6.

"Restricted Entities" has the meaning set forth in Section 7.3(a).

"Restrictive Covenants" has the meaning set forth in Section 7.3(d).

"Restrictive Period" has the meaning set forth in Section 7.3(a).

"Seller Expenses" has the meaning set forth in Section 9.1.

"Seller Indemnified Persons" has the meaning set forth in Section 6.2(b).

"Sellers" has the meaning set forth in the preamble to this Agreement.

"Shareholders" has the meaning set forth in the preamble to this Agreement.

"Shares" has the meaning set forth in Section 2.2.

"Software License Agreement" means that certain Software License and Support Agreement, dated as of the Closing Date, by and between Abacus America and Rodopi Software, Inc., a California corporation.

"Standards Organization" means any Person responsible for allocation or management of Internet domain names, Internet protocol addresses or similar identifiers on the World Wide Web, including the International Corporation for Assigned Names and Numbers ("ICANN").

"Stock Pledge Agreement" means that certain Stock Pledge Agreement, dated as of the Closing Date, by and among the Buyer and the Shareholders.

"Stockholders Agreement" means that certain Stockholders Agreement, dated as of the Closing Date, by and among the Buyer, Fund II, the Shareholders and certain other stockholders of the Buyer from time to time party to such agreement.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"Tax" means (a) federal, state, province, county, local, foreign or other income, gross receipts, ad valorem, franchise, profits, windfall profits, value-added, goods and services, sales or use, transfer, registration, excise, utility, environmental (including taxes under Code Section 59A) communications, real or personal property, capital stock, license, payroll, wage or other withholding, employment, unemployment, disability, social security (or similar), severance, stamp, occupation, alternative or add-on minimum, estimated, customs duties, fees, assessments charges and other taxes of any kind whatsoever, whether disputed or not, (b) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (a) above, and (c) all amounts described in clauses (a) and (b) above payable as a result of having been a member of a consolidated, combined, affiliated or unitary group.

"Tax Benefit" means, with respect to any party, an amount by which the Tax Liability of such party (or group of Affiliates including such party) is actually reduced (including by deduction, reduction of income by virtue of increased tax basis or otherwise, entitlement to refund, credit or otherwise), net of any increase in such party's Tax Liability, as a result of its receipt of payment for the applicable Indemnity Claim (but in any case, not below zero).

"Tax Return" means any return, declaration, report, claim for refund, estimate, information report, return statement or filing relating to Taxes, including any schedule or attachment thereto and including any amendment thereof.

"Third Party" means any Person other than a party to this Agreement (or an Affiliate thereof).

"Transaction Documents" means, collectively, this Agreement and all other agreements and instruments contemplated by this Agreement (including the Professional Services Agreement, the Stockholders Agreement, the Registration Rights Agreement, the Phoenix Datacenter Lease, and the Alabanza Litigation Assignment Agreement).

"Transition Period" has the meaning set forth in Section 7.11(a).

"Treasury Regulation" means the United States Treasury Regulations promulgated under the Code, and any reference to any particular Treasury Regulation section shall be interpreted to include any final or temporary revision of or successor to that section regardless of how numbered or classified.

"Unpaid Seller Expenses" means those Seller Expenses which have not been paid as of immediately prior to the Closing and which are not included in the calculation of Net Working Capital.

"WARN Act" has the meaning set forth in Section 2.17(b).

## ARTICLE IX
## Miscellaneous

9.1.    Fees and Expenses.  The Buyer shall pay all costs and expenses incurred by the Buyer in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby; *provided*, that immediately after the Closing, the Group Companies shall pay (or reimburse the Buyer for) all such costs and expenses incurred by the Buyer.  The Sellers shall pay at or prior to the Closing all costs and expenses incurred by the Sellers or the Group Companies in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby, including any brokerage fees incurred by the Sellers or the Companies (collectively, the "Seller Expenses").

9.2.    Press Release and Announcements.  None of the parties hereto nor any of their respective representatives shall issue any press releases or make any public announcement with respect to this Agreement or the transactions contemplated hereby without the prior written consent of the Buyer or the Shareholders, as the case may be.  Notwithstanding the foregoing, any such press release or public announcement may be made if required by applicable Law or a securities exchange rule; *provided*, that the party required to make such press release or public announcement shall, to the extent possible, confer with the other parties concerning the timing and content of such press release or public announcement before the same is made.

9.3.    Remedies.  The indemnity obligations under ARTICLE VI shall be the sole and exclusive remedy for any breach of any representation, warranty or covenant contained in this Agreement, other than for a claim of fraud or willful misconduct and except that nothing in this sentence or in any other provision of this Agreement shall operate to interfere with or impede the operation of the provisions of Section 1.3 with respect to disputes regarding the Cash Consideration or to limit the rights of the parties to seek equitable remedies (including specific performance or injunctive relief, without posting a bond or other security).  Except as otherwise expressly provided above in this Section 9.3, all such rights and remedies shall be cumulative and non-exclusive, and may be exercised singularly or concurrently.  Notwithstanding anything in this Agreement to the contrary, no party shall be liable to any other party to this Agreement for any indirect, special, incidental or consequential damages, including loss of future profit or revenue, loss of use, or cost of capital, or for punitive damages, arising out of or in relation to the performance of this Agreement, whether or not such liability is claimed in contract, tort (including negligence and strict liability), warranty, or any other legal or equitable theory; *provided, however*, that the foregoing exclusion shall not apply to preclude recovery under any indemnity for Third Party claims pursuant to Section 6.2(a) or 6.2(b).  Notwithstanding the foregoing or any other provision of this Agreement, the parties acknowledge that the Buyer determined the consideration it was willing to pay for the Group Companies based on a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) and the Buyer Indemnified Persons shall be entitled to claim Losses under ARTICLE VI based on such multiple if the applicable Loss results in more than a one-time reduction to EBITDA.

9.4.    Consent to Amendments; Waivers.  This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by the Buyer and the Shareholders.  No course of dealing between or among the parties hereto shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

9.5.    Successors and Assigns.  This Agreement and all covenants and agreements contained herein and rights, interests or obligations hereunder, by or on behalf of any of the parties hereto, shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not, except that neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by any Seller without the prior written consent of the Buyer, and neither this Agreement nor any of the covenants and agreements herein or rights, interests or obligations hereunder may be assigned or delegated by the Buyer without the prior written consent of the Shareholders; *provided*, that the Buyer and the Group Companies may assign this Agreement and their rights and obligations hereunder without such prior written consent to any of its Affiliates, any Person which provides financing to the Group Companies, the Buyer or any of their respective Affiliates, and any subsequent purchaser of the Buyer, the Group Companies or any of their respective Affiliates (whether by merger, consolidation, sale of stock, sale of assets or otherwise).

9.6.    Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable law or

rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

9.7.    Counterparts.  This Agreement may be executed in counterparts (including by means of facsimile signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same agreement.

9.8.    Descriptive Headings; Interpretation.  The headings and captions used in this Agreement and the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole (including any Schedules and Exhibits hereto) and not to any particular provision of this Agreement, and all Article, Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.  Any capitalized terms used in any Schedule or Exhibit attached hereto and not otherwise defined therein shall have the meanings set forth in this Agreement.  The words "include," "includes" and "including" will be deemed to be followed by the phrase "without limitation."  The word "if" means "if and only if."  The meanings given to terms defined herein will be equally applicable to both the singular and plural forms of such terms.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.    All references to "dollars" or "$" will be deemed references to the lawful money of the United States of America.

9.9.    Entire Agreement.  This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way, including the Letter of Intent, dated May 12, 2006, by and among Catalyst Investors II, L.P., Ivan Vachovsky, Lilian Vachovsky, APlus.net, Inc., Aviji, Inc., and Abacus Bulgaria.

9.10.    No Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their successors and permitted assigns and nothing herein expressed or implied shall give or be construed to give any Person, other than the parties hereto and such permitted successors and assigns, any legal or equitable rights hereunder.

9.11.    Schedules and Exhibits.  All Schedules and Exhibits attached hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.

9.12.    Governing Law.  All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of New York.  In furtherance of the foregoing, the internal law of the State of New York shall control the interpretation and construction of this Agreement (and all

Schedules and Exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

9.13.    <u>Waiver of Jury Trial</u>.    TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH PARTY HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE OR ACTION, CLAIM, CAUSE OF ACTION OR SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS AGREEMENT OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.    EACH PARTY HERETO ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTIES HERETO THAT THIS <u>SECTION 9.13</u> CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THEY ARE RELYING AND WILL RELY IN ENTERING INTO THIS AGREEMENT.    ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 9.13</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

9.14.    <u>Consent to Jurisdiction</u>.    Each of the parties hereto submits to the exclusive jurisdiction of any state or federal court sitting in the Borough of Manhattan, New York, New York, in any action or proceeding arising out of or relating to this Agreement and agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and hereby expressly submits to the personal jurisdiction and venue of such court for the purposes hereof and expressly waives any claim of improper venue and any claim that such courts are an inconvenient forum. Each of the parties hereby irrevocably consents to the service of process of any of the aforementioned courts in any such suit, action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to its address set forth in <u>Section 9.15</u>.

9.15.    <u>Notices</u>.    All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given when delivered personally to the recipient or when sent by facsimile (if received prior to 5:00 pm (local time of the recipient) on a Business Day (or otherwise on the next Business Day)), three (3) Business Days after being sent to recipient by U.S. First Class mail (postage prepaid), or one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid).    Such notices, demands and other communications shall be sent to the Buyer, the Sellers and the Group Companies at the addresses indicated below or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party.    All notices, demands and other communications hereunder may be given by any other means (including electronic mail), but shall not be deemed to have been duly given unless and until it is actually received by the intended recipient.

If to the Group Companies (after the Closing) or to the Buyer:

> c/o Catalyst Investors II, L.P.
> 711 Fifth Avenue, Suite 402
> New York, NY 10022
> Attn: Ryan McNally
> Facsimile: (212) 319-5771

> with a copy (which shall not constitute notice to the Group Companies) to:

> Kirkland & Ellis LLP
> 153 East 53rd Street
> New York, NY 10022
> Attn: Michael Brosse, Esq.
> Facsimile: (212) 446-6460

If to the Sellers:

> For U.S. Mail:

> Ivan Vachovsky
> P.O. Box 8274
> San Diego, CA 92067-8274

> For FedEx, UPS and other deliveries (other than U.S. Mail):

> Ivan Vachovsky
> 17181 Camino Acampo
> San Diego, CA, 92067

> Facsimile: (707) 922-7201

> with a copy (which shall not constitute notice to the Sellers) to:

> Musick, Peeler & Garrett LLP
> 225 Broadway, Suite 1900
> San Diego, California 92101
> Attn: Gary L. Wollberg, Esq.
> Facsimile: (619) 231-1234

9.16. <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party hereto by virtue of the authorship of any of the provisions of this Agreement.

\*    \*    \*    \*    \*

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement on the date first written above.

**APLUS HOLDINGS INC.**

By: _____
    Name: Tyler Newton
    Title: President and Chief Financial Officer


_____

Ivan Vachovsky


_____

Lilian Vachovsky


**ABACUS AMERICA, INC.**


By: _____
    Name:
    Title:


**ABACUS TRADE LTD.**


By: _____
    Name:
    Title:


**APLUS.NET PHILIPPINES INC.**


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have executed this Stock Purchase Agreement on the date first written above.

**APLUS HOLDINGS INC.**

By: _____
Name:
Title:

_____
Ivan Vachovsky

_____
Lilian Vachovsky

**ABACUS AMERICA, INC.**

By: _____
Name:
Title:

**ABACUS TRADE LTD.**

By: _____
Name:   Lilian Vachovsky
Title:   General Manager

**APLUSNET PHILIPPINES INC.**

By: _____
Name: ERLINDA C. BELTRAN
Title: CHIEF ACCOUNTANT

EXHIBIT A

See attached.

## CLOSING ADJUSTMENT CERTIFICATE

Reference is hereby made to that certain Stock Purchase Agreement (the "Agreement"), to be entered into among APLUS Holdings Inc. (the "Buyer"), Ivan Vachovsky, Lilian Vachovsky (collectively, "Sellers"), Abacus America, Inc., a California corporation, Abacus Trade Ltd., and Aplus.net Philippines Inc. Capitalized terms used herein and not defined herein shall have the meanings given to them in the Agreement.

The Sellers hereby certify to the Buyer that the following are our good faith estimates of the following amounts:

(i) Net Working Capital = $6,078,423

(ii) Closing Indebtedness = $3,156,227

(iii) Unpaid Seller Expenses = $1,000,000


_____
Ivan Vachovsky


_____
Lilian Vachovsky

EXHIBIT B

See attached.

# *Exhibit B*

**Working Capital Adjustment**

**<u>Current Assets</u>**
Cash (Unrestricted and Restricted)
Marketable Securities
Shareholder Loan Receivable
Accounts Receivable
Accounts Receivable - Rodopi (fixed)                    $     100,000.00
Inventory
Prepaid Expenses
Other Current Assets
    **Total Current Assets**

**<u>Current Liabilities</u>**
Accounts Payable / Payroll Liabilities
Accrued Expenses
Deferred Revenue (25% of GAAP balance)
Short Term Notes Payable
Other Current Liabilities
    **Total Current Liabilities**

    **Total Working Capital**

<u>EXHIBIT C</u>

See attached.

## ·áplus.net                SERVICE LEVEL AGREEMENT

# Service Level Agreement

**Abacus America, Inc. ("Aplus.Net") is committed to providing reliable, high quality services to its customers. We currently host over 4,000 servers, and hence, network uptime and server availability are of the highest importance to us. The following service levels are designed to assure Aplus.Net customers of ultimate server performance and the maximal uptime of servers hosted.**

1. **Server Hardware Replacement.** Aplus.Net guarantees that all Server Hardware will function properly for the lifetime of the server. We will replace any failed component at zero cost to the Customer within one (1) hour of receipt of the Customer's service ticket and identification of the problem. The following computer hardware is considered "Server Hardware": Processor(s), RAM, hard disk(s), motherboard, NIC card, Power Supply. The Customer will receive 5% off his/her monthly bill for every hour following the first hour that the server is not functioning due to hardware failure. See Remedies section below.

2. **Power and HVAC Availability.** We guarantee that our power and HVAC systems will be available 100% of the time in a given month, excluding Maintenance, as defined below. If these systems do not function properly the Customer is entitled to a Facilities Failure refund. "Facilities Failure" is defined as: (a) the Aplus.Net power or HVAC systems were not available (b) the Customer submits an Aplus.Net trouble ticket detailing the unavailability of the Aplus.Net power or HVAC systems resulting in Customer downtime.

3. **100% Network Uptime.** Aplus.Net guarantees that the Aplus.Net network will be functioning and available 100% of the time, excluding Maintenance (defined below). If that is not the case, the Customer is entitled to a Network Downtime refund. "Network Downtime" is defined as the inability to send and/or receive data due to a failure of network equipment managed and owned by Aplus.Net.

4. **Server Delivery.** We guarantee your server will be up within 24 hours of receipt of signed paperwork. For every hour we are late we will refund 5% of the monthly fee - up to 100% off. The guarantee is valid only for our Standard, Premium, and Standard AMD server plans. Guarantee is not valid for any custom server configurations. By 'server up' we mean the server will be setup in our data center, connected to the Internet, and have an Operating System and Control Panel of your choice. The guarantee does not include installation of any custom software applications.

5. **Remedies.** In the event that the Customer experiences downtime due to failure of Server Hardware or Facilities Failure or Network Downtime as described herein, provided the Customer follows the procedures described in this document, Aplus.Net will apply a Credit to that Customer's account. For each hour (or portion thereof) of downtime, the Customer will receive 5% off the server monthly fee (SMF) he/she is paying for the affected server. SMF is the standard monthly fee for the hosting of a given server. It does not include the amount paid for add-on services/hardware such as additional RAM, HDD etc.

6. **Procedures to claim credit.** In order to claim Credits, the Customer must open an Apus.Net trouble ticket. All downtimes will be measured from the time the ticket is received and validated by Aplus.Net technicians to the time Aplus.Net, in its sole discretion, is able to resolve the issue. A Customer may not receive more than one (1) Credit per incident and in no event will a Customer receive greater than 100% discount off the monthly fee.

Credit will be issued only to accounts that are in good standing. No Credit will be applied to accounts that are past-due or for accounts that are cancelled before the conditions for payment of the Credit are met. Upon cancellation of the Customer's account, any outstanding or previously accrued Credits will be forfeited. Credits will be applied against purchases or renewals for which payment is due after the date the credit is applied. Credits will not be applied against past due balances.

## ·äplus.net                    SERVICE LEVEL AGREEMENT

**7. Exceptions.** Customer shall not be entitled to any Credit if downtime is caused by:

    i. The actions of the Customer or other persons authorized by the Customer to use the Service;

    ii. Failure of systems, network equipment, power, facilities, or connections not provided and/or owned by Aplus.Net;

    iii. The failure of Third Party Service to the Aplus.Net's network;

    iv. Application, software, or operating system failure;

    v. The result of network maintenance activity (see Maintenance section below);

    vi. Denial of Service attack, hacker activity, or other malicious event targeting Aplus.Net or an Aplus.Net Customer;

    vii. Failure of any Network or Internet Infrastructure not owned or managed by Aplus.Net. Server Hardware Replacement guarantee does not include the time required to perform data restores and backups, if applicable.

**8. Maintenance.** "Maintenance" is defined as Scheduled Maintenance or Emergency Maintenance.

"Scheduled Maintenance" is defined as any maintenance in the Apus.Net data center (a) of which the customer is notified at least 24 hours beforehand, or (b) that is performed during Aplus.Net's standard maintenance hours.

"Emergency Maintenance" is defined as any maintenance in the Aplus.Net data center that: (a) in Aplus.Net sole discretion, is necessary to avoid an immediate threat to the Aplus.Net's data center or the Customer's server and (b) of which the Customer is notified. Any Emergency Maintenance in excess of 2 hours per event will count as Network Downtime.

This Service Level Agreement and all Aplus.Net Services are subject to the Aplus.Net Terms of Service.

**Schedule 2.1 – Organization; Power; Good Standing**

Abacus America, Inc.: California.
Abacus Trade, Ltd.: Bulgaria.
Aplus.Net Philippines, Inc.: Philippines.

## Schedule 2.2 – Capitalization

Abacus America, Inc. Share Ownership:

| Shareholder | Number of Shares |
|---|---|
| Ivan Vachovsky | 2,400,000 |
| Lilian Vachovsky | 2,600,000 |
| Total: | 5,000,000 |

Abacus Trade Ltd. Share Ownership:

| Shareholder | Number of Shares |
|---|---|
| Ivan Vachovsky | 2 |
| Lilian Vachovsky | 194 |
| Total: | 196 |

Aplus.Net Philippines Inc. Share Ownership:

| Shareholder | Number of Shares |
|---|---|
| Ivan Vachovsky | 498 |
| Lilian Vachovsky | 498 |
| Sneharthi Roy | 1 |
| Deogracias S. Hilario | 1 |
| Ariel V. Panugao | 1 |
| Welna T. Santos | 1 |
| Total: | 1,000 |

Abacus America, Inc. Optionees:

| Last Name | First Name | Date Options Granted | Number of Shares | Option Price | Expiration Date | Vesting Period | Vesting Schedule | Expires After Years | Shares Vested 14-Jul-06 |
|---|---|---|---|---|---|---|---|---|---|
| Iliev | Venzi | 4/21/2004 | 20,000 | $ 0.10 | 4/21/2014 | 3 years | 40-30-30 | 10 | 20,000 |
| Ouzounov | Youlian | 12/14/1999 | 30,000 | $ 0.10 | 12/13/2009 | 3 years | 40-30-30 | 10 | 12,000 |
| Todorova | Darina | 3/26/1999 | 50,000 | $ 0.10 | 3/25/2009 | 3 years | 40-30-30 | 10 | 50,000 |
| Dodds | Larry | 12/14/1999 | 60,000 | $ 0.10 | 12/13/2009 | 3 years | 40-30-30 | 10 | 60,000 |
| Montgomery | Joshua | 11/21/2001 | 5,000 | $ 4.50 | 11/20/2011 | 3 years | 40-30-30 | 10 | 5,000 |
| McAllister | Mark | 5/16/2003 | 5,000 | $ 4.50 | 5/14/2013 | 3 years | 40-30-30 | 10 | 5,000 |
| Kaloynov | George | 3/1/2004 | 5,000 | $ 4.50 | 2/28/2014 | 3 years | 40-30-30 | 10 | 3,500 |
| Planska | Vanya | 5/3/2004 | 5,000 | $ 4.50 | 5/2/2014 | 3 years | 40-30-30 | 10 | 3,500 |
| Kostov | Nikolay | 5/25/2004 | 5,000 | $ 4.50 | 5/24/2014 | 3 years | 40-30-30 | 10 | 3,500 |
| Chanchev | Atanas | 5/23/2005 | 5,000 | $ 4.50 | 5/22/2015 | 3 years | 40-30-30 | 10 | 2,000 |
| Davanathan | Ramakrishna | 11/1/2005 | 5,000 | $ 4.50 | 10/31/2015 | 3 years | 40-30-30 | 10 | 2,000 |
| Stanford | David | 8/18/2000 | 10,000 | $ 4.50 | 8/17/2010 | 3 years | 40-30-30 | 10 | 10,000 |
| Kolev | Ivo | 8/21/2002 | 10,000 | $ 4.50 | 8/19/2012 | 3 years | 40-30-30 | 10 | 10,000 |
| Yordanov | Yulian | 5/21/2001 | 15,000 | $ 4.50 | 5/20/2011 | 3 years | 40-30-30 | 10 | 15,000 |
| Tchorbadjiev | Assen | 6/3/2002 | 15,000 | $ 4.50 | 6/1/2012 | 3 years | 40-30-30 | 10 | 15,000 |
| Chtilianov | Dimitre | 8/18/2000 | 40,000 | $ 4.50 | 8/17/2010 | 3 years | 40-30-30 | 10 | 40,000 |
| Degan | Robert | 4/15/2000 | 50,000 | $ 4.50 | 4/14/2010 | 3 years | 40-30-30 | 10 | 50,000 |
| Dinev | Atanas | 1/17/2003 | 50,000 | $ 4.50 | 1/16/2013 | 3 years | 40-30-30 | 10 | 50,000 |
| Howard | Michael | 8/18/2002 | 60,000 | $ 4.50 | 8/17/2012 | 3 years | 40-30-30 | 10 | 60,000 |
| Gilman | Russel | 5/9/2005 | 50,000 | $ 5.00 | 5/8/2015 | 3 years | 40-30-30 | 10 | 20,000 |
| Vachovsky | Todor | 7/1/2005 | 50,000 | $ 5.00 | 6/30/2015 | 3 years | 40-30-30 | 10 | 20,000 |
| O'Neil | Matthew | 2/6/2006 | 50,000 | $ 5.50 | 2/5/2016 | 3 years | 40-30-30 | 10 | 8,333 |
| Roy | Sneharthi | 3/20/2006 | 20,000 | $ 6.50 | 3/19/2016 | 3 years | 40-30-30 | 10 | 8,000 |
| Patterson | Terry | 3/27/2006 | 20,000 | $ 6.50 | 3/26/2016 | 3 years | 40-30-30 | 10 | 8,000 |
| Caines | Clark | 4/20/2006 | 50,000 | $ 6.50 | 4/19/2016 | 3 years | 40-30-30 | 10 | 50,000 |
| Hurmuzov | Emil | 2/20/2006 | 10,000 | $ 7.00 | 2/19/2016 | 3 years | 40-30-30 | 10 | 4,000 |

**SCHEDULE 2.3(a) – Indebtedness**

Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

# SCHEDULE 2.3(b) – Accounts

| Bank | Account Number | GL Account | Account Name | Reason Used |
|---|---|---|---|---|
| **BANK ACCOUNTS** | | | | |
| US BANK | 153491013600 | 1001A00 | Abacus America Inc | DBA Cedant Web. |
| US BANK | 153492114050 | 1005A00 | Abacus America Inc | Checking Account |
| US BANK | 153491954811 | 1049A00 | Abacus America Inc | Payroll account |
| US BANK | 153492114043 | 1004A00 | Abacus America Inc | Names4ever |
| US BANK | 153492114472 | 1011A00 | Abacus America Inc | DBA Low Fat |
| US BANK | 161813023694 | 1002A00 | Abacus America Inc | DBA Intranet Soft |
| US BANK | 153493348889 | 1006A00 | Abacus America Inc | Premium Business Money Market |
| WELLS FARGO | 250-2466687005 | 1009A00 | Abacus America Inc | Advantage Funds: Corporation |
| WELLS FARGO | 627-3273638 | 1013A00 | Abacus America Inc | Business Checking |
| CHARLES SCHWAB | 1003-1317 | 1020A00 | Abacus America Inc | Money Market Funds |
| DISCOVER BANK | 506214 | 1087A00 | Abacus America Inc | Account Reserved Funds |
| | | | | |
| Equiptable PCI Bank - Phillipines | 0275-03880-6 | N/A | Aplus.net Philippines, Inc. | Manila Operations |
| | | | | |
| HVB BIOCHIM AD | BG36 BACX 9660 100 403 8006 | N/A | Abacus Trade | Bulgarian Currency |
| HVB BIOCHIM AD | BG48 BACX 9660 110 403 8000 | N/A | Abacus Trade | USD Currency |
| HVB BIOCHIM AD | BG32 BACX 9660 900 403 8000 | N/A | Abacus Trade | VAT Account |
| | | | | |
| BULBANK AD | BG85 BFTB 7630 100 727 7703 | N/A | Abacus Trade | Bulgarian Currency |
| BULBANK AD | BG21 BFTB 7630 110 727 7707 | N/A | Abacus Trade | USD Currency |
| BULBANK AD | BG29 BFTB 7630  900 727 7760 | N/A | Abacus Trade | VAT Account |
| | | | | |
| RAIFFEISENBANK | BG89 RZBB 9155 106 060 4618 | N/A | Abacus Trade | Bulgarian Currency |
| RAIFFEISENBANK | BG31 RZBB 9155 116 060 4611 | N/A | Abacus Trade | USD Currency |
| | | | | |
| **MERCHANT ACCOUNTS** | | | | |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5517 | N/A | Cedant | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5566 | N/A | A+ Net | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5533 | N/A | Names4ever | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5525 | N/A | Low Fat | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5558 | N/A | APRO | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5574 | N/A | Web-a-Photo | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5541 | N/A | Platinum Resellers | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 04601000 7356 | N/A | | Test Account for Gateway |
| | | | | |
| American Express | 504 083 321 2 | N/A | A+ Net | Customer Payments |
| American Express | 504 785 465 8 | N/A | Names4ever | Customer Payments |
| American Express | 504 756 532 0 | N/A | Cedant | Customer Payments |
| American Express | 504 997 266 4 | N/A | Low Fat | Customer Payments |
| American Express | 104 033 316 3 | N/A | APRO | Customer Payments |
| American Express | 104 033 317 1 | N/A | Web-a-Photo | Customer Payments |
| American Express | 104 033 318 9 | N/A | Platinum Resellers | Customer Payments |
| | | | | |
| Discover Card | 6011 010064 08585 | N/A | Names4ever | Customer Payments |
| Discover Card | 6011 010764 08788 | N/A | A+ Net | Customer Payments |
| Discover Card | 6011 010488 74109 | N/A | Cedant | Customer Payments |
| Discover Card | 6011 013764 08579 | N/A | Low Fat | Customer Payments |
| Discover Card | 6011 010602 81142 | N/A | Web-a-Photo | Customer Payments |
| Discover Card | 6011 010602 81159 | N/A | Platinum Resellers | Customer Payments |
| Discover Card | 6011 010602 81167 | N/A | APRO | Customer Payments |
| | | | | |
| Wells Fargo | 4812 0610 3998 | N/A | | Test Account for Gateway |
| | | | | |
| **CREDIT CARDS** | | | | |
| Capital One- VISA | 4115 0725 3532 3375 | N/A | Abacus America | Company Purchases |
| AMEX | 3712 839037 91013 | N/A | Abacus America | Company Purchases |
| AMEX | 3727 109757 62000 | N/A | Abacus America | Company Purchases |
| AMEX | 3722 673577 91008 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 983909 51006 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 933419 61014 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 933419 61006 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 983909 51022 | N/A | Abacus America | Company Purchases |

**SCHEDULE 2.3(c) – Capitalization**

Cedant, Inc. is a wholly-owned subsidiary of Abacus America, Inc. Cedant's authorized capital stock is 10,000 shares, all of which are designated as common shares. Cedant's issued and outstanding capital stock is 1,000 common shares, all of which are owned by Abacus America, Inc.

**Schedule 2.4(c) – No Breach**

Office Lease by and between Kilroy Realty, L.P. and Abacus America, Inc., dated February 28, 2002, as amended March 27, 2002.  Consent to Deemed Transfer, by and among Kilroy Realty, L.P., Abacus America, Inc. and Aplus Holdings, Inc., dated July 21, 2006.

Lease by and between Calwest Industrial Holdings, LLC and Abacus America, Inc., dated February 25, 2004.  Letter Agreement between Abacus America and Maguire Properties-San Diego Tech Center, LLC (successor-in-interest to Calwest Industrial Holdings, LLC), dated July 10, 2006, re: consent to assignment.

Registration of the amount of capital of Abacus Bulgaria in the commercial registry of Sofia City Court in Bulgaria.

**Schedule 2.5 – Financial Statements**

See attached Financial Statements and Bulgarian Expense Schedule.

## Abacus America, Inc. Financial Statements

**BALANCE SHEET**
As of 3/31/2006

| | | |
|---|---|---:|
| Cash | $ | 6,273,659 |
| AR | $ | 209,160 |
| AR - related party | $ | 847,792 |
| Inventory | $ | 296,518 |
| Prepaid Expenses | $ | 2,065,507 |
| **Current Assets** | $ | 9,692,637 |
| Fixed Assets | $ | 2,471,727 |
| Other Assets | $ | 912,970 |
| **Total Assets** | $ | 13,077,334 |
| Payable | $ | 2,041,161 |
| Deferred Revenue | $ | 9,150,553 |
| **Total Liabilities** | $ | 11,191,714 |
| Equity | $ | 1,885,620 |
| **Total Equity & Liabilities** | $ | 13,077,334 |

**Abacus America, Inc. Financial Statements**

**INCOME STATEMENT**

For the 9 months ending 3/31/2006

| | | |
|---|---|---:|
| Hosting | $ | 12,858,909 |
| Domain | $ | 2,431,572 |
| Web Design | $ | 1,105,737 |
| Access | $ | 179,125 |
| Other | $ | 15,004 |
|    Total Revenue | $ | 16,590,347 |
| | | |
| Cost of Goods Sold | $ | 2,751,610 |
| Cost of Goods Sold Other | $ | 49,324 |
| | $ | 2,800,934 |
| | | |
| Gross Profit | $ | 13,789,414 |
| | | |
| Operating Expenses | $ | 11,420,753 |
| | | |
| Operating Income | $ | 2,368,660 |
| | | |
| Other Income / (Expenses) | $ | 13,159 |
| Taxes | $ | (9,341) |
| | | |
| Net Income After Taxes | $ | 2,372,478 |

## Abacus America, Inc. Financial Statements

**CASH FLOW STATEMENT**
For the 9 months ending 3/31/2006

| | | |
|---|---|---:|
| Net Income | $ | 2,372,478 |
| | | |
| Depreciation & Amortization | $ | 3,688,641 |
| Changes in Working Capital | $ | 1,640,438 |
|     Cash Flow from Operations | $ | 5,329,079 |
| | | |
| Fixed Asset Purchases | $ | (1,216,716) |
| Increase in Shareholder Loans | $ | (100,214) |
|     Cash Flow from Funding | $ | (1,316,930) |
| | | |
| Net Cash Flow | $ | 4,012,149 |
| | | |
| Cash, Beginning | $ | 2,261,511 |
| Cash, Ending | $ | 6,273,659 |
| | $ | 4,012,148 |

| | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payroll** | | | | | | | | | | | | |
| Project Teams | 9,000 | 9,000 | 9,000 | 9,000 | 10,450 | 10,350 | 9,700 | 9,995 | 10,625 | 10,900 | 10,900 | 10,700 |
| Billing | 500 | 500 | 500 | 500 | 500 | 500 | 2,500 | 2,500 | 2,500 | 1,700 | 1,700 | 1,700 |
| Web Design | 11,050 | 11,050 | 11,050 | 11,050 | 11,700 | 12,550 | 13,480 | 15,710 | 16,010 | 15,430 | 15,680 | 17,697 |
| Sales & Commission | 6,517 | 6,517 | 6,517 | 6,517 | 12,565 | 12,540 | 15,412 | 11,094 | 11,220 | 10,960 | 15,742 | 16,886 |
| Support | 4,215 | 4,215 | 4,215 | 4,215 | 12,400 | 11,530 | 12,510 | 15,126 | 16,484 | 16,145 | 17,166 | 17,166 |
| Lead Generation Team | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,130 | 2,600 | 2,550 |
| Admin/Test/Tech Admin | 2,307 | 2,307 | 2,307 | 2,307 | 2,250 | 2,250 | 2,300 | 2,400 | 2,400 | 2,400 | 2,400 | 2,400 |
| Executive | 1,407 | 1,407 | 1,407 | 1,407 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 |
| **Total Payroll** | **34,995** | **34,995** | **34,995** | **34,995** | **51,265** | **51,120** | **55,302** | **58,225** | **60,639** | **62,065** | **67,588** | **70,499** |
| | | | | | | | | | | | | |
| **Payroll Taxes** | **6,037** | **6,037** | **6,037** | **6,037** | **7,502** | **7,502** | **21,584** | **30,455** | **30,455** | **30,455** | **30,455** | **30,455** |
| **General & Admin** | | | | | | | | | | | | |
| Internet Access | 2,315 | 2,315 | 2,315 | 2,315 | 2,465 | 2,465 | 2,465 | 2,465 | 2,465 | 2,465 | 2,465 | 2,465 |
| Help Wanted | 263 | 263 | 263 | 263 | 150 | 280 | 360 | 300 | 100 | 195 | 270 | 110 |
| Taxes & Insurance | 855 | 855 | 855 | 855 | 220 | 620 | 664 | 0 | 393 | 0 | 2,168 | 525 |
| Software Licenses | 3,105 | 3,105 | 3,105 | 3,105 | 678 | 1,000 | 3,505 | 6,438 | 2,775 | 0 | 0 | 0 |
| Overhead Expenses | 3,302 | 3,302 | 3,302 | 3,302 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,500 | 3,500 |
| Furniture & Fixtures | 867 | 867 | 867 | 867 | 637 | 1,010 | 528 | 540 | 0 | 0 | 1,170 | 0 |
| Travel | 0 | 0 | 0 | 0 | 0 | 1,350 | 1,718 | 1,631 | 2,975 | 1,205 | 2,675 | 450 |
| Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other | 933 | 933 | 933 | 933 | 1,400 | 3,250 | 2,507 | 2,100 | 1,900 | 2,700 | 2,850 | 7,420 |
| **Total G&A** | **11,640** | **11,640** | **11,640** | **11,640** | **8,850** | **13,275** | **15,047** | **16,774** | **13,908** | **9,865** | **15,098** | **14,470** |
| | | | | | | | | | | | | |
| **TOTAL ONGOING EXPENSE** | **52,672** | **52,672** | **52,672** | **52,672** | **67,617** | **71,897** | **91,933** | **105,454** | **105,002** | **102,385** | **113,141** | **115,424** |
| | | | | | | | | | | | | |
| **Computer Purchases** | **1,980** | **1,980** | **1,980** | **1,980** | **5,745** | **5,745** | **5,745** | **5,745** | **4,635** | **1,505** | **1,310** | **0** |
| | | | | | | | | | | | | |
| **TOTAL EXPENSE** | **54,652** | **54,652** | **54,652** | **54,652** | **73,362** | **77,642** | **97,678** | **111,199** | **109,637** | **103,890** | **114,451** | **115,424** |

| | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 | Jan-06 | Feb-06 | Mar-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Payroll** | | | | | | | | | | | | | | | |
| Project Teams | 15,410 | 14,330 | 15,430 | 15,580 | 14,680 | 14,380 | 14,495 | 15,230 | 15,255 | 14,055 | 14,465 | 13,680 | 15,980 | 15,085 | 14,420 |
| Billing | 0 | 2,267 | 2,530 | 2,485 | 2,512 | 2,590 | 2,485 | 2,750 | 2,373 | 2,448 | 2,738 | 3,493 | 2,768 | 2,773 | 2,920 |
| Web Design | 19,612 | 17,180 | 23,334 | 37,280 | 28,905 | 31,877 | 33,261 | 31,798 | 32,475 | 30,685 | 30,801 | 34,018 | 30,646 | 31,011 | 35,440 |
| Sales & Commission | 20,497 | 19,838 | 25,204 | 22,049 | 22,363 | 22,127 | 22,117 | 25,462 | 22,120 | 30,657 | 30,709 | 35,264 | 35,649 | 34,225 | 38,001 |
| Support | 16,213 | 15,497 | 21,070 | 20,476 | 20,222 | 21,456 | 23,270 | 24,344 | 24,447 | 25,276 | 28,799 | 32,267 | 31,154 | 29,920 | 34,508 |
| Lead Generation Team | 3,485 | 3,555 | 2,963 | 3,350 | 4,730 | 4,780 | 3,295 | 3,127 | 3,551 | 3,536 | 6,797 | 4,440 | 5,048 | 4,992 | 5,280 |
| Admin/Test/Tech Admin | 2,805 | 2,800 | 2,800 | 2,900 | 2,650 | 2,650 | 3,050 | 2,900 | 3,485 | 3,772 | 3,755 | 2,675 | 2,755 | 3,161 | 5,549 |
| Executive | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 1,400 | 2,800 | 2,847 | 2,826 | 2,826 | 2,826 | 2,826 | 2,826 |
| **Total Payroll** | **79,422** | **76,867** | **94,731** | **105,520** | **99,518** | **101,260** | **103,373** | **107,011** | **106,506** | **113,276** | **120,890** | **128,663** | **126,826** | **123,993** | **138,944** |
| | | | | | | | | | | | | | | | |
| **Payroll Taxes** | **30,455** | **30,455** | **32,285** | **32,285** | **33,005** | **33,005** | **33,005** | **33,701** | **28,790** | **28,109** | **34,988** | **35,804** | **49,289** | **49,264** | **51,329** |
| **General & Admin** | | | | | | | | | | | | | | | |
| Internet Access | 2,465 | 2,465 | 2,465 | 2,465 | 2,745 | 2,745 | 2,745 | 2,745 | 2,745 | 2,795 | 2,774 | 2,774 | 2,774 | 2,774 | 2,781 |
| Help Wanted | 110 | 555 | 634 | 280 | 280 | 543 | 146 | 65 | 391 | 920 | 606 | 543 | 543 | 1,120 | 2,158 |
| Taxes & Insurance | 0 | 0 | 2,331 | 0 | 140 | 127 | 0 | 0 | 0 | 0 | 1,505 | 334 | 134 | 0 | 0 |
| Software Licenses | 1,086 | 2,580 | 0 | 2,648 | 1,020 | 0 | 0 | 0 | 0 | 1,272 | 2,376 | 778 | 214 | 0 | 1,150 |
| Overhead Expenses | 3,645 | 4,296 | 3,018 | 3,019 | 3,018 | 1,500 | 1,400 | 2,132 | 2,319 | 2,358 | 5,412 | 5,506 | 5,733 | 5,542 | 5,577 |
| Furniture & Fixtures | 0 | 0 | 1,462 | 1,112 | 4,673 | 0 | 455 | 1,207 | 542 | 192 | 0 | 128 | 882 | 1,012 | 2,814 |
| Travel | 2,220 | 0 | 200 | 500 | 0 | 0 | 0 | 1,080 | 999 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent | 0 | 0 | 0 | 0 | 1,780 | 4,273 | 0 | 11,726 | 13,049 | 1,761 | 2,753 | 3,308 | 2,521 | 2,162 | 3,579 |
| Other | 4,675 | 2,190 | 3,315 | 4,930 | 11,729 | 2,855 | 4,572 | 5,183 | 3,154 | 4,397 | 6,591 | 4,391 | 5,658 | 5,604 | 7,162 |
| **Total G&A** | **14,201** | **12,086** | **14,445** | **14,953** | **25,385** | **12,043** | **9,318** | **24,138** | **23,199** | **13,695** | **24,017** | **17,762** | **18,459** | **20,286** | **25,221** |
| | | | | | | | | | | | | | | | |
| **TOTAL ONGOING EXPENSE** | **124,078** | **119,408** | **141,461** | **152,758** | **157,908** | **146,308** | **145,696** | **164,850** | **158,495** | **155,080** | **179,895** | **182,230** | **194,575** | **193,543** | **215,494** |
| | | | | | | | | | | | | | | | |
| **Computer Purchases** | **2,881** | **3,857** | **1,718** | **4,029** | **4,947** | **0** | **0** | **1,442** | **5,663** | **4,410** | **15,065** | **1,730** | **670** | **4,487** | **14,182** |
| | | | | | | | | | | | | | | | |
| **TOTAL EXPENSE** | **126,959** | **123,265** | **143,179** | **156,787** | **162,855** | **146,308** | **145,696** | **166,292** | **164,158** | **159,490** | **194,960** | **183,960** | **195,245** | **198,030** | **229,676** |

ABACUS AMERICA, INC.
TABLE OF CONTENTS
JUNE 30, 2005

|  | PAGE |
|---|---|
| Independent Auditors' Report | 1 |
| Balance Sheet | 2,3 |
| Statement of Income and Retained Earnings | 4,5 |
| Statement of Cash Flow | 6,7 |
| Notes to the Financial Statements | 8-16 |

**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584



Member of
American Institute of
Certified Public Accountants

**PARTNERS**

Theodore Cashuk, CPA
Donald T. Wiseman, CPA
Richard A. Goldberg, CPA
Arthur Birnbaum, CPA
Wes L. Salem, CPA

Member of
California Society of
Certified Public Accountants

**PROFESSIONAL STAFF**

Ma. Lolita Cremat, CPA
Jennifer R. Eastin
Joni L. Goin
Megan C. Hedgecoth
Michael Selamet Kwee, CPA
Dawn L. Watson, CPA

**OFFICE MANAGER**

Annemarie A. Rosen

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of
Abacus America, Inc.

We have audited the accompanying balance sheets of Abacus America, Inc. (a California corporation) as of June 30, 2005 and 2004, and the related statements of income and retained earnings and cash flows for the years then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Abacus America, Inc. as of June 30, 2005 and 2004, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Cashuk, Wiseman, Goldberg, Birnbaum & Salem*

CASHUK, WISEMAN, GOLDBERG, BIRNBAUM AND SALEM

San Diego, California
September 27, 2005

3333 Camino Del Rio South ◆ Suite 230 ◆ San Diego, CA 92108-3808 ◆ (619) 563-0145/283-7137 ◆ FAX (619) 563-9584 ◆ FEIN #95-3867687

ABACUS AMERICA, INC.
BALANCE SHEET

|  | JUNE 30 | |
|---|---|---|
|  | 2005 | 2004 |

### ASSETS

**CURRENT ASSETS**

| | | |
|---|---|---|
| Cash and Cash Equivalents (Note A) | $ 2,270,222 | $ 1,552,559 |
| Accounts Receivable, Net of Allowance (Note A & B) | 136,214 | 220,258 |
| Employee Advance | 1,320 | 4,170 |
| Receivable From Related Companies (Note K) | 522,619 | -0- |
| Inventory (Note A) | 121,166 | 133,657 |
| Prepaid Expenses (Note C) | 2,042,824 | 1,475,125 |
| Shareholder Loan (Note K) | 332,443 | 65,126 |
| TOTAL CURRENT ASSETS | 5,426,808 | 3,450,895 |

**PROPERTY & EQUIPMENT (Note A)**

| | | |
|---|---|---|
| Automobile | 20,500 | 20,500 |
| Leasehold Improvements | 156,184 | 119,300 |
| Office Equipment | 5,155,447 | 3,634,131 |
| Office Furniture | 211,658 | 191,161 |
| Accumulated Depreciation | (3,346,052) | (2,400,033) |
| NET PROPERTY & EQUIPMENT | 2,197,737 | 1,565,059 |

**OTHER ASSETS**

| | | |
|---|---|---|
| Deposits | 88,205 | 88,205 |
| Customer List, Net of Amortization (Note I) | 373,437 | 924,689 |
| Deferred Income Taxes (Note E) | 392,108 | 594,162 |
| TOTAL OTHER ASSETS | 853,750 | 1,607,056 |

| | | |
|---|---|---|
| TOTAL ASSETS | $ 8,478,295 | $ 6,623,010 |

See accompanying notes and accountants' report.

-2-



CWGBS  Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA INC

BALANCE SHEET

|  | JUNE 30 | |
|---|---|---|
|  | 2005 | 2004 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES** | | |
| Accounts Payable | $   729,715 | $   837,229 |
| Accrued Expenses (Note D) | 484,655 | 863,964 |
| Income Taxes Payable (Note E) | 7,816 | -0- |
| Deferred Income (Note A) | 7,742,968 | 5,772,326 |
| TOTAL CURRENT LIABILITIES | 8,965,154 | 7,473,519 |
| **STOCKHOLDERS' EQUITY** | | |
| Common Stock | 10,000 | 10,000 |
| 50,000,000 Shares Authorized | | |
| 5,000,000 Shares Issued and Outstanding | | |
| Retained Deficit | (496,859) | (860,509) |
| TOTAL STOCKHOLDERS' EQUITY | (486,859) | (850,509) |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 8,478,295 | $ 6,623,010 |

See accompanying notes and accountants' report.

-3-



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

## STATEMENT OF INCOME AND RETAINED EARNINGS

|  | JUNE 30 | |
|---|---|---|
|  | 2005 | 2004 |
| **INCOME** | | |
| Sales | $16,684,371 | $12,786,689 |
| | | |
| <u>COST OF SALES</u> | 3,111,343 | 1,960,452 |
| | | |
| GROSS PROFIT | 13,573,028 | 10,826,237 |
| | | |
| OPERATING EXPENSES | | |
| General & Administrative | 10,978,934 | 9,846,517 |
| Amortization | 326,251 | 504,375 |
| Depreciation | 947,486 | 558,086 |
| Interest Expense | -0- | 1,597 |
| Rent | 817,309 | 744,205 |
| TOTAL OPERATING EXPENSES | 13,069,980 | 11,654,780 |
| | | |
| NET OPERATING INCOME (LOSS) | 503,048 | (828,543) |
| | | |
| OTHER INCOME AND EXPENSES | | |
| Other Income | 72,247 | -0- |
| Gain (Loss) on Investments | -0- | 449,980 |
| Interest and Dividend Income | 9,935 | 2,208 |
| TOTAL OTHER INCOME AND EXPENSES | 82,182 | 452,188 |
| | | |
| INCOME (LOSS) BEFORE TAXES | 585,230 | (376,355) |
| Income Tax Expenses (Notes A & E) | | |
| Current Income Tax Expenses | 9,416 | 800 |
| Deferred Income Tax Expenses (Benefit) | 202,054 | (105,160) |
| | | |
| NET INCOME (LOSS) | $ 373,760 | $ (271,995) |
| | | |
| Shareholder Dividends | (10,110) | -0- |

See accompanying notes and accountants' report.

-4-


**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

STATEMENT OF INCOME AND RETAINED EARNINGS

| | JUNE 30 | |
|---|---|---|
| | 2005 | 2004 |
| **RETAINED DEFICIT AT BEGINNING OF YEAR** | | |
| As Previously Reported | (860,509) | (953,443) |
| Adjustment for | | |
| Understatement of Deferred Income Taxes | -0- | 363,753 |
| Overstatement of Income Tax Expense | -0- | 1,176 |
| Balance at Beginning of Year, as restated | (860,509) | (588,514) |
| **RETAINED DEFICIT AT END OF YEAR** | $  (496,859) | $  (860,509) |

See accompanying notes and accountants' report.

-5-



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

STATEMENT OF CASH FLOW

|  | JUNE 30 | |
|---|---|---|
|  | 2005 | 2004 |
| **OPERATING ACTIVITIES** | | |
| Net Income (Loss) | $ 373,760 | $ (271,995) |
| Adjustments to Reconcile Net Income: | | |
| Provided (Used) by Operating Activities: | | |
| Depreciation | 947,486 | 558,086 |
| Amortization | 326,251 | 504,375 |
| Prior Change in Depreciation | -0- | 2,031 |
| Prior Change in Income Taxes Payable | -0- | 1,176 |
| Unrealized Gain on Available for | | |
| Sale Securities | -0- | (1,000) |
| Cash Provided (Used) by Changes in | | |
| Operating Assets and Liabilities: | | |
| Accounts Receivable | 84,044 | 102,976 |
| Employee Advances | 2,850 | (2,370) |
| Receivable from Abacus Companies | (522,619) | |
| Shareholder Loan | (267,317) | (166,051) |
| Inventory | 12,491 | (95,875) |
| Prepaid Expenses | (567,699) | (566,675) |
| Current Liabilities | 1,491,635 | 2,375,147 |
| Customer List | 225,000 | (2) |
| Deposits | -0- | (26,866) |
| Deferred Tax Benefit | 202,054 | (105,160) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 2,307,936 | 2,307,797 |
| | | |
| **INVESTING ACTIVITIES** | | |
| Acquisition of Property and Equipment | (1,580,163) | (1,256,088) |
| Decrease in Securities | -0- | 101,000 |
| NET CASH USED BY INVESTING ACTIVITIES | (1,580,163) | (1,155,088) |
| | | |
| **FINANCING ACTIVITIES** | | |
| Increase in Note Payable | -0- | (113,889) |
| Dividends Distributed to Stockholders | (10,110) | -0- |
| NET CASH USED BY FINANCING ACTIVITIES | (10,110) | (113,889) |
| | | |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 717,663 | 1,038,820 |
| | | |
| Cash and Cash Equivalents at Beginning of Year | 1,552,559 | 513,739 |
| | | |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 2,270,222 | $ 1,552,559 |

See accompanying notes and accountants' report.



CWGBS Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
STATEMENT OF CASH FLOW

|  | JUNE 30 | |
| --- | --- | --- |
|  | 2005 | 2004 |

SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:

| | | |
| --- | --- | --- |
| Income Taxes Paid | $    800 | $   31,567 |

See accompanying notes and accountants' report.

-7-

 Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

<u>NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:</u>

1.  Abacus America, Inc. (the Company) was Incorporated under the laws of the State of California on July 1, 1992.  The Company has adopted a June 30 fiscal year end for reporting requirements.

2.  Abacus America, Inc. (dba APlus.net), ("the Company") is an Internet Service Provider that provides data communications services and Internet access to residential and business subscribers nationwide.  Services include Web hosting, domain registration, e-commerce, and Internet access.

    Web hosting services include leasing shared or dedicated server space and providing web services to companies and individuals desiring to present a web or e-commerce presence.  Web hosting services are provided under month-to-month and annual contracts that include one-time set-up fees and monthly service fees.  E-commerce services are provided to certain Web hosting customers.  These services consist of software (called the Mercury Merchant Server) that enables companies to easily and affordably create web sites and sell their products and services over the Internet.

    Domain name registration services are provided directly to customers and to resellers, with registration terms ranging from one to 10 years.

    Internet access is provided under month-to-month and annual contracts that include one-time set-up fees, equipment sales and monthly service fees.  The Company provides dial-up internet access.

    The Company's operations are located solely in the United States.  Revenues from customers located outside of the United States were immaterial for all of the periods presented.  No single customer accounted for 10% or more of the Company's revenues in any of the periods presented.

CWGBS    Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

> **Reorganization and Corporate Separation-** In June 2004, the company spun-off two of its divisions into separate corporations namely Rodopi Systems, Inc. (RDI) and DevStart, Inc. (DSI). Effective after incorporation, the company's operations for customer service software system and online content and marketing were transferred to RDI and DSI, respectively.
>
> The separation of these companies was accomplished by Abacus contributing the divisions to RDI and DSI in exchange for a 100% of these companies' stocks and immediately thereafter distributing these stocks to the shareholders of Abacus pro rata. The transfer transactions constituted a tax-free reorganization and corporate separation pursuant to Section 351,355 and 368 of the Internal Revenue Code of 1986, as amended.

3. **Cash and Cash Equivalents** for purposes of reporting cash flows, cash and cash equivalents include cash on hand, cash in checking and savings accounts with banks.

4. **Accounts Receivable** are primarily trade receivables reported at net of allowance for bad debts. Based on historical experience and management's assessment of the collectibility of the accounts receivable, the company provides a 67% bad debt allowance on accounts receivable 0-30 days old, and a 100% allowance for accounts over 60 days.

5. **Inventories** consist of computers and computer components stated at the lower of cost or market.

6. **Property and Equipment** are stated at cost. The straight-line method of depreciation is followed for financial reporting purposes. Depreciation is provided in amounts sufficient to relate the cost of assets to operations over their estimated service lives or the lives of the respective leases, whichever is shorter. Maintenance and repairs are charged to expense. Major renewals and improvements are capitalized. Gains and losses on dispositions are credited or charged to earnings as incurred.

CWGBS   Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

## NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

7.  <u>Deferred Income</u> consists of income received on signed contracts of which the services have not been rendered as of the year end. Deferred income is recognized as income over the term of the service contract.

    Based on the information provided by management, it has been determined that between 75% to 88% of deferred income as of June 30, 2005, will be amortized and recognized as income over the next 12 months.

8.  <u>Revenue</u> is recognized upon the Company meeting all of the following general criteria: a written agreement, contract or purchase order is executed; services or products are delivered; and the fee is fixed or determinable.

    Fees charged for Web hosting, e-commerce and Internet access services are recognized ratably over the terms of the related service periods. Fees and associated costs charged for domain name registration services are recognized ratably over the life of the registration term for initial registrations and registration renewals. One-time set-up fees are deferred and recognized ratably over twelve months. Equipment revenues and associated costs are recognized ratably over twelve months, as are the associated equipment costs.

    Revenue from perpetual software licenses for which there are no significant continuing obligations is recognized upon the Company meeting all of the aforementioned general criteria. In addition, vendor-specific objective evidence must exist to allocate the total fee to undelivered elements of the arrangement. Vendor-specific objective evidence is based on the price charged when an element is sold separately, or if not yet sold separately, is based on the price established by authorized management. Revenue from post-contract customer support services is recognized ratably over the related service periods.

    Amounts billed and received in advance of providing service are recorded as deferred revenue.



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

## NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

9.  **Income Taxes**-Deferred income taxes arise from timing differences from income and expense items reported for financial accounting and tax purposes in different periods.  Deferred taxes are classified as current or non-current, depending on the classification of the assets and liabilities to which they relate.  Deferred taxes arising from timing differences that are not related to an asset or liability are classified as current or non-current depending on the periods in which the timing differences are expected to reverse.

10.  **Leases** that meet criteria for capitalization are classified as capital leases.  There are no capital leases.  Leases that do not meet such criteria are classified as operating leases and related rentals are charged to expense as incurred(Note F).

11.  **Use of Estimates**-The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures.  Accordingly, actual results could differ from those estimates.

12.  **Advertising Costs** are expensed in the year incurred.  The Company incurred $2,323,882 in advertising expense in the year ended June 30, 2005.

## NOTE B-ACCOUNTS RECEIVABLE:

Accounts Receivable consist of the following:

|  | 2005 | 2004 |
|---|---|---|
| Accounts Receivable | $ 3,378,477 | $ 2,492,910 |
| Less Allowance for Doubtful Accounts | 3,242,263 | 2,272,652 |
| Total | $  136,214 | $  220,258 |


Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

## NOTE C-PREPAID EXPENSES:

Prepaid Expenses consist of the following:

|  | 2005 | 2004 |
|---|---|---|
| Prepaid Domain Name Reg Fees | $ 1,897,321 | $ 1,324,480 |
| Prepaid Insurance | 57,419 | 65,672 |
| Prepaid Property Taxes | 11,416 | 6,161 |
| Prepaid Software Licenses | 2,517 | 24,135 |
| Prepaid Other Expenses | 74,151 | 13,452 |
| Prepaid Income Taxes | -0- | 31,896 |
| Prepaid Rent | -0- | 9,329 |
|  | $ 2,042,824 | $ 1,475,125 |

## NOTE D-ACCRUED EXPENSES:

Accrued Expenses consist of the following:

|  | 2005 | 2004 |
|---|---|---|
| Other Accrued Expenses | $ 5,993 | $ -0- |
| Accrued Cedant Payable | -0- | 225,000 |
| Accrued Payables | 202,384 | 262,971 |
| Accrued Payroll Taxes | 11,052 | 13,815 |
| Vacation Payroll | 69,121 | 60,077 |
| Accrued Payroll | 129,353 | 161,440 |
| Sales Tax Payable | 11,265 | 41,096 |
| Interest Payable | -0- | -0- |
| 401-K Payable | 4,976 | 1,969 |
| Garnishments Payable | 375 | 796 |
| Credit Card Payables | 11,845 | 22,944 |
| Accrued Bonuses | 3,660 | 14,035 |
| Accrued Commissions | 34,631 | 59,821 |
|  | $ 484,655 | $ 863,964 |

CWGBS Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

## NOTE E-INCOME TAXES:

Under the provisions of Statement of Financial Accounting Standards No.109, "Accounting for Income Taxes" (FAS 109), an entity recognizes deferred tax assets and liabilities for future tax consequences or events that have been previously recognized in the Company's financial statements of tax returns.  The measurement of deferred tax assets and liabilities is based on provisions of the enacted tax law: the effects of future changes in tax laws or rates are not anticipated.

As of June 30, 2005, the Company recognized a deferred tax asset in the amount of $462,861.  This asset represents the anticipated utilization of net operating loss expiring as follows:

| ORIGINATED IN FISCAL YEARS ENDED JUNE 30 | REMAINING NET OPERATING LOSS AS OF 6/30/05 | NOL EXPIRATION |
|---|---|---|
| 2002 | 305,170 | 2017 |
| 2004 | 523,095 | 2024 |

Following is a summary of the components of corporate income taxes for the year ended June 30, 2005.

Income Tax Expense
| | | |
|---|---|---|
| Federal Corporate Income Tax | $ | 7,232 |
| California Corporate Income Tax | | 2,184 |
| | $ | 9,416 |

| | | |
|---|---|---|
| Deferred Income Tax Expense | $ | 202,054 |

## NOTE F-COMMITMENTS AND CONTINGENCIES:

As of June 30, 2005, the Company leases 3 office spaces and 6 automobiles.

-13-



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

## NOTE F-COMMITMENTS AND CONTINGENCIES-CON'T:

Future minimum lease payments are:

| YEAR ENDED JUNE 30 | |
|---|---|
| 2006 | 885,437 |
| 2007 | 693,401 |
| 2008 | 224,884 |
| 2009 | 231,628 |
| TOTAL | $ 2,035,350 |

## NOTE G-RETIREMENT PLAN:

The corporation has a discretionary 401k plan.  The corporation does not currently contribute to the plan.

## NOTE H-CONCENTRATION OF CASH:

The Company maintains corporate cash balances which, at times, may exceed federally insured limits.  The Company also maintains cash balances at a brokerage company that are not federally insured.  At June 30, 2005, the Company had $2,141,222 of uninsured balances.  The Company has never experienced any losses in such accounts.  Management believes it is not exposed to any significant risk on its cash balances.

## NOTE I-AMORTIZABLE INTANGIBLE ASSETS:

The intangible assets consist of customer list acquired in May 2002 which is being amortized over four years.  The carrying value of the customer lists has been written down by $225,000 to reverse the liability recorded in connection with its purchase, which the management determined to be no longer payable.

## NOTE J-PENDING LITIGATION:

The Company has a pending lawsuit filed against Alabanza Corporation ("Alabanza") claiming violation of Business and Professions Code sections 17200, and for intentional interference with economic relationship.  The claims relate to conduct by Alabanza arising out of Abacus' acquisition of Cedant in May 2002.

-14-



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2005

NOTE J-PENDING LITIGATION-CON'T:

Cedant sells and services websites to third party clients Cedant originally rented space for those websites from Alabanza. The sites were to be migrated to Abacus servers after its acquisition of Cedant. Abacus alleges that Alabanza wrongfully blocked Cedant from access to Alabanza computer servers before the migration was completed, in violation of Cedant's contract for use of such servers to host websites of Cedant clients.

Cross-complaint was also filed by Alabanza against Abacus and Cedant. The causes of action include claims of conversion, statutory misappropriation of trade secrets-Alabanza computer source code which it alleges to proprietary, defamation, intentional interference with prospective business advantage, violations of the Electronic Communication Privacy Act, the Computer Fraud and Abuse Act, California Business and Professions Code section 17200, breach of contract against Cedant, negligence and trespass to chattels. These relate to claimed misappropriation by Cedant and Abacus of Alabanza computer source code used for web hosting services.

As of June 30, 2005, these cases are currently pending in the Superior Court of California, San Diego County, with the trial date set for April 21, 2006. Cedant will continue to vigorously defend against the claims of Alabanza in its cross-complaint. It is the opinion of management that it does not appear likely that there will be an unfavorable result for Cedant and Abacus as against the claims of Alabanza thus no amount has been accrued in these financial statements. Legal expenses during the year related to defending this lawsuit were approximately $201,598.

NOTE K-RELATED PARTY TRANSACTIONS:

As of fiscal year end, a stockholder owed the company $332,443 in unsecured loans. These loans are non-interest bearing and are payable within the next twelve months.

CWGBS  Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

**ABACUS AMERICA, INC.**
**NOTES TO THE FINANCIAL STATEMENTS**
**JUNE 30, 2005**

## NOTE K-RELATED PARTY TRANSACTIONS-CON'T:

The company also has outstanding receivables and payables against companies partly owned by the company's stockholders. These receivables represent overhead expenses paid by Abacus America, Inc. for these related entities. Breakdown of receivables is as follows:

| | |
|---|---|
| Rodopi Software, Inc. | $ 496,420 |
| DevStart, Inc. | 26,199 |
| Total | $ 522,619 |

## NOTE L-OTHER CONTINGENCIES:

The company is being audited by California Board of Equalization (BOE) for violation of its reseller's permit. The company buys parts without sales tax using its reseller permit, but uses these parts to build servers for Abacus' dedicated server business. BOE has not issued a final determination on the audit. However, based on the initial assessment of the BOE auditor, the company recognizes a contingent sales tax liability estimated at $7,750 on $100,000 worth of parts in the inventory that have been purchased without sales tax. No accrual was reported in this financial statement pertaining to this issue due to immateriality of the amount involved.

-16-

**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
TABLE OF CONTENTS
JUNE 30, 2004
(RE-ISSUED ON FEBRUARY 2, 2005)

|                                              | PAGE  |
|----------------------------------------------|-------|
| Independent Auditors' Report                 | 1     |
| Balance Sheet                                | 2,3   |
| Statement of Income and Retained Earnings    | 4     |
| Statement of Cash Flow                       | 5,6   |
| Notes to the Financial Statements            | 7-13  |

**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584



Member of
American Institute of
Certified Public Accountants

**PARTNERS**

Theodore Cashuk, CPA
Donald T. Wiseman, CPA
Richard A. Goldberg, CPA
Arthur Birnbaum, CPA
Wes L. Salem, CPA

Member of
California Society of
Certified Public Accountants

**PROFESSIONAL STAFF**

Ma. Lolita Cremat, CPA
Jennifer R. Eastin
Joni L. Goin
Megan C. Hedgecoth

**OFFICE MANAGER**

Annemarie A. Rosen

### INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of
Abacus America, Inc.

We have audited the accompanying balance sheets of Abacus America, Inc. (a California corporation) as of June 30, 2004 and 2003, and the related statements of income and retained earnings and cash flows for the years then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Abacus America, Inc. as of June 30, 2004 and 2003, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Cashuk, Wiseman, Goldberg, Birnbaum & Salem*

CASHUK, WISEMAN, GOLDBERG, BIRNBAUM AND SALEM

San Diego, California
September 3, 2004

ABACUS AMERICA, INC.
BALANCE SHEET

|  | JUNE 30 | |
|---|---|---|
|  | 2004 | 2003 |

### ASSETS

**CURRENT ASSETS**
| | | |
|---|---|---|
| Cash and Cash Equivalents(Note A) | $ 1,552,559 | $    513,739 |
| Securities | -0- | 101,000 |
| Accounts Receivable Net of Allowance(Note A & B) | 220,258 | 323,234 |
| Employee Advance | 4,170 | 1,800 |
| Inventory(Note A) | 133,657 | 37,782 |
| Prepaid Expenses(Note C) | 1,475,125 | 908,450 |
| Shareholder Loan | 65,126 | 19,076 |
| TOTAL CURRENT ASSETS | 3,450,895 | 1,905,081 |

**PROPERTY & EQUIPMENT (Note A)**
| | | |
|---|---|---|
| Automobile | 20,500 | 20,507 |
| Leasehold Improvements | 119,300 | 58,919 |
| Office Equipment | 3,634,131 | 2,460,016 |
| Office Furniture | 191,161 | 169,562 |
| Accumulated Depreciation | (2,400,033) | (1,839,916) |
| NET PROPERTY & EQUIPMENT | 1,565,059 | 869,088 |

**OTHER ASSETS**
| | | |
|---|---|---|
| Deposits | 88,205 | 61,339 |
| Customer List, Net of Amortization(Note I) | 924,689 | 1,429,062 |
| Deferred Income Taxes(Note E) | 594,162 | 125,249 |
| TOTAL OTHER ASSETS | 1,607,056 | 1,615,650 |

| | | |
|---|---|---|
| TOTAL ASSETS | $ 6,623,010 | $ 4,389,819 |

See accompanying notes and accountants' report.

-2-


Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
BALANCE SHEET

|  | JUNE 30 | |
| --- | --- | --- |
|  | 2004 | 2003 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
| --- | --- | --- |
| **CURRENT LIABILITIES** | | |
| Accounts Payable (Note A) | $    837,229 | $    973,493 |
| Accrued Expenses (Note D) | 863,964 | 538,638 |
| Income Taxes Payable (Note E) | -0- | 33,871 |
| Deferred Income | 5,772,326 | 3,550,770 |
| Stockholder Loan | -0- | 121,601 |
| Notes Payable | -0- | 113,889 |
| TOTAL CURRENT LIABILITIES | 7,473,519 | 5,332,262 |
| | | |
| **STOCKHOLDERS' EQUITY** | | |
| Common Stock | 10,000 | 10,000 |
| 50,000,000 Shares Authorized | | |
| 5,000,000 Shares Issued and Outstanding | | |
| Unrealized Gain/Loss | -0- | 1,000 |
| Retained Deficit | (860,509) | (953,443) |
| TOTAL STOCKHOLDERS' EQUITY | (850,509) | (942,443) |
| | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | $ 6,623,010 | $ 4,389,819 |

See accompanying notes and accountants' report.

-3-



Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

# ABACUS AMERICA, INC.
## STATEMENT OF INCOME AND RETAINED EARNINGS

|  | JUNE 30 | |
|---|---|---|
|  | 2004 | 2003 |
| **INCOME** | | |
| Sales | $12,786,689 | $11,674,633 |
| **COST OF SALES** | 1,960,452 | 2,045,271 |
| GROSS PROFIT | 10,826,237 | 9,629,362 |
| **OPERATING EXPENSES** | | |
| General & Administrative | 9,846,517 | 7,633,200 |
| Amortization | 504,375 | 504,374 |
| Depreciation | 558,086 | 563,337 |
| Interest Expense | 1,597 | 51,709 |
| Rent | 744,205 | 747,457 |
| TOTAL OPERATING EXPENSES | 11,654,780 | 9,500,077 |
| NET OPERATING INCOME | (828,543) | 129,285 |
| **OTHER INCOME AND EXPENSES** | | |
| Gain(Loss) on Investments | 449,980 | -0- |
| Interest and Dividend Income | 2,208 | 1,200 |
| Miscellaneous Income | -0- | -0- |
| TOTAL OTHER INCOME AND EXPENSES | 452,188 | 1,200 |
| **INCOME BEFORE TAXES** | (376,355) | 130,485 |
| Income Tax Expenses(Notes A & E) | | |
| Current Income Tax | 800 | 33,871 |
| Deferred Income Tax Benefit | (105,160) | (125,249) |
| **NET INCOME** | $ (271,995) | $ 221,863 |
| **RETAINED EARNINGS AT BEGINNING OF YEAR** | | |
| As Previously Reported | (953,443) | (1,175,306) |
| Adjustment for | | |
| Understatement of Deferred Income Taxes(Note J) | 363,753 | -0- |
| Overstatement of Income Tax Expense(Note J) | 1,176 | -0- |
| Balance at Beginning of Year, as restated | (588,514) | (1,175,306) |
| **RETAINED EARNINGS AT END OF YEAR** | $ (860,509) | $ (953,443) |

See accompanying notes and accountants' report.

-4-

 **Cashuk, Wiseman, Goldberg, Birnbaum & Salem**
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

## ABACUS AMERICA, INC.
## STATEMENT OF CASH FLOW

|  | JUNE 30 | |
|---|---|---|
|  | 2004 | 2003 |
| **OPERATING ACTIVITIES** | | |
| Net Income(Loss) | $ (271,995) | $ 221,863 |
| Adjustments to Reconcile Net Income: | | |
| Provided(Used) by Operating Activities: | | |
| Depreciation | 558,086 | 563,337 |
| Amortization | 504,375 | 504,374 |
| Prior Change in Depreciation | 2,031 | -0- |
| Prior Change in Income Taxes Payable | 1,176 | -0- |
| Unrealized Gain on Available for | | |
| Sale Securities | (1,000) | (17,000) |
| Cash Provided(Used) by Changes in | | |
| Operating Assets and Liabilities: | | |
| Accounts Receivable | 102,976 | 253,310 |
| Employee Advances | (2,370) | (1,800) |
| Shareholder Loan | (166,051) | (362,341) |
| Inventory | (95,875) | 54,923 |
| Prepaid Expenses | (566,675) | 173,195 |
| Accounts Payable | (136,264) | (130,699) |
| Accrued Expenses | 325,326 | (76,990) |
| Income Taxes Payable | (35,471) | 33,071 |
| Deferred Income | 2,221,556 | (449,911) |
| Intangible Asset | (2) | -0- |
| Deposits | (26,866) | (4,987) |
| Deferred Tax Benefit | (105,160) | (125,249) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 2,307,797 | 635,096 |
| | | |
| **INVESTING ACTIVITIES** | | |
| Property and Equipment Acquired | (1,256,088) | (381,692) |
| Decrease in Securities | 101,000 | 17,000 |
| NET CASH USED BY INVESTING ACTIVITIES | (1,155,088) | (364,692) |
| | | |
| **FINANCING ACTIVITIES** | | |
| Increase in Note Payable | (113,889) | 11,975 |
| | | |
| INCREASE(DECREASE) IN CASH AND CASH EQUIVALENTS | 1,038,820 | 282,379 |
| | | |
| Cash and Cash Equivalents at Beginning of Year | 513,739 | 231,360 |
| | | |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | $ 1,552,559 | $ 531,739 |

See accompanying notes and accountants' report.

-5-

 Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
STATEMENT OF CASH FLOW

| | JUNE 30 | |
|---|---|---|
| | 2004 | 2003 |

SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:

| | 2004 | 2003 |
|---|---|---|
| Interest Paid | $ -0- | $ 73,436 |
| Income Taxes Paid | 31,567 | 800 |

See accompanying notes and accountants' report.

-6-

CWGBS    Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

1. Abacus America, Inc. (the Company) was Incorporated under the laws of the State of California on July 1, 1992. The Company has adopted a June 30 fiscal year end for reporting requirements.

2. Abacus America, Inc. (dba APlus.net), ("the Company") is an Internet Service Provider that provides data communications services and Internet access to residential and business subscribers nationwide. Services include Web hosting, domain registration, e-commerce, and Internet access. In addition, the Company licenses its Rodopi billing, provisioning and customer service software system under perpetual licenses to other Internet Service Providers.

Web hosting services include leasing shared or dedicated server space and providing web services to companies and individuals desiring to present a web or e-commerce presence. Web hosting services are provided under month-to-month and annual contracts that include one-time set-up fees and monthly service fees. E-commerce services are provided to certain Web hosting customers. These services consist of software (called the Mercury Merchant Server) that enables companies to easily and affordably create web sites and sell their products and services over the Internet.

Domain name registration services are provided directly to customers and to resellers, with registration terms ranging from one to 10 years.

Internet access is provided under month-to-month and annual contracts that include one-time set-up fees, equipment sales and monthly service fees. The Company provides dial-up Internet access as well as broadband access using Digital Subscriber Line (DSL) and satellite technologies. The Company also offers high-speed dedicated access to business subscribers using a range of technologies. In addition, the Company wholesales DSL accounts to smaller Internet Service Providers.

-7-

**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

The Company's operations are located solely in the United States. Revenues from customers located outside of the United States were immaterial for all of the periods presented. No single customer accounted for 10% or more of the Company's revenues in any of the periods presented.

3. Cash and Cash Equivalents for purposes of reporting cash flows, cash and cash equivalents include cash on hand, cash in checking and savings accounts with banks.

4. Securities are classified as available for sale securities and are recorded at fair market value. Changes in fair value market value during the year are included in stockholders' equity.

5. Accounts Receivable are trade receivables consisting of income both earned and unearned. The unearned portion is offset by an adjustment to deferred income.

6. Allowance for Doubtful Accounts is maintained based on managements assessment of the collectibility of accounts receivable. The Company estimates a 40% allowance for bad debt on accounts receivable 0-30 days old, an 80% allowance for accounts 30-61 days old, and a 95% allowance for accounts 61-90 days old. The allowance for accounts over 90 days varies from 95% to 100%.

7. Inventories consist of computers and computer components and is stated at the lower of cost or market.

8. Fixed Assets are being depreciated using the straight-line method over their useful lives.

9. Accounts Payable are trade payables.

10. Deferred Income consists of income received on signed contracts of which the services have not been rendered as of the year end.

11. Revenue is recognized upon the Company meeting all of the following general criteria: a written agreement, contract or purchase order is executed; services or products are delivered; and the fee is fixed or determinable.

-8-

CWGBS Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

Fees charged for Web hosting, e-commerce and Internet access services are recognized ratably over the terms of the related service periods. Fees and associated costs charged for domain name registration services are recognized ratably over the life of the registration term for initial registrations and registration renewals. One-time set-up fees are deferred and recognized ratably over twelve months. Equipment revenues and associated costs are recognized ratably over twelve months, as are the associated equipment costs.

Revenue from perpetual software licenses for which there are no significant continuing obligations is recognized upon the Company meeting all of the aforementioned general criteria. In addition, vendor-specific objective evidence must exist to allocate the total fee to undelivered elements of the arrangement. Vendor-specific objective evidence is based on the price charged when an element is sold separately, or if not yet sold separately, is based on the price established by authorized management. Revenue from post-contract customer support services is recognized ratably over the related service periods.

Amounts billed and received in advance of providing service are recorded as unearned revenue.

12. Income Taxes-Deferred income taxes arise from timing differences from income and expense items reported for financial accounting and tax purposes in different periods. Deferred taxes are classified as current or non-current, depending on the classification of the assets and liabilities to which they relate. Deferred taxes arising from timing differences that are not related to an asset or liability are classified as current or non-current depending on the periods in which the timing differences are expected to reverse.

13. Leases that meet criteria for capitalization are classified as capital leases. There are no capital leases. Leases that do not meet such criteria are classified as operating leases and related rentals are charged to expense as incurred(Note G).

-9-

CWGBS    Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

14. **Use of Estimates**-The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

NOTE B-ACCOUNTS RECEIVABLE:

Accounts Receivable consist of the following:

|  | 2004 | 2003 |
|---|---|---|
| Accounts Receivable | $ 2,492,910 | $ 4,919,714 |
| Less Allowance for Doubtful Accounts | 2,272,652 | (4,596,480) |
| Total | $    220,258 | $    323,234 |

NOTE C-PREPAID EXPENSES:

Prepaid Expenses consist of the following:

|  | 2004 | 2003 |
|---|---|---|
| Prepaid Domain Name Reg Fees | $ 1,324,480 | $    876,851 |
| Prepaid Insurance | 65,672 | 18,622 |
| Prepaid Property Taxes | 6,161 | 2,816 |
| Prepaid Software Licenses | 24,135 | 2,160 |
| Prepaid Advertising | -0- | 8,001 |
| Prepaid Rent | 9,329 | -0- |
| Prepaid Other Expenses | 13,452 | -0- |
| Prepaid Income Taxes | 31,896 | -0- |
|  | $ 1,475,125 | $    908,450 |

-10-

CWGBS    Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

## NOTE D-ACCRUED EXPENSES:

Accrued Expenses consist of the following:

|  | 2004 | 2003 |
|---|---|---|
| Accrued Cedant Payable | $   225,000 | $   225,000 |
| Accrued Payables | 262,971 | 66,639 |
| Accrued Payroll Taxes | 13,815 | 12,587 |
| Vacation Payroll | 60,077 | 60,077 |
| Accrued Payroll | 161,440 | 154,170 |
| Sales Tax Payable | 41,096 | 47 |
| Interest Payable | -0- | 20,118 |
| 401-K Payable | 1,969 | -0- |
| Garnishments Payable | 796 | -0- |
| Credit Card Payables | 22,944 | -0- |
| Accrued Bonuses | 14,035 | -0- |
| Accrued Commissions | 59,821 | -0- |
|  | $   863,964 | $   538,638 |

## NOTE E-INCOME TAXES:

Under the provisions of Statement of Financial Accounting Standards No.109, "Accounting for Income Taxes" (FAS 109), an entity recognizes deferred tax assets and liabilities for future tax consequences or events that have been previously recognized in the Company's financial statements of tax returns.  The measurement of deferred tax assets and liabilities is based on provisions of the enacted tax law: the effects of future changes in tax laws or rates are not anticipated.

-11-

CWGBS  Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

### NOTE E-INCOME TAXES-CON'T:

As of June 30, 2004. the Company recognized a deferred tax asset in the amount of $594,162. This asset represents the anticipated utilization of net operating loss expiring as follows:

| ORIGINATED IN FISCAL YEARS ENDED JUNE 30 | REMAINING NET OPERATING LOSS AS OF 6/30/04 | NOL EXPIRATION |
|---|---|---|
| 2002 | 1,069,862 | 2017 |
| 2004 | 453,095 | 2024 |

Following is a summary of the components of corporate income taxes for the year ended June 30, 2004.

| | 2004 |
|---|---|
| **Income Tax Expense** | |
| Federal Corporate Income Tax | $       -0- |
| California Corporate Income Tax | 800 |
| | $      800 |
| | |
| **Deferred Income Tax Benefit** | |
| Federal | $ (120,160) |
| State | 15,000 |
| | |
| **Total Income Tax Benefit** | $ (105,160) |

### NOTE F-LEASES:

As of June 30, 2004 the Company leases 3 office spaces and 6 automobiles.

Future minimum lease payments are:

| YEAR ENDED JUNE 30 | |
|---|---|
| 2005 | $  938,105 |
| 2006 | 874,406 |
| 2007 | 703,806 |
| 2008 | 224,884 |
| 2009 | 231,628 |
| | |
| TOTAL | $ 2,972,829 |

-12-

 Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2004

NOTE G-RETIREMENT PLAN:

The corporation has a discretionary 401k plan. The corporation does not currently contribute to the plan.

NOTE H-CONCENTRATION OF CASH:

The Company maintains corporate cash balances which, at times, may exceed federally insured limits. The Company also maintains cash balances at a brokerage company that are not federally insured. At June 30, 2004, the Company had $785,856 of uninsured balances. The Company has never experienced any losses in such accounts. Management believes it is not exposed to any significant risk on its cash balances.

NOTE I-GOODWILL AND OTHER INTANGIBLE ASSETS:

The intangible recorded by the Company is being amortized. The intangible asset is a customer list and is not considered to have an indefinite useful life. The customer list will continue to be amortized over its useful life. The Company is amortizing the intangible asset on a straight-line basis over four years.

NOTE J-PRIOR PERIOD ADJUSTMENT:

During the year ended June 30, 2004, a change was made to retained earnings to correct understatement of deferred income taxes due to non-inclusion of net operating loss carry forwards in the computation of deferred income tax balance and to correct overstatement of income tax expense. Correction of these errors resulted in an increase of previously reported net income and retained earnings for the year ended June 30, 2004 of $364,929.

-13-

Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CWGBS CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

# ABACUS AMERICA, INC.

## FINANCIAL STATEMENTS

## JUNE 30, 2003

## (AUDITED)



**CWGBS** Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
TABLE OF CONTENTS
JUNE 30, 2003

|                                              | PAGE  |
|----------------------------------------------|-------|
| Independent Auditors' Report                 | 1     |
| Balance Sheet                                | 2,3   |
| Statement of Income and Retained Earnings    | 4     |
| Statement of Cash Flow                       | 5,6   |
| Notes to the Financial Statements            | 7-13  |

**CWGBS** Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584



Member of
American Institute of
Certified Public Accountants

**PARTNERS**

Theodore Cashuk, CPA
Donald T. Wiseman, CPA
Richard A. Goldberg, CPA
Arthur Birnbaum, CPA
Wes L. Salem, CPA

Member of
California Society of
Certified Public Accountants

**PROFESSIONAL STAFF**

Jennifer E. Benroth, CPA
Jennifer R. Eastin
Brian L. Krugh
Mark G. Wilson, CPA

**OFFICE MANAGER**

Annemarie A. Rosen

## INDEPENDENT AUDITORS' REPORT

To the Board of Directors and Stockholders of
Abacus America, Inc.

We have audited the accompanying balance sheets of Abacus America, Inc. (a California corporation) as of June 30, 2003 and 2002, and the related statements of income and retained earnings and cash flows for the years then ended. These financial statements are the responsibility of the company's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Abacus America, Inc. as of June 30, 2003 and 2002, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Cashuk, Wiseman, Goldberg, Birnbaum & Salem*

CASHUK, WISEMAN, GOLDBERG, BIRNBAUM AND SALEM

San Diego, California
August 20, 2003

BALANCE SHEET

| | JUNE 30 | |
| --- | --- | --- |
| | 2003 | 2002 |

## ASSETS

**CURRENT ASSETS**

| | | |
| --- | ---: | ---: |
| Cash and Cash Equivalents(Note A) | $ 513,739 | $ 231,360 |
| Securities(Note B) | 101,000 | 118,000 |
| Accounts Receivable Net of Allowance(Note A) | 323,234 | 576,544 |
| Employee Advance | 1,800 | -0- |
| Interest Receivable | -0- | -0- |
| Inventory(Note A) | 37,782 | 92,705 |
| Prepaid Expenses(Note D) | 908,450 | 1,081,645 |
| Shareholder Loan | 19,076 | 69,569 |
| TOTAL CURRENT ASSETS | 1,905,081 | 2,169,823 |

**PROPERTY & EQUIPMENT**(Note A)

| | | |
| --- | ---: | ---: |
| Automobile | 20,507 | 20,507 |
| Leasehold Improvements | 58,919 | 58,919 |
| Office Equipment | 2,460,016 | 2,078,324 |
| Office Furniture | 169,562 | 169,562 |
| | 2,709,004 | 2,327,312 |
| Accumulated Depreciation | (1,839,916) | (1,276,579) |
| NET PROPERTY & EQUIPMENT | 869,088 | 1,050,733 |

**OTHER ASSETS**

| | | |
| --- | ---: | ---: |
| Deposits | 61,339 | 56,352 |
| Customer List Net of Amortization (Note K) | 1,429,062 | 1,933,436 |
| Deferred Tax Benefit | 125,249 | -0- |
| TOTAL OTHER ASSETS | 1,615,650 | 1,989,788 |
| TOTAL ASSETS | $ 4,389,819 | $ 5,210,344 |

See accompanying notes and accountants' report.

-2-



Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

BALANCE SHEET

|  | JUNE 30 | |
|  | 2003 | 2002 |

### LIABILITIES AND STOCKHOLDERS' EQUITY

**CURRENT LIABILITIES**

| | 2003 | 2002 |
|---|---|---|
| Accounts Payable (Note A) | $ 973,493 | $ 1,104,192 |
| Accrued Expenses (Note E) | 538,638 | 615,628 |
| Income Taxes Payable (Note F) | 33,871 | 800 |
| Deferred Income (Note A) | 3,550,770 | 4,000,681 |
| Stockholder Loan (Note K) | 121,601 | 534,435 |
| Notes Payable (Note K) | 113,889 | 101,914 |
| TOTAL CURRENT LIABILITIES | 5,332,262 | 6,357,650 |

**STOCKHOLDERS' EQUITY**

| | 2003 | 2002 |
|---|---|---|
| Common Stock | 10,000 | 10,000 |
| 50,000,000 Shares Authorized | | |
| 5,000,000 Shares Issued and Outstanding | | |
| Unrealized Gain/Loss | 1,000 | 18,000 |
| Retained Deficit | (953,443) | (1,175,306) |
| TOTAL STOCKHOLDERS' EQUITY | (942,443) | (1,147,306) |

| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | **$ 4,389,819** | **$ 5,210,344** |

See accompanying notes and accountants' report.

-3-



**CWGBS** Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

STATEMENT OF INCOME AND RETAINED EARNINGS

|  | JUNE 30 | |
|--|--|--|
|  | 2003 | 2002 |
| **INCOME** | | |
| Sales | $11,674,633 | $12,375,361 |
| **COST OF SALES** | 2,045,271 | 3,971,703 |
| GROSS PROFIT | 9,629,362 | 8,403,658 |
| **OPERATING EXPENSES** | | |
| General & Administrative | 7,633,200 | 6,393,951 |
| Amortization(Note K) | 504,374 | 84,063 |
| Depreciation | 563,337 | 492,522 |
| Interest Expense | 51,709 | 12,766 |
| Rent | 747,457 | 329,984 |
| TOTAL OPERATING EXPENSES | 9,500,077 | 7,313,286 |
| NET OPERATING INCOME | 129,285 | 1,090,372 |
| **OTHER INCOME AND EXPENSES** | | |
| Merger and Acquisition Advisory Services | -0- | (380,375) |
| Gain on Sale of Inventory | -0- | 20,333 |
| Gain(Loss) on Investments(Note B) | -0- | -0- |
| Interest and Dividend Income | 1,200 | 5,510 |
| Miscellaneous Income | -0- | -0- |
| TOTAL OTHER INCOME AND EXPENSES | 1,200 | (354,532) |
| **INCOME BEFORE TAXES** | 130,485 | 735,840 |
| Income Tax Benefit(Note A,F) | (125,249) | -0- |
| Income Tax Expense(Note A,F) | 33,871 | 800 |
| **NET INCOME** | $ 221,863 | $ 735,040 |
| **RETAINED EARNINGS AT BEGINNING OF YEAR** | (1,175,306) | (1,910,346) |
| **RETAINED EARNINGS AT END OF YEAR** | $ (953,443) | $(1,175,306) |

See accompanying notes and accountants' report.

-4-



**CWGBS** Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

STATEMENT OF CASH FLOW

|  | | JUNE 30 | |
| --- | --- | --- | --- |
|  | | 2003 | 2002 |
| OPERATING ACTIVITIES | | | |
| Net Income | | $ 221,863 | $ 735,040 |
| Adjustments to Reconcile Net Income to | | | |
| Net Cash Used by Operating Activities: | | | |
| Depreciation | | 563,337 | 492,522 |
| Amortization | | 504,374 | -0- |
| Prior Change in Depreciation | | -0- | (4,528) |
| Unrealized Gain on Available for | | | |
| Sale Securities | | (17,000) | 17,000 |
| Changes in Current Assets and Liabilities: | | | |
| Increase in Accounts Receivable | | 253,310 | (345,199) |
| Increase in Employee Advances | | (1,800) | -0- |
| Decrease in Interest Receivable | | -0- | 5,472 |
| Increase in Shareholder Loan | | (362,341) | 476,619 |
| Decrease in Inventory | | 54,923 | 58,067 |
| Increase in Prepaid Expenses | | 173,195 | (368,038) |
| Increase in Accounts Payable | | (130,699) | 655,912 |
| Increase in Accrued Expenses | | (76,990) | 127,553 |
| Increase in Income Taxes Payable | | 33,071 | 800 |
| Increase in Deferred Income | | (449,911) | 95,772 |
| Increase in Intangible Asset | | -0- | (1,933,436) |
| Increase in Deposits | | (4,987) | (52,352) |
| Increase in Deferred Tax Benefit | | (125,249) | -0- |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | | 635,096 | (38,796) |
| | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | |
| Property and Equipment Acquired | | (381,692) | (790,136) |
| (Increase)Decrease in Securities | | 17,000 | (17,000) |
| NET CASH PROVIDED(USED) BY | | | |
| INVESTING ACTIVITIES | | (364,692) | (807,136) |
| | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | |
| Increase in Note Payable | | 11,975 | 23,920 |
| | | | |
| INCREASE(DECREASE) IN CASH AND CASH EQUIVALENTS | | 282,379 | (822,012) |
| | | | |
| Cash and Cash Equivalents at Beginning of Year | | 231,360 | 1,053,372 |
| | | | |
| CASH AND CASH EQUIVALENTS AT END OF YEAR | | $ 531,739 | $ 231,360 |

See accompanying notes and accountants' report.

-5-



**CWGBS** Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
STATEMENT OF CASH FLOW

|  | JUNE 30 | |
|---|---|---|
|  | 2003 | 2002 |

**SUPPLEMENTAL DISCLOSURES OF CASH FLOW INFORMATION:**

| | | |
|---|---|---|
| Interest Paid | $ 73,436 | $ 12,766 |
| Income Taxes Paid | 800 | -0- |

-6-



**Cashuk, Wiseman, Goldberg, Birnbaum & Salem**
CERTIFIED PUBLIC ACCOUNTANTS
Telephone  (619) 563-0145/283-7137
FAX (619) 563-9584

ABACUS AMERICA, INC.
NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

NOTE A—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

1.  Abacus America, Inc. (the Company) was Incorporated under the laws of the State of California on July 1, 1992.  The Company has adopted a June 30 fiscal year end for reporting requirements.

2.  Abacus America, Inc. (dba APlus.net), ("the Company") is an Internet Service Provider that provides data communications services and Internet access to residential and business subscribers nationwide.  Services include Web hosting, domain registration, e-commerce, and Internet access.  In addition, the Company licenses its Rodopi billing, provisioning and customer service software system under perpetual licenses to other Internet Service Providers.

    Web hosting services include leasing shared or dedicated server space and providing web services to companies and individuals desiring to present a web or e-commerce presence.  Web hosting services are provided under month-to-month and annual contracts that include one-time set-up fees and monthly service fees.  E-commerce services are provided to certain Web hosting customers. These services consist of software (called the Mercury Merchant Server) that enables companies to easily and affordably create web sites and sell their products and services over the Internet.

    Domain name registration services are provided directly to customers and to resellers, with registration terms ranging from one to 10 years.

    Internet access is provided under month-to-month and annual contracts that include one-time set-up fees, equipment sales and monthly service fees.  The Company provides dial-up Internet access as well as broadband access using Digital Subscriber Line (DSL) and satellite technologies.  The Company also offers high-speed dedicated access to business subscribers using a range of technologies.  In addition, the Company wholesales DSL accounts to smaller Internet Service Providers.

    The Company's operations are located solely in the United States.  Revenues from customers located outside of the United States were immaterial for all of the periods presented.  No single customer accounted for 10% or more of the Company's revenues in any of the periods presented.

-7-

CWGBS  Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

3.  <u>Cash and Cash Equivalents</u> for purposes of reporting cash flows, cash and cash equivalents include cash on hand, cash in checking and savings accounts with banks.

4.  <u>Securities</u> are classified as available for sale securities and are recorded at fair market value.  Changes in fair value market value during the year are included in stockholders' equity.

5.  <u>Accounts Receivable</u> are trade receivables consisting of income both earned and unearned.  The unearned portion is offset by an adjustment to deferred income.

6.  <u>Allowance for Doubtful Accounts</u> is maintained based on managements assessment of the collectibility of accounts receivable.  The Company estimates a 40% allowance for bad debt on accounts receivable 0-30 days old, an 80% allowance for accounts 30-61 days old, and a 95% allowance for accounts 61-90 days old.  The allowance for accounts over 90 days varies from 95% to 100%.

7.  <u>Inventories</u> consist of computers and computer components and is stated at the lower of cost or market.

8.  <u>Fixed Assets</u> are being depreciated using the straight-line method over their useful lives.

9.  <u>Accounts Payable</u> are trade payables.

10.  <u>Deferred Income</u> consists of income received on signed contracts of which the services have not been rendered as of the year end.

11.  <u>Revenue</u> is recognized upon the Company meeting all of the following general criteria: a written agreement, contract or purchase order is executed; services or products are delivered; and the fee is fixed or determinable.

-8-

CWGBS

Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

NOTE A—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES—CON'T:

Fees charged for Web hosting, e-commerce and Internet access services are recognized ratably over the terms of the related service periods. Fees and associated costs charged for domain name registration services are recognized ratably over the life of the registration term for initial registrations and registration renewals. One-time set-up fees are deferred and recognized ratably over twelve months. Equipment revenues and associated costs are recognized ratably over twelve months, as are the associated equipment costs.

Revenue from perpetual software licenses for which there are no significant continuing obligations is recognized upon the Company meeting all of the aforementioned general criteria. In addition, vendor-specific objective evidence must exist to allocate the total fee to undelivered elements of the arrangement. Vendor-specific objective evidence is based on the price charged when an element is sold separately, or if not yet sold separately, is based on the price established by authorized management. Revenue from post-contract customer support services is recognized ratably over the related service periods.

Amounts billed and received in advance of providing service are recorded as unearned revenue.

12. <u>Advertising Costs</u> are expensed as incurred and are included in general and administrative expense. Advertising costs paid to Lycos are classified as prepaid and amortized over the life of the contract.

13. <u>Income Taxes</u>—Deferred income taxes arise from timing differences from income and expense items reported for financial accounting and tax purposes in different periods. Deferred taxes are classified as current or non-current, depending on the classification of the assets and liabilities to which they relate. Deferred taxes arising from timing differences that are not related to an asset or liability are classified as current or non-current depending on the periods in which the timing differences are expected to reverse.

CWGBS Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

## NOTE A-SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES-CON'T:

14. **Leases** that meet criteria for capitalization are classified as capital leases. There are no capital leases. Leases that do not meet such criteria are classified as operating leases and related rentals are charged to expense as incurred (Note C).

15. **Use of Estimates**-The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

## NOTE B-SECURITIES:

Following is a summary of investment securities classified as available for sale:

|  | FAIR VALUE | GROSS UNREALIZED GAINS | COST BASIS |
|---|---|---|---|
| Schwab Portfolio | $ 101,000 | $ 1,000 | $ 100,000 |

The change in net unrealized holding gain (loss) on securities available for sale that has been included as a separate component of stockholders' equity for the year ended June 30, 2003 was $(17,000).

## NOTE C-ACCOUNTS RECEIVABLE:

Accounts Receivable consist of the following:

|  | 2003 | 2002 |
|---|---|---|
| Accounts Receivable | $ 4,919,714 | $ 3,914,203 |
| Less Allowance for Doubtful Accounts | (4,596,480) | (3,337,659) |
|  | 323,234 | 576,544 |

CWGBS  Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

## NOTE D-PREPAID EXPENSES:

Prepaid Expenses consist of the following:

|                              | 2003 | 2002 |
|------------------------------|------|------|
| Prepaid DSL Setup Fees       | $ -0- | $ 172,381 |
| Prepaid Domain Name Reg Fees | 876,851 | 514,962 |
| Prepaid Insurance            | 18,622 | 28,868 |
| Prepaid Lycos                | -0- | 365,434 |
| Prepaid Property Taxes       | 2,816 | -0- |
| Prepaid Software Licenses    | 2,160 | -0- |
| Prepaid Advertising          | 8,001 | -0- |
|                              | $ 908,450 | $ 1,081,645 |

## NOTE E-ACCRUED EXPENSES:

Accrued Expenses consist of the following:

|                          | 2003 | 2002 |
|--------------------------|------|------|
| Accrued Cedant Payable   | $ 225,000 | $ 225,000 |
| Accrued Payables         | 66,639 | -0- |
| Accrued Payroll Taxes    | 12,587 | 13,840 |
| Vacation Payroll         | 60,077 | 103,621 |
| Accrued Payroll          | 154,170 | 167,285 |
| Sales Tax Payable        | 47 | 64,037 |
| Interest Payable         | 20,118 | 41,845 |
| Income Tax Payable       | -0- | -0- |
|                          | $ 538,638 | $ 615,628 |

## NOTE F-INCOME TAXES:

Under the provisions of Statement of Financial Accounting Standards No.109, "Accounting for Income Taxes" (FAS 109), an entity recognizes deferred tax assets and liabilities for future tax consequences or events that have been previously recognized in the Company's financial statements of tax returns. The measurement of deferred tax assets and liabilities is based on provisions of the enacted tax law: the effects of future changes in tax laws or rates are not anticipated.

As of June 30, 2003, the Company recognized a deferred tax asset in the amount of $125,249. This asset represents the anticipated utilization of $1,464,567 net operating loss expiring in 2021.

-11-



Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137 .
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

## NOTE F-INCOME TAXES-CON'T:

Following is a summary of the components of corporate income taxes for the year ended June 30, 2003.

|  | 2003 |
|---|---|
| **Income Tax Expense** | |
| Federal Corporate Income Tax | $ -0- |
| California Corporate Income Tax | 33,871 |
| | $ 33,871 |
| **Deferred Tax Benefit** | |
| Federal | $ (99,404) |
| State | (25,845) |
| | $ (125,249) |
| Total Tax Expense (Benefit) | $ (91,378) |

## NOTE G-LEASES:

As of June 30, 2003 the Company leases 3 office spaces and 6 automobiles.

Future minimum lease payments are:

| YEAR ENDED JUNE 30 | |
|---|---|
| 2004 | $ 736,878 |
| 2005 | 747,393 |
| 2006 | 758,516 |
| 2007 | 654,300 |
| 2008 | 483,040 |
| TOTAL | $ 3,380,127 |

## NOTE H-RETIREMENT PLAN:

The corporation has a discretionary 401k plan. The corporation does not currently contribute to the plan.



Cashuk, Wiseman, Goldberg Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

NOTES TO THE FINANCIAL STATEMENTS
JUNE 30, 2003

## NOTE I-CONCENTRATION OF CASH:

The Company maintains corporate cash balances which, at times, may exceed federally insured limits. The Company also maintains cash balances at a brokerage company that are not federally insured. At June 30, 2003, the Company had $298,830 of uninsured balances. The Company has never experienced any losses in such accounts. Management believes it is not exposed to any significant risk on its cash balances.

## NOTE J-GOODWILL AND OTHER INTANGIBLE ASSETS:

The intangible recorded by the Company is being amortized. The intangible asset is a customer list and is not considered to have an indefinite useful life. The customer list will continue to be amortized over its useful life. The Company is amortizing the intangible asset on a straight-line basis over four years.

## NOTE K-RELATED PARTY TRANSACTION:

Lilian Vachovsky, a 52% shareholder, loaned the corporation $180,000 in May 2002. The outstanding balances of the loan at December 31, 2003 was $88,242. The loan is unsecured.

Abacus, Inc. owns Abacus Trade, LTD., a Bulgarian company, $113,889. There is no affiliation between the 2 companies, but Abacus Trade, LTD. is partially owned by Lilian Vachovsky. The note is unsecured and payable on demand.

 Cashuk, Wiseman, Goldberg, Birnbaum & Salem
CERTIFIED PUBLIC ACCOUNTANTS
Telephone (619) 563-0145/283-7137
FAX (619) 563-9584

**Schedule 2.6 – Absence of Undisclosed Liabilities**

Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

## Schedule 2.8 – Products and Services Warranty

Service Level Agreement.

Terms of Service; see http://www.aplus.net/sup_serv_agreement.html.

## Schedule 2.9 – Absence of Certain Developments

<u>(a)</u>:
Subsequent to June 30, 2005, Abacus America, Inc. issued stock options to seven (7) employees, as set forth in Schedule 2.2, "Abacus America, Inc. Optionees," which schedule is incorporated by reference.

<u>(b)</u>:
In May 2006, Abacus America, Inc. paid $13,385.30 in satisfaction of a judgment in connection with Kelly Services, Inc. v. Abacus America, Inc. (Superior Court of California, County of San Diego, Case No. IC844702).

<u>(c), (d), (e)</u>:
None.

<u>(f)</u>:
The Company sold a UPS for approximately $7,000.

On July 14, 2006, Abacus Bulgaria sold residential real estate property located at 22, Veliko Tarnovo Str., Sofia, Bulgaria, and vacant land located at complex Mladost 2, Sofia, Bolgaria to Ivan Vachovsky for an aggregate purchase price of approximately $136,105.87.

<u>(g)</u>:
Since June 30, 2005, Abacus America, Inc. made several loans to shareholder Lilian Vachovsky.  As of July 18, the aggregate amount of all loans to Ms. Vachovsky was $494,715.19.  On July 18, 2006, Ms. Vachovsky repaid $390,000 of the loan balance.  On July 20, 2006, Ms. Vachovsky repaid the remaining loan balance.

Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

<u>(h)</u>:
Subsequent to June 30, 2005, Abacus America, Inc. entered into the following employment agreements:

Clark Caines Employee Offer Letter, dated April 4, 2006.
Terry Patterson Employee Offer Letter, dated February 24, 2006.
Sneharthi Roy Employee Offer Letter, dated March 5, 2006.
Mattew O'Neil Employee Offer Letter, dated January 29, 2006 and Bonus Plan.
Andrew Bennett Employee Offer Letter, dated June 7, 2006.
David Ransom Employee Offer Letter, dated June 13, 2006.
Martin Acosta Employee Offer Letter, dated May 31, 2006.
Phil Lancashire Employee Offer Letter, dated June 17, 2006.

Bulgarian law requires employment agreements for all employees of Abacus Trade, Ltd. Accordingly, all employees hired by Abacus Trade, Ltd. subsequent to June 30, 2005 are party to Abacus Trade Ltd.'s Form Employment Agreements (hourly and salary), copies of which have been provided to Buyer.

(i):

Abacus America, Inc., modified the terms of Russell Gilman's employment in an email from Lilian Vachovsky to Mr. Gilman dated February 22, 2006.

(j):

Consistent with the Company's past practice and ordinary course of business, the Company periodically adjusts its commission plans in order to provide what it believes to be proper incentives to its employees.

(k):

Since June 30, 2005, Abacus America, Inc. made several loans to shareholder Lilian Vachovsky. As of July 18, the aggregate amount of all loans to Ms. Vachovsky was $494,715.19. On July 18, 2006, Ms. Vachovsky repaid $390,000 of the loan balance. On July 20, 2006, Ms. Vachovsky repaid the remaining loan balance.

Since June 30, 2005, Abacus America, Inc. made several expenditures on behalf of the Sellers related to the acquisition of a datacenter facility in Phoenix, Arizona. As the date of this Agreement, the aggregate amount of all such expenditures was $499,821.92. This amount was reimbursed to Abacus America, Inc. on July 20, 2006.

On July 17, 2006, Abacus America, Inc. made a payment to General Electric Capital Corporation, on behalf of Sellers, in the amount of $1,158,673.28. This amount is reflected in the Closing Indebtedness set forth in the Closing Adjustment Certificate, and accordingly, this amount will be repaid to Abacus America, Inc. at Closing.

Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

(l):

Capital expenditures for the Group Companies consist primarily of dedicated servers, hosting servers, network equipment, such as routers and switches, data center equipment, such as UPS and HVAC units, security systems, installation of the foregoing, office equipment, office furniture and computers for operations. Since June 30, 2005, the aggregate investment and commitments for computers and computer-related equipment was approximately $2.2 million. Of this amount, approximately $1.5 million was for dedicated servers, approximately $450,000 was for hosting servers, datacenter equipment and installation, peripherals and employee workstations and the remaining approximately $250,000 was for equipment and related setup costs for the Phoenix datacenter. Since June 30, 2005, maintenance and upgrades for the dedicated servers totaled approximately $100,000. Maintenance and upgrade costs are expensed.

(m):
None.

(n):
After discussions with Buyer's accounting advisor, Trent Chambers of Pricewaterhouse Coopers, LLP, and pursuant to an agreement between Buyer and Sellers, Abacus America, Inc. has written down all inventory to zero.

(o), (p):
None.

(q):
The temperature in the Company's San Diego datacenter is currently excessively warm. The Company believes that this can be addressed by moving servers to the Company's new datacenter in Phoenix, AZ or by adding cooling equipment, and that the issue will be mitigated by natural churn and adding all new servers in the Phoenix datacenter.

(r):
The Company is in the process of building up a call center in Manila, the Philippines. As part of this effort, Aplus.Net Philippines, Inc. was formed, a temporary facility has been leased and some office equipment has been purchased. Four employees are in Manila to assist in this effort. The Company has come to terms on a long term lease for a facility of approximately 15,000 sq ft., but has made no commitment in connection therewith. The Company's total commitment and expenditure to date has been approximately $20,000.

(s):
None.

(t):
Software License Agreement.

(u):
Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

On July 14, 2006, Abacus Bulgaria sold residential real estate properties located at 22, Veliko Tarnovo Str., Sofia, Bulgaria, and vacant land located at complex Mladost 2, Sofia, Bolgaria to Ivan Vachovsky for an aggregate purchase price of approximately $136,105.87.

Since June 30, 2005, Abacus America, Inc. made several loans to shareholder Lilian Vachovsky. As of July 18, the aggregate amount of all loans to Ms. Vachovsky was $494,715.19. On July 18, 2006, Ms. Vachovsky repaid $390,000 of the loan balance. On July 20, 2006, Ms. Vachovsky repaid the remaining loan balance.

Since June 30, 2005, Abacus America, Inc. made several expenditures on behalf of the Sellers related to the acquisition of a datacenter facility in Phoenix, Arizona. As the date

of this Agreement, the aggregate amount of all such expenditures was $499,821.92. This amount was reimbursed to Abacus America, Inc. on July 20, 2006.

On July 17, 2006, Abacus America, Inc. made a payment to General Electric Capital Corporation, on behalf of Sellers, in the amount of $1,158,673.28. This amount is reflected in the Closing Indebtedness set forth in the Closing Adjustment Certificate, and accordingly, this amount will be repaid to Abacus America, Inc. at Closing.

Clark Caines Employee Offer Letter, dated April 4, 2006.
Terry Patterson Employee Offer Letter, dated February 24, 2006.
Sneharthi Roy Employee Offer Letter, dated March 5, 2006.
Mattew O'Neil Employee Offer Letter, dated January 29, 2006 and Bonus Plan.
Andrew Bennett Employee Offer Letter, dated June 7, 2006.
David Ransom Employee Offer Letter, dated June 13, 2006.
Martin Acosta Employee Offer Letter, dated May 31, 2006.
Phil Lancashire Employee Offer Letter, dated June 17, 2006.
Abacus America, Inc., modified the terms of Russell Gilman's employment in an email from Lilian Vachovsky to Mr. Gilman dated February 22, 2006.

Microsoft Services Provider License Agreement, dated June 20, 2006.

Fee Agreement, by and among Abacus America, Inc. and SG Capital, dated May 12, 2006.

Master Agreement between AT&T Corp. and Abacus America, Inc. dba Aplus.Net Internet Services, dated June 6, 2006.

CNET Networks Insertion Order, dated March 30, 2006.

In July 2006, Abacus America, Inc. gave notice of termination of that certain Digital Services Agreement, by and between MCI Worldcom Network Services, Inc. and Abacus America, Inc., dated November 1, 2004. This agreement will no longer be effective as of August 10, 2006.

(v):
None.

## SCHEDULE 2.11 – Tax Matters

(a):
Since its acquisition by Abacus America, Inc., Cedant, Inc. has not filed tax returns and has been consolidated with the tax returns of Abacus America, Inc.

(b):
Abacus America has paid all taxes due and owing by it through the fiscal year ended June 30, 2005; Abacus America has not made payment for any taxes that may be due for any period subsequent thereto.

(c), (d), (e), (f), (g), (h):
None.

(i):
Plan and Agreement of Reorganization and Corporate Separation, by and between Abacus America, Inc. and Rodopi Software, Inc., dated June 30, 2004.

Plan and Agreement of Reorganization and Corporate Separation, by and between Abacus America, Inc. and Devstart, dated July 2, 2004.

(j), (k), (l):
None.

(m):
The Company has not computed taxes for the period subsequent to June 30, 2005.

(n), (o), (p), (q), (r):
None.

(s):
The Company's deferred revenue balance as of June 30, 2006, was $9,259,859.

## Schedule 2.12(a) – Contracts and Commitments

(i):
Abacus America, Inc. Second Amended and Restated 1998 Nonqualified Stock Option Plan, dated May 2000.

(ii):
Bulgarian law requires that all Abacus Trade, Ltd. employees with non-provisional employee agreements shall be given 30 day notice prior to termination.

(iii):
Abacus America, Inc, Company Personnel Policies, dated July 2003.

(iv):
Clark Caines Employee Offer Letter, dated April 4, 2006.
Terry Patterson Employee Offer Letter, dated February 24, 2006.
Sneharthi Roy Employee Offer Letter, dated March 5, 2006.
Mattew O'Neil Employee Offer Letter, dated January 29, 2006 and Bonus Plan.
Russ Gilman Employee Offer Letter, dated March 31, 2005.
Russ Gilman Compensation Package Email, dated February 22, 2006.
Andrew Bennett Employee Offer Letter, dated June 7, 2006.
David Ransom Employee Offer Letter, dated June 13, 2006.
Phil Lancashire Employee Offer Letter, dated June 17, 2006.

Bulgarian law requires employment agreements for all employees of Abacus Trade, Ltd. Accordingly, all employees of Abacus Trade, Ltd. are party to Abacus Trade Ltd.'s Form Employment Agreements (hourly and salary), copies of which have been provided to Buyer.

(v), (vi):
None.

(vii):
Motor Vehicle Lease Agreement between Midway Jeep Chrysler and Abacus America, Inc., lease term October 31, 2003 to November 1, 2006 (Jeep Liberty).

Motor Vehicle Lease Agreement between Rancho Chrysler Jeep Dodge and Abacus America, Inc., lease term November 15, 2003 to February 15, 2007 (Chrysler Pacifica).

(viii):
None.

(ix):
Microsoft Services Provider License Agreement, dated June 20, 2006.

CM4all Licensing Agreement, dated March 22, 2005.

LiveSite License Agreement, dated May 29, 2001.

Miva Distribution Agreement, dated March 18, 2003.

Stalker Software License Agreement, dated January 1, 2005.

TemplateMonster.com Reseller Agreement, dated May 5, 2004.

SWSoft, Inc. Hosting Partner Reseller Agreement, dated September 29, 2003.

Registry-Registrar Agreement between Afilias Limited and Abacus America, Inc. dba Names4Ever.com, dated May 24, 2001.

Registry/Registrar IP Claim Service Agreement, between NeuLevel, Inc. and Abacus America, Inc. dba Names4ever.com, dated May 18, 2001.

Registry-Registrar between Public Interest Registry and Abacus America, Inc., dated December 23, 2002.

Registration Services Agreement, between American Registry for Internet Numbers, Ltd. and Abacus America, Inc., dated May 27, 1997.

Registrar Accreditation Agreement, by and between ICANN and Abacus America, Inc. dba Names4ever, dated June 25, 2005.

Registry-Registrar Agreement by and between Verisign, Inc. and Abacus America, Inc., dated August 16, 2001, as amended November 2, 2004.

ccTLD Access Program Agreement, by and between Network Solutions, Inc. dba VeriSign Global Registry Services and Abacus America, Inc., dated September 13, 2001.

Registration Services Agreement, by and between The .TV Corporation International and Abacus America, Inc. dba Names4ever.com, dated May 17, 2001.

usTLD Registrar Accreditation Agreement, by and between NeuStar, Inc. and Abacus America, Inc., dated March 28, 2002.

usTLD Administrator-Registrar Agreement, by and between NeuStar, Inc. and Abacus America, Inc. dated March 28, 2002.

Web Design Service Agreement with customers; Appendices B and C thereto.

Domain Name Registration Services Agreement with customers.

Shared Hosting Agreement with customers.

(x):
Abacus America, Inc. affiliate program
([http://www.aplus.net/affiliate_program_reseller.html](http://www.aplus.net/affiliate_program_reseller.html)).

Abacus America, Inc. hosting resellers program:
([http://www.aplus.net/hosting_resellers.html](http://www.aplus.net/hosting_resellers.html)).

Abacus America, Inc. domain name resellers program:
([http://www.aplus.net/domain_namerp.html](http://www.aplus.net/domain_namerp.html)).

## ABACUS AMERICA, INC.
## COMMISSION AND BONUS PLANS

In addition to salaries certain employees are eligible to receive commissions and bonuses relating to sales performance.  The following is an explanation of the various commission and bonus plans as of May 2006. Commissions and bonuses are paid for sales generated from the US facility and from the Bulgarian facility.  The commission and bonus plans differ between locations.

### Closers

Closers call prospective customers who have contacted the company or have been contacted through telemarketing.  Closers receive commissions based on the achievement of monthly new APRO sales goals.  New hires are given an initial new sales goal that increases over a four month period:

### US Closers Monthly New Sales Goal

Month 1: $6,000
Month 2: $10,000
Month 3: $15,000
Month 4: $20,000

### US Commission (cumulative payout)

| | |
|---|---|
| 0 – 50% | 0% |
| 51 – 70% | 5% |
| 71 – 80% | 6% |
| 81 – 110% | 8% |
| 111 – 125% | 10% |
| 126 – 150% | 12% |
| 151 – 199% | 13% |
| 200% + | 15% |

### Bulgarian Closers Monthly New Sales Goal

Month 1: $6,000
Month 2: $10,000
Month 3: $15,000
Month 4: $20,000

### Bulgarian Commission

10% of all new sales

US Closers will receive credit and commission for renewal sales. The commission rate is based on the amount of new sales in the month. As an example, if the Closer has a new sales goal of $20,000, and is credited for $5,000 of renewal sales and $15,000 of new sales, the commission rate would be 6% on the $20,000 of sales (75% of goal).

## Managers

### US Sales Manager

Salary: $5,833 per month
Commission:  0.75% of new sales

### US Sales Training Manager

Salary: $4,500 per month
Commission:  0.75% of Sales Training Manager's group new sales
                      10% on individual new sales

### Bulgarian Head Sales Managers

The Bulgarian Head Sales Manager, Nas Chad, is paid $1,500 base salary per month plus:
- Commission on his team sales:

| | |
|---|---|
| Under $50K | 0.00% |
| $50K to $100K | 0.75% |
| $101K to $200K | 1.00% |
| $201K to $300K | 1.20% |
| $301K to $400K | 1.25% |
| Over $400K | 1.30% |

- Commission on other team's sales

| | |
|---|---|
| $50K to $100K | 0.37% |
| $100K to $200K | 0.50% |

| | |
|---|---|
| $200K to $300K | 0.60% |
| $300K to $400K | 0.62% |
| Over $400K | 0.65% |

**Bulgarian Sales Managers**

Bulgarian Sales Managers receive a starting salary of $600 a month plus:

- 10% commission on their individual new sales
- Commission on team sales as follows:

| | |
|---|---|
| Under $50K | 0.00% |
| $50K to $100K | 0.75% |
| $101K to $200K | 1.00% |
| $201K to $300K | 1.20% |
| $301K to $400K | 1.25% |
| Over $400K | 1.30% |

- Salaries increase as follows:

| |
|---|
| $800 a month after 3 months or $50k in sales |
| $1,000 a month after $150k in sales |

## Callers

### US Callers' Manager

Salary: $3,000 per month
Commission:  Based on new sales originating from the Veleka Telephone System and Telemarketing.

| | |
|---|---|
| $0 - $50K | 4% |
| $50K - $100K | 3% |
| $100K - $150K | 2% |
| $150K - $200K | 1% |

The commissions are paid at the rate for each level. As an example, if the new sales are $80,000, the commission would be:
$50K @ 4% = $2,000
$30K @ 3% = $  900
Total Commission = $2,900

### US Callers

Callers' commissions have a pool of 1.5% of the new paid sales (not recurring) of the whole company.  This is distributed as per the caller manager's discretion.

<u>(xi)</u>:
Revocable Letter of Agency appointing Spectrum Settlement Recovery as limited agent, attorney-in-fact and agent with respect to Visa Check/MasterCard Antitrust Litigation Settlement, dated June 8, 2005.

<u>(xii)</u>:
Letter Agreement between Catalyst Investors II, L.P. and Abacus America, Inc. dba Aplus.Net, dated December 2, 2005.

Mutual Non-Disclosure Agreement between CenturyTel Service Group, LLC and Abacus America, Inc. dba Aplus.Net, dated January 12, 2006.

Mutual Non-Disclosure Agreement between Navisite, Inc. and Abacus America, Inc. dba Aplus.Net, dated December 5, 2005.

Nondisclosure Agreement between Summit Partners, L.P. and Abacus America, Inc. dba Aplus.Net, dated November 8, 2005.

Mutual Non-Disclosure Agreement between CBD Media LLC and Abacus America, Inc. dba Aplus.Net, dated November 29, 2005.

Mutual Non-Disclosure Agreement between Office Depot, Inc. and Abacus America, Inc. dba Aplus.Net, dated November 10, 2005.

Mutual Non-Disclosure Agreement between InfoUSA, Inc. and Abacus America, Inc. dba Aplus.Net, dated November 29, 2005.

Confidentiality Agreement between Mirus Securities, Inc. and Abacus America, Inc. dba Aplus.Net, dated November 13, 2004.

Mutual Non-Disclosure Agreement between Voicetech Communications Corp. USA and Abacus America, Inc., dated February 25, 2003.

Non-Disclosure Agreement between SmartDisk Corporation and Abacus America, Inc., dated December 4, 2001.

Non-Disclosure Agreement between IKANO Communications, Inc. and Abacus America, Inc, dated June 25, 2004.

Confidential Disclosure Agreement between New Global Telecom, Inc. and Abacus America, Inc. dba Aplus.Net, dated October 12, 2004.

Letter Agreement between Versailles Group, Ltd. and Abacus America, Inc. dba Aplus.Net, dated October 27, 2005.

Supplier Nondisclosure Agreement between Amazon.com, Inc. and Abacus America, Inc. dba Aplus.Net, dated June 1, 2006.

Confidentiality Agreement by and between Verisign, Inc. and Abacus America, Inc., dated August 16, 2001.

Mutual Non-Disclosure between Affinity Internet, Inc. and Abacus America, Inc. dba Aplus.Net, dated August 20, 2002.

Non-Disclosure and Limitation on Use Agreement, by and between FortuneCity.com Inc. and Abacus America, Inc. dba Aplus.Net, dated May 16, 2006.

Form NDA for Web Design Customers.

(xiii):
Settlement Agreement and Mutual General Release, by and between AuctionDollar.com and Abacus America, Inc., dated March 19, 2005.

Settlement Agreement and Mutual Release, by and between Charles Benninghoff, dated May 14, 2004.

Settlement Agreement and Mutual Release, between Venture Direct Worldwide, Inc. and Abacus America, Inc., dated February 27, 2003.

Settlement Agreement and Mutual Release, by and between Equis Corporation, Alex Giovannotto and Abacus America, Inc., dated December 20, 2002.

Settlement and Mutual Release Agreement, by and between Jeff Fraser and Abacus America, Inc., dated June 11, 2005.

Settlement Agreement and General Release, by and between Simon Aronson and Abacus America, Inc., dated August 18, 2003.

Settlement Agreement between Business Software Alliance and Abacus America, Inc., dated June 21, 2006.

Kelly Services Paid Judgment (May 2006).

IPC Paid Judgment (January 2004).

(xiv):
Finance Agreement with W.I. Simonson and Abacus America, Inc. re: Mercedes S550, dated February 15, 2006.

Clark Caines Employee Offer Letter, dated April 4, 2006.
Terry Patterson Employee Offer Letter, dated February 24, 2006.

Sneharthi Roy Employee Offer Letter, dated March 5, 2006.
Mattew O'Neil Employee Offer Letter, dated January 29, 2006 and Bonus Plan.
Russ Gilman Employee Offer Letter, dated March 31, 2005.
Russ Gilman Compensation Package Email, dated February 22, 2006.
Andrew Bennett Employee Offer Letter, dated June 7, 2006.
David Ransom Employee Offer Letter, dated June 13, 2006.
Phil Lancashire Employee Offer Letter, dated June 17, 2006.

Fee Agreement, by and among Abacus America, Inc. and SG Capital, dated May 12, 2006.

Master Agreement between AT&T Corp. and Abacus America, Inc. dba Aplus.Net Internet Services, dated June 6, 2006.

Master Telecommunications Services Agreement, by among ICG Telecom Group, Inc. and Abacus America, Inc., dated February 19, 2003.

Master Service Agreement by and between Level 3 Communications, LLC and Abacus America, Inc., dated December 18, 2003.

MegaPOP Wholesale Service Agreement, by and between StarNet, Inc. and Abacus America, Inc., dated December 16, 2003.

Registry-Registrar Agreement between Afilias Limited and Abacus America, Inc. dba Names4Ever.com, dated May 24, 2001.

Registry/Registrar IP Claim Service Agreement, between NeuLevel, Inc. and Abacus America, Inc. dba Names4ever.com, dated May 18, 2001.

Registry-Registrar between Public Interest Registry and Abacus America, Inc., dated December 23, 2002.

Registration Services Agreement, between American Registry for Internet Numbers, Ltd. and Abacus America, Inc., dated May 27, 1997.

Registrar Accreditation Agreement, by and between ICANN and Abacus America, Inc. dba Names4ever, dated June 25, 2005.

Registry-Registrar Agreement by and between Verisign, Inc. and Abacus America, Inc., dated August 16, 2001, as amended November 2, 2004.

ccTLD Access Program Agreement, by and between Network Solutions, Inc. dba VeriSign Global Registry Services and Abacus America, Inc., dated September 13, 2001.

Registration Services Agreement, by and between The .TV Corporation International and Abacus America, Inc. dba Names4ever.com, dated May 17, 2001.

usTLD Registrar Accreditation Agreement, by and between NeuStar, Inc. and Abacus America, Inc., dated March 28, 2002.

usTLD Administrator-Registrar Agreement, by and between NeuStar, Inc. and Abacus America, Inc. dated March 28, 2002.

CNET Networks Insertion Order, dated March 30, 2006.

(xv), (xvi):
None.

(xvii):
Office Lease by and between Kilroy Realty, L.P. and Abacus America, Inc., dated February 28, 2002, as amended March 27, 2002.

Lease by and between Calwest Industrial Holdings, LLC and Abacus America, Inc., dated February 25, 2004.

Phoenix Datacenter Lease.

Master Agreement between AT&T Corp. and Abacus America, Inc. dba Aplus.Net Internet Services, dated June 6, 2006.

Master Telecommunications Services Agreement, by among ICG Telecom Group, Inc. and Abacus America, Inc., dated February 19, 2003.

Master Service Agreement by and between Level 3 Communications, LLC and Abacus America, Inc., dated December 18, 2003.

Microsoft Services Provider License Agreement, dated June 20, 2006.

CM4all Licensing Agreement, dated March 22, 2005.

LiveSite License Agreement, dated May 29, 2001.

SWSoft, Inc. Hosting Partner Reseller Agreement, dated September 29, 2003.

Registry-Registrar Agreement between Afilias Limited and Abacus America, Inc. dba Names4Ever.com, dated May 24, 2001.

Registry/Registrar IP Claim Service Agreement, between NeuLevel, Inc. and Abacus America, Inc. dba Names4ever.com, dated May 18, 2001.

Registry-Registrar between Public Interest Registry and Abacus America, Inc., dated December 23, 2002.

Registration Services Agreement, between American Registry for Internet Numbers, Ltd. and Abacus America, Inc., dated May 27, 1997.

Registrar Accreditation Agreement, by and between ICANN and Abacus America, Inc. dba Names4ever, dated June 25, 2005.

Registry-Registrar Agreement by and between Verisign, Inc. and Abacus America, Inc., dated August 16, 2001, as amended November 2, 2004.

Schedule 2.16 – Insurance is incorporated by reference.

<u>(xviii)</u>:
Merchant Referral Agreement, between Humboldt Merchant Services, LP and Abacus America, Inc. dba Aplus.Net, dated October 4, 2004.

## Schedule 2.13(a) – Intellectual Property Rights

<u>(i), (ii)</u>:
None.

<u>(iii)</u>:
Microsoft software, including Windows, SQL, etc.: Microsoft Services Provider License Agreement, dated June 20, 2006.

Website creator tool: CM4all Licensing Agreement, dated March 22, 2005.

Trelix Web design tool: LiveSite License Agreement, dated May 29, 2001.

Shopping cart tool: Miva Distribution Agreement, dated March 18, 2003.

Control panel: Rodopi Software Technical Support Service Agreement, dated December 23, 2003.

Mail server software: Stalker Software License Agreement, dated January 1, 2005.

Web design templates: TemplateMonster.com Reseller Agreement, dated May 5, 2004.

Plesk dedicated server control panel: SWSoft, Inc. Hosting Partner Reseller Agreement, dated September 29, 2003.

<u>(iv)</u>:

| | |
|---|---|
| <u>Trade and corporate names</u>: | 877aplusnet.com |
| Abacus America, Inc. | abac.com |
| Abacus Trade, Ltd. | abac.net |
| Cedant, Inc. | abacus-corp.com |
| Aplus.Net Philippines, Inc. | abacustrade.com |
| Aplus.Net Internet Services | affordablewebhosting.biz |
| Names4ever | amazon-connector.com |
| <u>Internet domain names</u>: | apls.biz |
| 4ecommercesolutions.com | apls.net |
| 877aplus.com | aplus.net |
| 877aplus.net | aplus4us.com |

| | |
|---|---|
| aplus-host.com | computersonline.biz |
| aplus-host.net | computers-online.biz |
| apluskb.com | computers-online.com |
| aplusnet.biz | controlpanel4me.com |
| a-plusnet.biz | controlpanel4you.com |
| aplus-net.biz | cpteam-bg.com |
| aplusnet.info | cpteam-unix.com |
| a-plusnet.info | dedicatedservers.cc |
| aplus-net.info | dedicated-servers-hosting.cc |
| aplusnet.net | domain-names-direct.net |
| aplus-net.net | domain-names-direct.org |
| a-plusnet.org | domainsmadeeasy.biz |
| aplusnet.us | dsl4ever.com |
| aplusnetdate.com | dslduo.com |
| aplusnetdesign.com | dslduo.net |
| aplusnetdsl.com | dslduo.org |
| aplusnetdsl.net | easywebphoto.com |
| aplusnetinternet.com | ebayconnector.com |
| aplusnetre.com | ebay-connector.com |
| apluswebservices.net | ezonlinephotos.com |
| awebhost4me.com | ezwebphoto.com |
| cedant.com | fatfreehosting.com |
| cedantkb.com | fatfreehosting.net |
| comconnector.com | fiberia.com |
| com-connector.com | fiberia.info |

| | |
|---|---|
| fiberia.net | myphotos2web.com |
| fiberia.us | myweb-sitehost.com |
| from-bulgaria.com | mywebsite-host.com |
| froogleconnector.com | myweb-sitehosting.com |
| froogle-connector.com | mywebsite-hosting.com |
| hostingresellerprogram.net | myweb-site-hosting.com |
| hostinvestment.com | name4ever.com |
| hostinvestments.com | name4ever.net |
| intranet-software.biz | nameforever.com |
| intranet-software.com | nameforever.net |
| i-want-a-domain-name.com | names4ever.biz |
| i-want-a-domain-name.net | names-4ever.biz |
| i-want-a-domain-name.org | names4ever.com |
| i-want-to-register-a-domain-name.net | names4-ever.com |
| i-want-to-register-a-domain-name.org | names4ever.info |
| lowfathost.com | names4ever.net |
| low-fat-host.com | names-4ever.net |
| lowfathost.net | names4-ever.net |
| low-fat-host.net | names-4-ever.net |
| lowfathosting.com | names4ever.org |
| low-fat-hosting.com | names-4ever.org |
| low-fat-hosting.net | names4-ever.org |
| myezphotos.com | names-4-ever.org |
| myezpictures.com | names4ever.us |
| myphoto2web.com | names4never.com |

| | |
|---|---|
| namesforever.biz | thedomainregister.com |
| namesforever.com | thesitehosting.com |
| namesforever.net | theweb-sitehost.com |
| nofathosting.com | thewebsite-host.com |
| nofathosting.net | thewebsite-hosting.com |
| pagebutton.com | theweb-site-hosting.com |
| parsleysoft.com | velekapd.com |
| parsleysoft.net | velekapd.net |
| parsleysoftware.com | venzitest2.com |
| parsleysoftware.net | webabusiness.com |
| paybutton.biz | web-a-business.com |
| paybutton.com | webabusiness.net |
| paybutton.info | web-a-business.net |
| qualitydsl.biz | webaccess4ever.com |
| rpg.biz | webafile.com |
| r-p-g.biz | web-a-file.com |
| r-p-g.com | webafile.net |
| r-p-g.org | web-a-file.net |
| server4me.biz | webahome.biz |
| server4me.com | web-a-home.biz |
| server4me.info | webahome.com |
| server4me.net | webahome.info |
| server59.com | web-a-home.info |
| sitefeedback.net | webahome.net |
| superiordsl.biz | web-a-home.net |

| | |
|---|---|
| webahome.org | web-panel.org |
| web-a-home.org | webresellers.biz |
| webahome.us | web-resellers.biz |
| web-a-home.us | webresellers.com |
| webaphoto.biz | web-sitehost.biz |
| web-a-photo.biz | web-sitehost.org |
| webaphoto.com | web-sitehost.us |
| web-a-photo.com | website-hosting.cc |
| webaphoto.info | web-site-hosting.cc |
| web-a-photo.info | web-sitehosting.org |
| webaphoto.net | web-sitehosting.us |
| web-a-photo.net | website-hostingonline.com |
| webaphoto.us | websitehostonline.com |
| web-a-photo.us | web-sitehostonline.com |
| webatune.com | websolo.biz |
| web-a-tune.com | websolo.com |
| webhosting4ever.com | websolo.info |
| webhosting-aplus.net | websolo.us |
| webiphoto.biz | wvgifts.com |
| web-i-photo.biz | yourclient.biz |
| webiphoto.com | your-client.biz |
| web-i-photo.com | yourclient.com |
| webiphoto.net | your-company-web-site.com |
| web-i-photo.net | your-personal-web-site.com |
| web-panel.biz | |

(v):
Aplus.net
Aplus.Net Internet Services
Cedant
Web-a-photo
Web-a-file
Names4ever.com

**Schedule 2.13(b) – Intellectual Property Rights**

None.

## Schedule 2.13(c) – Intellectual Property Rights

<u>(i), (ii)</u>:
None.

<u>(iii)</u>:
A dispute arose regarding the Company's alleged unauthorized copying of certain computer software products of Symantec Corporation, which is represented by the trade association, Business Software Alliance.  This dispute between the parties was settled by entering into that certain Settlement Agreement between Business Software Alliance and Abacus America, Inc., dated June 21, 2006.

<u>(iv)</u>:
On June 5, 2003, the Company wrote a letter to Aplushosting.com ("Hosting"), informing Hosting that the name APLUSHOSTING infringes its trademark Aplus.Net Web Hosting and asking that Hosting cease and desist all use of this name.  On July 5, 2003, Hosting's attorney sent a letter to the Company requesting more information and the Company responded with an email to Hosting's attorney on July 8, 2003.  Subsequently, on June 2, 2006, the Company filed a complaint with WIPO (Case No. D2006-0703) to dispute Hosting's domain name <Aplushosting.com>.  Hosting filed a WIPO response on July 7, 2006.  There has been no resolution to this claim.

**Schedule 2.14 – Litigation**

(a):
Abacus America, Inc. v. Alabanza Corporation, et al., Superior Court of California, San Diego County, Case No. GIC790137.

EFund Capital Partners, LLC v. Robert Pless, Abacus America, Inc., et al., Superior Court of California, Los Angeles County, Case No. BC344790.

Letter from Liggett, Davis and Pagnini re: Cydoor, dated July 29, 2004.

Voytek, Inc. v. Abacus America, Inc., Superior Court of California, San Diego County, Case No. IC 865622.

Routine customer complaints, which individually and in the aggregate are consistent with the Company's ordinary course of business, and none of which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b):
Abacus America, Inc. v. Alabanza Corporation, et al., Superior Court of California, San Diego County, Case No. GIC790137.

Letter from Musick, Peeler & Garrett LLP to Dick A. Semerdjian, dated November 29, 2005, re: Kevin Denny.

Letter from Paul, Plevin, Sullivan & Connaughton LLP to Lucas Roh, Chief Executive Officer, Hostway Corporation, dated April 5, 2006.

On June 5, 2003, the Company wrote a letter to Aplushosting.com ("Hosting"), informing Hosting that the name APLUSHOSTING infringes its trademark Aplus.Net Web Hosting and asking that Hosting cease and desist all use of this name. On July 5, 2003, Hosting's attorney sent a letter to the Company requesting more information and the Company responded with an email to Hosting's attorney on July 8, 2003. Subsequently, on June 2, 2006, the Company filed a complaint with WIPO (Case No. D2006-0703) to dispute Hosting's domain name <Aplushosting.com>. Hosting filed a WIPO response on July 7, 2006. There has been no resolution to this claim.

**Schedule 2.15 – Brokerage**

Fee Agreement, by and among Abacus America, Inc. and SG Capital, dated May 12, 2006.

**Schedule 2.16 – Insurance**

Insurance policies:

Abacus, America, Inc.:  See attached Insurance Summary.

Abacus Trade Ltd.:

| Insurer | Policy Number | Period | Amount | Scope of Coverage |
|---------|---------------|--------|--------|-------------------|
| Allianz Bulgaria | 08190052180000151 | Nov 23, 2005 to Nov 22, 2006 | 150,000 BGN | Fire insurance |

Claims:

| Date of Loss | Policy # | Company | Policy Period | Claim # | Claimant | Allegation | Status | Reserve | Paid |
|---|---|---|---|---|---|---|---|---|---|
| 10/08/01 | TPL-000224-02 | Indian Harbor | 6/1/02 - 6/1/03 | COMEO-002 | Alabanza Corp. | Infringement of proprietary software | Closed | - | 750 |
| 03/01/02 | GU0448306 | Gulf Und. | 6/1/01 - 6/1/02 | 38786 | Alabanza Corp. | Infringement of proprietary software | Open | Yes | 182,859 |
|  | OGL065564-00 | Illinois Union | 3/29/02 - 3/18/03 | 641-22729 | Alabanza Corp. | Patent infringement | Open* |  |  |
| 07/30/02 | TPL-000224-02 | Indian Harbor | 6/1/02 - 6/1/03 | COMEO-005 | Simon Aronson | Breach of contract, fraud | Closed | - | 14,962 |
| 03/18/03 | CCP253345-1 | Century Insurance | 3/18/03 - 3/18/04 | 30093 | Alabanza Corp. | Breach of contract, defamation | Closed |  | 4,881 |
| 06/18/04 | TPL-000224-04 | Indian Harbor | 6/1/04 - 6/1/05 | COMEO-016 | Cedant Inc. | Patent infringement | Open | 158,413 | 82,737 |
| 06/21/04 | TPL-000224-04 | Indian Harbor | 6/1/04 - 6/1/05 | COMEO-015 | AuctionDollar.com | Breach of contract | Closed | - | 74,900 |
|  | GU0448306 | Gulf Und. | 6/1/01 - 6/1/02 | 37806 | Wayne Oyama | Domain name not transferred | Closed | - | - |

* Reservation of rights letter issued April 4, 2005

# INSURANCE SCHEDULE

Date Prepared: April 21, 2006

**Prepared for:**
**Abacus America, Inc.**

**John Burnham Insurance Services**
A Division of UnionBanc Insurance Services
CA License # 0619252

| Coverage | Policy Number | Effective Date | Expiration Date | Company |
|---|---|---|---|---|
| Coml Package | TT06100002 | 03/18/2006 | 03/18/2007 | St. Paul Fire & Marine Insurance Co. |

**Schedule of Locations**

| Loc. # | Address | City | State | Zip |
|---|---|---|---|---|
| 1 | 10350 Barnes Canyon Rd | San Diego | CA | 92130 |
| 2 | 9645 Scranton Road | San Diego | CA | 92121 |
| 3 | 5276 - 5278 Eastgate Mall Rd | San Diego | CA | 92121 |
| 4 | 424 Second St. A | Davis | CA | 95619 |
| 5 | 64 Orland Square Drive | Orland Park | IL | 60462 |

**Commercial General Liability**

| | |
|---|---|
| General Aggregate | $2,000,000 |
| Products/Completed Operations Aggregate | $2,000,000 |
| Each Occurrence | $1,000,000 |
| Personal and Advertising Injury | $1,000,000 |
| Fire Damage Legal Liability | $250,000 |
| Medical Expense Limit (Any one person) | $10,000 |

Coverage written on an Occurrence Basis

| Classification | Code | Exposure | Exposure Basis | Loc.# | State |
|---|---|---|---|---|---|
| internet provider | 47366 | 16649000 | Receipts | | CA |

This Schedule is only a brief outline of coverages provided. Please refer to your policy for terms, conditions and exclusions.

Insurance products offered through UnionBanc Insurance Services, Inc. (CA Insurance License #0619252), a subsidiary of Union Bank of California, N. A., dba Armstrong/Robitaille Business and Insurance Services, Knight Insurance Agency, John Burnham Insurance Services, John Burnham & Company, Tanner Insurance Brokers, and RSD Insurance Brokers. Insurance Products Are Not Bank Deposits • Are Not FDIC Insured • Are Not Guaranteed By Bank Or Any Affiliate • May Lose Value • Are Not Insured By Any Federal Government Agency • Are Products of the Insurance Carrier.

# INSURANCE SCHEDULE

**Prepared for:**
**Abacus America, Inc.**

**John Burnham Insurance Services**
A Division of UnionBanc Insurance Services
CA License # 0619252

Page 2 of 5

*Date Prepared: April 21, 2006*

| Coverage | Policy Number | Effective Date | Expiration Date | Company |
|---|---|---|---|---|
| Coml Package | TT06100002 | 03/18/2006 | 03/18/2007 | St. Paul Fire & Marine Insurance Co. |

## Commercial Property

### Schedule of Locations

| Loc. # | Address | City | State | Zip |
|---|---|---|---|---|
| 1 | 10350 Barnes Canyon Rd | San Diego | CA | 92130 |
| 2 | 9645 Scranton Road | San Diego | CA | 92121 |
| 3 | 5276 - 5278 Eastgate Mall Rd | San Diego | CA | 92121 |
| 4 | 424 Second St. A | Davis | CA | 95619 |
| 5 | 64 Orland Square Drive | Orland Park | IL | 60462 |

## Blanket Commercial Property Coverages

| Subject of Insurance | Limit | Ded | Cause of Loss | Coins% | Valuation |
|---|---|---|---|---|---|
| Personal Property | $2,740,000 | $5,000 | SPCL | 100 | Agreed Value |
| Business Income & Extra Expense | $22,000,000 | | SPCL | 100 | Agreed Value |

This Schedule is only a brief outline of coverages provided. Please refer to your policy for terms, conditions and exclusions.

Insurance products offered through UnionBanc Insurance Services, Inc. (CA Insurance License #0619252), a subsidiary of Union Bank of California, N. A., dba Armstrong/Robitaille Business and Insurance Services, Knight Insurance Agency, John Burnham Insurance Services, John Burnham & Company, Tanner Insurance Brokers, and RSD Insurance Brokers. Insurance Products Are Not Bank Deposits • Are Not FDIC Insured • Are Not Guaranteed By Bank Or Any Affiliate • May Lose Value • Are Not Insured By Any Federal Government Agency • Are Products of the Insurance Carrier.

# INSURANCE SCHEDULE

**John Burnham Insurance Services**
A Division of UnionBanc Insurance Services
CA License # 0619252

**Prepared for:**
Abacus America, Inc.

*Page 3 of 5*

*Date Prepared: April 21, 2006*

| Coverage | Policy Number | Effective Date | Expiration Date | Company |
|---|---|---|---|---|
| Coml Package | TT06100002 | 03/18/2006 | 03/18/2007 | St. Paul Fire & Marine Insurance Co. |

**Additional Coverages Technology Premier Property Form**

| | Limit |
|---|---|
| Accounts Receivable | $200,000 |
| Employee Dishonesty | $10,000 |
| Property Off Premises @ unscheduled locs | $30,000 |
| Extra Expense | $25,000 |
| Money & Securities - On Premises | $20,000 |
| Money and Securities - Off Premises | $10,000 |
| Pollution clean up | $25,000 |
| Valuable Papers & Records | $50,000 |
| Property in Transit | $25,000 |

**This Schedule is only a brief outline of coverages provided. Please refer to your policy for terms, conditions and exclusions.**

Insurance products offered through UnionBanc Insurance Services, Inc. (CA Insurance License #0619252), a subsidiary of Union Bank of California, N. A., dba Armstrong/Robitaille Business and Insurance Services, Knight Insurance Agency, John Burnham Insurance Services, John Burnham & Company, Tanner Insurance Brokers, and RSD Insurance Brokers. Insurance Products Are Not Bank Deposits • Are Not FDIC Insured • Are Not Guaranteed By Bank Or Any Affiliate • May Lose

# INSURANCE SCHEDULE

John Burnham Insurance Services
A Division of UnionBanc Insurance Services
CA License # 0619252

Prepared for:
Abacus America, Inc.

Page 4 of 5

*Date Prepared: April 21, 2006*

| Coverage | Policy Number | Effective Date | Expiration Date | Company |
|---|---|---|---|---|
| Coml Package | TT06100002 | 03/18/2006 | 03/18/2007 | St. Paul Fire & Marine Insurance Co. |

Business Automobile

Limit of Coverage
Non-Owned and Hired Autos

$1,000,000 each accident

This Schedule is only a brief outline of coverages provided. Please refer to your policy for terms, conditions and exclusions.

Insurance products offered through UnionBanc Insurance Services, Inc. (CA Insurance License #0619252), a subsidiary of Union Bank of California, N. A., dba Armstrong/Robitaille Business and Insurance Services, Knight Insurance Agency, John Burnham Insurance Services, John Burnham & Company, Tanner Insurance Brokers, and RSD Insurance Brokers.  Insurance Products Are Not Bank Deposits • Are Not FDIC Insured • Are Not Guaranteed By Bank Or Any Affiliate • May Lose Value • And Are Not A Federal Government Agency. Are Products of the Insurance Carrier.

# INSURANCE SCHEDULE

*Date Prepared: April 21, 2006*

**Prepared for:**

**Abacus America, Inc.**

**John Burnham Insurance Services**
A Division of UnionBanc Insurance Services
CA License # 0619252

*Page 5 of 5*

## Commercial Umbrella/Excess

| | |
|---|---|
| Each Occurrence – Bodily Injury & Property Damage | $5,000,000 |
| General Aggregate | $5,000,000 |
| Retention | $10,000 |

## General Liability

## Automobile Liability – Non-owned/hired only

## Employers Liability

| COMPANY | POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE | EACH ACCIDENT | POLICY LIMIT | DISEASE EACH EMPLOYEE |
|---|---|---|---|---|---|---|
| Farmers | A2008766806 | 02/01/2006 | 02/01/2007 | $1,000,000 | $1,000,000 | $1,000,000 |

**This Schedule is only a brief outline of coverages provided. Please refer to your policy for terms, conditions and exclusions.**

Insurance products offered through UnionBanc Insurance Services, Inc. (CA Insurance License #0619252), a subsidiary of Union Bank of California, N. A., dba Armstrong/Robitaille Business and Insurance Services, Knight Insurance Agency, John Burnham Insurance Services, John Burnham & Company, Tanner Insurance Brokers, and RSD Insurance Brokers. Insurance Products Are Not Bank Deposits • Are Not FDIC Insured • Are Not Guaranteed By Bank Or Any Affiliate • May Lose Value • Are Not Insured By Any Federal Government Agency • Are Products of the Insurance Carrier.

 **ST PAUL TRAVELERS**

# Crime PLUS+® Policy

**DECLARATIONS**                                                              **POLICY NO.** 104714458

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(Stock Insurance Company, herein called the Company)

*IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.*

**1. NAMED INSURED:** Abacus America, Inc.

The Named Insured listed above or as may be amended by endorsement includes any Employee Benefit Welfare or Pension Plan,
as defined in Title I of the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto, sponsored
exclusively by any one or more of those entities named as Insureds under this Policy.

**2. MAILING ADDRESS:** 10350 BARNES CANYON ROAD
SAN DIEGO, CA 92130

**3. POLICY PERIOD:**      From March 18, 2006      To March 18, 2007
(12:01 A.M. Standard Time at your mailing address shown above))

**4. LIMIT OF INSURANCE AND DEDUCTIBLE: Subject to Section 6 of this Policy.**

| Insuring Agreements | Limit of Insurance | Deductible |
|---|---|---|
| Insuring Agreement I - Employee Dishonesty | 200,000 | 5,000 |
| Insuring Agreement II - Forgery or Alterations | 200,000 | 5,000 |
| Insuring Agreement III - On Premises | 20,000 | 5,000 |
| Insuring Agreement IV - In Transit | 20,000 | 5,000 |
| Insuring Agreement V -Money Orders  &  Counterfeit Currency | **Not covered** | |
| Insuring Agreement VI - Computer Fraud  &  FTF | 200,000 | 5,000 |

*If "Not Covered" is inserted above opposite any specified Insuring Agreement, such Insuring Agreement and any other
reference thereto in this policy is deemed to be deleted therefrom.*

**5. ENDORSEMENTS FORMING PART OF THIS POLICY WHEN ISSUED:**

ILT-1018 09-04, F-3169 04-97, F-3179 12-99, F-3010A 01-00, F-3070 01-97, F-3075 06-99, F-3183 04-02

**6. CANCELLATION OF PRIOR INSURANCE:**
By acceptance of this Policy, you give us notice canceling prior Policy or Bond Numbers      103818965
The cancellation to be effective at the time this Policy becomes effective.

_____
Countersigned By (if required)

F-3000 (6/97)

# INFORMATION PAGE
# RENEWAL AGREEMENT

**Attach this Certificate to your policy.**

**TRUCK INSURANCE EXCHANGE**
**18244** (An Inter-Insurance Exchange hereinafter Sometimes Referred To As Company)

Members of the Farmers Insurance Group of Companies
Home Office: 4680 Wilshire Blvd., Los Angeles, California 90010

When you pay the premium due, it is agreed that the policy is renewed for the policy period stated below, subject to all its terms and conditions. If you do not wish to renew this policy, please notify our office in writing before the renewal date to avoid the annual minimum premium charge.

| | |
|---|---|
| **2006** Policy Year | **A2008-76-68  06** Policy No. |
| **WESTERN-WCC** Issuing Office | **A2008-76-68  05** Renewal of Policy No. |
| **99-65-32P** Issuing Office Telphone No. | |
| Agent No. | **4256077** Risk Identification No. |
| **330520254** Identification No. | Unemployment Account No. |
| Federal Identification No. | Federal Identification No. |

1. Named
   Insured
   Mailing
   Address

   **ABACUS AMERICA, INC.**
   **RODOPI SOFTWARE, INC.**
   **10350 BARNES CANYON RD**

   **SAN DIEGO        CA 921212716**

Legal Entity: ☐ Individual  ☐ Partnership  ☒ Corporation
☐ Other _____

Other workplaces not shown above:    **SEE ENDORSEMENT**

2. Policy Period: From ___**02/01/06**___ to ___**02/01/07**___ 12:01 a.m. Standard Time at the insured's mailing address.

3. A. Workers Compensation Insurance: Part One of this policy applies to the Workers Compensation Law of the states listed here:
   **CA CO FL GA IL NY**

   B. Employers Liability Insurance: Part Two of the policy applies to work in each state listed in item 3A. The limits of liability under Part Two are:
   Bodily Injury by Accident   $ ___**1,000,000**___ each accident
   Bodily Injury by Disease   $ ___**1,000,000**___ each employee
   Bodily Injury by Disease   $ ___**1,000,000**___ policy limit

   C. Other States Insurance. Part Three of the policy applies to the states, if any, listed here: "All states except No. Dakota, Ohio, Washington, West Virginia, Wyoming, states designated in item 3A of the Information Page and

4. The premium for this policy will be determined by our Manuals of Rules, Classifications, Rates and Rating Plans. The information required below is subject to verification and change by audit.

| | | |
|---|---|---|
| $ | **6,356.00** | Total Deposit Premium |
| $ | SEE INVOICE | Prior Year's Deposit |
| $ | SEE INVOICE | **Other Credits** |
| $ | SEE INVOICE | **BALANCE DUE** |

| Classification of Operations | Code No. | Premium Basis Estimated Total Annual Remuneration | Rates Per $100 of Remu- neration | Estimated Annual Premium |
|---|---|---|---|---|
| **SEE CLASSIFICATION OF OPERATIONS SCHEDULE** Your Workers' Compensation premium may be subject to midterm adjustment, for the unexpired term of your policy, because the Insurance Commissioner of California has the authority to disapprove rates. | | | | |
| **THIS IS NOT AN INVOICE** | | | | |

| | | |
|---|---|---|
| Minimum Premium $ | **1,500.00** | Total Estimated Annual Premium $ **31,780.00** |
| | | Expense Constant $ **280.00** |

If indicated, interim adjustments of premium shall be made:   ☒ **Monthly**

This policy includes these endorsements and schedules:

| | | | | | |
|---|---|---|---|---|---|
| E5112-ED2 | WC000000A | WC040601A | WC040407 | S9032-ED3 | PN049901A | S9023-ED4 | E0022-ED1 |
| PN049902B | WC000420 | WC040003 | WC040360A | WC040301A | 25-2320ED3 | 51-0666 | 56-5285ED3 |
| WC050402 | 90-0719 | 25-2646 | WC000414 | E5028-ED3 | E5001-ED2 | WC000421 | 25-8016 |
| E5153-ED5 | E5003-ED2 | WC090606 | 56-5285ED2 | WC000419 | WC100601A | 25-2315 | WC120601C |
| WC310308 | WC000406 | 25-4681 | | | | | |



# AMERICAN INTERNATIONAL
# SPECIALTY LINES INSURANCE COMPANY

A Member Company of American International Group, Inc.

A Capital Stock Insurance Company

175 Water Street

New York, NY  10038

**NOTICE:  THIS INSURANCE COMPANY IS NOT LICENSED IN THE STATE OF NEW YORK**

**AND IS NOT SUBJECT TO ITS SUPERVISION**

---

## AIG netAdvantage Professional℠

### INTERNET PROFESSIONAL INSURANCE

**NOTICE:  THIS POLICY CONTAINS SEVERAL COVERAGE PARTS. CERTAIN LIABILITY COVERAGE PARTS OF THIS POLICY ARE LIMITED TO LIABILITY FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSUREDS DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN.  DEFENSE EXPENSE UNDER THE LIABILITY COVERAGE PARTS OF THIS POLICY SHALL REDUCE THE APPLICABLE LIMIT OF LIABILITY AND ARE ALSO SUBJECT TO THE RETENTION SET FORTH IN THE DECLARATIONS.  PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE PROVIDED BY THIS POLICY WITH YOUR INSURANCE AGENT OR BROKER.**

Prior Policy Number: *492-01-76*          Policy Number: *672-36-51*

## DECLARATIONS

ITEM 1.    **NAMED INSURED: ABACUS AMERICA, INC.**

**ADDRESS: 10350 BARNES CANYON RD**

**SAN DIEGO, CA 92121**

ITEM 2.    **POLICY PERIOD:**  FROM <u>JUNE 1, 2006</u>  TO <u>JUNE 1, 2007</u>

(12:01 A.M. standard time at the address of the **named insured**)

ITEM 3.    **LIMITS OF LIABILITY** (including **claim expenses**):

A.    AGGREGATE LIMIT OF LIABILITY

(aggregate for all coverages combined)          $<u>1,000,000</u>

B.    SUBLIMITS OF LIABILITY:

| COVERAGE | COLUMN (1):  sublimit of liability per wrongful act | COLUMN (2): aggregate sublimit of liability per coverage |
|---|---|---|
| A.   Internet Media Liability Coverage | $<u>1,000,000</u> each **wrongful act** or series of continuous, repeated or related **wrongful acts** | $<u>1,000,000</u> |
| B.   Internet Professional Services Liability Coverage | $<u>1,000,000</u> each **wrongful act** or series of continuous, repeated or related **wrongful acts** | $<u>1,000,000</u> |

78083 (3/03)

1

ITEM 4.    **RETENTIONS:**

| COVERAGE | Per **claim** |
|----------|---------------|
| A.  Internet Media Liability Coverage | $75,000 each **claim** |
| B.  Internet Professional Services Liability Coverage | $75,000 each **claim** |

ITEM 5.    **RETROACTIVE DATE:**                    June 01, 2002

ITEM 6.    **SCHEDULE OF COVERED INTERNET PROFESSIONAL SERVICES**

| INTERNET PROFESSIONAL SERVICES | Covered under Coverage B of the Policy (only if checked) |
|--------------------------------|----------------------------------------------------------|
| ASP Services | ☒ |
| Domain Name Registration Services | ☒ |
| e-Commerce Transaction Services | ☒ |
| Electronic Exchange and Auction Services | ☐ |
| Internet Hosting Services | ☒ |
| Internet Media Services | ☒ |
| ISP Services | ☐ |
| Managed and Network Security Services | ☒ |
| Public Key Infrastructure Services | ☒ |
| Search Engine Services | ☒ |
| Web Portal Services | ☒ |

ITEM 7.    **PREMIUM:**                    *$46,696*

ITEM 8.    **NAME AND ADDRESS OF INSURER:**
            (This policy is issued only by the insurance company indicated below)
            AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY
            175 WATER STREET
            NEW YORK, NEW YORK 10038

78083 (3/03)                    2

**Schedule 2.17(a) – Labor Matters**

Todor Vachovsky, the Company's Marketing Manager, has informed the Company that he intends to terminate his employment in August 2006 in order to pursue an MBA at the University of Chicago.

<u>(i), (ii)</u>:
See attached Employee Spreadsheet.

The Company currently pays Lilian Vachovsky $5,000 per month for use of a condominium that has been used by Company employees, including Nikola Nikolov, who uses the condominium as his current residence. After Closing, the Company will no longer pay for use of the condominium and it is anticipated that Mr. Nikolov will require a pay increase of approximately $1,500/month to compensate him for the need to procure housing.

<u>(iii)</u>:

| Name | Total Compensation |
| --- | --- |
| Ivan Vachovsky | $97,500.00 |
| Lilian Vachovsky | $97,500.00 |
| Michael Howard | $12,000.00 |
| Clarke Caines | $26,927.10 |
| Dimitre Chtilianov | $81,109.55 |
| Atanas Dinev | $95,108.20 |
| Larry Dodds | $88,741.64 |
| Mark McAllister | $56,893.64 |
| Russ Gillman | $87,798.21 |
| Matt O'Neill | $52,689.43 |
| Terry Patterson | $24,230.77 |
| Sneharthi Roy | $24,062.50 |
| Venzi Iliev | $36,000.00 |
| Assen Chordbadjiev | $19,200.00 |

<u>(iv)</u>:
Abacus America, Inc.: Ivan Vachovsky, Lilian Vachovsky, Robert Degan.
Abacus Trade, Ltd.: Ivan Vachovsky, Lilian Vachovsky.
Cedant, Inc.: Ivan Vachovsky, Lilian Vachovsky.
Aplus.Net Philippines Inc.: Ivan Vachovsky, Lilian Vachovsky, Sneharthi Roy, Deogracias S. Hilario, Ariel V. Panugao, Welna T. Santos.

<u>(v)</u>:
Robert Degan is paid $3,000 per quarter plus expenses for serving on the board of Abacus America, Inc.

| HEADCOUNT DETAIL FOR A+ (SAN DIEGO AND BULGARIA INCLUDED) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
| Asen P. Petkov | Accounting | Admin | San Diego | 12/19/2005 | F/T | S | $40,000 | N | D | N | N |
| Youlian Ouzounov | Accounting Clerk | Admin | San Diego | 6/1/1995 | F/T | S | $43,200 | N | M/D | N | N |
| Jeffrey Ibanez | Billing | Admin | San Diego | 5/7/2001 | F/T | H | $32,240 | N | M/D | N | N |
| Larissa Rascon | Billing | Admin | San Diego | 5/7/2001 | F/T | H | $31,200 | N | M | N | N |
| Anthony Lindsey | Billing Manager | Admin | San Diego | 3/13/2002 | F/T | S | $55,000 | N | M/D | N | N |
| Raymond Seemeyer | Collections | Admin | San Diego | 6/28/2004 | F/T | H | $20,800 | N | M/D | Y | N |
| Maria Lerinska | Payroll / Assistant | Admin | San Diego | 7/19/2004 | F/T | H | $29,120 | N | M/D | N | N |
| Michael Howard | VP, Accounting | Admin | San Diego | 5/1/2006 | P/T | S | $72,000 | N | M | N | N |
| Vladimir Petrov | Warehouse Manager | Admin | San Diego | 11/30/1995 | F/T | S | $34,800 | N | M/D | N | N |
| Lucinia Baxter | Front Desk | Amin | San Diego | 5/1/2006 | F/T | H | $24,960 | N | | N | N |
| Derek Soiu | Customer Support | Cedant | Davis | 2/8/2006 | F/T | S | $24,000 | N | M/D | N | N |
| Domenic Santangelo | Customer Support | Cedant | Davis | 7/11/2005 | P/T | H | $12.50/hour | N | | N | N |
| Olga Melvin | Customer Support | Cedant | Davis | 7/26/2002 | F/T | S | $34,800 | N | M | N | N |
| Kurt Stauffacher | Manager - Cedant | Cedant | Davis | 5/1/2002 | F/T | S | $66,000 | N | | N | N |
| Adan Callaghan | Customer Support | Cedant | Davis | 5/1/2002 | F/T | S | $51,251 | N | M | N | N |
| Alex Ligeti | Customer Support | Cedant | Davis | 5/1/2002 | F/T | S | $59,800 | N | M | N | N |
| Erik Levinson | Customer Support | Cedant | Davis | 10/18/2005 | F/T | S | $24,000 | N | M | N | N |
| Lowell Kepics | Customer Support | Cedant | Davis | 5/1/2002 | F/T | S | $56,136 | N | M | N | N |
| Ronald Pritchard | Customer Support | Cedant | Davis | 5/1/2002 | F/T | S | $58,578 | N | M | N | N |
| Thomas Jay | Customer Support | Cedant | Davis | 12/16/2002 | F/T | S | $43,313 | N | | N | N |
| Russell L. Gilman | General Manager, Bulgaria | Customer Support | Bulgaria | 2/2/2006 | F/T | S | $100,000 | N | M/D | N | Y |
| Ivan Vachovsky | CEO | Executive | San Diego | 6/30/1992 | F/T | S | $120,000 | Y | M/D | N | N |
| Lilian Vachovsky | COO | Executive | San Diego | 7/1/1992 | F/T | S | $120,000 | Y | M/D | N | N |
| Terry Patterson | General Manager - Phoenix | Executive | San Diego | 3/27/2006 | F/T | S | $90,000 | N | | N | Y |
| Matthew O'Neill | VP, Business Affairs | Executive | San Diego | 2/6/2006 | F/T | S | $130,000 | N | | N | Y |
| Sneharthi Roy | General Manager - Philippines | Executives | San Diego | 3/20/2006 | F/T | S | $90,000 | N | M/D | N | Y |
| Amanda Rusich | Marketing Coordinator | Marketing | San Diego | 9/26/2005 | F/T | S | $43,500 | N | M/D | N | N |
| Nathan Denny | Marketing Copyright | Marketing | San Diego | 5/23/2006 | F/T | S | $55,000 | N | | N | N |
| Todor Vachovsky | Marketing Manager | Marketing | San Diego | 1/5/2001 | F/T | S | $70,000 | N | M/D | N | N |
| Adrian Guillermo Topete | Caller | Sales | San Diego | 11/21/2005 | F/T | H | $24,128 | N | | Y | N |
| Alvin Boatner | Caller | Sales | San Diego | 12/12/2005 | F/T | H | $24,960 | N | | Y | N |
| Brian Keon | Caller | Sales | San Diego | 4/17/2006 | F/T | H | $23,296 | N | | Y | N |
| Mary Anne Paulet | Caller | Sales | San Diego | 12/5/2005 | F/T | H | $24,960 | N | | Y | N |
| Nicholas Hofeld | Caller | Sales | San Diego | 5/22/2006 | F/T | H | $24,128 | N | | Y | Y |
| Alexander Moorhead | Caller Manager | Sales | San Diego | 3/30/2006 | F/T | H | $30,000 | N | | Y | Y |
| Ali Mokayef | Closer | Sales | San Diego | 3/8/2006 | F/T | S | $36,000 | N | | Y | N |
| Alyssa Mezoui | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $36,000 | N | | Y | N |
| Andrew Moore | Closer | Sales | San Diego | 4/24/2006 | F/T | S | $30,000 | N | | Y | N |
| Armando Quinonez | Closer | Sales | San Diego | 12/15/2005 | F/T | S | $36,000 | N | M/D | Y | N |
| Ben Jacobs | Closer | Sales | San Diego | 9/20/2005 | F/T | S | $20,800 | N | | Y | N |
| Bruce Cohen | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $36,000 | N | | Y | N |
| Damian Gahagan | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $30,000 | N | | Y | N |
| Edwin Robinson | Closer | Sales | San Diego | 12/19/2005 | F/T | S | $36,000 | N | M/D | Y | N |
| Henry Moody | Closer | Sales | San Diego | 9/1/2004 | F/T | S | $24,000 | N | | Y | N |
| John Longo | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $42,000 | N | | Y | N |
| John Phelan | Closer | Sales | San Diego | 6/1/2004 | F/T | S | $24,000 | N | M/D | Y | N |
| Kenneth Gardner | Closer | Sales | San Diego | 11/16/2005 | F/T | S | $20,800 | N | M | Y | N |
| Mark Evans | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $36,000 | N | | Y | N |
| Melanie Pilgrim | Closer | Sales | San Diego | 4/24/2006 | F/T | S | $36,000 | N | | Y | N |
| Michael Carpenter | Closer | Sales | San Diego | 12/5/2005 | F/T | S | $30,000 | N | M/D | Y | N |
| Michael Vitali | Closer | Sales | San Diego | 12/5/2005 | F/T | S | $36,000 | N | M/D | Y | N |
| Michelle Olande | Closer | Sales | San Diego | 1/24/2006 | F/T | S | $36,000 | N | | Y | N |
| Niels Henrik Fogt Jr. | Closer | Sales | San Diego | 1/16/2006 | F/T | S | $36,000 | N | M/D | Y | N |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| HEADCOUNT DETAIL FOR A+ (SAN DIEGO AND BULGARIA INCLUDED) | | | | | | | | | | | |
| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
| Riad Mezoui | Closer | Sales | San Diego | 5/30/2006 | F/T | S | $36,000 | N | | Y | N |
| Robert Platt | Closer | Sales | Florida | 6/5/2001 | F/T | S | $24,000 | N | M/D | Y | N |
| Shaun Donnelly | Closer | Sales | San Diego | 3/8/2006 | F/T | S | $30,000 | N | | Y | N |
| Sherzad Mossa | Closer | Sales | San Diego | 11/14/2005 | F/T | S | $30,000 | N | M/D | Y | N |
| Thomas Hoffman | Closer | Sales | San Diego | 4/24/2006 | F/T | S | $36,000 | N | | Y | N |
| Tom Sebastiani | Closer | Sales | San Diego | 2/20/2004 | F/T | S | $24,960 | N | M/D | Y | N |
| Chris Plueger | Sales Manager | Sales | San Diego | 8/29/2005 | F/T | S | $70,000 | N | | N | Y |
| Thomas Marvan | Sales Trainer | Sales | San Diego | 1/16/2003 | F/T | S | $54,000 | Y | M/D | Y | Y |
| Clark Caines | VP Sales | Sales | San Diego | 4/20/2006 | F/T | S | $137,500 | N | M | N | Y |
| Adam Rusch | Dedicated Provisioning | Support | San Diego | 8/1/2005 | F/T | H | $31,200 | N | | Y | N |
| Vassil Lerinsky | Dedicated Assembly | Support | San Diego | 12/5/2002 | F/T | S | $30,160 | N | M/D | N | N |
| Zachary Gilman | Dedicated Assembly | Support | San Diego | 2/2/2006 | F/T | H | $20,800 | N | | N | N |
| Ali Rashidi | Dedicated Provisioning | Support | San Diego | 5/10/2006 | F/T | H | $22,880 | N | | N | N |
| Christopher Haynie | Dedicated Provisioning | Support | San Diego | 5/30/2006 | F/T | H | $33,280 | N | | N | N |
| Jeremy McLaurin | Dedicated Provisioning | Support | San Diego | 3/10/2006 | F/T | H | $22,880 | N | | N | N |
| Jerrod Smith | Dedicated Provisioning | Support | San Diego | 5/19/2003 | F/T | H | $37,440 | N | M/D | Y | N |
| Ryan Lewon | Dedicated Provisioning | Support | San Diego | 4/25/2006 | F/T | H | $33,280 | N | | Y | N |
| Ryan Uber | Dedicated Provisioning | Support | San Diego | 4/4/2006 | F/T | H | $33,280 | N | | Y | N |
| Brad Fino | Dedicated Support | Support | San Diego | 10/10/2005 | F/T | H | $41,600 | N | M/D | N | N |
| Corey Thalman | Dedicated Support | Support | Guatemala | 4/5/2002 | F/T | H | $37,440 | N | D | N | N |
| David Fowler | Dedicated Support | Support | San Diego | 6/20/2005 | F/T | H | $35,360 | N | M/D | Y | N |
| James Sweere | Dedicated Support | Support | San Diego | 3/16/2006 | P/T | H | $33,280 | N | | Y | N |
| John Van Dyke | Dedicated Support | Support | San Diego | 4/6/2006 | F/T | H | $33,280 | N | | Y | N |
| Orion Morgan | Dedicated Support | Support | San Diego | 2/10/2005 | F/T | H | $47,840 | N | | Y | N |
| Shaun McManus | Dedicated Support | Support | San Diego | 3/2/2005 | F/T | H | $37,440 | N | M/D | Y | N |
| Taylor Giddens | Dedicated Support | Support | San Diego | 10/14/2005 | F/T | H | $45,000 | N | | N | N |
| Travis Walter | Dedicated Support | Support | San Diego | 10/18/2005 | F/T | H | $41,600 | N | | Y | N |
| Chris Kohler | Dedicated Support Manager | Support | San Diego | 5/14/2004 | F/T | S | $70,000 | N | M/D | N | N |
| Joshua Montgomery | Domain Support | Support | San Diego | 11/7/2000 | F/T | H | $39,520 | N | M/D | N | N |
| Ryan Paguio | Domain Support | Support | San Diego | 4/22/2002 | F/T | H | $31,200 | N | M/D | N | N |
| Tamer Kamal Hanafy | Shared Support - graveyard | Support | San Diego | 12/27/2004 | F/T | H | $27,040 | N | D | N | N |
| Scott Oertel | Shared Support - level 3 | Support | Bulgaria | 5/19/2003 | F/T | S | $45,000 | N | M/D | N | N |
| David Stanford | Data Center Engineer | Technology | San Diego | 11/16/1998 | F/T | S | $66,000 | Y | M/D | N | N |
| John Cardinale | IT admin | Technology | San Diego | 4/16/2001 | F/T | S | $42,000 | Y | M/D | N | N |
| Larry Dodds | Network Engineer | Technology | San Diego | 5/18/1994 | F/T | S | $95,000 | Y | M/D | N | N |
| Mark McAllister | Phone Engineer | Technology | San Diego | 5/16/2003 | F/T | S | $57,000 | N | M/D | N | N |
| Nikola Nikolov | Programmer | Technology | San Diego | 9/2/2003 | F/T | S | $42,400 | N | M/D | N | N |
| Maria Minkova | Programmer | Technology | San Diego | 1/4/2004 | F/T | S | $60,000 | Y | | N | N |
| Dimitre Chtilianov | Programmer - Rodopi & SQL | Technology | San Diego | 9/16/2000 | F/T | S | $90,000 | Y | M/D | N | N |
| Steven De Trafford | Senior NT admin | Technology | San Diego | 3/6/2006 | F/T | S | $63,000 | N | | N | N |
| Atanas Dinev | Unix Admin | Technology | San Diego | 11/1/2001 | F/T | S | $95,000 | N | M/D | N | N |
| Stoyan Stoyanov | Unix Admin | Technology | San Diego | 9/9/2002 | F/T | S | $60,000 | N | M/D | N | N |
| Toni Barraza | Project Manager | Web Design | San Diego | 3/1/2006 | F/T | H | $29,120 | N | | Y | N |
| Ivo Kolev | Billing | Admin | Bulgaria | 6/9/2006 | F/T | H | $4,992 | N | | N | N |
| James | Billing | Admin | Bulgaria | 3/20/2006 | F/T | H | $5,408 | N | | Y | N |
| Lidiya | Billing | Admin | Bulgaria | 2/20/2006 | F/T | H | $5,408 | N | | Y | N |
| Matt | Billing | Admin | Bulgaria | 3/4/2005 | F/T | H | $6,448 | N | | N | N |
| Ryan | Billing | Admin | Bulgaria | 6/9/2006 | F/T | H | $4,992 | N | | N | N |
| Suzi | Billing | Admin | Bulgaria | 12/12/2005 | F/T | H | $5,408 | N | | Y | N |
| Tania | Billing | Admin | Bulgaria | 11/1/2005 | F/T | H | $5,408 | N | | N | N |
| Miller | Billing Manager | Admin | Bulgaria | 4/20/2005 | F/T | H | $8,528 | N | | Y | N |
| Emil Hurmuzov | CTO - Bulgaria | Admin | Bulgaria | 2/20/2006 | F/T | S | $23,340 | N | | N | N |
| Darina Todorova | HR Manager | Admin | Bulgaria | 4/30/1993 | F/T | S | $18,000 | N | | N | N |
| Cvetomir Cvetkov | IT admin | Admin | Bulgaria | 12/12/2005 | F/T | S | $6,600 | N | | N | N |

| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | **HEADCOUNT DETAIL FOR A+ (SAN DIEGO AND BULGARIA INCLUDED)** | | | | |
| Ivo Petrov | IT admin | Admin | Bulgaria | 4/25/2006 | F/T | S | $8,400 | | | N | N |
| Stoyan Varliakov | IT admin | Admin | Bulgaria | 7/18/2005 | F/T | S | $2,975 | | | N | N |
| Sahka Ivanova | Office Manager | Admin | Bulgaria | 11/1/1999 | F/T | S | $6,000 | | | N | N |
| Rumiana Staneva | Purchasing Manager | Admin | Bulgaria | 11/1/1999 | F/T | S | $6,000 | | | N | N |
| Julia Mavrudieva | secretary | Admin | Bulgaria | 4/3/2006 | F/T | S | $6,000 | | | N | N |
| Krassy Vodenicharova | secretary | Admin | Bulgaria | 2/17/2004 | F/T | S | $2,940 | | | N | N |
| Victoria Angelova | secretary | Admin | Bulgaria | 6/9/2005 | F/T | S | $8,400 | | | N | N |
| Alex Todorov | internal programmer | Marketing | Bulgaria | 12/29/2002 | F/T | S | $6,000 | | | N | N |
| Zdravko Shishmaniv | internal programmer | Marketing | Bulgaria | 4/5/2006 | F/T | S | $9,540 | | | N | N |
| Martin Svilenov | internal SEO | Marketing | Bulgaria | 2/24/2006 | F/T | S | $6,000 | | | N | N |
| Elica Stoyanova | internal web designer | Marketing | Bulgaria | 6/21/2004 | F/T | S | $10,080 | | | N | N |
| Kris Popchovsky | internal web designer | Marketing | Bulgaria | 6/14/2004 | F/T | S | $9,000 | | | N | N |
| Nikolai Todorov | internal web designer | Marketing | Bulgaria | 10/1/2002 | F/T | S | $9,000 | | | N | N |
| Ivo Kolev | Markeiting Manager | Marketing | Bulgaria | 8/21/2002 | F/T | S | $19,200 | | | N | N |
| Ekaterina Ivanova | Quality Control | Marketing | Bulgaria | 6/10/1994 | F/T | S | $6,000 | | | N | N |
| Iglena Ruseva | Senior internal web designer | Marketing | Bulgaria | 1/1/2003 | F/T | S | $9,600 | | | N | N |
| Joradan ugrinov | website editor | Marketing | Bulgaria | 3/14/2006 | F/T | S | $6,000 | | | N | N |
| Maria Micova | website editor | Marketing | Bulgaria | 4/10/2006 | F/T | S | $6,600 | | | N | N |
| Stoyan Beronov | internal web designer | Marketing | Bulgaria | 3/17/2004 | F/T | S | $9,000 | | | N | N |
| Alan Decker | Closer | Sales | Bulgaria | 6/8/2006 | F/T | S | $3,000 | | | Y | N |
| Alek Rubben | Closer | Sales | Bulgaria | no contract | F/T | S | $3,000 | | | Y | N |
| Alex Sergiev | Closer | Sales | Bulgaria | 11/21/2003 | F/T | S | $3,600 | | | Y | N |
| Ally Dole | Closer | Sales | Bulgaria | 2/1/2005 | F/T | S | $9,600 | | | Y | Y |
| Amy Ross | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Andy Nenkov | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Axel Denton | Closer | Sales | Bulgaria | no contract | F/T | S | $3,000 | | | Y | N |
| Bill Tann | Closer | Sales | Bulgaria | 8/24/2004 | F/T | S | $3,600 | | | Y | N |
| Chris Jordan | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Chris Raynolds | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Christine Moore | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Collin Kent | Closer | Sales | Bulgaria | 4/4/2006 | F/T | S | $3,000 | | | Y | N |
| Deya Gerth | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Eric Patterson | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Gery Thompson | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Greg Terziiski | Closer | Sales | Bulgaria | 7/20/2004 | F/T | S | $3,600 | | | Y | N |
| Jack Johnson | Closer | Sales | Bulgaria | 10/15/2004 | F/T | S | $3,600 | | | Y | N |
| Jenny Bell | Closer | Sales | Bulgaria | 2/1/2005 | F/T | S | $3,600 | | | Y | N |
| Jim Derm | Closer | Sales | Bulgaria | 12/1/2003 | F/T | S | $3,600 | | | Y | N |
| Jimmy Davis | Closer | Sales | Bulgaria | 6/3/2006 | F/T | S | $3,600 | | | Y | N |
| Kerry Stevens | Closer | Sales | Bulgaria | 2/1/2005 | F/T | S | $7,200 | | | Y | Y |
| Kim Fox | Closer | Sales | Bulgaria | 7/1/2005 | F/T | S | $3,000 | | | Y | N |
| Liz Clayton | Closer | Sales | Bulgaria | 8/8/2005 | F/T | S | $3,600 | | | Y | N |
| Mark Penna | Closer | Sales | Bulgaria | 4/4/2006 | F/T | S | $3,000 | | | Y | N |
| Matt Dawson | Closer | Sales | Bulgaria | 4/4/2006 | F/T | S | $3,000 | | | Y | N |
| Matt Istatkov | Closer | Sales | Bulgaria | 6/14/2004 | F/T | S | $3,600 | | | Y | N |
| Max Kelly | Closer | Sales | Bulgaria | 7/1/2005 | F/T | S | $3,600 | | | Y | N |
| Mia George | Closer | Sales | Bulgaria | 7/1/2005 | F/T | S | $3,000 | | | Y | N |
| Mike Biller | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Nas Chad | Closer | Sales | Bulgaria | 5/23/2005 | F/T | S | $18,000 | | | Y | Y |
| Neil Anderson | Closer | Sales | Bulgaria | 4/4/2006 | F/T | S | $3,000 | | | Y | N |
| Nick Penev | Closer | Sales | Bulgaria | 7/1/2005 | F/T | S | $3,000 | | | Y | N |
| Paul Petroff | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Peter Cooper | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Polly Christy | Closer | Sales | Bulgaria | 6/8/2006 | F/T | S | $3,000 | | | Y | N |

| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Rodney Howard | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Sam Rooney | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Silvia Brown | Closer | Sales | Bulgaria | 5/16/2005 | F/T | S | $3,000 | | | Y | N |
| Simona Ray | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Steve Lee | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Tony Vitt | Closer | Sales | Bulgaria | 5/12/2006 | F/T | S | $3,000 | | | Y | N |
| Vee Peterson | Closer | Sales | Bulgaria | 9/16/2005 | F/T | S | $3,000 | | | Y | N |
| Vince Merrick | Closer | Sales | Bulgaria | 1/12/2006 | F/T | S | $3,000 | | | Y | N |
| Anna Borisova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $5,980 | | | N | N |
| Denitsa Kirilova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $4,732 | | | N | N |
| Diana Petrova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $4,745 | | | N | N |
| Dimo Dimov | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $3,337 | | | N | N |
| Emily Stefanova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $11,007 | | | N | N |
| Ilya Garaliev | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $6,057 | | | N | N |
| Ivan Ganav | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $7,605 | | | N | N |
| Krasimira Karasemova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $4,906 | | | N | N |
| Ludmilla Hagiova | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $3,224 | | | N | N |
| Stefan Ketilov | Lead Generation | Sales | Bulgaria | no contract | F/T | 1$ / 60 leads | $392 | | | N | N |
| Temenuga Giorgiova | Lead Generation | Sales | Bulgaria | 3/13/2006 | F/T | 1$ / 60 leads | $5,763 | | | N | N |
| Alexander Kosev | Lead Generation - Team Leader | Sales | Bulgaria | 11/15/2004 | F/T | 1$ / 60 leads | $11,763 | | | N | N |
| Theo Dach | Abuse Support | Support | Bulgaria | 8/2/2004 | F/T | H | $6,656 | | | N | N |
| Parakram Iazarus | Billing Escalation Support | Support | Bulgaria | 6/5/2006 | F/T | S | $7,800 | | | N | N |
| David Raman | Customer Support Manager | Support | Bulgaria | 11/1/2005 | F/T | S | $15,600 | | | N | N |
| Antoni Grancharov | Dedicated Support | Support | Bulgaria | 7/1/2005 | F/T | H | $6,864 | | | Y | N |
| Miroslav Kostadinov | Dedicated Support | Support | Bulgaria | 9/27/2004 | F/T | H | $7,488 | | | Y | N |
| Nuckola Rupev | Dedicated Support | Support | Bulgaria | 9/1/2005 | F/T | H | $5,928 | | | Y | N |
| Stefan Batanov | Dedicated Support | Support | Bulgaria | 9/27/2004 | F/T | H | $6,968 | | | Y | N |
| Vassil Vassilev | Dedicated Support | Support | Bulgaria | 7/18/2005 | F/T | H | $5,824 | | | Y | N |
| Spas K | Dedicated Support Manager | Support | Bulgaria | 3/29/2004 | F/T | H | $9,568 | | | Y | N |
| George Kaloyanov | KnowledgeBase & Support Trainin | Support | Bulgaria | 3/1/2004 | F/T | H | $12,480 | | | N | N |
| Stoian Getov | KnowledgeBase & Support Trainin | Support | Bulgaria | 9/15/2004 | F/T | H | $6,864 | | | N | N |
| Vladimir Filimonov | Postmaster Support | Support | Bulgaria | 2/7/2005 | F/T | H | $6,240 | | | N | N |
| Andrei Mihov | Shared & Domain Support | Support | Bulgaria | 6/8/2006 | F/T | H | $4,992 | | | Y | N |
| Bilyana Dimova | Shared & Domain Support | Support | Bulgaria | 11/1/2005 | F/T | H | $4,992 | | | Y | N |
| Borislav Lozanov | Shared & Domain Support | Support | Bulgaria | 2/16/2006 | F/T | H | $4,992 | | | Y | N |
| Bozhidar Zlatev | Shared & Domain Support | Support | Bulgaria | 7/1/2005 | F/T | H | $5,928 | | | Y | N |
| Constantine Constantinov | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |
| Daniel Iosifov | Shared & Domain Support | Support | Bulgaria | 3/14/2006 | F/T | H | $5,824 | | | Y | N |
| Dimitar Dimitrov | Shared & Domain Support | Support | Bulgaria | 9/1/2005 | F/T | H | $5,824 | | | Y | N |
| Dimitar Petrov | Shared & Domain Support | Support | Bulgaria | 3/1/2005 | F/T | H | $6,240 | | | Y | N |
| Dimitar Terziev | Shared & Domain Support | Support | Bulgaria | 11/1/2005 | F/T | H | $4,992 | | | Y | N |
| Doichin Damyanov | Shared & Domain Support | Support | Bulgaria | 10/3/2005 | F/T | H | $4,992 | | | Y | N |
| George Mihov | Shared & Domain Support | Support | Bulgaria | 5/4/2006 | F/T | H | $4,992 | | | Y | N |
| Georgi Ganev | Shared & Domain Support | Support | Bulgaria | 6/8/2006 | F/T | H | $4,992 | | | Y | N |
| Georgi Kolarov | Shared & Domain Support | Support | Bulgaria | 11/1/2005 | F/T | H | $4,992 | | | Y | N |
| Gregor Rodev | Shared & Domain Support | Support | Bulgaria | 11/7/2006 | F/T | H | $4,992 | | | Y | N |
| Hristo Boyadzhiev | Shared & Domain Support | Support | Bulgaria | 11/1/2005 | F/T | H | $4,992 | | | Y | N |
| Iordan Daskalov | Shared & Domain Support | Support | Bulgaria | 3/14/2006 | F/T | H | $4,992 | | | Y | N |
| Ivan Tellalev | Shared & Domain Support | Support | Bulgaria | 3/15/2006 | F/T | H | $4,992 | | | Y | N |
| Ivaylo Petkov | Shared & Domain Support | Support | Bulgaria | 9/1/2005 | F/T | H | $5,824 | | | Y | N |
| Kamen Iankov | Shared & Domain Support | Support | Bulgaria | 3/13/2006 | F/T | H | $4,992 | | | Y | N |
| Kostadin Dimov | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |
| Maria Yurukova | Shared & Domain Support | Support | Bulgaria | 9/1/2005 | F/T | H | $6,032 | | | Y | N |
| Martin Anastasov | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |

| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | HEADCOUNT DETAIL FOR A+ (SAN DIEGO AND BULGARIA INCLUDED) | | | | |
| Martin Linkov | Shared & Domain Support | Support | Bulgaria | 9/1/2005 | F/T | H | $5,928 | | | Y | N |
| Martin Marchev | Shared & Domain Support | Support | Bulgaria | 5/4/2006 | F/T | H | $4,992 | | | Y | N |
| Michail Marin | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |
| Miglena Birimirska | Shared & Domain Support | Support | Bulgaria | 3/1/2005 | F/T | H | $6,448 | | | Y | N |
| Mihail Ivanov | Shared & Domain Support | Support | Bulgaria | 6/8/2006 | F/T | H | $4,992 | | | Y | N |
| Mladen Varbanov | Shared & Domain Support | Support | Bulgaria | 3/16/2005 | F/T | H | $6,656 | | | Y | N |
| Nikolay Apostolov | Shared & Domain Support | Support | Bulgaria | 8/1/2005 | F/T | H | $5,824 | | | Y | N |
| Nikolay Papazov | Shared & Domain Support | Support | Bulgaria | 11/8/2004 | F/T | H | $6,656 | | | Y | N |
| Peter Kindalov | Shared & Domain Support | Support | Bulgaria | 2/16/2006 | F/T | H | $4,992 | | | Y | N |
| Peter Stoinov | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |
| Petko Ivanov | Shared & Domain Support | Support | Bulgaria | 5/10/2004 | F/T | H | $6,864 | | | Y | N |
| Philip Petrov | Shared & Domain Support | Support | Bulgaria | 3/8/2004 | F/T | H | $7,072 | | | Y | N |
| Ralitsa Mitkova | Shared & Domain Support | Support | Bulgaria | 4/15/2005 | F/T | H | $6,864 | | | Y | N |
| Rosalva Tsoneva | Shared & Domain Support | Support | Bulgaria | 2/16/2006 | F/T | H | $4,992 | | | Y | N |
| Venelin Videno | Shared & Domain Support | Support | Bulgaria | 1/5/2006 | F/T | H | $4,992 | | | Y | N |
| Victor Dimitrov | Shared & Domain Support | Support | Bulgaria | 5/4/2006 | F/T | H | $4,992 | | | Y | N |
| Vlad Dimitrov | Shared & Domain Support | Support | Bulgaria | 5/4/2006 | F/T | H | $4,992 | | | Y | N |
| Christo Vanev | Support - Level 2 | Support | Bulgaria | 6/22/2004 | F/T | H | $8,320 | | | N | N |
| Ilyan Bobev | Support - Level 2 | Support | Bulgaria | 5/10/2004 | F/T | H | $8,320 | | | N | N |
| James Dimitrov | Support - Level 2 | Support | Bulgaria | 4/27/2005 | F/T | H | $9,360 | | | N | N |
| Kiril Valeriev | Support - Level 2 | Support | Bulgaria | 4/15/2005 | F/T | H | $5,928 | | | N | N |
| Stefan Dimitrov | Support - Level 2 | Support | Bulgaria | 4/26/2004 | F/T | H | $8,008 | | | N | N |
| Vladimir Topuzov | Support - Level 2 | Support | Bulgaria | 5/10/2004 | F/T | H | $8,008 | | | N | N |
| Borislav Alexandrov | Support - Other | Support | Bulgaria | 3/15/2005 | F/T | H | $5,824 | | | N | N |
| Alex Stoyanov | Support Monitor | Support | Bulgaria | 3/1/2004 | F/T | S | $11,400 | | | N | N |
| Vesko Chiporikov | Unix Admin Support | Support | Bulgaria | 11/1/2005 | F/T | S | $16,800 | | | N | N |
| Andrei Kozovski | Control Panel Team - Programmer | Technology | Bulgaria | 8/16/2004 | F/T | S | $9,000 | | | N | N |
| Lukian Tabidjan | Control Panel Team - Programmer | Technology | Bulgaria | 9/7/2004 | F/T | S | $10,200 | | | N | N |
| Vladimir Georgiev | Control Panel Team - Programmer | Technology | Bulgaria | 1/5/2006 | F/T | S | $12,000 | | | N | N |
| Assen Chorbadjiev | Control Panel Team - Team Leade | Technology | Bulgaria | 6/3/2002 | F/T | S | $19,200 | | | N | N |
| Angel Dinev | Veleka Team - Programmer | Technology | Bulgaria | 3/1/2002 | F/T | S | $9,600 | | | N | N |
| George Cochev | Veleka Team - Programmer | Technology | Bulgaria | 9/7/2004 | F/T | S | $8,520 | | | N | N |
| Rumen Yordanov | Veleka Team - Programmer | Technology | Bulgaria | 1/9/1900 | F/T | S | $10,440 | | | N | N |
| Sibin Georgiev | Veleka Team - Programmer | Technology | Bulgaria | 6/27/1905 | F/T | S | $6,000 | | | N | N |
| Venzi Iliev | Veleka Team - Programmer | Technology | Bulgaria | 1/20/1900 | F/T | S | $36,000 | | | N | N |
| Vladislav Borisov | Veleka Team - Programmer | Technology | Bulgaria | 3/20/2006 | F/T | S | $12,720 | | | N | N |
| Yulian Yordanov | Veleka Team - Team Leader | Technology | Bulgaria | 5/21/2001 | F/T | S | $19,200 | | | N | N |
| Alex Baruh | designer | Web Design | Bulgaria | 3/8/2005 | F/T | S | $6,000 | | | N | N |
| Aneta Kruglii | designer | Web Design | Bulgaria | 9/1/2005 | F/T | S | $5,400 | | | N | N |
| Diana Koleva | designer | Web Design | Bulgaria | 2/16/2004 | F/T | S | $7,680 | | | N | N |
| Dimiter Dimitrov | designer | Web Design | Bulgaria | 3/29/2004 | F/T | S | $7,800 | | | N | N |
| Eva Grahovska | designer | Web Design | Bulgaria | 10/1/2002 | F/T | S | $9,000 | | | N | N |
| Evelina Georgieva | designer | Web Design | Bulgaria | 5/20/2004 | F/T | S | $4,900 | | | N | N |
| Hristina Manzurska | designer | Web Design | Bulgaria | 1/13/2005 | F/T | S | $8,520 | | | N | N |
| Ivan Hristov | designer | Web Design | Bulgaria | 5/15/2006 | F/T | S | $3,180 | | | N | N |
| Jordan Yordanov | designer | Web Design | Bulgaria | 3/8/2005 | F/T | S | $6,000 | | | N | N |
| Kaloyan Chanchev | designer | Web Design | Bulgaria | 9/1/2005 | F/T | S | $8,400 | | | N | N |
| Leonid Sharlandjiev | designer | Web Design | Bulgaria | 4/4/2005 | F/T | S | $7,800 | | | N | N |
| Maria Hadjieva | designer | Web Design | Bulgaria | 4/25/2004 | F/T | S | $6,000 | | | N | N |
| Ognian Antonov | designer | Web Design | Bulgaria | 11/5/2003 | F/T | S | $9,120 | | | N | N |
| Orlin Nedialkov | designer | Web Design | Bulgaria | 2/21/2005 | F/T | S | $6,600 | | | N | N |
| Stefan Paskalev | designer | Web Design | Bulgaria | 12/13/2004 | F/T | S | $6,600 | | | N | N |
| Miroslav Danov | Estimation Manager | Web Design | Bulgaria | 3/1/2006 | F/T | S | $6,600 | | | N | N |
| Kristian | e-traffic | Web Design | Bulgaria | 4/3/2006 | F/T | S | $5,400 | | | Y | N |

| HEADCOUNT DETAIL FOR A+ (SAN DIEGO AND BULGARIA INCLUDED) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee Name | Title | Department | Location | Date of Hire | Full / Part Time | Hourly / Salary | Annual Pay | 401K | Group Health | Commissioned | Bonused |
| Teodor Stoyanov | e-traffic - Manager | Web Design | Bulgaria | 7/27/2005 | F/T | S | $7,200 | | | Y | N |
| Branimir Minkov | programmer | Web Design | Bulgaria | 6/21/2004 | F/T | S | $8,040 | | | N | N |
| Cvetelin Kachov | programmer | Web Design | Bulgaria | 2/10/2005 | F/T | S | $8,040 | | | N | N |
| George Popov | programmer | Web Design | Bulgaria | 4/4/2005 | F/T | S | $7,800 | | | N | N |
| Maria Valcheva | programmer | Web Design | Bulgaria | 3/8/2005 | F/T | S | $5,640 | | | N | N |
| Pavel Conkov | programmer | Web Design | Bulgaria | 3/7/2005 | F/T | S | $7,800 | | | N | N |
| Petar Stankov | programmer | Web Design | Bulgaria | 5/13/2005 | F/T | S | $7,200 | | | N | N |
| Stanislav Alexiev | programmer | Web Design | Bulgaria | 4/14/2003 | F/T | S | $10,200 | | | N | N |
| Stanislav Toshev | programmer | Web Design | Bulgaria | 5/4/2005 | F/T | S | $6,720 | | | N | N |
| Nikolay Kostov | Programmer Manager | Web Design | Bulgaria | 5/25/2004 | F/T | S | $12,000 | | | N | N |
| Anita Kavrakova | Project Manager | Web Design | Bulgaria | 5/16/2006 | F/T | S | $3,180 | | | Y | N |
| Berta Li | Project Manager | Web Design | Bulgaria | 3/21/2005 | F/T | S | $7,200 | | | Y | N |
| Boris Pockov | Project Manager | Web Design | Bulgaria | 4/4/2005 | F/T | S | $7,800 | | | Y | N |
| Ivailo Kostadinov | Project Manager | Web Design | Bulgaria | 9/1/2005 | F/T | S | $7,200 | | | Y | N |
| Margarita Dimitrova | Project Manager | Web Design | Bulgaria | 9/12/2005 | F/T | S | $6,600 | | | Y | N |
| Maria Stoyanova | Project Manager | Web Design | Bulgaria | 9/12/2005 | F/T | S | $6,600 | | | Y | N |
| Teodora Nestorova | Project Manager | Web Design | Bulgaria | 3/1/2006 | F/T | S | $5,400 | | | Y | N |
| Todor Georgiev | Project Manager | Web Design | Bulgaria | 9/12/2005 | F/T | S | $6,600 | | | Y | N |
| Valentina Gateva | Project Manager | Web Design | Bulgaria | 5/9/2006 | F/T | S | $4,200 | | | Y | N |
| Vasil Vasilev | Project Manager | Web Design | Bulgaria | 5/15/2006 | F/T | S | $3,180 | | | Y | N |
| Vasko Topalov | Project Manager | Web Design | Bulgaria | 9/16/2003 | F/T | S | $8,400 | | | Y | N |
| Dobromir   Hadjiev | SEO Booster | Web Design | Bulgaria | 4/13/2006 | F/T | S | $5,400 | | | N | N |
| Veselina Andreeva | SEO Booster | Web Design | Bulgaria | 4/13/2006 | F/T | S | $5,400 | | | N | N |
| Ivana Planska | Team Leader | Web Design | Bulgaria | 5/3/2004 | F/T | S | $14,400 | | | N | Y |

Notes:

1. Scott Oertel is now in the US and will be transitioning into a junior UNIX administrator position at the Company's San Diego office.  His salary will remain the same and his position in Bulgaria will be handled by the Bulgaria escalation team with no additional hire.

2. It is anticipated that Nikola Nikolov's salary will be increased by approximately $1,500/month as a housing allowance.  See Schedule 2.17(a).

3. Maria Minkova has been on maternity leave since March 2006. It is anticipated that she will return to work in or around January 2007.

4. Beginning in August 2004, Anthony Lindsey will work in the Company's Bulgaria office and train the Company's Bulgaria team to perform the functions now performed by Jeff Ibanez and Larissa Rascon.  At the conclusion of this training,  it is anticipated that the positons held by Mr. Ibanez and Ms. Rascon will be eliminated.  Mr. Ibanez and Ms. Rascon have been offered sales positions at the conclusion of this transition, but it is not yet known if they will accept these positions.

**Schedule 2.17(b) – Labor Matters**

None.

**Schedule 2.18 – Employee Benefits**

(a):
Abacus Trade has no United States employees with United States sourced income and for that reason do not participate in the Employee Benefit Plans.

Abacus America, Inc. 401(k) Plan.

Abacus America, Inc. Second Amended and Restated 1998 Nonqualified Stock Option Plan, dated May 2000.

Blue Cross PPO/HMO Abacus America.

Blue Cross HMO Plan CaliforniaCare for Abacus America Inc.

Abacus America Inc. Dental Plan.

(g):
None.

**Schedule 2.19(a) – Compliance with Laws**

Abacus America, Inc. v. Alabanza Corporation, et al., Superior Court of California, San Diego County, Case No. GIC790137.

EFund Capital Partners, LLC v. Robert Pless, Abacus America, Inc., et al., Superior Court of California, Los Angeles County, Case No. BC344790.

Letter from Liggett, Davis and Pagnini re: Cydoor, dated July 29, 2004.

Voytek, Inc. v. Abacus America, Inc., Superior Court of California, San Diego County, Case No. IC 865622.

# ABACUS AMERICA, INC.
## INTER OFFICE MEMO

To:         Distribution
From:       Mike Howard
Date:       July 7, 2006
Subject:    Employment Development Department Audit
            Period January 1, 2003 to December 31, 2003

The purpose of this memo is to provide an explanation regarding the EDD audit for the period of January 1, 2003 to December 31, 2003, and the final assessment.

**EDD Audit**

In September 2004 the California Employment Development Department conducted an audit of the Abacus payroll to determine if Abacus was correctly classifying all labor staff as employees or contract labor, and that it was withholding payroll taxes and remitting these taxes along with the employer related payroll taxes for all employees.

At that time, Abacus was using the services of about 8 programmers who were paid as contract labor. It was the determination of EDD that a few of these individuals should be classified as employees and, as such, Abacus should have withheld payroll taxes and paid the employer portion of the payroll taxes related to these individuals.

The final assessment was $6,917. Abacus paid the assessment. Since that time, Abacus has discontinued using the services of contract programming labor. Contract programming has been performed at the Bulgarian operations, Abacus Trade.

*    *    *

# ABACUS AMERICA, INC.
## INTER OFFICE MEMO

To:             Distribution
From:           Mike Howard
Date:           May 26, 2006
Subject:        Sales Tax Audit and Inventory

In 2005 the California State Board of Equalization (CASBE) began an audit of the sales and sales tax reported by Abacus from the period October 2002 through October 2005. The audited was completed in March 2006 with a final assessment of $21,987 and the revocation of the reseller's permit. Now, Abacus does not file sales tax reports.

**Background**

At its founding, Abacus sold and serviced computers. It also sold peripheral equipment and software. At that time, Abacus obtained a resellers permit. Sales and sales tax were reported to the CASBE on a monthly basis.

When Abacus changed its business model to that of an ISP, the hardware and software sales declined. However, by acting as a reseller Abacus was able to continue buying computer parts at dealer prices. Since Abacus was considered a reseller there was no sales tax charged for the parts at the point of purchase. Abacus used these parts to build its own computers. The company accounted for the transaction as follows:

1. Purchase of parts was debited to an inventory account.
2. The parts were used to build the computers.
3. When the computer was built, Abacus would prepare a sales invoice to itself. This invoice would relieve the inventory and move the computers to fixed assets. In the case of maintenance parts, the inventory was charged to equipment maintenance.
4. Invoices generated in a month were reported as sales on the sales tax report. At that time the sales tax was paid.

Initially, the value of the inventory account each month was a nominal amount. As the dedicated server business started to increase in mid-2003, the value of the inventory account began to increase. At the time of the sales tax audit the inventory account balance was about $275,000.

**Audit Conclusion**

The sales tax auditor determined that Abacus was not allowed to have a resellers permit for the reason that Abacus was purchasing parts and selling these parts to itself. Even though the sales tax was eventually paid, there was a lag between the time the parts were purchased without sales tax and when the sales tax was paid.

In March 2006 the CASBE rescinded the resellers permit and Abacus paid the assessment of $21,987. This included the sales tax assessment of the ending inventory of $275,000, and an interest amount of about $500. (note: there was no penalty assessment. For various reasons,

including the sense of cooperation that Abacus gave to the audit process, the sales tax auditor did not add a penalty to the assessment.)

**DevStart**

As mentioned earlier, acting as a dealer Abacus was able to purchase parts at discounted prices using the reseller permit. With the increase in the dedicated server business this amounts to a significant savings on parts. In addressing this issue, it was decided that DevStart would apply for a resellers permit. As a reseller, DevStart would purchase the inventory, build the servers and sell them to Abacus. DevStart would invoice Abacus for the servers, and report the sales and sales tax to the CASBE. This process has been established and began in April 2006.

**Abacus Inventory**

There still remain some parts in the Abacus inventory that can be used for upgrade and maintenance purposes. Eventually, the usable parts will move out of inventory and into equipment maintenance. Abacus will create an invoice to itself when this happens, but no sales will be reported or sales tax paid.

Abacus may continue to purchase parts and goods that will be recorded as inventory items. Sales tax for all items going into inventory will have to be paid at the time of purchases.

A physical count of inventory will be taken in May 2006 to determine how much of the remaining inventory can be used. It is anticipated that a significant portion of the inventory is old, damaged or, otherwise, cannot be used. This will require a write-off of most of the inventory.

\* \* \*

Letter from County of San Diego, re: Notice of Proposed Escape Assessment – Audit Results, dated August 25, 2004.

Settlement Agreement and Mutual General Release, by and between AuctionDollar.com and Abacus America, Inc., dated March 19, 2005.

Settlement Agreement and Mutual Release, by and between Charles Benninghoff, dated May 14, 2004.

Settlement Agreement and Mutual Release, between Venture Direct Worldwide, Inc. and Abacus America, Inc., dated February 27, 2003.

Settlement Agreement and Mutual Release, by and between Equis Corporation, Alex Giovannotto and Abacus America, Inc., dated December 20, 2002.

Settlement and Mutual Release Agreement, by and between Jeff Fraser and Abacus America, Inc., dated June 11, 2005.

Settlement Agreement and General Release, by and between Simon Aronson and Abacus America, Inc., dated August 18, 2003.

Settlement Agreement between Business Software Alliance and Abacus America, Inc., dated June 21, 2006.

Kelly Services Paid Judgment (May 2006).

IPC Paid Judgment (January 2004)

Routine customer complaints, which individually and in the aggregate are consistent with the Company's ordinary course of business, and none of which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Schedule 2.19(b) – Permits**

Certificate of Registration issued by County of San Diego, Air Pollution Control District (Certificate No. 975828).

Certificate of Registration issued by County of San Diego, Air Pollution Control District (Certificate No. 974637).

City of San Diego Certificate of Payment of Business Tax (Certificate No. B1996004892).

**Schedule 2.20(a) – Environmental and Safety Matters**

Certificate of Registration issued by County of San Diego, Air Pollution Control District (Certificate No. 975828).

Certificate of Registration issued by County of San Diego, Air Pollution Control District (Certificate No. 974637).

**Schedule 2.21(a) – Affiliate Transactions**

(i):
None.

(ii):
Rodopi, Inc. (wholly-owned by Sellers) owns the software that is the subject of the Software License Agreement.

Devstart, Inc. (wholly-owned by Sellers) owns the (i) search engine related tools available for use at promotionworld.com and (ii) domain tools available for use at domaininformer.com used by the Company.

Litmath, LLC (wholly-owned by Sellers) owns the datacenter facility that is the subject of the Phoenix Datacenter Lease.

## Schedule 2.21(b) – Affiliate Transactions

Software License Agreement.

Phoenix Datacenter Lease.

**Schedule 2.22 – Suppliers and Customers**

<u>(a)</u>:

| | |
|---|---|
| AP2763254677 | $37,369.93 |
| AP2388430412 | $90,416.18 |
| AP2313974154 | $28,370.70 |
| AP2659275792 | $90,014.67 |
| AP2939450185 | $20,364.00 |
| AP2698468305 | $24,686.60 |
| AP2778077475 | $33,911.44 |
| AP2872180767 | $88,959.65 |
| AP2886872573 | $20,557.62 |
| AP2790133919 | $20,083.76 |
| AP2393726199 | $32,249.81 |
| AP2664602385 | $37,316.39 |
| AP2885089259 | $37,137.27 |
| AP2381219688 | $169,276.68 |
| AP2785143571 | $41,524.90 |
| AP2425622190 | $25,148.19 |

(b):

| Vendor | Description | Amount |
|---|---|---|
| ABCOW Services, Inc. | Temp Agency | $ 158,855 |
| Act-1 | Temp Agency | $ 26,210 |
| Afilias | Registry for Domain Names | $ 46,095 |
| Astreya Partners, Inc. | Parts for building dedicated servers | $ 40,618 |
| Business.com | Marketing | $ 28,872 |
| Blue Cross | Group Health Insurance | $ 267,626 |
| Content Management, Inc. | Web Design Template Service | $ 29,551 |
| CNet Networks, Inc. | Marketing | $ 696,809 |
| Compare Web Hosts | Marketing | $ 36,000 |
| Computer Protection Tech | UPS Contracts | $ 29,540 |
| DevStart | Dedicated Servers and computer parts | $ 513,969 |
| EMJAY Corp | 401K | $ 48,276 |
| Google | Marketing | $ 1,292,185 |
| ICANN | Registry for Domain Names | $ 63,230 |
| ICG Mpower Communications | Dialup customers in San Diego area | $ 46,752 |
| Imperial Premium | Liability Insurance - AICCO | $ 62,514 |
| Kilroy Realty | Barnes Canyon facility rent | $ 738,317 |
| Level 3 Communication | Bandwidth | $ 507,227 |
| MA Laboratories | Parts for building dedicated servers | $ 1,129,183 |
| Maguire Properties | Scranton Road Data Center | $ 331,772 |
| MCI Worldcom | Bandwidth | $ 338,204 |
| MCI Worldcom LongDistance | Telephone | $ 30,821 |
| Morgan Design, Inc. | Parts for building dedicated servers | $ 86,524 |
| Microsoft Licensing | Microsoft Licenses | $ 185,630 |
| Musick, Peeler and Garrett | Legal | $ 277,014 |
| Neustar Registry Service | Registry for Domain Names | $ 62,499 |
| Overture/GoTo.com | Advertising | $ 189,635 |
| Public Interest Registry | Registry for Domain Names | $ 197,000 |
| Quick Micro | Parts for building dedicated servers | $ 85,164 |
| Rodopi Software | Rodopi Software Support | $ 81,624 |
| San Diego Treasurer | Business Property Tax | $ 26,203 |
| San Diego Gas & Electric | Utilities | $ 669,173 |
| SBC | Telephone | $ 127,408 |
| Sedona Staffing Services | Temp Agency | $ 172,790 |
| Southcoast Heating and Air | Air conditioning service | $ 39,923 |
| Starnet US Lec | Dialup services nationwide | $ 27,439 |
| SWSoft Inc. | Plesk control panel software licenses | $ 216,665 |
| Template Help.com | Web design template service | $ 27,103 |
| The Saint Paul | Insurance | $ 62,952 |
| Truck Insurance | Workman's Comp insurance | $ 75,109 |
| Verisign Global Registry | Registry for Domain Names | $ 2,216,097 |
| Vertical Scope, Inc. | Tophost marketing | $ 88,000 |
| Law Offices of White and Oliver | Legal services re. Alabanza | $ 99,514 |
| | | |
| Data Pro Ltd. | Computer and network equipment (Bulgaria) | $ 59,940 |
| Electronika AD | Office lease (Bulgaria) | $ 94,309 |
| Omega Trans | Transportation (Bulgaria) | $ 31,390 |
| Telecom Partners Network AD | Telecommunications (Bulgaria) | $ 25,527 |

(B)(i):

Routine customer complaints, which individually and in the aggregate are consistent with the Company's ordinary course of business, and none of which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(B)(ii):

Routine customer complaints, which individually and in the aggregate are consistent with the Company's ordinary course of business, and none of which could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(B)(iii), (B)(iv):

None.

## Schedule 2.23(b) – Real Property

10350 Barnes Canyon Road, San Diego, CA  92130.  Office Lease by and between Kilroy Realty, L.P. and Abacus America, Inc., dated February 28, 2002, as amended March 27, 2002.

9645 Scranton Road, San Diego, CA  92121.  Lease by and between Calwest Industrial Holdings, LLC and Abacus America, Inc., dated February 25, 2004.

3265 North 27th Street, Phoenix, Arizona.  Phoenix Datacenter Lease.

424 Second Street, Suite A, Davis, CA  95616.  Office Lease between Edward D. Smith and Cedant, Inc., dated July 31, 2001.

63 Shipchenski Prohod Blvd, 4th floor, Sofia 1000.  Office lease by and between Electronika Ltd. and Abacus Trade Ltd., dated February 23, 2005.

63 Shipchenski Prohod Blvd, 5th floor, Sofia 1000.  Office lease by and between Electronika Ltd. and Abacus Trade Ltd., dated November 6, 2003.

Dimcho Debelianov Street #18, Sofia 1000.  Lease agreement between Irena Stefanova Kurteva-Stefanova and Abacus Trade Ltd., dated November 18, 2004.

Hubavka Street 1-3, Sofia 1000.  Lease agreement by and between Evgenia Vassileva Koleva and Abacus Trade Ltd., dated May 10, 2005.

**Schedule 3.3 – Brokerage**

None.

# Schedule 7.10 – Transition of Accounts

**MERCHANT ACCOUNTS**

| | | | | |
|---|---|---|---|---|
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5517 | N/A | Cedant | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5566 | N/A | A+ Net | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5533 | N/A | Names4ever | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5525 | N/A | Low Fat | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5558 | N/A | APRO | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5574 | N/A | Web-a-Photo | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 0460 1000 5541 | N/A | Platinum Resellers | Customer Payments |
| First Data -Humboldt Merchant Svcs | 4194 04601000 7356 | N/A | | Test Account for Gateway |
| | | | | |
| American Express | 504 083 321 2 | N/A | A+ Net | Customer Payments |
| American Express | 504 785 465 8 | N/A | Names4ever | Customer Payments |
| American Express | 504 756 532 0 | N/A | Cedant | Customer Payments |
| American Express | 504 997 266 4 | N/A | Low Fat | Customer Payments |
| American Express | 104 033 316 3 | N/A | APRO | Customer Payments |
| American Express | 104 033 317 1 | N/A | Web-a-Photo | Customer Payments |
| American Express | 104 033 318 9 | N/A | Platinum Resellers | Customer Payments |
| | | | | |
| Discover Card | 6011 010064 08585 | N/A | Names4ever | Customer Payments |
| Discover Card | 6011 010764 08788 | N/A | A+ Net | Customer Payments |
| Discover Card | 6011 010488 74109 | N/A | Cedant | Customer Payments |
| Discover Card | 6011 013764 08579 | N/A | Low Fat | Customer Payments |
| Discover Card | 6011 010602 81142 | N/A | Web-a-Photo | Customer Payments |
| Discover Card | 6011 010602 81159 | N/A | Platinum Resellers | Customer Payments |
| Discover Card | 6011 010602 81167 | N/A | APRO | Customer Payments |
| | | | | |
| Wells Fargo | 4812 0610 3998 | N/A | | Test Account for Gateway |

**CREDIT CARDS**

| | | | | |
|---|---|---|---|---|
| Capital One- VISA | 4115 0725 3532 3375 | N/A | Abacus America | Company Purchases |
| AMEX | 3712 839037 91013 | N/A | Abacus America | Company Purchases |
| AMEX | 3727 109757 62000 | N/A | Abacus America | Company Purchases |
| AMEX | 3722 673577 91008 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 983909 51006 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 933419 61014 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 933419 61006 | N/A | Abacus America | Company Purchases |
| AMEX | 3782 983909 51022 | N/A | Abacus America | Company Purchases |

# EXHIBIT B

**APLUS HOLDINGS, INC.**
**7500 W. 110th Street, Suite 400**
**Overland Park, KS 66210**


December 17, 2007


<u>VIA FACSIMILE & OVERNIGHT DELIVERY</u>

Mr. Ivan Vachovsky
17181 Camino Acampo
San Diego, CA 92067
Facsimile: (707) 922-7201

Dear Ivan:

    Reference is made herein to that certain Stock Purchase Agreement dated as of July 25, 2006 (as amended, the "<u>Purchase Agreement</u>"), by and among APLUS Holdings Inc., a Delaware corporation (the "<u>Buyer</u>"), Ivan Vachovsky and Lilian Vachovsky (each, a "<u>Shareholder</u>" and, collectively, the "<u>Shareholders</u>" or a "<u>Seller</u>" and, collectively, the "<u>Sellers</u>"), Abacus America, Inc., a California corporation ("<u>Abacus America</u>"), Aplus.Net Philippines Inc., a corporation formed under the laws of the Philippines ("<u>Abacus Philippines</u>"), and Abacus Trade Ltd., a Bulgarian limited liability company ("<u>Abacus Bulgaria</u>", and together with Abacus America and Abacus Philippines, each, a "<u>Company</u>" and, collectively, the "<u>Companies</u>"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement, and Section 9.8 of the Purchase Agreement is incorporated herein by reference.

    In accordance with Article VI and Section 9.15 of the Purchase Agreement, notice is hereby given of certain claims for indemnification pursuant to the Purchase Agreement as set forth below. The aggregate of all Losses for which the Buyer is hereby seeking indemnification from the Shareholders (jointly and severally) is $5,081,451 (which is net of the $300,000 Basket). As you know, and as stated in Section 9.3 of the Purchase Agreement, the Buyer determined the consideration it was willing to pay for the Group Companies based on a multiple of EBITDA (earnings before interest, taxes, depreciation and amortization) and the Buyer Indemnified Persons are entitled to claim Losses under Article VI of the Purchase Agreement based on such multiple if the applicable Loss results in more than a one-time reduction to EBITDA. Among the claims for Losses which the Buyer is asserting hereunder are claims regarding the difference between the purchase price paid under the Agreement and what the purchase price under the Agreement would have been if the purchase price multiple was applied to the actual EBITDA.

1.  Non-Payment of Pre-Closing Taxes.  Pursuant to Section 6.7 of the Purchase Agreement, the Shareholders, jointly and severally, are responsible for the payment of all Pre-Closing Taxes.  The Companies are required to pay the following Pre-Closing Taxes, all of which (plus any Losses attributable thereto) are the responsibility of the Shareholders (and not subject to the Basket or the Cap).

(a)  Non-Payment of Bulgarian VAT Taxes.  Abacus Bulgaria did not pay any Bulgarian value added tax ("VAT") prior to Closing.  Under Bulgarian tax law in effect at such time, all revenues earned by Abacus Bulgaria (other than the revenues earned by Abacus Bulgaria for "software development" services) were subject to VAT, and the revenues earned by Abacus Bulgaria for "software development" services were only exempt if certain formal statutory requirements were met (e.g., a formal agreement in writing explicitly providing for transfer of rights over software).  The formal statutory requirements were not met prior to Closing, so all revenues earned by Abacus Bulgaria prior to Closing are subject to VAT.  The Buyer has calculated the total VAT due for the pre-Closing period to $326,291, plus any penalties and interest, plus any additional costs the Buyer and the Companies may incur in connection therewith, including audit, legal, and tax consultant costs.  Finally, because the VAT was not paid prior to Closing and not included in the Financial Statements, and the impact on EBITDA is recurring, the Buyer's Losses also include $878,955 ($36,623 VAT due for the period January 1, 2006 to March 31, 2006, not paid prior to Closing and not included in the Financial Statements, or $146,484 annualized (actual impact on EBITDA) multiplied by 6 (the multiple of EBITDA paid by the Buyer for the Companies)).  This total current indemnification claim is thus $878,955 in respect of the recurring impact on EBITDA, and any additional Losses in respect of VAT for the pre-Closing period (including taxes due, interest, penalties and additional costs) to be due and payable when and as incurred by the Buyer or the Companies.

(b)  Non-Reporting/Non-Payment of Taxes Due on Bonuses/Commissions Paid to Employees of Abacus Bulgaria.  Between January 2006 and May 2006, Abacus Bulgaria deposited bonus and commissions due to certain Bulgarian employees directly into the employees' bank accounts and failed to pay income and other Taxes due on the payment of bonuses and commissions for these employees.  Total Taxes owed by Abacus Bulgaria in respect of the payment of bonuses and commissions for the pre-Closing period are estimated to be $28,507, plus any penalties and interest, plus any additional costs in connection therewith, including audit, legal, and tax consultant costs.  A portion of the Total Taxes due for the period January 1, 2006 to March 31, 2006, $16,952.26, were not paid prior to Closing and not included in the Financial Statements.  Thus, the impact on EBITDA is recurring, and the Buyer's Losses also include $406,854 ($16,952.26 not paid prior to Closing and not included in the Financial Statement, or $67,809 annualized (actual impact on EBITDA) multiplied by 6 (the multiple of EBITDA paid by the Buyer for the Companies)).  This total current indemnification claim is thus $406,854 in respect of the recurring impact on EBITDA, with any additional Losses in respect of the applicable Taxes for the pre-Closing period (including taxes due, interest, penalties and additional costs) to be due and payable when and as incurred by the Buyer or the Companies.

2

2. <u>Under-reporting of Credit Card Processing Fees</u>. From January 2006 through June 2006, Abacus America failed to report the deduction of the portion of its credit card revenues (referred to as the "discount fees") which had been automatically deducted from credit card payments made to the Companies by customers paying with either American Express or the Discover credit card during that period. The information containing the discount fees for each month is contained on the merchant account statements, which are mailed by the processing companies (Discover and American Express) to Abacus America. The Companies did not refer to the merchant account statements to ascertain the discount fees for each such month in preparing the Financial Statements and, therefore, no accounting of discount fees were made for American Express or Discover charges. Therefore, the Shareholders breached the representations and warranties set forth in Sections 2.5 and 2.6 of the Purchase Agreement. The average unreported monthly deduction for January, February and March 2006 (the relevant months included in the Financial Statements) was $18,191. Because these deductions were not included in the Financial Statements and the impact on EBITDA is recurring, the Buyer's Losses are $1,309,716 ($218,292 (impact on EBITDA of $18,191 multiplied by 12 months) multiplied by 6 (the multiple of EBITDA paid by the Buyer for the Companies)). This total indemnification claim is thus $1,309,716.

3. <u>Licensing Costs</u>. Prior to the Closing, the Companies, in violation of the Intellectual Property Rights of other Persons, failed to pay a number of licensing fees, as described herein. Each such failure is a breach of the representations and warranties set forth in Section 2.13(c)(ii) of the Purchase Agreement. In addition, because these breaches were knowing and intentional, the Shareholders fraudulently breached the applicable representations and warranties, so these Losses are not subject to the Basket or Cap.

(a) <u>Web Design Software and Microsoft Licensing Costs</u>. Prior to the Closing, Abacus Bulgaria used illicit copies of web design software products, including Dreamweaver, Flash, and FTP, as well as unlicensed versions of Microsoft Office (the Windows Office/XP operating system). Post-Closing, Abacus Bulgaria had to replace all of the illicit and unlicensed software with legal copies at a cost of $40,587. This total indemnification claim is thus $40,587.

(b) <u>Other Microsoft Licensing Costs</u>. Prior to the Closing and during the months in which the Financial Statements were calculated, Abacus America underreported to Microsoft its use of Microsoft server and other licenses in the U.S. and thus underpaid Microsoft license fees. If Microsoft makes any claims against the Companies in respect of the period prior to Closing with respect to any of the foregoing, then the Shareholders, jointly and severally, will be responsible for making such payments to Microsoft and indemnifying the Buyer and the Companies for all Losses incurred as a result of, in connection with, relating or incidental to or by virtue of such claims. Post-Closing, Abacus America began to accurately report to Microsoft its use of Microsoft server and other licenses and to thus incur additional license fees. Due to Abacus America's violations, EBITDA was overstated by an average of $21,550.33 per month. Therefore, the Buyer's current Losses are $1,551,624 ($258,603.96 (decrease in EBITDA of $21,550.33 multiplied by 12 months) multiplied by 6 (the multiple of EBITDA paid by the Buyer for the Companies)). This total indemnification claim is thus $1,551,624 in respect of the recurring impact on EBITDA only.

3

     (c) Telephone System Licensing Costs. Prior to the Closing, Abacus America used an unlicensed Avaya telephone system in its San Diego office. Abacus America is currently in the process of replacing this unlicensed telephone system with a licensed telephone system with additional features from another vendor at a cost of approximately $245,000. Buyer is claiming as Losses only the estimated cost the Buyer would incur for replacing the unlicensed Avaya system with a licensed Avaya system with identical capabilities, or $135,000. This total indemnification claim is thus $135,000.

    4. Overpayment of Working Capital Adjustment. Abacus America is required to pay domain name registrars for each domain name registered by a customer of Abacus America. Domain name registration fees average approximately $7.00 for an annual registration, and some multiple of this amount for each additional year of registration. The payments made to the registrars are recorded as a prepaid domain name fee, and amortized to expense over the registration period of the domain name. For example, a domain name registration fee for one year would be amortized over a twelve-month period and a three-year registration fee would be amortized over thirty-six months. In like manner, domain name registration fees paid to Abacus America by its customers are deferred and amortized to revenue over the registration periods. On Abacus America's July 31, 2006 working capital statement, a portion of the ending prepaid domain name fee balance represented domain name fees that would be amortized over the next twelve months (the short-term portion) and a portion represented domain name fees that would be amortized over longer periods (the long term portion). Specifically, of the total prepaid domain name fee of $2,191,587, $1,570,948 was the current portion (which should have been included as part of the working capital adjustment) and $620,639 was the long term portion (which should not have been included as part of the working capital adjustment). However, the entire domain name registration fee of $2,191,587 was included as part of the working capital adjustment. Therefore, this total indemnification claim is $620,639 (the long-term portion of the domain registration fees).

    5. Pending Litigation. With respect to Takach v. Abacus America, Inc., a Pending Litigation, Abacus America incurred $5,984.25 of legal fees through December 13, 2007, and settlement costs of $7,500. Documentation regarding this matter has been previously provided to the Shareholders. Pursuant to Section 6.2(a)(v) of the Purchase Agreement, the Shareholders, jointly and severally, are responsible for these amounts (not subject to the Basket or the Cap). The total indemnification claim related to Takach v. Abacus America, Inc is thus $13,484.25. We also note that the eFund v. Pless et al. matter is ongoing and, to date, the Shareholders have been paying directly the cost of the defense and will be responsible for any additional costs, Losses and settlement amounts in connection therewith.

    6. Undisclosed Personnel. The Companies, within days prior to Closing, hired 24 sales people in Phoenix, AZ. Within approximately two (2) months after Closing, nearly all of these employees were terminated, largely because they were unproductive, inexperienced and/or not reasonably necessary for the Companies' operations (the "Terminated New Hires"). None of these last-minute hires were disclosed to the Buyer as required under Sections 2.9(h), 2.9(i) and 2.17(a) of the Purchase Agreement. As a result, compensation expense was underreported. The aggregate payroll expense incurred by the Buyer with respect to the

Terminated New Hires was $121,606.03.    The total indemnification claim related to the Terminated New Hires is thus $121,606.03.

7. AT&T Contract Misrepresentation.    Pursuant to Section 2.23(c) of the Purchase Agreement, the Shareholders were responsible to disclose any actual knowledge they had of "structural deficiencies or latent defects affecting any of the [Leased Real Property] Improvements" or "facts or conditions affecting any of the Improvements which could...interfere in any material respect with the use or occupancy of the Improvements or any portion thereof in the operation of the business of the Group Companies." The AT&T contract for the Phoenix data center that was referenced in the Purchase Agreement stated that the facility had a capacity of 1Gig of bandwidth; however, pre-acquisition, Lilian Vachovsky instructed AT&T to configure the bandwidth in Phoenix to 100Mps, thus decreasing the contracted capacity of the facility by 90%. This action by a Shareholder interfered in a material way "with the use or occupancy of the Improvements...in the operation of the business of the Group Companies" and damaged Buyer as described herein. In addition, because this breach was knowing and intentional, the Shareholders fraudulently breached the applicable representations and warranties, so these Losses are not subject to the Basket or Cap. This is also a breach of Section 2.10 of the Purchase Agreement.

(a) Wireless Bandwidth Provider.    The Buyer was forced to contract with Strategic Technology Communications, Inc. ("STC") to obtain wireless bandwidth service for the Phoenix data center facility in order to make the facility suitable for the operation of the business of the Group Companies. The cost of engaging STC through December 1, 2007, was approximately $108,938.00. This total indemnification claim is thus $108,938.00.

(b) Service Level Agreement ("SLA") Credits.    The Buyer has been forced to pay SLA credits to dedicated server customers as a result of downtime experienced by customers using wireless bandwidth provided by STC. The cost of these SLA credits through December 1, 2007 was approximately $29,138.08. This total indemnification claim is thus $29,138.08.

(c) Additional Credits and Damages.    On November 29, 2007, all wireless capacity for the Phoenix data center facility was lost due to signal degradation. As a result, Buyer expects to incur significant future costs in the form of, among other things, customer refunds, SLA credits, damage settlement payments, and legal fees. The total cost is not ascertainable at this time, but Buyer will notify the Shareholders as Buyer is able to ascertain such costs and such costs will be indemnifiable Losses at such time.

After applying the $300,000 Basket to the amount of Losses suffered, as applicable, the Buyer hereby demands that the Shareholders, jointly and severally, indemnify and hold harmless the Buyer for its already incurred Losses outlined in this letter in an amount equal to $5,081,451. In accordance with Section 6.5 of the Purchase Agreement, the Buyer is offsetting $1,000,000.00 of such amount from the unpaid portion of the Non-Compete Amount. Please pay by wire transfer of immediately available funds the balance of such amount ($4,081,451) to the following account within fifteen (15) days after the date hereof.

BANK NAME: Enterprise Bank & Trust
BANK CITY: Overland Park
BANK STATE: Kansas
ROUTING NUMBER: 081006162
ACCOUNT NUMBER: 1090015381
SWIFT CODE: ENTRUS44
BENEFICIARY NAME: Aplus.Net
BENEFICIARY ADDRESS: 7500 W. 110th St, Suite 400
BENEFICIARY CITY: Overland Park
BENEFICIARY STATE: Kansas

      The assertion of the claims set forth herein shall not impair any of the Buyer Indemnified Persons' rights under the Purchase Agreement and shall not preclude the Buyer Indemnified Persons from asserting any other claims after the date hereof.  Without limiting the generality of the foregoing, please be advised that (a) this letter does not constitute a final settlement of the potential claims and/or Losses that the Buyer or any Buyer Indemnified Persons may have against any of the Shareholders and (b) claims and/or Losses due to Buyer or any Buyer Indemnified Persons from any of the Shareholders not promptly paid by the Shareholders will be aggressively pursued by Buyer and any applicable Buyer Indemnified Persons under any rights available to them in law or in equity.  The Buyer expressly reserves any and all rights, including the right to make and assert additional or different claims and/or Losses against the Shareholders or to notify the Shareholders of additional claims and/or Losses, whether or not related to the events described herein, and whether or not related to any fact described herein or known to the Buyer as of the date hereof.  Nothing in this letter shall in any way waive, alter or limit any of the Buyer Indemnified Persons' rights under the Purchase Agreement.

6

Upon your reasonable request, we can make additional information available to you regarding the foregoing claims.

Sincerely,

APLUS HOLDINGS, INC.

By:

Gabriel Murphy
Chief Executive Officer

cc:    Musick, Peeler & Garrett LLP
       225 Broadway, Suite 1900
       San Diego, California 92101
       Attn: Gary L. Wollberg, Esq.
       Facsimile: (619) 231-1234

# EXHIBIT C

**APLUS HOLDINGS, INC.**
**7500 W. 110th Street, Suite 400**
**Overland Park, KS 66210**

January 24, 2008

VIA FACSIMILE & E-MAIL

Mr. Ivan Vachovsky
17181 Camino Acampo
San Diego, CA 92067
Facsimile: (707) 922-7201

Dear Ivan:

Reference is made herein to that certain Stock Purchase Agreement dated as of July 25, 2006 (as amended, the "Purchase Agreement"), by and among APLUS Holdings Inc., a Delaware corporation (the "Buyer"), Ivan Vachovsky and Lilian Vachovsky (each, a "Shareholder" and, collectively, the "Shareholders" or a "Seller" and, collectively, the "Sellers"), Abacus America, Inc., a California corporation ("Abacus America"), Aplus.Net Philippines Inc., a corporation formed under the laws of the Philippines ("Abacus Philippines"), and Abacus Trade Ltd., a Bulgarian limited liability company ("Abacus Bulgaria", and together with Abacus America and Abacus Philippines, each, a "Company" and, collectively, the "Companies"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement, and Section 9.8 of the Purchase Agreement is incorporated herein by reference.

In accordance with Article VI and Section 9.15 of the Purchase Agreement, notice is hereby given of certain claims for indemnification pursuant to the Purchase Agreement as set forth below. These claims are in addition to and supplement, but do not replace, the claims for which notice was given in a letter from the Buyer to the Shareholder(s) dated December 17, 2007 ("December 17th Letter"). The aggregate of additional Losses for which the Buyer is hereby seeking indemnification from the Shareholders (jointly and severally) under this letter are $50,000.

1. <u>Additional Interest Expense.</u> Post-Closing, the Companies have had to incur certain costs including those set forth herein and in the December 17th Letter which arose out of the Shareholders' breach of its responsibilities under the Purchase Agreement. Payment of these costs by the Company reduced the Company's EBIDTA in one or more quarters since the Closing, may have increased the Company's effective interest rate under its Senior Loan Covenants, and may have resulted in an increase in the Company's interest expense in one or more quarters. The total of such additional interest expense is not ascertainable at this time, but Buyer will notify the Shareholders as Buyer is able to ascertain such costs and such costs will be indemnifiable Losses at such time.

2. <u>3265 North 27th Street Lease Electrical Expenses.</u> Post-Closing the Buyer had to incur approximately $50,000 in expenses in order to upgrade the electrical systems at its 3265 North 27th Street. Phoenix, Arizona facility in order to make the facility sufficient for the purpose

of conducting the Buyer's business. This need to upgrade the facility was required due to the Sellers' breach of Section 2.23(c) of the Purchase Agreement, under which the Sellers represented and warrantied that the Leased Real Estate was "in good condition and repair ... and ... sufficient for the conduct of the business of the Group Companies."  This total indemnification claim is thus $50,000.

3.  Getty Images.  Pre-Closing, the Companies and Cedant, Inc. used unlicensed copies of photographs owned by Getty Images on their customers' web sites or on their own web sites. These actions are in breach of the Shareholders' representations and warranties set forth in Section 2.13(c)(ii) of the Purchase Agreement.  Post-Closing the Companies and Cedant, Inc. have received (or have paid) Getty Images' settlement demand notices totaling $13,210, although the Buyer's total liability under this contract is not ascertainable at this time.  Buyer will notify shareholders as Buyer is able to ascertain such costs and such costs will be indemnifiable Losses at such time.  To the extent that these breaches were knowing and intentional, the Shareholders fraudulently breached the applicable representations and warranties and these Losses are not subject to the Basket or Cap

4.  Pending Litigation.

(a) Pre-Closing, a number of cases not disclosed in the Purchase Agreement were filed against Abacus America in Small Claims courts in various jurisdictions and for which the Buyer has made certain settlement payments.  In addition, other cases not disclosed in the Purchase Agreement may have been filed post-Closing against Abacus America in Small Claims courts in various jurisdictions related to events which occurred pre-Closing.  Pursuant to Section 6.2(a)(v) of the Purchase Agreement, the Shareholders, jointly and severally, are responsible for these amounts (not subject to the Basket or the Cap).  The total cost of these cases has not been calculated, but Buyer will notify shareholders as Buyer calculates such costs and such costs will be indemnifiable Losses at such time.

(b) Pre-Closing, a number of cases not disclosed in the Purchase Agreement were filed against Abacus America with the Better Business Bureau ("BBB") for which the Buyer has made certain settlement payments.  In addition, other cases may have been filed post-Closing against Abacus America with the BBB related to events which occurred pre-Closing.  Pursuant to Section 6.2(a)(v) of the Purchase Agreement, the Shareholders, jointly and severally, are responsible for these amounts (not subject to the Basket or the Cap).  The total cost of these cases has not been calculated, but Buyer will notify shareholders as Buyer calculates such costs and such costs will be indemnifiable Losses at such time.

5.  Undisclosed Contracts.    The Buyer has been notified by Qwest Communications International Inc. ("Qwest") of a contract Abacus America and Qwest.  The Buyer was not notified of this contract in the  Purchase Agreement nor was a a copy of the contract provided to the Buyer, both of which are required Section 2.12 of the Purchase Agreement.  Each such failure is a thus breach of the representations and warranties set forth in Section 2.12 of the Purchase Agreement.  The Buyer's total liability under this contract, if any, is not ascertainable at this time, but Buyer will notify shareholders as and if Buyer is able to ascertain such costs and such costs will be indemnifiable Losses at such time.

2

After applying the $300,000 Basket to the amount of Losses suffered, as applicable, the Buyer hereby demands that the Shareholders, jointly and severally, indemnify and hold harmless the Buyer for its already incurred Losses as outlined in the December 17th Letter and in this letter in an amount equal to $5,131,451. In accordance with Section 6.5 of the Purchase Agreement, the Buyer is offsetting $1,000,000.00 of such amount from the unpaid portion of the Non-Compete Amount. Please pay by wire transfer of immediately available funds the balance of such amount ($4,131,451) to the following account within fifteen (15) days after the date hereof.

BANK NAME: Enterprise Bank & Trust
BANK CITY: Overland Park
BANK STATE: Kansas
ROUTING NUMBER: 081006162
ACCOUNT NUMBER: 1090015381
SWIFT CODE: ENTRUS44
BENEFICIARY NAME: Aplus.Net
BENEFICIARY ADDRESS: 7500 W. 110th St, Suite 400
BENEFICIARY CITY: Overland Park
BENEFICIARY STATE: Kansas

The assertion of the claims set forth herein shall not impair any of the Buyer Indemnified Persons' rights under the Purchase Agreement and shall not preclude the Buyer Indemnified Persons from asserting any other claims after the date hereof. Without limiting the generality of the foregoing, please be advised that (a) this letter does not constitute a final settlement of the potential claims and/or Losses that the Buyer or any Buyer Indemnified Persons may have against any of the Shareholders and (b) claims and/or Losses due to Buyer or any Buyer Indemnified Persons from any of the Shareholders not promptly paid by the Shareholders will be aggressively pursued by Buyer and any applicable Buyer Indemnified Persons under any rights available to them in law or in equity. The Buyer expressly reserves any and all rights, including the right to make and assert additional or different claims and/or Losses against the Shareholders or to notify the Shareholders of additional claims and/or Losses, whether or not related to the events described herein, and whether or not related to any fact described herein or known to the Buyer as of the date hereof. Nothing in this letter shall in any way waive, alter or limit any of the Buyer Indemnified Persons' rights under the Purchase Agreement.

Upon your reasonable request, we can make additional information available to you regarding the foregoing claims.

Sincerely,

APLUS HOLDINGS, INC.

By: _____

Gabriel Murphy
Chief Executive Officer

cc:    Musick, Peeler & Garrett LLP
       225 Broadway, Suite 1900
       San Diego, California 92101
       Attn: Gary L. Wollberg, Esq.
       Facsimile: (619) 231-1234

4